# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**C.A. No. 05-11682MLW**

---

| | |
|---|---|
| L & T YACHT SALES, INC. | ) |
| | ) |
| Plaintiff, | ) |
| VS. | ) |
| | ) *Filed Electronically* |
| | ) |
| POST MARINE CO., INC., | ) |
| | ) |
| Defendant | ) |

## STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 IN SUPPORT OF DEFENDANT POST MARINE CO., INC.'S MOTION FOR SUMMARY JUDGMENT

Defendant Post Marine Co., Inc., pursuant to Local Rule 56.1, states that the following material facts are not in dispute:

1. L&T Yacht Sales, Inc. ("L&T") is a Rhode Island corporation. *See*, Complaint, ¶1. The Complaint is attached hereto as Exhibit A.

2. Post manufactured the boat the Relentless. *See*, Complaint, ¶ 1 (Exhibit A).

3. The Relentless was a 2001 model year boat. *See*, Complaint, ¶1 (Exhibit A).

4. The Relentless was sold to the initial purchaser in 2001. *See*, ¶3 of Affidavit of Ken Jensen attached hereto as Exhibit B.

5. The boat was covered by a written <u>one year</u> Limited Warranty. *See*, One-Year Limited Warranty attached as an exhibit to Affidavit of Ken Jensen (Exhibit B).

6. The Limited Warranty did not cover "[v]arnishes, <u>gel coats</u>, paints, vinyls, fabrics, glass, chromium plated, stainless steel, and aluminum finishes because of the varying effect resulting from different climatic and use conditions." *See*, One-Year Limited Warranty attached

1

as an exhibit to Affidavit of Ken Jensen (Exhibit B).

7.   The duration of the implied warranty of merchantability is limited to the duration of the Limited Warranty - one year.  *See*, One-Year Limited Warranty attached as an exhibit to Affidavit of Ken Jensen (Exhibit B).

8.   The warranty was extended solely to the initial purchaser.  Specifically, the Limited Warranty provides: "THIS WARRANTY SHALL NOT APPLY TO: others than the first owner."  *See*, One-Year Limited Warranty attached as an exhibit to Affidavit of Ken Jensen (emphasis original) (Exhibit B).

9.   The Limited Warranty expired by its own terms at the absolute latest at the end of 2002.  *See*, One-Year Limited Warranty attached as an exhibit to Affidavit of Ken Jensen (Exhibit B).

10.   L&T purchased the boat in a used condition in mid-2003 from a Jim Zappi in Connecticut.  *See,* Deposition of Todd Hamilton, p.8, ln. 21-21, p. 9, ln. 13-14., p. 9, ln. 18-19, attached hereto as Exhibit C.

11.   In May of 2004, L&T discovered the gel coat's failure.  *See*, Complaint, ¶7 (Exhibit A).

12.   In August of 2004, Post agreed to repair the gel coat on the boat.  *See,* letter of August 25, 2004 attached hereto as Exhibit D.

13.   The August 25, 2004 letter stated that the boat was out of warranty, but that Post would make the repairs gratuitously as an accommodation, and further set out the scope and manner in which the repairs would be made.[1]  *See* August 25, 2004 letter (Exhibit D).

---

[1]  The letter specifically provided:

14.  This letter was received by Lisa Kane, L&T's attorney at the time.  See, Deposition of Lisa Kane, p. 16, ln. 17-23, attached hereto as Exhibit E.[2]

---

Post Marine will inspect the entire vessel to determine the extent of the gel coat repairs to be performed.  The areas affected will be treated in the following manner:

1.  The engine room will be isolated by sealing the exhausts at the transom, sealing the hull side intake vents, sealing the cockpit hatches and engine room door.

2.  Bottom paint will be removed and the bottom will be inspected to locate any areas of gel coat cracking.

3.  Topsides and hull sides will be covered prior to bottom sanding, the bottom will be sanded to remove gel coat in areas of cracking. Any hardware affected by stress cracking will be removed and reinstalled.

4.  Epoxy barrier coatings will be applied within manufacturer specifications.  Two coats of bottom paint will then be applied.

5.  All necessary hardware will be removed and reinstalled to facilitate gel coat removal.

6.  Gel coat will be sanded off using random orbital sanders, laminate will be inspected, and prepared for reapplication of gel coat.

7.  The vessel will be taped off and covered in appropriate areas in preparation for spraying gel coat to proper specifications.

8.  Once gel coat has been sprayed, it will be sanded to a 1200 grit finish in preparation for polishing.

9.  Polishing will be completed and a coat of fiberglass gel coat resin cleaner-sealer will be applied.

[2]  Defendant propounded a request for admissions on Plaintiff on May 30, 2006 which requested Plaintiff to admit its receipt of letters dated August 25, 2004, and August 10, 2005. *See*, Request for Admissions attached hereto as Exhibit K.

The request for admissions was never answered and are therefore deemed admitted. *See,* Fed.R.Civ.P. 36(a).

15.  Joseph Martorana clarified the letter of August 25, 2004 on September 2, 2004 when he sent a letter to Todd Hamilton.  This letter, which was produced by Plaintiff during discovery, stated specifically:   "To clarify the letter sent to you from Michel Weisz.  In making the repairs to your your[sic] boat we will spray gelcoat in such a way as to eliminate any spotting or color variations in the areas to be repaired.  Gelcoat will be removed from entire surfaces, examples being shelter sides, cockpit, forward deck, side decks, pulpit and hull to ensure consistency."  *See*, September 2, 2004 letter, attached hereto as Exhibit F (emphasis added).

16.  No time frame to complete the repairs was ever established in the letters, apart from an estimate in the August 25, 2004 letter.  *See*, August 25, 2004 letter (Exhibit D).

17.  The agreement to repair the boat, as set forth in the August 25, 2004 and September 2, 2004, letter, is the only agreement between the parties.  *See*, Deposition of Todd Hamilton, p. 27, ln. 10-21 (Exhibit C).

18.   Neither Post nor L & T ever paid or provided any consideration to bind the agreement.  *See*, August 25, 2004 letter (Exhibit D); *see also*, Deposition of Todd Hamilton (Exhibit C).

19.  On November 1, 2004, Todd Hamilton drove the boat to Post's New Jersey Facility.  *See*, Complaint, ¶ 17 (Exhibit A).

20.  Todd Hamilton visited the facility in February 2005.  S*ee*, Complaint, ¶ 18 (Exhibit A).

21.  Todd Hamilton visited the facility in May of 2005.  *See*, Complaint, ¶ 19 (Exhibit A).

22.  On or about June 15, 2005 Todd Hamilton sent Post a letter listing the repair work remaining to be done on the boat.  There is no reference in the letter to Post's failure to re-gel

coat the entire boat, nor is there any indication Mr. Hamilton was dissatisfied with the manner in which the work was done. Instead, the letter lists a number of relatively minor repairs that are still outstanding. *See*, June 15, 2005 letter, attached hereto as Exhibit G.

23. Thereafter, on or about July 15, 2005, L&T directed Post to stop performing repair work on the boat. *See*, July 15, 2005 letter, attached hereto as Exhibit H.

24. Up to that point, Post had spent over 2,200 hours repairing the boat in accordance with the terms of its August 25, 2004 letter. *See*, Deposition of Joseph Matorana, p.24, ln. 2-3, attached hereto as Exhibit I.

25. The value of the work performed by Post is $143,000.00. *See,* Affidavit of Ken Jensen ¶8 (Exhibit B); *See also*, Deposition of Joseph Matorana, p.24, ln. 2-3 (Exhibit I).

26. The complaint was filed on August 14, 2005. *See*, Complaint (Exhibit A).

27. Defendant filed its Answer and Affirmative Defenses on September 13, 2005. *See*, Answer and Affirmative Defenses, attached hereto as Exhibit J.

28. On May 30, 2006 Defendant served a Request for Production of Documents on Plaintiff. Request No. 1 specifically requested that Plaintiff produce "all documents that in any way relate to, will be relied on, or will be used by Plaintiff to in any way substantiate, demonstrate, establish or proof any damages which Plaintiff is asserting were suffered by it." Plaintiff's only response to this request was three letters which were not responsive to the request. *See,* Letter of Todd Hamilton dated July 15, 2005, Facsimile of Bill Catauro Sr. to Todd Hamilton dated July 14, 2004 and Facsimile of Bill Catauro Sr. to Todd Hamilton dated August 6, 2004 attached hereto as composite Exhibit L.

29.  The boat's port of call is in Rhode Island.  *See*, Certificate of Documentation attached

hereto as Exhibit M.

/s/ Howard M. Brown
Howard M. Brown
BBO #547948
Bartlett Hackett Feinberg P.C.
155 Federal Street, 9th floor
Boston, MA 02110
(617) 422-0200

SEGREDO & WEISZ
9350 South Dixie Highway
Suite 1500
Miami, Florida 33156
(305) 670-3820 Telephone
(305) 670-8230 Facsimile


    /s/ Michel O. Weisz
Michel Ociacovski Weisz, Esquire
Florida Bar No. 336939
Dated:  June 1, 2007          Attorney for Post Marine Co., Inc.

# EXHIBIT "A"

AO 440 (Rev. 8/01) Summons in a Civil A.

# UNITED STATES DISTRICT COURT

District of _____

L+T Yacht Sales, Inc.

v.

Post Marine Co. Inc.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

## 05-11682 MLW

TO: (Name and address of Defendant)

Post Marine Company Inc.
100 Post Road
Mays Landing, New Jersey 08330

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

John E. Zajac, Esq.
Carmichael + Zajac P.C.
170 High Street
Taunton, MA 02780

an answer to the complaint which is served on you with this summons, within _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.



SARAH A. THORNTON

CLERK

(By) DEPUTY CLERK

AUG 1 2 2005

DATE

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

BOSTON DIVISION
DOCKET NO.

| | |
|---|---|
| L & T YACHT SALES, INC., | ) |
| Plaintiff | ) |
| | ) |
| VS. | ) |
| | ) |
| POST MARINE CO., INC., | ) |
| Defendant | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### PARTIES

1.   The Plaintiff, L & T YACHT SALES, INC., (hereinafter "L & T") is a duly organized Rhode Island corporation with a business address at 56 Ruggles Avenue, Newport, Rhode Island.  L & T, is the registered owner of a 2001 50' yacht known as the "Relentless," (serial no. PMC500 76A901), manufactured by the Defendant, Post Marine Co., Inc. (the "boat").

2.   Todd J. Hamilton of 1061 Brush Hill Road, Milton, Massachusetts ("Hamilton") is each officer and the sole director of L & T.

3.   L & T and Hamilton usually docks and stores the boat in Hingham or New Bedford, Massachusetts.

4.   The Defendant, Post Marine Co., Inc., (hereinafter "Post") is, upon information and belief, a duly organized New Jersey corporation with a principal place of business at 100 Post Road, Mays Landing, New Jersey.

5.   Post advertises, sells yachts and does business throughout the United States, including the

1

Commonwealth of Massachusetts. Some of this is done through a network of eight (8) authorized Post dealers. Two (2) of the eight (8) authorized Post dealer locations are in the Commonwealth of Massachusetts.

### JURISDICTION AND VENUE

6.    Jurisdiction and venue are conferred upon this Court pursuant to Article III, Section 2 of the United States Constitution and 28 U.S.C § 1332 et seq.

### FACTS COMMON TO ALL COUNTS

7.    In May of 2004, while the boat was docked in Hingham, Massachusetts, Hamilton discovered a serious defect with the boat, in particular, the severe and extensive cracking and failure of its gel coat outer skin, as a result of design and /or manufacturing defects

8.    Post confirmed this finding to Hamilton and was or became aware a similar defect of other yachts manufactured by Post.

9.    Hamilton made Post aware that L & T had an existing bona fide offer to purchase the boat, but the amount offered was substantially diminished due to significant and widespread damage to the boat, which had become apparent to Hamilton in May of 2004.

10.    At the time of this offer on the boat, L & T stood to lose, *inter alia*, in excess of one hundred thousand dollars ($100,000.00) in the diminished resale value of the boat, as a result of the damage from the defect in the gel coat.

11.    Post informed Hamilton that they were repairing the gel coat on the boats that were brought in by Post customers.

12.    Post agreed to fix the gel coat problem on L & T's boat.

13.    Hamilton inquired about the process that Post would undertake to repair the boat and about the level of care and workmanship that would go into Post's repair of the boat. Post directed

2

Hamilton to another Massachusetts Post owner to review the recent work performed by Post to this owner's particular boat.

14.     Hamilton was very displeased with the work he viewed on this particular boat, noting that the defective gel coat was not removed, but instead only sanded down in certain spots and covered up with new gel coat. This method of repair was unacceptable to Hamilton. Therefore, Post agreed to completely replace the gel coat to the boat.

15.     On September 2, 2004, five months following the initial discussions with Post, Mr. Joseph Matorana, Vice President of Post, provided Hamilton a letter agreeing to perform the necessary repairs, which specifically included agreeing to remove the gel coat from the entire surface to ensure consistency.

16.     In addition, the parties also discussed in detail the overall standard care to be used by Post, so as to prevent over spray, dust in the engine or in the living quarters of the boat, etc. Post agreed to take the necessary measures to insure that the boat would be returned in the same, clean condition in which Hamilton would deliver it to Post.

17.     On November 1, 2004, Hamilton drove the boat from Massachusetts to Post's facility in New Jersey for the agreed-to repairs. At the time Post took delivery of the boat for the repairs, Post indicated to Hamilton that the boat would be ready by May of 2005; in time for most of the 2005 boating season. Post was fully aware that Hamilton was attempting to sell the boat and had at least two potential buyers for it once the anticipated repairs were completed.

18.     In February, Hamilton flew to Post to review the status of the work. At this time, very little work had been completed on the boat; however, Post continued to assure Hamilton that the repairs to the boat would be completed by May, as the parties had agreed.

19.     In May of 2005, Hamilton once again flew to Post's facility in New Jersey, expecting to find

3

the boat close to complete.   Hamilton inspected boat and noted and further indicated and

provided in writing to Post a list of outstanding items, which were yet to be completed.

20.    Post indicated to Hamilton that they had not yet begun work to replace the gel coat on the

sides of the hull or the bottom of the hull and but again assured Hamilton that it would be

completed as the parties had discussed and agreed.  However, Post stated that the boat repairs

would not be completed in May, but not until mid July 2005, just prior to Post closing down

for a two-week vacation beginning on July 18, 2005.  Once again Hamilton and L & T relied

on Post's word.

21.    The week of July 11, 2005, Hamilton contacted Post to let them know he would be down that

week to pick up the boat before Post closed for vacation.  Post indicated to Hamilton that the

boat was indeed ready.  Hamilton purchased a plane ticket, rented a car and got a hotel room,

all at his expense, and took time out of his work schedule to go to the Post facility.  For this

trip however, he purchased only a one-way plane ticket based on Post's assurance that the

boat was complete and he could drive it back to Massachusetts.

22.    Upon Hamilton's arrival at Post on July 12, 2005, it was apparent that the repairs were not

complete.  The bottom of the boat had not even been touched and the sides of the boat still

had cracks.  It was also apparent to Hamilton that additional cracks were occurring on the

boat and that, contrary to what the parties had agreed, Post failed to remove the defective gel

coat and replace it.

23.    Other portions of the boat were not in the same, clean condition as when Hamilton had

delivered it from Massachusetts in November of 2004 and needed extensive cleaning or

repair.

24.    Hamilton requested in writing that Post not do any additional work on the sides or the bottom

of the boat until the parties could have further since Post clearly failed to remove the defective gel coat as the parties had agreed. Post failed to contact Hamilton before closing for its two week vacation.

25.    After this two week vacation, Hamilton again traveled from Massachusetts to New Jersey and had the boat inspected by another yacht repair company, who concurred with Hamilton's findings that the boat was not repaired correctly.

26.    The 2005 boating season has almost ended and the value of the boat has diminished significantly. L & T continues to pay insurance and carrying cost on a boat that he cannot use and cannot sell.

27.    Post has now demanded that Hamilton remove the boat from its facility without performimg any additional repairs or cleaning.

## COUNT I: BREACH OF CONTRACT

28.    The Plaintiff re-alleges paragraphs 1 through 26 of this Complaint as if set forth in full herein and incorporates the same by reference.

29.    Post breached its contract with L & T by failing to repair the boat as promised and in a good and workmanlike and timely manner.

30.    As a result of the actions of Post and its breach of contract, L & T has incurred substantial monetary damages including, but not limited to, a loss of the benefit of its bargain; the diminished value of the boat; the lost opportunity of sale; expenditures for travel, insurance and carrying costs while the boat was at Post's facility in New Jersey; and the anticipated future expense of proper repair and cleaning, and has otherwise been damaged.

**WHEREFORE**, the Plaintiff demands the relief as set forth below

## COUNT II: FRAUDULENT MISREPRESENTATION

31.    The Plaintiff re-alleges paragraphs 1 through 30 of this Complaint as if set forth in full herein and incorporates the same by reference.

32.    In agreeing to provide said repairs to L & T's boat, Post, on numerous occasions falsely and fraudulently represented that Post was willing, ready and able to provide the repairs in a TIMELY, complete and workmanlike manner.

33.    Those representations were false and in fact known to be false by Post at the time they were made. In truth and in fact, Post did not intend to provide the repairs in a quality, workmanlike manner as promised.

34.    L & T relied on Post's false and misleading representations all to L & T's detriment.

35.    As a result of L & T's reliance on Post's false and misleading representations L & T was financially damaged.

**WHEREFORE,** the Plaintiff demands the relief as set forth below.

## COUNT III
## NEGLIGENT MISREPRESENTATION

36.    The Plaintiff re-alleges paragraphs 1 through 35 of this Complaint as if set forth in full herein and incorporates the same by reference.

37.    In agreeing to provide the repairs to L & T's boat, Post negligently represented that it was willing, ready and able to provide the repairs in a TIMELY, complete and workmanlike manner, when it knew or should have known that it could not or would not perform as promised.

38.    Post knew or reasonably should have known that the Plaintiff would rely on said promises and representations.

6

39.    The Defendants had a duty to truthfully represent its ability and willingness to provide the repairs in a TIMELY, complete and workmanlike manner, as promised.

40.    As a result of L & T's reliance on Post's misrepresentations, L & T has suffered substantial financial damages.

**WHEREFORE**, the Plaintiff demands the relief as set forth below.

## COUNT IV: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

41.    The Plaintiff re-alleges paragraphs 1 through 40 of this Complaint as if set forth in full herein and incorporates the same by reference.

42.    Post is a merchant as that term is defined by the Uniform Commercial Code.

43.    Post knew at the time of constructing the boat and its gel coat, its purchaser would rely on Post's skill and judgment in furnishing suitable products.

44.    The boat and its gel coat were not suited for its particular purpose.

**WHEREFORE**, the Plaintiff demands the relief as set forth below.

## COUNT V: NEGLIGENCE

45.    The Plaintiff re-alleges paragraphs 1 through 44 of this Complaint as if set forth in full herein and incorporates the same by reference.

46.    In undertaking to perform repairs to the boat, Post had a duty to L & T do so at a certain standard of care.

47.    Post breached its duty to L & T, proximately causing damage to the boat and L & T.

**WHEREFORE**, the Plaintiff demands the relief as set forth below.

7

## **RELIEF SOUGHT**

I. That a judgment for breach of contract be entered on Count I in favor of L & T with prejudgment interest from the date of breach;

II. That a judgment based upon fraudulent misrepresentation stated be entered on Count II in favor of L & T with prejudgment interest;

III. That a judgment for negligent misrepresentation be entered on Count III in favor of L & T with prejudgment interest;

IV. That a judgment for breach of implied warranty be entered on Count IV in favor of L & T with prejudgment interest;

V. That a judgment for negligence be entered on Count V in favor of L & T with prejudgment interest;

VI. That the Court award the Plaintiffs costs and reasonable attorney's fees;

VII. For further relief the Court deems just and proper.

### **THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully submitted,
The Plaintiff,
By its Attorneys,

_____

John E. Zajac, Esquire
Carmichael & Zajac, P.C.
170 High Street
Taunton, MA 02780
(508) 821-2552
BBO No. 560195

Dated: August 14, 2005

8

08/16/05    07:33    POST MARINE → 13056708230                    NO.058    D01



100 Post Road • Mays Landing, NJ 08330-1698 • (609) 625-2434 • Fax: (609) 625-2335 • www.postyachts.com

# FAX COVER SHEET

DATE: _____ 8/16/05 _____

TO: _____ Michel / Carmen _____

FROM: _____ Ken Jensen _____

SUBJECT: _____ Todd Hamilton _____

NUMBER OF PAGES INCLUDING COVER SHEET: _____ 10 _____

MESSAGE: _____

# EXHIBIT "B"

Michel O. Weisz, Esquire
9350 South Dixie Highway
Suite 1500
Miami, Florida 33175
Tel: (305) 670-3820
Fax: (305) 670-82301

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**BOSTON DIVISION**
**C.A. No. 05-11682-MLW**

| | | |
|---|---|---|
| L & T YACHT SALES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| VS. | ) | *Filed Electronically* |
| | ) | |
| | ) | |
| POST MARINE CO., INC., | ) | **AFFIDAVIT OF** |
| | ) | **KENNETH JENSEN** |
| Defendant | ) | |

BEFORE ME, the undersigned authority duly authorized to take oaths, personally appeared Kenneth Jensen, who upon oath deposes and states:

1.  My name is Kenneth Jensen, I am over the age of 18 years of age, and I make this affidavit based upon my own personal knowledge of the facts set forth herein.

2.  I am the President of Post Marine Company and have been President since January 1, 2003.

3. Attached hereto and incorporated by reference herein is a true and correct copy of a one year limited warranty which is issued by Post marine Company and which covered the Post Yacht which is now known as the ARelentless@ when the yacht was initially sold in 2001.

4. The yacht was manufactured by Post Marine and was completed on March 16, 2001.

5.  The yacht was then sold to Portland Boat Works, Inc. an authorized Post yacht dealer.

6.  The yacht was sold by Portland Boat Works, Inc. to the original retail purchaser on June 21, 2001.

7.  The terms of the express written limited warranty expired one year after the date of sale which was June 21, 2002.

8.  The applicable labor rate for the work done on the yacht is $65 per hour.


FURTHER AFFIANT SAYETH NOT.

Kenneth Jenson

## VERIFICATION

I verify that the foregoing statements made by me are true. Pursuant to 28 U.S.C. ' 1746, I understand that I make this Verification under penalty of perjury.

_____
Signature

Kenneth S. Jensen _____
Print Name

President _____
Title

May 30, 2007 _____
Date

WENDY WONG
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Oct. 24, 2010

# ONE YEAR LIMITED WARRANTY

**1** THERE ARE NO EXPRESS WARRANTIES ON PRODUCTS MANUFACTURED BY POST MARINE COMPANY, INC., EXCEPT THAT the Company will, through its selling Dealer, replace or repair, at the Company's option any part (except as hereinafter provided) which is proven to its satisfaction to be defective under normal use and service within one year from the date of delivery to the first owner (maximum 18 months from date of delivery from the factory), if the part is returned transportation prepaid, within thirty days after the defect is discovered, to the Dealer or to such other point of manufacture as the Company may designate.

**2** THIS WARRANTY SHALL NOT APPLY TO:
(a) The cost of removal or reinstallment of part, disassembly, or reassembly of the unit of which it is a component.
(b) Varnishes, gel coats, paints, vinyls, fabrics, glass, chromium plated, stainless steel and aluminum finishes because of the varying effect resulting from different climatic and use conditions.
(c) Products not of the Company's manufacture. Any warranty provided by the manufacturer will be passed on to the owner if possible.
(d) Racing boats or engines.
(e) Boats that are used in commercial activities.
(f) Parts which have been altered in a manner which has impaired the original characteristics.
(g) The installation of any equipment by a Dealer or other installer.
(h) Speeds, fuel consumption and other performance characteristics because they are estimated and not guaranteed.
(i) Others than the first owner.

**3** THE DURATION OF ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE SHALL BE LIMITED TO AND COINCIDENT WITH THE DURATION OF THIS EXPRESS WARRANTY. The replacement or repair of defective parts as stated in this warranty shall be under sole remedy of the purchaser and the sole liability of the Dealer and the Company under this warranty and any implied warranties. THE COMPANY OR ITS DEALER SHALL NOT BE LIABLE UNDER ANY CIRCUMSTANCE FOR INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES CAUSED BY DEFECTS IN PARTS OR WORKMANSHIP OR ANY DELAY IN THE REPAIR OR REPLACEMENT THEREOF.
(a) Some states do not allow limitations on how long an implied warranty lasts or on the exclusion of incidental or consequential damages, so the above limitation on the duration of implied warranties and the above exclusion of incidental and consequential damages may not apply to you.

**4** THE DEALER IS NOT THE AGENT OF POST MARINE COMPANY, INC. The Company does not authorize the Dealer, or any other person, to assume for the Company any liability in connection herewith or any liability or expense incurred in the repairing of its products other than those expressly authorized herein.

**5** POST MARINE RESERVES THE RIGHT TO MAKE CHANGES IN DESIGN, EQUIPMENT, LAYOUT OR CONSTRUCTION WITHOUT NOTICE OR BEING OBLIGATED TO INCORPORATE SUCH CHANGES IN PREVIOUS PRODUCTS.

**6** You may secure performance of warranty obligations hereunder by:
(a) Telephoning the Post Dealer from which you purchased the boat for an appointment to have the Dealer examine your Post Boat.
(b) Delivering your Post Boat to the selling Post Dealer for his examination.
(c) In certain cases the Dealer is authorized to complete warranty obligations unilaterally, and in others he must receive authorization from the Post Marine Company Factory. The Dealer is obliged to follow whichever course is appropriate.
(d) Upon completion of warranty obligations, the Dealer will notify you of the availability of your Post Boat for your pickup.
(e) Major mechanical components, such as engines, generator sets, electronics, appliances, and air conditioners for example, are warranted by the manufacturer of the component. They have authorized service dealers in most major boating markets. Your Post Dealer will identify such service dealers upon request.

**7** Any other communications necessary in connection with this warranty should be sent to the following address:

POST MARINE COMPANY, INC.
36 Post Road
Mays Landing, New Jersey 08330

**8** THIS WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS, AND YOU MAY ALSO HAVE OTHER RIGHTS WHICH VARY FROM STATE TO STATE.



Post Marine Company, Inc.
36 Post Road
Mays Landing, New Jersey 08330
609-625-2434

Printed in U.S.A.



# EXHIBIT "C"

Case 1:05-cv-11682-MLW   Document 22-4   Filed 06/01/2007   Page 2 of 19

L&T Yacht Sales vs. Post Marine                          Todd J. Hamilton                                      April 17, 2007

Vol. 1 - 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


C.A. NO. 05-11682MLW



L & T YACHT SALES, INC.,
        Plaintiff,

vs.

POST MARINE CO., INC.,
        Defendant.



        DEPOSITION OF TODD J. HAMILTON, taken
pursuant to Notice under the applicable
provisions of the Federal Rules of Civil
Procedure on behalf of the Defendant, before
Simonne J. Elwood, R.P.R. and a Notary Public
in and for the Commonwealth of Massachusetts,
at the office of Bartlett Hackett Feinberg
P.C., 155 Federal Street, 9th Floor, Boston,
Massachusetts, commencing on Tuesday, April 17,
2007 at 9:57 a.m.

NEAL A. SALLOWAY - COURT REPORTERS
FIVE CARDIGAN ROAD
WEST PEABODY, MA 01960
781-581-3993 - 978-535-0313 - FAX 978-536-3142

---

Vol. 1 - 2

APPEARANCES:

JOHN E. ZAJAC, ESQ.
CARMICHAEL & ZAJAC, P.C.
170 HIGH STREET
TAUNTON, MA 02780
  REPRESENTS THE PLAINTIFF

MICHEL OCIACOVSKI WEISZ, ESQ.
SEGREDO & WEISZ
9350 SOUTH DIXIE HIGHWAY - SUITE 1500
MIAMI, FL 33156
  REPRESENTS THE DEFENDANT

---

Vol. 1 - 3

1              I N D E X

2    DEPONENT                    DIRECT EXAMINATION

3    TODD J. HAMILTON

4      By Mr. Weisz                      6

5

6
                      E X H I B I T S
7
     EXHIBIT NO.          DESCRIPTION          PAGE NO.
8
      1      Subpoena                      24
9
      2      Defendant Post Marine Co.,    24
10           Inc.'s Re-Notice of Taking
             Deposition
11
      3      Letter - 8/17/04 to Mr. Michel  28
12           O. Weisz from Lisa A. Kane,
             Esq.
13
      4      Letter - 8/25/04 to Ms. Lisa   30
14           A. Kane from Michel O. Weisz
15    5      Fax - To Mr. Hamilton from    32
             Joseph Martorana
16
      6      Letter - 6/15/05 to Dear Joe  37
17           & Ken from Todd
18    7      Fax - 7/13/05 to Dear Joe &   46
             Ken from Todd
19
      8      Fax - 7/15/05 to Dear Joe &   50
20           Ken from Todd
21    9      Fax - 8/10/05 to Mr. Todd     52
             Hamilton from Michel Ociacovski
22           Weisz
23

---

Vol. 1 - 4

1    CONTINUED
     EXHIBIT NO.          DESCRIPTION          PAGE NO.
2
      10     Request for Production of     55
3            Documents

4     11     Summons                       56

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Case 1:05-cv-11682-MLW    Document 22-4    Filed 06/01/2007    Page 3 of 19

L&T Yacht Sales vs. Post Marine                Todd J. Hamilton                April 17, 2007

**Vol. 1 - 5**

T. HAMILTON

1               S T I P U L A T I O N S

2           It is hereby stipulated and agreed by

3    and between counsel for the respective

4    parties that all objections, except as to

5    form, are reserved until the time of trial,

6    including motions to strike.

7           It is further stipulated and agreed

8    that the reading and signing of the

9    deposition are not waived and is to be read and

10   signed under the pains and penalties of

11   perjury.

12         It is further stipulated and agreed

13   that the filing and sealing of the deposition

14   are waived.

15

16        TODD J. HAMILTON

17      A witness called on behalf of the

18   Defendant, having been satisfactorily

19   identified by the production of his

20   Massachusetts driver's license 022609789 and

21   duly sworn, under oath, by the Court Reporter

22   and Notary Public, was examined and testified

23   as follows:

**Vol. 1 - 6**

T. HAMILTON

1     DIRECT EXAMINATION

2  Q  (By Mr. Weisz)  Good morning, Mr. Hamilton.

3    I'm going to assume that your lawyer has told

4    you what to expect at the deposition, so I

5    won't go through the ground rules; but if I

6    ask you something that you don't understand,

7    please let me know.

8  A  Okay.

9  Q  If you need a break, please let me know, and

10   we'll try to make this as, I guess, the least

11   uncomfortable as possible.

12      I'm going to show you -- Well, before

13   we do that, let me ask you, please, to state

14   your full name.

15  A  Todd J. Hamilton.

16  Q  And, Mr. Hamilton, what's your relationship

17   to L & T Yacht Sales, Inc.?

18  A  President.

19  Q  How long have you been the President?

20  A  Since it was formed, I guess.

21  Q  Okay.  Do you know when it was formed?

22  A  Not off the top of my head, I don't.

23  Q  Do you have an estimate?

**Vol. 1 - 7**

T. HAMILTON

1  A  Sometime in '03.  I don't know the exact

2    month or date.

3  Q  Okay.  What was the purpose of forming L & T

4    Yacht Sales?

5  A  Just I was advised by attorneys and an

6    accountant.

7  Q  Was there a business purpose?

8  A  No, just that's what they told me to do, so I

9    listened to them.

10  Q  What is the business of L & T Yacht Sales?

11  A  Just L & T Yacht Sales.

12  Q  What does the company do?

13  A  Bought a boat, and it's holding a boat.

14  Q  Is that the only asset?

15  A  Yes.

16  Q  Does L & T Yacht Sales file tax returns?

17  A  Yeah.

18  Q  Does it have any income?

19  A  I'd have to ask the accountant that one.  I

20    don't even know.  I don't handle any of the

21    tax stuff to be honest with you; I don't; the

22    accountant does.

23  Q  Do you know who signs the tax return?

**Vol. 1 - 8**

T. HAMILTON

1  A  I don't know that.  I would assume I would be

2    the guy.

3  Q  Okay.  What does L & T stand for if anything?

4  A  Just Todd and Linda.  My mother's maiden name

5    is Linda.

6  Q  So it refers to your mother's maiden name?

7  A  My mother's first name is Linda.

8  Q  Okay.  Does L & T have any assets other than

9    the boat?

10  A  Not that I know of, no.

11  Q  Who are the other officers of L & T Yacht

12    Sales?

13  A  I think -- I'm not positive, but I think I'm

14    the only person, I believe, but I could be

15    wrong.  Without the documents, I don't know.

16  Q  Okay.  What boat does L & T Yacht Sales own?

17  A  Do I say by name or hull number?

18  Q  If you could describe it by the manufacturer?

19  A  50-foot Post.  P-O-S-T.

20  Q  When was that boat purchased?

21  A  Sometime in the spring of '03, spring or late

22    winter, somewhere in there.

23  Q  Were there any written documents related to

Case 1:05-cv-11682-MLW   Document 22-4   Filed 06/01/2007   Page 4 of 19

L&T Yacht Sales vs. Post Marine                Todd J. Hamilton                        April 17, 2007

Vol. 1 - 9
T. HAMILTON

1        the sale?
2    A   Whatever they do for the paperwork, the bill
3        of sales or whatever, yeah.
4    Q   Okay.  Is the boat documented?
5    A   Yes.
6    Q   Okay.  U.S. Coast Guard?
7    A   I believe.  I don't know.  The company -- The
8        documentation company handled it.
9    Q   Do you know if it's documented with the Coast
10       Guard or whether it's registered with the
11       title in a particular state?
12   A   I think it's Coast Guard stuff.
13   Q   Okay.  Who was the boat purchased from?
14   A   Jim Zappi (phonetic).
15   Q   Could you spell the last name, please?
16   A   I have no idea how to spell that.  It's Jim
17       Zappi (phonetic).
18   Q   Where was the boat purchased?
19   A   In Connecticut.
20   Q   Was it purchased through a broker?
21   A   No.
22   Q   Okay.  Who made the decision to buy the boat?
23   A   I guess I did.

Vol. 1 - 10
T. HAMILTON

1    Q   Why did you decide to buy this boat?
2    A   It was a good deal at the time.
3    Q   Where did you learn about the availability of
4        the boat?
5    A   Someone I had bumped into.  I can't remember
6        if it was in the Cape or the Vineyard; one of
7        the places I was at, I had bumped into
8        someone and knew this guy that was selling
9        the boat, and he was trading it in on a new
10       boat or something, and they weren't giving
11       him much money for it or as much as he wanted
12       or whatever, and they put me in touch with
13       him.
14   Q   Did you contact this person, or did the
15       person contact you?
16   A   I contacted him.  I believe I contacted him.
17   Q   Okay.  How much did you pay for it?  How much
18       did L & T pay for the boat?
19   A   700,000.  Excuse me.  703,000, I think.
20       Between 700 and 710, I think.
21   Q   Where did the closing take place?
22   A   You know, I don't know.  That documentation
23       or whatever, the registration people handled

Vol. 1 - 11
T. HAMILTON

1        most of the stuff.
2    Q   Where was that office located?
3    A   I think they're out of Winchester, Mass.
4    Q   What's their name?
5    A   New England Marine Documentation.
6    Q   Does the boat have a mortgage?
7    A   I believe it does.
8    Q   Did L & T borrow any money to purchase the
9        boat?
10   A   Yeah.  I guess it would be from me.
11   Q   Do you know if sales tax was paid on the
12       purchase?
13   A   I have no idea how the documentation was
14       handled with the corporation.
15   Q   Well, I'm not asking about documentation.
16       I'm asking about sales tax.
17   A   I don't believe in Rhode Island you have to
18       pay it.
19           MR. ZAJAC:  What's the relevance of
20       that, anyway?
21           MR. WEISZ:  Well, there's a venue
22       question, Counsel.  I think there's a
23       jurisdiction to which the tax is paid would

Vol. 1 - 12
T. HAMILTON

1        have a bearing on it.
2    Q   You don't think sales tax was paid?
3    A   Not in Rhode Island.
4    Q   What does Rhode Island have to do with the
5        sale of this boat?
6    A   I don't understand.
7    Q   Well, the seller was in Connecticut, is that
8        right?
9    A   Yes.
10   Q   Okay.
11   A   I don't know if he's from Connecticut,
12       though.  He might be from the another state,
13       too.
14   Q   Where did you see the boat; in what state?
15   A   Connecticut.
16   Q   Okay.  How did Rhode Island come into the
17       picture?
18   A   What do you mean, how did it come in?  I
19       don't understand.
20   Q   Well, you said that sales tax is not due in
21       Rhode Island.  How did Rhode Island become
22       the place where the sale took place, or how
23       did Rhode Island become involved with any

Case 1:05-cv-11682-MLW    Document 22-4    Filed 06/01/2007    Page 5 of 19

L&T Yacht Sales vs. Post Marine                Todd J. Hamilton                                April 17, 2007

Vol. 1 - 13

T. HAMILTON

1       part of this transaction?
2   A   Because sometimes I leave the boat in Rhode
3       Island. I used to boat in Rhode Island with
4       my father constantly. His boat used to be
5       there for years at the Sakonnet River.
6   Q   Is the boat based in Rhode Island?
7   A   Currently, no. It's being fixed.
8   Q   Okay. Other than when it's being fixed, is
9       it based in Rhode Island?
10  A   It's in Rhode Island; it's in Mass.; it's
11      been in Connecticut; it's been in New Jersey;
12      it's been all over.
13  Q   Okay. Where is the boat's home port?
14  A   There isn't one right now; hasn't been for
15      two years.
16  Q   Okay. Where is the boat registered?
17  A   Rhode Island.
18  Q   Did you do anything to prepare for today's
19      deposition?
20  A   No.
21  Q   Did you review any documents?
22  A   No.
23  Q   Did you review the notice of taking

Vol. 1 - 14

T. HAMILTON

1       deposition?
2   A   No.
3   Q   Did you review the complaint?
4   A   No.
5   Q   Have you ever read the complaint?
6   A   I probably have at one point a long time ago.
7   Q   Why do you say you probably have?
8   A   From time to time, John gives me stuff to
9       read, and I read it.
10  Q   Do you know whether you actually read the
11      complaint in this case?
12  A   I believe I did in the very very beginning.
13  Q   Okay. Do you know when the complaint was
14      filed?
15  A   No, I don't know the exact date.
16  Q   Do you know how long after you removed your
17      boat from Post the complaint was filed?
18  A   I don't know that either.
19  Q   Do you know whether the complaint was filed
20      before you removed the boat from Post?
21  A   I don't know that. The lawyers would handle
22      that. I wouldn't even know how to file it if
23      I tried to.

Vol. 1 - 15

T. HAMILTON

1   Q   I'm not asking you if you filed it. I'm just
2       asking you when it was filed.
3   A   Okay. No. I'm just saying I don't know.
4       The paperwork, I don't handle any of it.
5   Q   Did you bring a copy of the complaint down
6       with you when you went to Post?
7   A   Yes, I did.
8   Q   When you went to Post with the complaint, was
9       your boat still at Post?
10  A   Yes.
11  Q   Does that seem to indicate to you that the
12      complaint was filed before you took the boat
13      from Post?
14  A   I didn't even think about it to be honest.
15  Q   Okay. But let's go back over it. You took a
16      copy of the filed complaint with you when you
17      went down to Post?
18  A   Yes.
19  Q   Your boat was still there?
20  A   Yes.
21  Q   You gave a copy of the complaint to somebody
22      at Post?
23  A   Yes, I did. Ken Jensen.

Vol. 1 - 16

T. HAMILTON

1   Q   Okay. And then you took the boat away?
2   A   Yeah. They put it in the water then, and
3       then I left.
4   Q   So does that lead you to conclude that the
5       complaint was filed before you took the boat
6       out of Post?
7   A   I'd be lying. I don't know the answer
8       whether it was or wasn't. I don't know.
9   Q   Okay. All right. When you took the boat
10      from Post, were there any areas of gel coat
11      cracking that had not been fixed?
12  A   Yes.
13  Q   Which ones?
14  A   The back deck, the stern, the port side, the
15      bottom, the hard top, the freezer, the sink
16      area in the back, the step area in the back,
17      the gunnels in the back, the dashboard and
18      the compass area and the bridge floor and the
19      opposite side of the port which I'm drawing a
20      blank for some reason, that side of the hull.
21  Q   Okay. The back deck, is that on the top
22      sides or on the hull?
23  A   It's when you walk in the boat, you step

Case 1:05-cv-11682-MLW    Document 22-4    Filed 06/01/2007    Page 6 of 19

L&T Yacht Sales vs. Post Marine                    Todd J. Hamilton                                    April 17, 2007

### Vol. 1 - 17
### T. HAMILTON

1       down.  It's the floor like in the back of the
2       boat.
3  Q  The stern, are you talking about the stern
4       where the name of the boat is?
5  A  Correct.
6  Q  On the outside of the boat?
7  A  Correct.
8  Q  That would be on the hull then?
9  A  Yes.
10  Q  When you say the port side, are you referring
11      to the hull?
12  A  Yes, I am.
13  Q  When you say the bottom, are you talking
14      about the bottom of the boat where the paint
15      is?
16  A  Yes.
17  Q  When you say the hard top, what are you
18      referring to?
19  A  Above the bridge where you drive, the hard
20      top above your head that -- both sides of
21      that top and bottom of that were cracked.
22  Q  Okay.  Are you saying the underside and the
23      topside?

### Vol. 1 - 18
### T. HAMILTON

1  A  Yes.  And the forward seat in front of the
2      windshield was still cracked.
3  Q  Okay.  Which freezer are you referring to?
4  A  On the back deck, there's a freezer to your
5      right when you walk in the back door.
6  Q  Which sink area are you referring to?
7  A  When you walk into the back door of the boat,
8      to your left, there's a sink next to the
9      engine-room compartment.
10  Q  What step area are you referring to?
11  A  The step that you walk into the back of the
12      boat.
13  Q  That's where you walk into the inside of the
14      boat?
15  A  Correct.
16  Q  Okay.  When you say the gunnels in back, what
17      are you referring to?
18  A  I might have that worded wrong.  When you
19      step onto the back deck, there's a wall that
20      goes like this on the inside.  (Indicating)
21  Q  Okay.
22  A  There's three walls.  There's one that backs
23      up to where the back of the stern is, the

### Vol. 1 - 19
### T. HAMILTON

1       inside of the stern, and the two side walls
2       that connect to that were cracked.
3  Q  Okay.  When you say the dashboard, what
4      dashboard are you referring to?
5  A  The helm where you drive up top.
6  Q  When you say the compass area, what does that
7      refer to?
8  A  The bridge area.
9  Q  How is that different from the helm?
10  A  It's probably three or four feet away.  It's
11      in the bridge walls.
12  Q  Okay.  The bridge floor, I guess, is the
13      floor of that area --
14  A  Correct.
15  Q  -- where the helm station is?
16  A  Yes.
17  Q  And then you say office inside of port, what
18      was the last area?  I thought you said
19      something about office inside of port.
20  A  No.  I said the opposite side of the port of
21      the hull.  I was drawing a blank on it, the
22      name on it.
23  Q  Okay.  Opposite side of?

### Vol. 1 - 20
### T. HAMILTON

1  A  The port side of the hull.
2  Q  You mean the starboard side?
3  A  Correct.
4  Q  Okay.  That's on the hull?
5  A  Yes.
6  Q  And you say these cracks were all there when
7      you took the boat?
8  A  Yes.
9  Q  Okay.
10  A  The gentleman that picked it up with me also
11      witnessed the cracks.
12  Q  Did you take any photographs at that time?
13  A  We did; but taking pictures of white, you
14      can't see anything.
15  Q  Okay.
16  A  It's like taking a picture of a wall that's
17      white, you just don't see anything.
18  Q  Okay.  Did you ever take any pictures after
19      that?
20  A  Pictures when we started to do a lot of the
21      repairs.
22  Q  Okay.  Who did the repairs?
23  A  Some repairs were done by Nemic (phonetic)

Case 1:05-cv-11682-MLW     Document 22-4     Filed 06/01/2007     Page 7 of 19

L&T Yacht Sales vs. Post Marine                    Todd J. Hamilton                                April 17, 2007

Vol. 1 - 21
T. HAMILTON

1  Marine; some were done by me and Eric Mobilia
2  (phonetic).
3  Q  Where are those pictures now?
4  A  I believe that's a disk that I turned over to
5     John which I think went to your --
6  Q  Not in this lifetime.
7        MR. ZAJAC:  You don't have the disk
8     with the pictures?
9        MR. WEISZ:  No, I don't.
10       MR. ZAJAC:  I'll have to get it for
11    you.
12 A  I supplied that months and months ago.
13 Q  Did any of these pictures show the existing
14    cracks?
15 A  Yeah.  You could see some of it.  If it was a
16    sunny day, you couldn't see anything with a
17    camera, but we ended up stripping it down
18    completely to bare fiberglass.  You can see
19    the difference as we were stripping it with
20    tools.  You'll see it in the pictures.  It's
21    completely stripped in the pictures.
22 Q  The question I asked, though, is:  Do any of
23    the pictures show the existing cracks before

Vol. 1 - 22
T. HAMILTON

1     they were stripped?
2  A  Without having the pictures in front of me, I
3     can't remember now.  The pictures were taken
4     last spring of '06.
5  Q  Okay.  What damages are you claiming in this
6     lawsuit?
7  A  The loss of the sale of the boat and the
8     damages to repair it and the carrying cost.
9  Q  Okay.  How much do you claim for the loss of
10    the sale of the boat?
11 A  I'd have to sit down and figure it out now
12    that it's been three years.
13 Q  Okay.  Do you have an estimate?
14 A  I don't.  I haven't really sat down; no one
15    has asked me to sit down and put a number
16    together yet.
17 Q  Okay.  How much are you claiming for repairs
18    to the boat?
19 A  The estimates I have are between, I believe,
20    between 420,000 to 450,000.
21 Q  Are these repairs that have been performed
22    already?
23 A  Some have been done.  Some areas have been

Vol. 1 - 23
T. HAMILTON

1     completed 100 percent.
2  Q  What are you claiming, if anything, for
3     repairs that have been done?
4  A  That would be with the estimate that was
5     given.
6  Q  How much is the value of the work that has
7     been done?
8  A  I don't know.  They didn't break it down in
9     sections.  I would have to ask them to come
10    out and redo the estimate for the section.
11 Q  Have you paid any money to have any cracks in
12    the boat repaired?
13 A  Yes.
14 Q  How much have you paid?
15 A  Oh, I don't know exactly to date with
16    materials and stuff.  I could get it for you.
17 Q  What are you claiming the carrying costs?
18 A  Again, I'd have to sit down and figure out
19    what my costs are to carry it.
20 Q  You haven't done that before today?
21 A  No.  I haven't been asked to either.
22 Q  Did you review the Notice of Taking
23    Deposition that was sent for today's

Vol. 1 - 24
T. HAMILTON

1     deposition?
2  A  No.
3  Q  Okay.
4        MR. WEISZ:  Why don't we mark this as
5     Defendant's Exhibit 1, please.
6        (Whereupon the Stenographer marked as
7     Exhibit No. 1 - Subpoena.)
8  Q  Would you take a look at this document,
9     please?  (Indicating)
10 A  Do you want to me to read everything?
11 Q  No.  Just take a look at it.  You don't need
12    to read it.
13 A  Okay.
14 Q  Could you look at the following pages; make
15    sure you've looked at all the pages?
16 A  (Reviewing document).
17       MR. WEISZ:  Actually, let's do this.
18    Let's mark this as L & T 2, please.
19       (Whereupon the Stenographer marked as
20    Exhibit No. 2 - Defendant Post Marine Co.,
21    Inc.'s Re-Notice of Taking Deposition.)
22 Q  Would you take a look at what we've marked as
23    Exhibit 2 to this deposition?  (Indicating)

Vol. 1 - 25

T. HAMILTON

1   A   (Reviewing document) Okay.
2   Q   Have you ever seen that before?
3   A   You know, I don't know. I've seen so much.
4       I don't know what I have seen and haven't
5       seen.
6   Q   Okay. All right. When you removed the boat
7       from Post, did you provide Post with anything
8       in writing indicating what still had to be
9       done on the boat?
10  A   At the time I took it out?
11  Q   Yes.
12  A   No.
13  Q   Did you ever provide them anything in writing
14      after that time indicating what had not been
15      done?
16  A   No. Only before I took the boat.
17  Q   Okay. Since you took the boat from Post,
18      have you ever indicated to them what problems
19      remained to be fixed on the boat?
20  A   No.
21  Q   When you took the boat from Post, did anyone
22      at Post ever tell you they would not fix the
23      items that were still outstanding?

Vol. 1 - 26

T. HAMILTON

1   A   They wouldn't communicate with me when I
2       tried before I took the boat to get an answer
3       how we're going to fix the rest of it.
4   Q   Did they ever tell you that they would not
5       fix the items that you claimed were
6       outstanding?
7   A   Yes, they did.
8   Q   Who told you that?
9   A   Joe Martorana.
10  Q   When did he tell you that?
11  A   That was the week prior — Let me think now.
12      That would be the week that I gave him the
13      letter of July 13th.
14  Q   So he told you that before you gave him the
15      letter?
16  A   Yes.
17  Q   What did he say?
18  A   That they would not be stripping the bottom;
19      they would not be stripping the hull; they
20      wouldn't be doing this; they wouldn't be
21      doing that.
22  Q   So they wouldn't fix the boat the way you
23      wanted it, is that right?

Vol. 1 - 27

T. HAMILTON

1   A   No, not the way I wanted, the way they said
2       they were going to.
3   Q   How did they say they were going to fix it?
4   A   They said they were going to strip the hull
5       and the cracked areas.
6   Q   Okay. Were they going to strip the entire
7       hull or the areas where there were cracks?
8   A   They said they were going to strip the hull,
9       deck, sides, the bottom.
10  Q   Was there ever anything in writing that
11      indicated what Post was going to do?
12  A   Yes.
13  Q   Okay. What was there in writing?
14  A   A letter from Joe Martorana to me.
15  A   Anything else?
16  A   About the work they were going to do?
17  Q   Yes.
18  A   No, not about — The only thing in writing
19      from them about work was the one letter, I
20      believe, except for the letter from you, of
21      course.
22  Q   Okay. Do you think the letter from me
23      counts?

Vol. 1 - 28

T. HAMILTON

1   A   It didn't really say what they were going to
2       do. That's why I called Joe back to verify
3       it.
4   Q   Who is Linda Kane; Lisa Kane?
5   A   My fiance.
6   Q   How long has she been your fiance?
7   A   2001 or 2002. I think it was August of 2001;
8       I think.
9   Q   Okay. We'll seal that part of the record.
10      Was she ever your lawyer?
11  A   Yes.
12  Q   Did she act as your lawyer in your dealings
13      with Post?
14  A   Yes.
15  Q   Did she ever write a letter on your behalf?
16  A   Yes.
17  Q   Did you look at the letter before it was
18      sent?
19  A   Yes.
20          MR. WEISZ: Why don't we mark this as
21      Exhibit 3, please.
22          (Whereupon the Stenographer marked as
23      Exhibit No. 3 - Letter - 8/17/04 to Mr.

Vol. 1 - 29
T. HAMILTON

1    Michel O. Weisz from Lisa A. Kane, Esq.)
2  Q  You can take a look at that letter, please.
3    Let me know when you're finished looking at
4    it. (Indicating)
5  A  **(Reviewing document) Yes.**
6  Q  Have you seen that letter before?
7  A  **Yes.**
8  Q  Okay. Can you tell me what that letter is?
9  A  **It's a letter addressed to you regarding the**
10   **boat and the situation.**
11 Q  Okay. Was that written by Lisa Kane?
12 A  **Yes, it was.**
13 Q  Was she acting as your attorney when she sent
14   that letter?
15 A  **At that time, yes.**
16 Q  When I say, "your," by the way, I mean L & T
17   Yacht Sales?
18 A  **Yes, I understand.**
19 Q  All right. Do you know if there was ever a
20   response to this letter?
21 A  **I know you had sent a letter to her. I don't**
22   **know the exact date or whatever. I know I've**
23   **seen it.**

Vol. 1 - 30
T. HAMILTON

1  Q  Okay.
2     MR. WEISZ: Mark this as the next
3     exhibit.
4     (Whereupon the Stenographer marked as
5     Exhibit No. 4 - Letter - 8/25/04 to Ms. Lisa
6     A. Kane from Michel O. Weisz.)
7  Q  (Indicating)
8  A  **(Reviewing document) I have seen this.**
9  Q  That's a letter that I wrote to Ms. Kane?
10 A  **Yes, it is.**
11 Q  Okay. Do you see the bottom of the first
12    page where it says No. 1?
13 A  **Yes.**
14 Q  Do you see the line above that or the
15    paragraph above that that says, "Post Marine
16    will inspect the entire vessel to determine
17    the extent of the gel coat repairs to be
18    performed." Is that what it says?
19 A  **Yes, it does.**
20 Q  Does it say after that, "The areas affected
21    will be treated in the following manner."?
22 A  **Yes, it does.**
23 Q  Okay. Do you know if any written response

Vol. 1 - 31
T. HAMILTON

1    was ever sent on behalf of L & T to this
2    letter?
3  A  **Yes, the letter from Joe Martorana.**
4  Q  I'm asking a slightly different question.
5  A  **Okay.**
6  Q  Do you know if anybody from L & T, either you
7    or your attorney at the time, ever sent a
8    letter in response to this?
9  A  **No. I called Ken Jensen.**
10 Q  Okay.
11 A  **Because, at the time, Bill Kachero**
12   **(phonetic), the guy that wanted to buy the**
13   **boat wouldn't accept this letter because he**
14   **said it was too vague; he wouldn't purchase**
15   **the boat. So I called Ken. Ken wasn't**
16   **around, and I spoke to Joe, and I said, "Joe,**
17   **the sale is falling apart. The guy is not**
18   **comfortable with what repairs and how they're**
19   **going to be done." I said, "You've got to**
20   **clarify it." And he faxed me that letter.**
21   MR. WEISZ: Let's mark this as the
22   next exhibit, please.
23

Vol. 1 - 32
T. HAMILTON

1     (Whereupon the Stenographer marked as
2     Exhibit No. 5 - Fax - To Mr. Hamilton from
3     Joseph Martorana.)
4  Q  Do you recognize that letter? (Indicating)
5  A  **Yes, I do.**
6  Q  Do you know when that letter was sent?
7  A  **I do. I don't have it in front of me because**
8     **it's on the top.**
9  Q  Okay.
10 A  **But it's not -- You can't see it here, but**
11    **the original you can see the date and time it**
12    **was faxed. I believe it was in either**
13    **September or October of 2004.**
14 Q  Do you know whether that letter was sent
15    before you brought the boat to Post for
16    repairs?
17 A  **Yes, it was.**
18 Q  Okay. And when did you bring the boat to
19    Post for repairs?
20 A  **I believe it was the end of October or**
21    **November 1st, somewhere in there.**
22 Q  Did you ever pay Post anything to repair the
23    boat?

## Vol. 1 - 33
### T. HAMILTON

1  A  Nope.
2  Q  Do you know what the value of the work was
3     that Post performed on the boat?
4  A  The value that Post did?
5  Q  Yes.
6  A  Zero.
7  Q  Okay.  And why do you say that?
8  A  Because they sprayed gel coat over gel coat
9     that's recracking so now it's double the work
10    to take it off.
11 Q  How do you know that's what they did?
12 A  When you're sanding it off, you could see
13    three layers; it was so thick.
14 Q  And --
15 A  Three different colors.
16 Q  Okay.  Is this something that you have
17    observed yourself?
18 A  Yes.
19 Q  And how do you know it's three layers of gel
20    coat?
21 A  Three different colors.
22 Q  What does that mean; why does that mean three
23    different --

## Vol. 1 - 35
### T. HAMILTON

1  A  Runs the boatyard and does a lot of gel coat
2     and fiberglass work.
3  Q  Have you ever paid him to do fiberglass work?
4  A  Yes, I did.
5  Q  How much have you paid him?
6  A  Off the top of my head, between $8,000 and
7     $10,000.
8  Q  And what have you paid him to do?
9  A  Respray a lot of the areas after they were
10    taken down and redone.
11 Q  Okay.
12 A  The pictures will show all the work that was
13    done and all the stripping.
14 Q  Okay.  Now, was he fixing cracked gel coat on
15    your boat?
16 A  No.  What he did I paid him because he has
17    the facility to bring it inside and spray the
18    gel coat.  We did all the preparation.
19 Q  What do you mean, "We did all the
20    preparation"?
21 A  Myself and Eric Mobilia (phonetic).
22 Q  What did you do?
23 A  We removed all the gel coat; we refilled all

## Vol. 1 - 34
### T. HAMILTON

1  A  Well, if you put three -- If you put paint on
2     this wall that's white and then put an off
3     white on top of that white then another off
4     white, you've got three different colors.
5     You can see the different layers.
6  Q  I see.
7  A  When you bury (phonetic) coat the bottom of a
8     boat and you buy the stuff from Intelex, they
9     tell you to put four coats, and the coats go
10    white, brown, white, brown so you can keep
11    track of how many colors and layers you put
12    on it.
13 Q  Okay.  And has anyone else told you that's
14    how they repaired the boat?
15 A  Yes.
16 Q  Who else has told you?
17 A  Nemic (phonetic) Marine.
18 Q  Who, anybody in particular?
19 A  Marty.
20 Q  What's Marty's last name?
21 A  I don't know offhand.  I can get it for you,
22    though.
23 Q  And what does Marty do?

## Vol. 1 - 36
### T. HAMILTON

1     the pin holes or the polyester and prep'd it
2     for them to spray the gel coat.
3  Q  So has all the gel coat cracking been fixed
4     on the boat now?
5  A  The bottom and the cockpit only.
6  Q  Okay.  So the areas you still discussed are
7     the ones that are still cracked?
8  A  The sides of the hull.  As a matter of fact,
9     I uncovered the boat last week.  They're
10    working on another section.  I uncovered the
11    top side to have another inspector look at
12    it, and all the cracks and the helm that they
13    fixed and by the compass are coming back
14    right through.
15 Q  Did you inspect the boat at Post while it was
16    being fixed?
17 A  Yes.
18 Q  Did you ever write them a letter telling them
19    what you observed?
20 A  Somewhat.  I mean, most of the time when I
21    went there, it was always a section to the
22    boat that were covered so you couldn't see
23    the whole boat.

Case 1:05-cv-11682-MLW    Document 22-4    Filed 06/01/2007    Page 11 of 19

L&T Yacht Sales vs. Post Marine          Todd J. Hamilton                          April 17, 2007

Vol. 1 - 37

T. HAMILTON

1  Q    Did you ever write a letter to Post after you
2        inspected the boat?
3  A    I know I sent them a list one time with a
4        letter.
5  Q    Okay.
6              MR. WEISZ:  Mark this as the next
7        document, please.
8              (Whereupon the Stenographer marked as
9        Exhibit No. 6 - Letter - 6/15/05 to Dear Joe
10       & Ken from Todd.)
11 Q    Exhibit 6.  (Indicating)
12 A    (Reviewing document)  Yes.
13 Q    Okay.  Did you look at the boat before June
14       15th, 2005?
15 A    Yes, I did.
16 Q    Did you look at it personally?
17 A    Yes, I did.
18 Q    Okay.  Did you write this letter dated June
19       15th, 2005?
20 A    What do you mean did I write it.
21 Q    Did you write it?
22 A    No.  I dictated it.  I can't write.  I can't
23       type.

Vol. 1 - 38

T. HAMILTON

1  Q    Okay.
2  A    I'll be honest with you.
3  Q    Okay.  Who did you dictate the letter to?
4  A    It was either my mother or Lisa did it for
5        me.
6  Q    Did you check the letter after it had been
7        dictated?
8  A    Yes.
9  Q    Did you make sure it was correct?
10 A    For what I wanted, yes.
11 Q    Okay.  Did you sign it?
12 A    Yes, I did.
13 Q    Okay.  What was it that you wanted?
14 A    I wanted the areas fixed.  I mean, they told
15       me they stripped the front deck; and then,
16       you know, I put in the letter the blended
17       spots around the front deck hatches.  Well,
18       if you're telling me you stripped the front
19       deck and you sprayed the whole front deck,
20       why is there blended areas around the
21       hatches, you know, I mean?
22 Q    When did they tell you they stripped the
23       whole front deck?

Vol. 1 - 39

T. HAMILTON

1  A    They told me that in March.
2  Q    Okay.  And how did they tell you that, over
3        the phone or in person?
4  A    Over the phone.  I kept calling for a
5        progress report through the winter.
6  Q    It would always be Joe or Ken is the only two
7        people I'd speak to.
8  A    All right.
9  A    Let's just see what you say here.
10 A    Okay.
11 Q    "As a follow up to our conversation on June
12       14, 2005 at Post Marine in New Jersey, --."
13       So that was an in-person conversation?
14 A    Yes, it was.
15 Q    Okay.  And you were at the boat?
16 A    I went and reviewed the boat.  I remember
17       when they had the boat.  It was outside.
18       They had one side covered.  They were doing
19       something on the back.
20 Q    Okay.  "-- and our subsequent phone
21       conversation on June 15, 2005, the following
22       are the items we have agreed that I need you
23       to repair prior to me picking up the boat

Vol. 1 - 40

T. HAMILTON

1        from Post Marine during first week of July."
2  A    Correct.
3  Q    Okay.  "Blend spots around the front deck
4        hatches."  What does that mean?
5  A    What I was saying is they told me they had
6        stripped the front deck; and when I walked up
7        on the front deck, I could see big spots like
8        this that was one color; then there was
9        another color over here.  (Indicating)
10 Q    So what were they supposed to do?
11 A    Well, they told me because the front deck was
12       cracked from where the seat was to the bow
13       pulpit that they were going to remove the old
14       gel coat so they would spray one whole coat
15       over it.
16 Q    What does it mean -- What were they supposed
17       to do to blend spots around the front deck
18       hatches?
19 A    That's what I wanted to know what they were
20       going to do with it.
21 Q    Okay.  So you didn't know what they were
22       going to do?
23 A    No.  I was trying to get that out of them.

Case 1:05-cv-11682-MLW    Document 22-4    Filed 06/01/2007    Page 12 of 19

L&T Yacht Sales vs. Post Marine                Todd J. Hamilton                                April 17, 2007

## Vol. 1 - 41
### T. HAMILTON

1  Q  Okay. Where does it say you wanted an
2     explanation as to what you're going to do?
3  A  Well, I had spoke to Joe when we walked
4     around the boat.
5  Q  No. Where does it say in the letter?
6  A  It doesn't. It doesn't.
7  Q  Okay. "Refinish non skid on the front bench
8     seat." What does that mean?
9  A  The non skid was all cracked on the seat
10    front like this. (Indicating)
11 Q  So you wanted them to refinish that?
12 A  I wanted them to fix it.
13 Q  Okay. "Fix the over spray on the back deck
14    walls below the fish holders."
15 A  Yes.
16 Q  You wanted them to fix the overspray?
17 A  Yeah. They didn't — When they had sprayed
18    the back-deck floor, they didn't cover the
19    walls in there, and it was like 80-grit paper
20    when you put your hand over it.
21 Q  "Refinish bridge compartment door where the
22    paint was burned off caused by buffing."
23 A  Correct.

## Vol. 1 - 42
### T. HAMILTON

1  Q  "Refinish the compass area on the bridge."
2     What does that mean to refinish?
3  A  Well, they went in there, and they spot —
4     they went and fixed one little corner, and
5     then they fixed another corner over here.
6     (Indicating) The whole thing was three
7     colors. It's a square box. There was one
8     color here; one color here and then the
9     original color. (Indicating)
10 Q  Okay. "Fix the overspray on the bridge
11    components and aluminum pipe."
12 A  Yes.
13 Q  Okay. "Recock side windows." What does that
14    mean?
15 A  They had taken some caulking out around the
16    windows, and they didn't put it back in the
17    way it was in there before.
18 Q  All right. So instead of "recock," it's
19    recaulk, C-A-U-L-K?
20 A  Yes, I guess you could say that.
21 Q  Okay. No. 8, "Clean the gunnels from
22    overspray."
23 A  Yes.

## Vol. 1 - 43
### T. HAMILTON

1  Q  Okay. No. 9, "Repair a bubble below the
2     stern light on the transom."
3  A  Correct.
4  Q  The transom is the back of the boat?
5  A  Yes.
6  Q  Okay. What's a bubble?
7  A  When I brought the boat in, where the name
8     was, there was cracks from the top rugrail
9     right down to the bottom paint through the
10    boot stripe, and Joe said, "We're going to
11    have to strip the stern, strip the tuna
12    (phonetic) door." I said, "I know. I
13    understand." So they took all the lettering
14    off. They told me they had stripped it. I
15    get down there, and there's bubbles as big
16    as — inch and-a-half bubbles protruding out
17    through the gel coat.
18 Q  Well, this says, "Repair a bubble." That
19    means one bubble.
20 A  There was more than one. I just put in there
21    a bubble. I didn't really get into
22    specifics. At this point, I thought we were
23    working through it. I just didn't get into

## Vol. 1 - 44
### T. HAMILTON

1     nitty-gritty with them. I just wanted to get
2     it over with to be honest with you.
3  Q  Well, the word, "a" is a pretty specific
4     word, isn't it?
5  A  Yes.
6  Q  Okay. And it's a pretty specific area below
7     the stern light, right?
8  A  Yep.
9  Q  Nothing in here about bubbles all over the
10    transom, is there, in writing?
11 A  There was two bubbles; just two.
12 Q  Just two. Okay. No. 10, "Repair right and
13    left side boot stripe where there are
14    bubbles." Is that right?
15 A  Correct.
16 Q  Okay. "Re do the crack below the engine in
17    takes on the side of boat."
18 A  Correct.
19 Q  Is that correct?
20 A  Yes.
21 Q  "Refinish the back door step."
22 A  Correct.
23 Q  "Fix crack in the stem of the bow."

Case 1:05-cv-11682-MLW    Document 22-4    Filed 06/01/2007    Page 13 of 19

L&T Yacht Sales vs. Post Marine                    Todd J. Hamilton                                    April 17, 2007

Vol. 1 - 45
T. HAMILTON

1  A  Correct.
2  Q  Okay. And 14 is blank.
3  A  Yes.
4  Q  Okay. And that was your entire list of items
5     that needed to be done before the boat was
6     picked up, is that correct?
7  A  For what I could see. The boat was half
8     covered when I got there.
9  Q  Okay. Did you ask them to remove the cover?
10 A  They couldn't. They had guys sanding. They
11    had the thing all mast off. So I kept poking
12    my head where I could put it.
13 Q  Okay. Did you go back and look at the boat
14    again when they took it off?
15 A  When I came back in July, yes. When it was
16    uncovered when I got there and it was a
17    cloudy day, yes, I did.
18 Q  Okay.
19 A  You can't look at the boat in direct sunlight
20    because it's too blinding.
21 Q  Okay. So you can see the cracks better on a
22    cloudy day?
23 A  Oh, absolutely.

Vol. 1 - 46
T. HAMILTON

1  Q  Okay. And you were there on a cloudy day?
2  A  Not in June; in July.
3  Q  All right.
4        MR. WEISZ: Please mark this as the
5     next exhibit.
6        (Whereupon the Stenographer marked as
7     Exhibit No. 7 - Fax - 7/13/05 to Dear Joe &
8     Ken from Todd.)
9  Q  (Indicating)
10 A  (Reviewing document) I recognize this.
11 Q  Did you dictate this?
12 A  Yes, I did.
13 Q  Did you have this sent to Post?
14 A  Yes, I did.
15 Q  Did you have it sent on or about July 13th,
16    2005?
17 A  Yes, I did.
18 Q  Okay. It says, "As per our conversation
19    today, July 13, 2005 during my third visit to
20    Post Marine in New Jersey, --." Do you see
21    that?
22 A  Yes, I do.
23 Q  All right. Was that your third visit since

Vol. 1 - 47
T. HAMILTON

1     the first time you brought the boat?
2  A  No. That would be my fourth then if you
3     wanted to -- See, I didn't bring the boat to
4     Post because when I called them, they said,
5     "Leave it at the mouth of the river because
6     the river is not marked." There's no marking
7     on the charts to bring it into their dock
8     unless you know how to get in there. So they
9     told me to leave it there. So I never went
10    to Post. The first time, I went to New
11    Jersey and got on a plane from that marina.
12 Q  Okay. The letter that you wrote on June
13    15th, the one we were looking at before this,
14    was that your first visit to Post?
15 A  No. I think the first visit to Post was
16    either March or April, I think.
17 Q  Okay. The letter you wrote on June 15th, was
18    that your second visit to Post?
19 A  I believe so.
20 Q  Okay. The letter that you're writing on July
21    13th, was that your third visit to Post?
22 A  I believe I was at Post the 12th, I thought.
23    I'd have to check the plane tickets to

Vol. 1 - 48
T. HAMILTON

1     remember exactly -- whether it was the 13th
2     or the 12th, but it's one of those two days.
3  Q  "-- due to my disappointment regarding the
4     current condition of the boat, even after
5     numerous visits, --." Were there more than
6     three visits?
7  A  Not to my knowledge that I can remember
8     offhand.
9  Q  Okay. "-- phone conversations and faxes --."
10    What faxes do you have before July 13th, 2005
11    regarding the fixing of the boat?
12 A  There was a lot of faxes prior to the boat
13    going there.
14 Q  Where are those?
15 A  Those are some of the letters between you and
16    Lisa, the letter from Joe, and I have one
17    more letter that I've got to go through
18    because I moved. It's in storage boxes
19    somewhere, a letter that Ken made me a
20    written offer to settle it, a $50,000 cash
21    offer. I've got to check two more storage
22    facilities to see if I can find the letter,
23    but I believe I have it.

L&T Yacht Sales vs. Post Marine                    Todd J. Hamilton                              April 17, 2007

Vol. 1 - 49
T. HAMILTON

1  Q   When do you think you're going to do that?
2  A   I'm going to try -- I was going to try and do
3      it over this weekend.  I was just too sick.
4      I'm going to try and do it in the next couple
5      days.
6  Q   You further state, "-- I now must request
7      that you do not touch the bottom or the sides
8      of my boat until the three of us have the
9      opportunity to discuss the steps moving
10     forward."
11 A   Correct.
12 Q   So you tell them not to touch the bottom or
13     the sides of the boat, is that right?
14 A   Yes.
15 Q   Okay.
16 A   Because they wouldn't tell me how they were
17     going to fix it.
18 Q   Okay.
19 A   And I asked them.
20 Q   All right.  Did you put anything in writing
21     here that indicates that anything other than
22     the bottom or sides of the boat still needs
23     to be fixed?

Vol. 1 - 50
T. HAMILTON

1  A   No.  At that point when I went down on July
2      13th, Joe walked me around, and they took the
3      step off the back of the boat.  They had a
4      worker taking the step off the back of the
5      boat where you walk into it, and he'd
6      actually taped off around the non-skid and
7      sanded the non-skid very lightly and went to
8      spray over it, and I said to Joe, "You're
9      spraying gel coat right over the other gel
10     coat without removing it.  What do you think
11     this is going to do?"  I said, "This is what
12     the whole boat has been."  I said, "We're not
13     doing the hull this way and bottom this way."
14     I said, "Until we get firm what we're doing,
15     I'm not going further."
16 Q   Okay.
17         MR. WEISZ:  Mark this as the next
18     exhibit.
19         (Whereupon the Stenographer marked as
20     Exhibit No. 8 - Fax - 7/15/05 to Dear Joe &
21     Ken from Todd.)
22 Q   (Indicating)
23 A   (Reviewing document)  Yes, I recognize this.

Vol. 1 - 51
T. HAMILTON

1  Q   All right.  Did you dictate this letter?
2  A   Yes, I did.
3  Q   Did you send it?
4  A   Did I, personally, send it?
5  Q   Or did someone send it for you?
6  A   Yes.  Do you know what?  This one I could
7      have done because I was home then.  I could
8      have faxed it myself.
9  Q   Okay.  Do you know if it was sent on or about
10     July 15th, 2005?
11 A   It was sent -- Yeah.  I remember that day,
12     distinctly, being on the phone with Ken from
13     morning until late afternoon.
14 Q   And the next to the last paragraph, the last
15     sentence reads, "It is for this reason that
16     you are not to do ANY --," and "any" is in
17     capitals and bold, "-- further work on this
18     boat as of today, July 15, 2005."  Is that
19     right?
20 A   Correct.
21 Q   Okay.  Did you ever authorize Post to proceed
22     with the repairs that remained to be done on
23     the boat after July 15th, 2005?

Vol. 1 - 52
T. HAMILTON

1  A   Could you repeat that again?
2  Q   Sure.  Did you ever tell Post to go ahead and
3      finish doing the work they were going to do
4      after July 15th, 2005?
5  A   No.  I never heard from them.  I begged Ken
6      to get back with a response so we could try
7      and settle it, him and I, without lawyers to
8      be honest, and we couldn't get anywhere.
9          MR. WEISZ:  Would please mark this as
10     the next exhibit?
11         (Whereupon the Stenographer marked as
12     Exhibit No. 9 - Fax - 8/10/05 to Mr. Todd
13     Hamilton from Michel Ociacovski Weisz.)
14 Q   Did you receive that letter?  (Indicating)
15 A   (Reviewing document)  Yes, I did.
16 Q   Did you ever respond to that letter in
17     writing?
18 A   No.
19 Q   Okay.  Did you, in fact, remove the boat?
20 A   Yes, I did.
21 Q   Other than the letters you've looked at today
22     and the faxes that you've looked at today,
23     are you aware of any other written

Case 1:05-cv-11682-MLW    Document 22-4    Filed 06/01/2007    Page 15 of 19

L&T Yacht Sales vs. Post Marine                Todd J. Hamilton                                   April 17, 2007

Vol. 1 - 53
T. HAMILTON

1    communications between yourself and Post
2    regarding the repairs to your boat?
3  A  **Repairs, not that I know of unless I don't**
4    **have one of the letters, but I think**
5    **everything, except for the one letter that**
6    **Ken made me the written offer in November of**
7    **'04. There was a letter, I think, in the**
8    **very beginning that I addressed to him just**
9    **about how it was going to be repaired and all**
10   **that stuff, but I think that's in this pile,**
11   **my concerns. (Indicating)**
12 Q  Did you buy this as a new boat or a used
13   boat?
14 A  **Used boat; secondhand.**
15 Q  Did you communicate with Post at any time
16   before you bought this boat?
17 A  **Yes, I did.**
18 Q  Who did you communicate with?
19 A  **Joe Martorana.**
20 Q  And when did you see Mr. Martorana or speak
21   to Mr. Martorana?
22 A  **It was sometime in the spring or whenever it**
23   **was when the boat was purchased.**

Vol. 1 - 54
T. HAMILTON

1  Q  After it was purchased?
2  A  **No, before. It could have been before or**
3    **after, somewhere in there.**
4  Q  What do you recall of that conversation or
5    meeting?
6  A  **There was a list of things that they hadn't**
7    **repaired for the previous owner because they**
8    **said they would take care of it, so I called**
9    **him to confirm it, and they said they would.**
10 Q  Did they?
11 A  **No.**
12 Q  Did you ever follow up and say, "You didn't
13   fix stuff that you said you were going to
14   fix."?
15 A  **No.**
16 Q  Did you ever have any written communications
17   with Post?
18 A  **They had sent a letter to Jim, the original**
19   **owner, that they were going to fix the hole**
20   **in the back deck because they had to fix the**
21   **sending unit for the fuel tank. I guess when**
22   **he had the boat, the fuel gauge wasn't**
23   **working, so they had to drill a hole in the**

Vol. 1 - 55
T. HAMILTON

1    **back deck to get it out, and they put a metal**
2    **plate over it. So that was something they**
3    **were going to fix for him. I don't know.**
4    **There were a couple of little things, nothing**
5    **major that I know of.**
6  Q  Okay.
7       MR. WEISZ: Let's mark this as the
8    next document.
9       (Whereupon the Stenographer marked as
10   Exhibit No. 10 - Request for Production of
11   Documents.)
12 Q  Okay. Have you ever seen that before?
13   (Indicating)
14 A  **I'm pretty sure I have read -- at one point,**
15   **I'm sure I read it.**
16 Q  Do you know what it is?
17 A  **Yeah, request for the documents and any**
18   **paperwork, I guess, pertaining to the boat or**
19   **the claims or whatever.**
20 Q  Okay. Did you look for any of the documents
21   that are asked for in this request?
22 A  **Yes, I did.**
23 Q  Did you produce everything that you found and

Vol. 1 - 56
T. HAMILTON

1    had?
2  A  **At that time, everything that I could get my**
3    **hands on, yes, except for that one thing that**
4    **I think I'm missing.**
5  Q  Well, this document is dated May 30th, 2006.
6    Do you see that, the back, the last page?
7  A  **Yes, it is.**
8  Q  All right. Are there any documents you have
9    responsive to this request that have not been
10   produced?
11 A  **It would only be the one if I have it in my**
12   **storage facility, and I only remembered it**
13   **the other day when Ken was asked a question**
14   **that popped into my head.**
15      MR. WEISZ: Mark this as the next
16   document, please.
17      (Whereupon the Stenographer marked as
18   Exhibit No. 11 - Summons.)
19 Q  Do you recognize that? (Indicating)
20 A  **I think I've seen it.**
21 Q  Do you know what it is?
22 A  **I think it was the paper, the lawsuit when it**
23   **was filed.**

Case 1:05-cv-11682-MLW    Document 22-4    Filed 06/01/2007    Page 16 of 19

L&T Yacht Sales vs. Post Marine                Todd J. Hamilton                                April 17, 2007

Vol. 1 - 57
T. HAMILTON

1  Q    Okay. Do you know if you read it before it
2       was filed?
3  A    I believe I did.
4  Q    Have you read it since it was filed?
5  A    No.
6  Q    Did you have an offer from somebody to buy
7       your boat before you contacted Post to repair
8       it?
9  A    Yes.
10 Q    Did you look at another boat Post had
11      repaired before Post started working on your
12      boat?
13 A    Yes.
14 Q    Which boat did you look at?
15 A    It was a 2150 Post over in the Charles River.
16 Q    Were you dissatisfied with the repairs --
17 A    Yes.
18 Q    -- on that boat?
19 A    Yes.
20 Q    Did you tell Post?
21 A    Yes.
22 Q    Did you tell them that before they started
23      working on your boat?

Vol. 1 - 58
T. HAMILTON

1  A    I told them less than two hours after looking
2       at it by cell phone.
3  Q    What happened after that?
4  A    They told me that was a quickie, and they
5       would ensure that they would do better with
6       mine. And the reason I was sent there is
7       Ken, originally, said that he would stand
8       behind if the guy bought the boat; he'd fix
9       it; and the guy that was buying the boat
10      said, "I want to see a boat that they fixed
11      first." And I said to Ken, "I think I better
12      look at it before he does." And thank God I
13      did.
14 Q    Okay. And then after you saw that boat, you
15      decided to let Post fix your boat, anyway, is
16      that right?
17 A    At that point, they didn't want to settle it
18      any other way. They put in writing how they
19      were going to do it. They said they were
20      going to do it right. I gave them the
21      benefit of the doubt.
22 Q    Okay. You state in the complaint that L & T
23      continues to pay insurance and carrying costs

Vol. 1 - 59
T. HAMILTON

1       on a boat that he cannot use. What do you
2       mean you cannot use?
3  A    Well, for nine months, I couldn't use it
4       because Post had it, and then it came back
5       here and sat for another ten months being
6       stripped and worked on. That's two years.
7  Q    Why was it taking ten months to strip and
8       work on it after you took it from Post?
9  A    Because they sprayed right over the old gel
10      coat, so I had to redo their work; twice the
11      work.
12 Q    Is the boat completely fixed now?
13 A    Nope.
14 Q    What still needs to be done?
15 A    The sides of the hull, the front deck, the
16      bridge, the hard top, the front of the
17      windshield and where it says, "Post," it all
18      has to be stripped. It's all cracking.
19      Everything they've touched and sprayed is
20      cracked.
21 Q    Why hasn't that been fixed yet?
22 A    Because it took us six and-a-half months to
23      strip that one section correctly and do it

Vol. 1 - 60
T. HAMILTON

1       right.
2  Q    Which section was stripped and done
3       correctly?
4  A    The complete bottom, the complete cockpit,
5       back wall, sink, freezers, gunnels. All the
6       pictures, and I don't know why you don't have
7       them; but when you have them, you'll see what
8       was stripped exactly right to bare
9       fiberglass.
10 Q    Okay. Have you complained to anybody that
11      it's taking too long to get your boat fixed?
12 A    When who's fixing it?
13 Q    Whoever is fixing it now?
14 A    They're only spraying it. I'm making sure I
15      do it myself so it's done right.
16 Q    So you're not complaining to yourself that
17      it's taking too long?
18 A    Sure I am. I spent probably six straight
19      months and my weekends and weekdays going
20      there.
21 Q    Are you complaining to yourself that it's
22      taking too long to fix?
23 A    Oh, very very upset.

Case 1:05-cv-11682-MLW    Document 22-4    Filed 06/01/2007    Page 17 of 19

L&T Yacht Sales vs. Post Marine                    Todd J. Hamilton                              April 17, 2007

Vol. 1 - 61
T. HAMILTON

1 Q    Okay.  So why don't you just work faster?
2 A    Because I want to do it right.
3 Q    I see.
4 A    I'm not just going to do a make-O.
5 Q    Okay.  Is the boat for sale?
6 A    No.
7 Q    The offer that you claim you had before you
8      notified Post of the cracking problem, how
9      much was that offer for?
10 A   750,000.
11 Q   So you were offered more than what you paid
12     for the boat?
13 A   Yeah.  I put probably 10,000 or 15,000 into
14     it.
15 Q   Okay.
16 A   The gentleman that was buying the boat
17     notified me of the cracks.  I didn't even
18     know that there was an issue.  He had been
19     looking at Vikings and Post and told me there
20     was a serious problem with it when he saw
21     them on my boat, and that's when I called
22     Ken.
23 Q   Have you discussed this lawsuit with anyone

Vol. 1 - 62
T. HAMILTON

1      other than your attorneys?
2 A    Yes.
3 Q    Who have you discussed it with?
4 A    I haven't discussed in detail.  I've told
5      people that there's a lawsuit pending.
6 Q    Who have you told?
7 A    Nemic (phonetic) Marine; other Post dealers,
8      probably.
9 Q    Okay.
10 A   Portland Boat Work.
11 Q   Have you contacted anybody who -- I'm sorry.
12     Have you contacted the company that makes the
13     gel coat?
14 A   Not to date.
15 Q   Have they contacted you?
16 A   Not to date.
17 Q   Have you contacted the attorneys who are
18     representing the gel coat manufacturer?
19 A   Not as of to date.
20 Q   Has your -- Have they contacted you?
21 A   You already asked me that I believe.
22 Q   No.  I asked if you contacted them.  I'm
23     asking if they contacted you?

Vol. 1 - 63
T. HAMILTON

1 A    No, they have not at this date.
2 Q    Do you know if they have contacted your
3      attorneys?
4 A    Not to my knowledge.  You'd have to ask them.
5 Q    Have you ever had this boat surveyed?
6 A    You mean for the fiberglass gel coat itself?
7 Q    Any type of survey?
8 A    Just the gel coat.
9 Q    Who did the gel coat survey?
10 A   I'm drawing a blank on his name.  I'd have to
11     get you his name.
12 Q   When was the survey done?
13 A   Last -- I don't know the exact date now.
14 Q   What year was it done?
15 A   '06, I believe.
16 Q   What was the purpose of the survey?
17 A   I wanted someone to witness the thicknesses
18     of the gel coat.
19 Q   What was the purpose of doing that?
20 A   To show that it was too thick.
21 Q   What were the results of the survey?
22 A   He couldn't believe what he saw.
23 Q   What did he say?

Vol. 1 - 64
T. HAMILTON

1 A    He saw gel coat that was too thick.  He saw
2      gel coat applied over gel coat.  He saw gel
3      coat cracking that was just repaired.  Daniel
4      Briggs, that's the name, Daniel Briggs.
5 Q    B-R-I-G-G-S?
6 A    You're going to have to -- I told you, I left
7      school at 16.  When it comes to spelling and
8      stuff, I'm not good.
9 Q    You don't have to go to school to learn how
10     to spell.
11 A   No.  I just -- It was one of the things I
12     couldn't grasp.
13 Q   I understand that.  I have the same problem.
14 A   I'm a guy with my hands.  I can't do anything
15     with a pen; but if you give me something to
16     fix or build, I can do it.
17 Q   Okay.  Is Mr. Briggs a surveyor?
18 A   Yes, he is.
19 Q   Do you know where he's based?
20 A   I think Dartmouth, Mass., I think.
21 Q   Is it your contention that when you were told
22     the boat -- Is it your contention that when
23     Post told you that the gel coat would be

Vol. 1 - 65
T. HAMILTON

1  stripped that you understood that they would
2  strip the entire boat?
3  A    That was my impression, yes. Anything that
4       was cracked was going to be completely
5       stripped.
6  Q    Okay.
7  A    If it was anything different, I would have
8       never brought the boat there.
9  Q    Okay. And does strip mean that the crack
10      would be ground down to the underlying
11      fiberglass?
12 A    No. You wouldn't grind the crack down. You
13      would take the gel coat down until you
14      started seeing the glass itself beneath it.
15 Q    But that's what stripped means, that you
16      would take the gel coat down to the glass
17      itself?
18 A    Yeah. Most of the people use a tool called a
19      peeler instead of a sander, and they peel off
20      the gel coat.
21 Q    Okay. And that would apply to the areas
22      where the gel coat cracks were?
23 A    Yeah, which would be the entire boat.

Vol. 1 - 66
T. HAMILTON

1  Q    Okay. So you're saying that every area of
2       the entire boat was cracked?
3  A    Currently, you could find a crack anywhere
4       except where I repaired right now
5       anywhere you want. You're welcome to come
6       visit it.
7  Q    Were those cracks there when you took the
8       boat from Post?
9  A    Probably about 80 percent of them, yeah.
10      Eric Mobilia (phonetic), the guy that picked
11      it up with me, couldn't believe the cracks.
12 Q    Okay. And you have no photographs of the
13      cracks that were there when you picked the
14      boat up from Post, is that correct?
15 A    I took pictures, but it's like staring into
16      this white piece of paper with your face like
17      this. You can't see anything. (Indicating)
18 Q    And where are those photographs?
19 A    I have them at home, but you can't see
20      anything.
21 Q    Okay.
22 A    All you can see is this big white wall. You
23      wouldn't know if you're looking at a piece of

Vol. 1 - 67
T. HAMILTON

1  paper or a boat.
2  Q    Did you have the opportunity, after you took
3       the boat, to have somebody professionally
4       photograph the boat so you could see the
5       cracks that you claim were there?
6  A    We tried it with a videocam. We've tried it
7       with a digital camera. We've tried it with a
8       35-millimeter. That's how many times we've
9       tried it. You just can't — It's no thicker
10      than your hair. It's so fine. You can't see
11      it. I mean, you can see it on a cloudy day.
12      If you go look at the boat on a sunny day,
13      you can't look at it because it blinds your
14      eyes, at least my eyes. I mean, the other
15      guys were trying.
16 Q    Did you try to take any pictures on cloudy
17      days?
18 A    Yeah. That's the photographs that you'll see
19      that we did the best we could do including
20      the videocam.
21 Q    Now, none of your letters indicate that those
22      cracks existed when you took the boat, is
23      that right?

Vol. 1 - 68
T. HAMILTON

1  A    Well, no, it does. It exists because I said
2       to him flat out, "The hull on the bottom
3       hasn't been touched." And I didn't want him
4       going forward putting a bit of putty right
5       here, a bit of putty right here, and then
6       it's all recracking. It was already cracked
7       before I left. They never even touched it.
8  Q    That's the hull and the bottom?
9  A    And the back deck that they did spray which
10      was cracked all the way across it.
11 Q    But that's not in any of the written letters,
12      is it?
13 A    No, no, no.
14 Q    All right.
15        MR. WEISZ: I don't have any further
16      questions.
17        MR. ZAJAC: Okay. No questions.
18        (Whereupon the deposition of Todd J.
19      Hamilton concluded at 11:02 p.m.)
20
21
22
23

Vol. 1 - 69
T. HAMILTON

## C E R T I F I C A T E

I, TODD J. HAMILTON, do hereby certify that I have read the foregoing transcript of my testimony and further certify that said transcript is a true and accurate record of said testimony and signed under the pains and penalties of perjury.

Dated this _____ day of_____ 2007.

_____
TODD J. HAMILTON

Vol. 1 - 70
T. HAMILTON

## C E R T I F I C A T E

I, Simonne J. Elwood, R.P.R. and a Notary Public within and for the Commonwealth of Massachusetts, duly commissioned, qualified and authorized to administer oaths and to take and certify depositions, do hereby certify that heretofore, to wit, on the 17th day of April 2007, personally appeared before me Todd J. Hamilton, at the office of Bartlett Hackett Feinberg P.C., 155 Federal Street, 9th Floor, Boston, Massachusetts, in the aforecaptioned cause pending in the United States District Court for the District of Massachusetts; that the witness was by me duly sworn to testify to the truth, the whole truth and nothing but the truth; that thereupon and while said witness was under oath, the within deposition was taken down by me in shorthand at the time and place herein named and was thereafter reduced to computer transcription under my supervision. I further certify that I am not interested in the event of the action.

IN WITNESS WHEREOF, I have hereunto subscribed my hand and affixed my seal of office this _____ day of _____, 2007.

_____
Simonne J. Elwood
REGISTERED PROFESSIONAL REPORTER

My Commission Expires: February 14, 2008

Vol. 1 - 71
T. HAMILTON

## ERRATA SHEET

Date of Deposition: April 17, 2007

Case Name: L & T Yacht Sales, Inc. vs. Post Marine Co., Inc.
C.A. No. 05-11682MLW

Deponent's Name: Todd J. Hamilton

I, the undersigned, do hereby certify that I have read the foregoing deposition transcript and that to the best of my knowledge, said deposition transcript is true and accurate (with the exceptions of the following changes listed below):

_____
TODD J. HAMILTON

Dated _____

Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____

Vol. 1 - 72
T. HAMILTON

Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____
Page No. ___Line No.___ Correction _____

# EXHIBIT "D"

# SEGREDO & WEISZ

## ATTORNEYS AT LAW

A Partnership Including Professional Associations

Michel O. Weisz, P.A.
Frank J. Segredo, P.A.

Suite 1500
9350 South Dixie Highway
Miami, Florida 33156
Telephone: (305) 670-3820
Facsimile: (305) 670-8230

FAXED

August 25, 2004

Delivered Via Fax
(617) 333-3203

Ms. Lisa A. Kane
77 Rocsam Park Road
Braintree, MA 02184

    Re: <u>Post Marine/Todd Hamilton</u>

Dear Ms. Kane:

    I have reviewed various items of correspondence concerning a Post yacht owned by your husband, Todd Hamilton. It is my understanding that your husband purchased the yacht in a used condition sometime in the early summer of 2003. The yacht is a 2001 model year vessel which had been sold by a Post dealer at retail to the original purchaser in early to mid 2001.

    As you may be aware, all Post yachts are covered by a written limited warranty. The warranty in effect at the time the yacht was originally sold was for one year from date of sale. Thus the warranty expired well before your husband purchased the yacht. In addition, the warranty expressly disclaims coverage of gel coat. As I understand it, the current issues related to the yacht concern gel coat issues, which in my view are not covered by the warranty and for which Post Marine has no liability or duty.

    Having said that, Post is willing as a matter of accommodation and customer good will to gratuitously undertake and perform repairs to the gel coat finish. This work will be done at no cost to your husband and will consist of the following:

    Post Marine will inspect the entire vessel to determine the extent of the gel coat repairs to be performed.  The areas affected will be treated in the following manner.

1.    The engine room will be isolated by sealing the exhausts at the transom, sealing the hull side intake vents, sealing the cockpit hatches and engine room door.

Ms. Kane
Page 2
August 25, 2004

Re: Post Marine/Todd Hamilton

2.  Bottom paint will be removed and the bottom will be inspected to locate any areas of gel coat cracking.

3.  Topsides and hull sides will be covered prior to bottom sanding, the bottom will be sanded to remove gel coat in areas of cracking. Any hardware affected by stress cracking will be removed and reinstalled.

4.  Epoxy barrier coatings will be applied within manufacturer specifications. Two coats of bottom paint will then be applied.

5.  All necessary hardware will be removed and reinstalled to facilitate gel coat removal.

6.  Gel coat will be sanded off using random orbital sanders, laminate will be inspected, and prepared for reapplication of gel coat.

7.  The vessel will be taped off and covered in appropriate areas in preparation for spraying gel coat to proper specifications.

8.  Once gel coat has been sprayed, it will be sanded to a 1200 grit finish in preparation for polishing.

9.  Polishing will be completed and a coat of fiberglass gel coat resin cleaner-sealer will be applied.

Prior to delivery, the boat will be cleaned as we clean all new boats for customer pickup. Post Marine will make every attempt to complete these repairs in a timely manner and estimate the process will take approximately four months upon receipt of the vessel at our facility.

These repairs are made as an accommodation only and no warranty will be provided other than a 90 warranty of workmanlike performance which will cover only the workmanship of the application of the gel coat. No warranty will be extended with respect to the gel coat, its characteristics, color or finish.

Very truly yours,

Michel O. Weisz

SEGREDO & WEISZ, 9350 South Dixie Highway, Miami, Florida 33156 • Tel: (305) 670-3820, Fax: (305) 670-8230

# EXHIBIT "E"

Case 1:05-cv-11682-MLW   Document 22-6   Filed 06/01/2007   Page 2 of 8

L&T Yacht Sales vs. Post Marine                    Lisa A. Kane                                        April 17, 2007

Vol. 1 - 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11682MLW

L & T YACHT SALES, INC.,
Plaintiff,

vs.

POST MARINE CO., INC.,
Defendant.

DEPOSITION OF LISA A. KANE, taken
pursuant to Notice under the applicable
provisions of the Federal Rules of Civil
Procedure on behalf of the Defendant, before
Simonne J. Elwood, R.P.R. and a Notary Public
in and for the Commonwealth of Massachusetts,
at the office of Bartlett Hackett Feinberg
P.C., 155 Federal Street, 9th Floor, Boston,
Massachusetts, commencing on Tuesday, April 17,
2007 at 1:42 p.m.

NEAL A. SALLOWAY - COURT REPORTERS
FIVE CARDIGAN ROAD
WEST PEABODY, MA 01960
781-581-3993 - 978-535-0313 - FAX 978-536-3142

---

Vol. 1 - 2

APPEARANCES:

JOHN E. ZAJAC, ESQ.
CARMICHAEL & ZAJAC, P.C.
170 HIGH STREET
TAUNTON, MA 02780
  REPRESENTS THE PLAINTIFF

MICHEL OCIACOVSKI WEISZ, ESQ.
SEGREDO & WEISZ
9350 SOUTH DIXIE HIGHWAY - SUITE 1500
MIAMI, FL 33156
  REPRESENTS THE DEFENDANT

---

Vol. 1 - 3

I N D E X

1
2    DEPONENT                    DIRECT EXAMINATION
3    LISA A. KANE
4      By Mr. Weisz                      5
5
6
7

8                    E X H I B I T S

9    EXHIBIT NO.        DESCRIPTION        PAGE NO.
10      1      Letter - 8/17/04 to Mr. Michel    8
              O. Weisz from Lisa A. Kane, Esq.
11
12      2      Letter - 8/25/04 to Ms. Lisa A.   16
              Kane from Michel O. Weisz
13
        3      Request for Production of        19
14            Documents
15      4      Complaint and Demand for Jury    23
              Trial
16
17
18
19
20
21
22
23

---

Vol. 1 - 4

L. KANE

1              S T I P U L A T I O N S
2              It is hereby stipulated and agreed by
3    and between counsel for the respective
4    parties that all objections, except as to
5    form, are reserved until the time of trial,
6    including motions to strike.
7              It is further stipulated and agreed
8    that the reading and signing of the
9    deposition are not waived and to be read and
10   signed under the pains and penalties of
11   perjury.
12             It is further stipulated and agreed
13   that the filing and sealing of the deposition
14   are waived.
15
16             LISA A. KANE
17             A witness called on behalf of the
18   Defendant, having been satisfactorily
19   identified by the production of her
20   Massachusetts driver's license 011600756 and
21   duly sworn, under oath, by the Court Reporter
22   and Notary Public, was examined and testified
23   as follows:

## Vol. 1 - 5
### L. KANE

1    <u>DIRECT EXAMINATION</u>
2 Q   (By Mr. Weisz)  Ms. Kane, have you ever been
3    deposed before?
4 A   **No.**
5 Q   Okay.  Do you know what a deposition is?
6 A   **Yes.**
7 Q   Okay.  Have you ever been at a deposition?
8 A   **Yes.**
9 Q   Okay.  I'm not going to go through the ground
10    rules extensively but what I would ask is if
11    you don't understand a question that I ask,
12    would you please let me know?
13 A   **Uh-huh.**
14 Q   And please answer out loud; uh-huh and uh-uh
15    doesn't really work for the court reporter.
16 A   **Okay.**
17 Q   So if you could verbalize your answers, it
18    would help the court reporter.  All right?
19 A   **Okay.**
20 Q   Thank you.  Could you please state your full
21    name.
22 A   **Lisa Anne Kane.**
23 Q   And you're an attorney?

## Vol. 1 - 6
### L. KANE

1 A   **Yes.**
2 Q   And what states are you licensed?
3 A   **Massachusetts.**
4 Q   And what is your area of specialty if any?
5 A   **Intellectual property law, contract law.**
6 Q   Have you ever represented L & T Yacht Sales,
7    Inc.?
8 A   **No.**
9 Q   Do you know the company, L & T Yacht Sales,
10    Inc.?
11 A   **Yes.**
12 Q   What is that company?
13 A   **L & T Yacht Sales is a Rhode Island**
14    **corporation.  That's about what I know about**
15    **it.**
16 Q   Okay.  Did you set up the company?
17 A   **No.  I'd have to look at the -- It's been set**
18    **up for awhile.  No, I don't think I did.**
19 Q   Okay.  Do you know what the business purpose
20    of that company is?
21 A   **No.**
22 Q   Do you know what the assets of that company
23    are?

## Vol. 1 - 7
### L. KANE

1 A   **No.**
2 Q   Do you know if that company prepares or files
3    federal income tax returns?
4 A   **I don't know enough about the company.**
5 Q   That's fine.  Are you an officer or a
6    director of the company?
7 A   **No.**
8 Q   Have you ever been?
9 A   **I don't think so.  I mean, I'd have to look**
10    **at the file.  I'd have to look at the file on**
11    **the company.  I don't -- I do so much, you**
12    **know, with Todd that I'm not exactly sure**
13    **if --**
14 Q   Okay.  Have you ever set up companies before?
15 A   **Yes.**
16 Q   Incorporated companies?
17 A   **When I worked for Intellution, yes.  I used**
18    **to set up -- Yes.**
19 Q   Okay.  Are you licensed to practice in Rhode
20    Island?
21 A   **No.**
22 Q   Are you familiar with a 2001 Post yacht that
23    is the subject of the litigation of L & T

## Vol. 1 - 8
### L. KANE

1    Yacht Sales, Inc., versus Post Marine, Inc.?
2 A   **Yes.**
3 Q   Do you represent any party to that
4    litigation?
5 A   **Yes.**
6 Q   Who do you represent?
7 A   **I represent Todd Hamilton, L & T Yacht.**
8 Q   Okay.  Are Todd Hamilton and L & T Yacht the
9    same entity?
10 A   **I don't know how the entity is set up so —**
11 Q   Do you know if L & T Yacht Sales, Inc., has
12    an independent existence from Mr. Hamilton?
13 A   **I don't know.  Again, I don't know how L & T**
14    **Yacht is -- I'm not sure how it's set up.**
15    **I'd have to look at the file.**
16        MR. WEISZ:  Could you please mark this
17    as Exhibit 1?
18        (Whereupon the Stenographer marked as
19    Exhibit No. 1 - Letter - 8/14/04 to Mr.
20    Michel O. Weisz from Lisa A. Kane, Esq.)
21 Q   Ms. Kane, I'm handing you a letter dated
22    August 17, 2004.  I'd like you to please take
23    a look at it and let me know when you've

## Vol. 1 - 9
### L. KANE

1       finished going over it?  (Indicating)

2  A   **(Reviewing document) Uh-Huh.**

3  Q  Okay.  Did you write that letter?

4  A   **Yes, I did.**

5  Q  Is that your signature on the second page?

6  A   **Yes, it is.**

7  Q  Where did you send that letter?

8  A   **I don't remember if it was sent or faxed.**

9  Q  You indicate that you have been retained by

10     Todd Hamilton, the owner of a 2001 Model Post

11     Sport Fish manufactured by Post Marine, Inc.

12     Do you see that?

13  A   **Uh-huh.**

14  Q  Was Mr. Hamilton the owner of that boat on

15     the date you wrote this letter?

16  A   **Yes.**

17  Q  Okay.

18  A   **I believe that he was.**

19  Q  Okay.  The second sentence indicates that

20     you're writing concerning a defect in the gel

21     coat, a problem that he has previously

22     discussed with representatives from your

23     company.  Do you see that?

## Vol. 1 - 10
### L. KANE

1  A   **Yes.**

2  Q  Okay.  Were you present at any of those

3     discussions?

4  A   **No.**

5  Q  Did you have any discussions with anyone at

6     Post about the gel-coat issue?

7  A   **I don't think, specifically, about the**

8     **gel-coat issue.  I may have spoken to Ken**

9     **Jensen or Joe, but I can't remember.  I don't**

10    **think we actually spoke about gel coat.  We**

11    **probably spoke about this letter.**

12  Q  Okay.  Do you believe you spoke to them

13     before or after this letter was written?

14  A   **I don't know.  I would -- I would think**

15    **after.**

16  Q  Okay.  Do you see in the first line that you

17     indicated that you had been retained by Mr.

18     Hamilton?

19  A   **Uh-huh.**

20  Q  Were you his lawyer at that time?

21  A   **Yes.**

22  Q  Okay.  Do you see that this letter is

23     addressed to me?

## Vol. 1 - 11
### L. KANE

1  A   **Yes.**

2  Q  Can you explain to me why as an attorney for

3     a party you would communicate directly with a

4     party and not a party's attorney?

5  A   **I wouldn't, actually.**

6  Q  Well, you just testified that you had

7     conversations with either Joe or Ken after

8     you wrote this letter.

9  A   **Then it was probably before.**

10  Q  You think?

11  A   **You know, I would have to -- I keep records.**

12    **I could probably look in my notebook and see**

13    **exactly when I spoke to them.**

14  Q  Okay.  Can you think of any reason why it

15     would be appropriate for you to contact a

16     client directly when you know they're

17     represented by counsel?

18  A   **I would not have contacted the client**

19    **directly, no.**

20  Q  Can you think of any reason why you would

21     have spoken to them after writing this

22     letter?

23  A   **No.**

## Vol. 1 - 12
### L. KANE

1  Q  The second paragraph of this letter indicates

2     that, "In May of 2004, Mr. Hamilton made Post

3     aware that he has an existing bona fide offer

4     to purchase his boat, --."  Did you write

5     that?

6  A   **Uh-huh.  Yes.**

7  Q  Okay.  Had you seen the offer?

8  A   **Are we getting into any attorney/client**

9    **privilege here?**

10  Q  I'm not asking you for any communications

11     with your client.  I'm asking whether you had

12     seen an offer to purchase the boat from a

13     third party?

14         MR. ZAJAC:  From a third party to Mr.

15     Hamilton, you can testify to it as not being

16     privileged.

17  A   **Yes, I have seen an offer.**

18  Q  Okay.  Was the offer in writing?

19  A   **Yes.**

20  Q  What was the offer?

21  A   **I don't remember offhand.**

22  Q  Do you have a copy of it?

23  A   **Not with me, but I believe you do.**

Case 1:05-cv-11682-MLW    Document 22-6    Filed 06/01/2007    Page 5 of 8

L&T Yacht Sales vs. Post Marine                    Lisa A. Kane                                                    April 17, 2007

Vol. 1 - 13
L. KANE

1   Q   Do you have a copy of it in your files?
2   A   Yes.
3   Q   Okay. "In light of this defective condition,
4       Mr. Hamilton stands to lose, inter alia, in
5       excess of $100,000 in diminished resale value
6       of the boat." What is your factual basis for
7       that statement?
8           MR. ZAJAC: I'm going to object to the
9       extent that that could come into
10      attorney/client privileged information. If
11      there's anything that wouldn't be
12      privileged, --
13  A   I was just going to say it was based on
14      discussion with Todd.
15  Q   Okay. Do you have any independent basis for
16      this statement other than communications with
17      your client?
18  A   You mean do I have, you know, in my --
19  Q   Any knowledge from any person or entity other
20      than your client, any fact that supports --
21  A   Well, I guess I know what the boats are worth
22      but --
23  Q   How do you know what the boats are worth?

Vol. 1 - 14
L. KANE

1   A   Because I know what they -- You can go online
2       and see what they buy and sell for.
3   Q   Okay. How do you know that this boat was
4       worth $100,000 less?
5   A   Again, I had discussions with my client.
6   Q   Okay. Other than discussions with your
7       client, do you have any independent basis for
8       that assessment?
9   A   I'd have to look in the files, but there may
10      be stuff from some of the experts indicating.
11  Q   Had Mr. Hamilton retained experts on August
12      17, 2004?
13  A   I don't know by that date. If you look in
14      the files, see when he obtained them.
15  Q   What file would that be?
16          THE WITNESS: Didn't we give them
17      records of the experts looking at the boat?
18          MR. ZAJAC: We gave them estimates.
19          THE WITNESS: Estimates.
20  Q   Okay. Now, on the second page of your
21      letter, in the first full paragraph, "In
22      light of this information, Mr. Hamilton has
23      very serious and warranted concerns over the

Vol. 1 - 15
L. KANE

1       effectiveness of Post's repair of the
2       cracking gel coat problem." Did you write
3       that?
4   A   Yes.
5   Q   Okay. Do you know whether Mr. Hamilton,
6       after the date of this letter, agreed to
7       permit Post to fix his boat?
8           MR. ZAJAC: You can answer that to the
9       extent that you have such knowledge that do
10      not come from communications with him.
11  A   Yes.
12  Q   Okay. And further, in this paragraph, you
13      state, "Accordingly, Mr. Hamilton is asking
14      one last time for an explanation, in writing,
15      as to precise manner in which Post intends to
16      repair the cracking in the gel coat of his
17      boat." Do you see that?
18  A   Yes.
19  Q   Did Mr. Hamilton receive that information in
20      writing?
21          THE WITNESS: I can answer that?
22          MR. ZAJAC: Yes.
23  A   Yes.

Vol. 1 - 16
L. KANE

1   Q   Okay. And based on that information, Mr.
2       Hamilton decided to proceed with the repairs
3       of the boat at Post?
4           MR. ZAJAC: I'll object as to her
5       knowing his state of mind.
6   Q   Okay.
7           MR. WEISZ: If you can mark this as
8       the next exhibit, please.
9           (Whereupon the Stenographer marked as
10      Exhibit No. 2 - Letter - 8/25/04 to Ms. Lisa
11      A. Kane from Michel O. Weisz.)
12  Q   If you could please take a look at this
13      letter dated August 25th, 2004 and please let
14      me know when you're finished with your
15      review? (Indicating)
16  A   (Reviewing document) Okay.
17  Q   Do you recognize that letter?
18  A   Yes.
19  Q   Did you receive it?
20  A   Yes.
21  Q   At the time you received it, were you Mr.
22      Hamilton's attorney?
23  A   Yes.

Vol. 1 - 17

L. KANE

| | | |
|---|---|---|
| 1 | Q | Do you see beginning at the bottom of the |
| 2 | | first page the last full paragraph before the |
| 3 | | numeral one, "Post Marine will inspect the |
| 4 | | entire vessel to determine the extent of the |
| 5 | | gel coat repairs to be performed. The areas |
| 6 | | affected will be treated in the following |
| 7 | | manner." Do you see that? |
| 8 | A | Yes. |
| 9 | Q | Did you read that when you received the |
| 10 | | letter about August 25th, 2004? |
| 11 | A | I read the whole letter. |
| 12 | Q | Okay. So would you have read those two |
| 13 | | sentences? |
| 14 | A | Yes. |
| 15 | Q | Okay. Did you then read the following |
| 16 | | numbered nine paragraphs? |
| 17 | A | Yes. |
| 18 | Q | Did you, at any time, object to or disagree |
| 19 | | with any of the statements outlined in that |
| 20 | | letter? |
| 21 | | What do you -- Object to who? |
| 22 | Q | Object to anyone? |
| 23 | A | I had discussions with Todd. |

Vol. 1 - 18

L. KANE

| | | |
|---|---|---|
| 1 | Q | I'm not asking about that. |
| 2 | A | I'm not sure what you're asking then. |
| 3 | Q | Other than discussions with Todd, did you |
| 4 | | ever notify anybody at Post in any manner |
| 5 | | that these items as listed here or any of the |
| 6 | | statements set forth in the letter were |
| 7 | | inadequate? |
| 8 | A | Yeah, I believe we did send a follow-up |
| 9 | | letter. |
| 10 | Q | When did you do that? |
| 11 | A | I don't remember right now. |
| 12 | Q | Okay. Did you ever indicate in writing, at |
| 13 | | any time after August 25th, 2004, that the |
| 14 | | term set out in this letter were unacceptable |
| 15 | | to Mr. Hamilton? |
| 16 | A | Yes. Yes. |
| 17 | Q | When did you do that? |
| 18 | A | I think I did. I most likely followed up |
| 19 | | right away and said that -- I think we put |
| 20 | | something in writing indicating that your |
| 21 | | letter was very ambiguous, and it wasn't |
| 22 | | clear as exactly what they were going to do, |
| 23 | | and we needed something much clearer. |

Vol. 1 - 19

L. KANE

| | | |
|---|---|---|
| 1 | Q | And who has that letter? |
| 2 | A | I would assume I do, and I believe you do. |
| 3 | Q | Okay. Did you check your files before coming |
| 4 | | to today's deposition? |
| 5 | A | No. Actually, I didn't because I was with my |
| 6 | | dog all morning. |
| 7 | Q | Yes. But this deposition wasn't scheduled |
| 8 | | this morning, was it? It's been scheduled |
| 9 | | for awhile, hasn't it? |
| 10 | A | Yes, it has. |
| 11 | Q | At any time between the time the deposition |
| 12 | | was scheduled and today, did you review your |
| 13 | | file? |
| 14 | A | Yes. |
| 15 | Q | Did you find any such letter in your file? |
| 16 | A | There's a letter that goes to Post indicating |
| 17 | | that -- There is a letter to Post indicating |
| 18 | | that your letter was ambiguous. |
| 19 | Q | Okay. All right. |
| 20 | | MR. WEISZ: Would you mark this as the |
| 21 | | next exhibit, please? |
| 22 | | (Whereupon the Stenographer marked as |
| 23 | | Exhibit No. 3 - Request for Production of |

Vol. 1 - 20

L. KANE

| | | |
|---|---|---|
| 1 | | Documents.) |
| 2 | Q | (Indicating) |
| 3 | A | (Reviewing document) Okay. |
| 4 | Q | I'd like you to look at Item No. 11, please. |
| 5 | A | Uh-huh. Yes. |
| 6 | Q | Do you know if in response to Item No. 11 any |
| 7 | | correspondence was produced from you to Post |
| 8 | | other than the two letters that have been |
| 9 | | identified to this deposition? |
| 10 | A | Any -- Yes. |
| 11 | Q | You think other letters from you have been |
| 12 | | produced? |
| 13 | A | Oh, not from me, no. I don't think so. I |
| 14 | | think there was only two from me. |
| 15 | Q | The letter that you're referring to that you |
| 16 | | believe -- |
| 17 | A | I drafted other stuff, but there wasn't |
| 18 | | anything directly from me. |
| 19 | Q | The letter that you were referring to that |
| 20 | | you believe was created indicating that the |
| 21 | | letter of August 10, 2004 was ambiguous, was |
| 22 | | that letter written by you? |
| 23 | A | Yes. I typed it. |

Case 1:05-cv-11682-MLW    Document 22-6    Filed 06/01/2007    Page 7 of 8

L&T Yacht Sales vs. Post Marine                     Lisa A. Kane                              April 17, 2007

Vol. 1 - 21
L. KANE

1  Q   Okay.
2  A   But it was -- Yeah. I typed it.
3  Q   All right. Who was it signed by?
4  A   It was signed -- It was from Todd Hamilton.
5      It was signed by me.
6  Q   Do you know why no letter of that ilk was
7      produced in discovery in this case in
8      response to that request?
9  A   All the letters were. I can show you the
10     letter. We have it. I know what letter
11     you're referring to, Mr. Weisz.
12 Q   I'm going to show you -- I'm asking letters
13     from you?
14 A   Oh. I already answered that. I answered
15     that.
16 Q   Letters from --
17 A   From me, right. No. So, no, I don't believe
18     that there was any other letters from me.
19 Q   Okay. How about any letters from Mr.
20     Hamilton?
21 A   Yes.
22 Q   Okay. You think there was a letter from Mr.
23     Hamilton to Post in response to that August

Vol. 1 - 22
L. KANE

1      10th, 2004 letter?
2  A   I'd have to look. I think it was from Mr.
3      Hamilton.
4  Q   Okay. Who else could it have been from if
5      not from one of the two of you?
6  A   When you say, like, "from," it would have
7      been from either myself or Mr. Hamilton.
8  Q   Okay.
9  A   Or possibly John.
10 Q   In 2004?
11 A   I think he was retained at that time.
12     THE WITNESS: Were you?
13 Q   Unfortunately, he can't answer any questions,
14     and I don't think he wants to answer any
15     questions.
16     Are you aware of what the damage claim
17     is in this matter?
18 A   Yes.
19 Q   Can you tell me what it is?
20 A   It is for the loss, the diminished value of
21     the boat, the resale value, lost profits for
22     the offer, Mr. Hamilton's time, travel.
23 Q   Anything else?

Vol. 1 - 23
L. KANE

1  A   I'd have to look. Can I look at my files?
2  Q   You can look at whatever you'd like to?
3      THE WITNESS: Can I look at your
4      files?
5      MR. ZAJAC: This is the complaint.
6  A   Here's the complaint. No. This is the --
7      MR. ZAJAC: Do you want this marked?
8      MR. WEISZ: Do you? Okay. Sure.
9      Mark that as the next exhibit.
10     (Whereupon the Stenographer marked as
11     Exhibit No. 4 - Complaint and Demand for Jury
12     Trial.)
13     MR. WEISZ: Let the record indicate
14     that the witness is reviewing the plaintiff's
15     complaint.
16 A   What was the question again?
17 Q   Anything else that's part of the damage
18     claim?
19 A   The damage claim. Okay. Reasonable
20     attorneys' fees, plaintiff's cost, reasonable
21     attorneys' fees. What other damages did we
22     have here? Damage to the boat. I think I
23     covered them all.

Vol. 1 - 24
L. KANE

1  Q   Okay.
2      MR. WEISZ: I don't have anymore
3      questions.
4      MR. ZAJAC: No questions.
5      MR. WEISZ: Read or waive?
6      MR. ZAJAC: We'll let her read.
7      MR. WEISZ: Okay.
8      (Whereupon the deposition of Lisa A.
9  Kane concluded at 2:07 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Case 1:05-cv-11682-MLW    Document 22-6    Filed 06/01/2007    Page 8 of 8

L&T Yacht Sales vs. Post Marine                    Lisa A. Kane                    April 17, 2007

Vol. 1 - 25
L. KANE

# C E R T I F I C A T E

I, LISA A. KANE, do hereby certify that I have read the foregoing transcript of my testimony and further certify that said transcript is a true and accurate record of said testimony and signed under the pains and penalties of perjury.

Dated this _____ day of_____ 2007.

_____
LISA A. KANE

---

Vol. 1 - 26
L. KANE

# C E R T I F I C A T E

I, Simonne J. Elwood, R.P.R. and a Notary Public within and for the Commonwealth of Massachusetts, duly commissioned, qualified and authorized to administer oaths and to take and certify depositions, do hereby certify that heretofore, to wit, on the 17th day of April 2007, personally appeared before me Lisa A. Kane, at the office of Bartlett Hackett Feinberg P.C., 155 Federal Street, 9th Floord, Boston, Massachusetts, in the aforecaptioned cause pending in the United States District Court for the District of Massachusetts; that the witness was by me duly sworn to testify to the truth, the whole truth and nothing but the truth; that thereupon and while said witness was under oath, the within deposition was taken down by me in shorthand at the time and place herein named and was thereafter reduced to computer transcription under my supervision. I further certify that I am not interested in the event of the action.

IN WITNESS WHEREOF, I have hereunto subscribed my hand and affixed my seal of office this _____ day of _____, 2007.

_____
Simonne J. Elwood
REGISTERED PROFESSIONAL REPORTER

My Commission Expires: February 14, 2008

---

Vol. 1 - 27
L. KANE

## ERRATA SHEET

Date of Deposition: April 17, 2007

Case Name: L & T Yacht Sales, Inc. vs. Post Marine Co., Inc.
C.A. No. 05-11682MLW

Deponent's Name: Lisa A. Kane

I, the undersigned, do hereby certify that I have read the foregoing deposition transcript and that to the best of my knowledge, said deposition transcript is true and accurate (with the exceptions of the following changes listed below):

_____
LISA A. KANE

Dated _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

---

Vol. 1 - 28
L. KANE

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

Page No. ___ Line No.___ Correction _____

# EXHIBIT "F"



100 Post Road • Mays Landing, NJ 08330-1698 • (609) 625-2434 • Fax: (609) 625-2338 • www.postyachts.com

Todd Hamilton
Via FAX: 617-333-3203

Dear Mr. Hamilton:

To clarify the letter sent to you from Michel Weisz. In making the repairs to your
your boat we will spray gelcoat in such a way as to eliminate any spotting or color
variation in the areas to be repaired. Gelcoat will be removed from entire surfaces,
example being shelter sides, cockpit, forward deck, side decks, pulpit and hull to
ensure consistency.

Sincerely,

Joseph Martorana
Vice President

# EXHIBIT "G"

June 15, 2005

Dear Joe & Ken:

As a follow up to our conversation on June 14, 2005 at Post Marine in New Jersey, and our subsequent phone conversation on June 15, 2005, the following are the items we have agreed that I need you to repair prior to me picking up the boat from Post Marine during first week of July:

1) Blend spots around the front deck hatches
2) Refinish non skid on the front bench seat
3) Fix the over spray on the back deck walls below the fish holders
4) Refinish bridge compartment door where the paint was burned off caused by buffing
5) Refinish the compass area on the bridge
6) Fix the overspray on the bridge components and aluminum pipe
7) Recock side windows
8) Clean the gunnels from overspray
9) Repair a bubble below the stern light on the transom
10) Repair right and left side boot stripe where there are bubbles
11) Re do the crack below the engine in takes on the side of boat
12) Refinish the back door step
13) Fix crack in the stem of the bow
14)

If you need to reach me please call or fax the following numbers

FAX:    617-333-3203
CELL:   781-640-9669
HOME:   617-333-3222

Very truly yours,

*Todd* (signature)

Todd

608489_1

# EXHIBIT "H"

July 15, 2005

Dear Joe & Ken:

As per our conversation today, July 15, 2005, and to reiterate once again my comments in my fax to you on July 13, 2005, I demand that Post Marine is not to do any additional work on my Boat whatsoever.

Ken & Joe there is no question that there is defects in the gel coat used on my boat and my decision to request that you halt all work is a result of the fact that it has now been 9 months since you received my boat to correct the defects in the gel coat. Ken informed me that the boat would be ready in the spring and that Post would complete the repairs as we discussed. We are now in mid July and I was informed to pick up the boat the weeks of July 11, 2005.

I arrived at Post on July 12th, 2005, at which time the sides and bottom of the boat had not even been touched. Additionally during this visit there were obvious additional defects on the topside of the boat.

I indicated to you during this <u>third</u> visit to Post Marine in New Jersey, that the current condition of the boat is incomplete and totally unacceptable.

Ken & Joe I have spent numerous hours including visits, phone conversations and faxes regarding the work to be done, and the boat is still not complete. At this late date I have no options. I am will be at Post Marine shortly with experts to review the current status of the boat and the workmanship. It is for this reason that you are not to do ANY further work on this boat as of today, <u>July 15, 2005</u>.

If you need to reach me please call or fax the following numbers

FAX:    617-333-3203
CELL:   781-640-9669
HOME:  617-333-3222

Very truly yours,

Todd

EXHIBIT "I"

CONDENSED COPY

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3              BOSTON DIVISION

4              C.A. NO. 05-11682 MLW

5

6    L & T YACHT SALES, INC.,                    :

7                      Plaintiff,               :

8              -vs-                              :

9    POST MARINE CO., INC.,                      :

10                     Defendant.                :

11   - - - - - - - - - - - - - - - - - - - -

12

13

14      DEPOSITION OF:  JOSEPH MARTORANA

15        WEDNESDAY, APRIL 11, 2007

16

17

18

19

20        Atlantic City Court Reporting, LLC.

21     Certified Shorthand Reporters & Videographers

22        1125 Atlantic Avenue - Suite 416

23        Atlantic City, New Jersey  08401

24              (609) 345-8448

25           www.accourtreporting.com

2

1    Deposition of JOSEPH MARTORANA, taken in the
2    above-entitled matter before Betty Ann Wasilewski, a
3    Certified Shorthand Reporter, License No. XI01032,
4    Registered Professional Reporter, Certificate of Merit
5    Holder and Notary Public of the State of New Jersey,
6    taken at the offices of ATLANTIC CITY COURT REPORTING,
7    LLC., 1125 Atlantic Avenue, Suite 416, Atlantic City,
8    New Jersey 08401, on Wednesday, April 11, 2007,
9    commencing at 2:14 p.m.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4

1                    I N D E X
2    WITNESS        EXAMINATION BY        PAGE
3    JOSEPH MARTORANA  MR. ZAJAC              5
4
5
6
7
8
9
10                  E X H I B I T S
11    NUMBER        DESCRIPTION        PAGE
12                  (NONE.)
13
14
15
16
17
18
19
20
21
22
23
24
25

3

1    A P P E A R A N C E S :
2
3        CARMICHAEL & ZAJAC, P.C.
4        BY:  JOHN E. ZAJAC, ESQ.
5        170 High Street
6        Taunton, Massachusetts  02780
7        (508) 821-2552
8        For the Plaintiff.
9
10        SEGREDO & WEISZ
11        BY:  MICHEL O. WEISZ, ESQ.
12        9350 South Dixie Highway
13        Suite 1500
14        Miami, Florida  33156
15        (305) 670-3820
16        For the Defendant.
17
18    ALSO PRESENT:
19        Todd Hamilton
20
21
22
23
24
25

5

1            JOSEPH    MARTORANA,
2    having been first duly sworn, testified as follows:
3                  EXAMINATION
4    BY MR. ZAJAC:
5        Q.    Good afternoon, Mr. Martorana.
6        A.    Good afternoon.
7        Q.    How are you?  My name is John Zajac and
8    I represent L & T Yacht Sales, Incorporated in
9    litigation in the federal district court against Post
10    Marine Company, Incorporated.
11            Have you ever given a deposition before?
12        A.    Yes, I have.
13        Q.    I'm going to assume that you're
14    relatively familiar with the ground rules, but I'm
15    going to state them very briefly, which is that we're
16    here to record your testimony, and I'm going to ask
17    you questions, and you're going to answer them; that
18    it's important that you answer verbally with yes or no
19    if that's the appropriate answer and not uh-huh or
20    uh-uh because that doesn't form a transcript or
21    nodding your head or indicating something, other than
22    verbally.
23            If you don't understand my questions,
24    please feel free to ask me to rephrase them or to
25    explain anything so that you are clear in what I'm

(MARTORANA - ZAJAC)

6

1  asking you when you're answering a question that I've
2  posed to you.
3        If you want to take a break at any time
4  for any reason, we can do that. I would simply ask
5  that if there is a question before you, that you
6  answer that question before we take that break and
7  that would include any break that you wanted to do
8  to talk to Post's attorney if you chose to do that.
9        Simply, if there is a question, answer
10  it before we take such a break?
11     A.    Uh-huh.
12        MR. ZAJAC:  Same stipulations as the
13  last deposition?
14        MR. WEISZ:  Same stipulations.
15  BY MR. ZAJAC:
16     Q.    Mr. Martorana, what is your position
17  with Post?
18     A.    I am vice president in charge of
19  manufacturing.
20     Q.    And how long have you held that position
21  at Post?
22     A.    Since 1997, I believe.
23     Q.    Did you work for Post before 1997?
24     A.    Yes, I did.
25     Q.    What was your job at Post before 1997?

7

1     A.    I was a hardware supervisor. I was a
2  hardware installer. I was -- I worked in a fiberglass
3  department.
4     Q.    And how long have you worked for Post?
5     A.    Since 1978.
6     Q.    What's your date of birth?
7     A.    2/24/55, 1955.
8     Q.    Could you briefly describe for me your
9  educational background?
10     A.    I completed high school, Cherry Hill
11  High School East. I went to Camden County Community
12  College. I did not get my degree from there. I was
13  in engineering science technologies and then I went to
14  work for Post Marine Company.
15     Q.    So, basically, your first job after
16  college was for Post?
17     A.    I worked at odd jobs while working my
18  way through school, but it was my first full-time
19  employment. Yes.
20     Q.    And what are the duties of your job?
21     A.    To oversee manufacturing in the plant,
22  plant operations.
23     Q.    Does it include both manufacturing as
24  well as any repairs that Post performs?
25     A.    Yes, it does.

8

1     Q.    And how many people work in your
2  department at Post?
3     A.    My department would be the whole plant,
4  and, currently, I'm not sure how many we have there.
5  I think we're at about 30, 25 in production, I think.
6  I'm not sure of that number.
7     Q.    So when you say "25 in production," what
8  are the -- anyone who is not in production?
9     A.    Office personnel.
10     Q.    So are you still a supervisor for the
11  office personnel or --
12     A.    No, I'm not.
13     Q.    Okay. So there's 25 people who work
14  under you specifically in manufacturing?
15     A.    Yes.
16     Q.    And is your job strictly supervisory or
17  do you do any hands-on work?
18     A.    I do some hands-on work.
19     Q.    What type of hands-on work would you do,
20  yourself?
21     A.    Actually, I could probably do most of --
22  most of the jobs in that place.
23     Q.    That was actually my next question. In
24  your previous working for Post, is there any
25  manufacturing position that you haven't worked in in

9

1  some capacity?
2     A.    At Post Marine Company?
3     Q.    Yes.
4     A.    No.
5     Q.    So, basically, you've done the same or a
6  very similar job to everyone who works under you
7  involved in the manufacturing of boats?
8     A.    I didn't understand the question.
9     Q.    You've basically been involved in every
10  aspect of manufacturing?
11     A.    I am involved in every aspect of
12  manufacturing, yes.
13     Q.    And are you presently also involved with
14  regard to any of the repairs that's being done with
15  regard to gel coat?
16     A.    Yes, I am.
17     Q.    And have you been involved in those
18  repairs since Post began doing any repairs concerning
19  the 953 gel coat?
20     A.    Yes, I have.
21     Q.    When there's been a problem with the 953
22  gel coat necessitating a repair, at what point in the
23  process do you get involved?
24     A.    I get involved in -- right up front, in
25  the whole process.

(MARTORANA - ZAJAC)

10

1    Q.    When did you become aware of a problem
2  with the 953 gel coat?
3    A.    I suspected a problem with 953 gel coat
4  in 2002.
5    Q.    What part of 2002?
6    A.    I don't recall to be honest with you.
7    Q.    What made you suspect a problem with the
8  953 gel coat at that time?
9    A.    I had done a couple test panels and put
10 the test panels out to weather for a period of time,
11 and I had only done the test panels only looking --
12 just look -- comparing it to another gel coat, and I
13 thought that the 953 did not perform as well as the
14 other gel coat.
15   Q.    What was the other gel coat you were
16 comparing it to?
17   A.    It was an Interplastic's gel coat.
18   Q.    Is that the one that Post is presently
19 using or is it using a different Interplastic's gel
20 coat?
21   A.    No, that's -- well, yeah, that's
22 Interplastic's we are looking at. It might not be the
23 same color, but it is Interplastic's gel coat.
24   Q.    Is that the only gel coat Interplastic's
25 manufactures or just the only one that Post uses?

11

1    A.    It's the only one Post uses. They
2  probably manufacture a lot of gel coats.
3    Q.    Was running these tests something you
4  routinely did as part of your job? Were you trying to
5  test it for a particular reason?
6    A.    No. I would routinely look at gel coats
7  when they presented that to me by a salesman.
8    Q.    When did Post begin using the 953 gel
9  coat?
10   A.    953, I believe it was in 1998, 1998 or
11 1999. I'm not sure which, but it was around there.
12   Q.    For some period of time, was the 953 gel
13 coat the only gel coat that Post was using?
14   A.    Yes.
15   Q.    What time frame would that be?
16   A.    From when we started, which was 1998
17 'til 2002.
18   Q.    When did Post stop using the 953 gel
19 coat?
20   A.    2002.
21   Q.    And why was that?
22   A.    Because I liked Interplastic's gel coat
23 better.
24   Q.    What about the Interplastic gel coat did
25 you like better?

12

1    A.    I thought it had better flexible
2  properties to it, and it was better -- it was priced
3  better. It was cheaper to be honest with you.
4    Q.    Had Post already been receiving
5  complaints about boats with the 953 gel coat at that
6  time?
7    A.    At what -- in 19 -- in 2002?
8    Q.    Yes.
9    A.    We had some boats, yes, but not -- yeah,
10 we did have some boats. Yes, I believe.
11   Q.    Was it the complaints or was it the
12 better performance characteristics of the
13 Interplastic's at that time that made you select
14 Interplastic's over the 953?
15   A.    It was my suspicion of the
16 characteristics of 953 and the better pricing of the
17 other gel coat and the better characteristics of the
18 other gel coat.
19   Q.    Did you begin testing comparing the 953
20 to Interplastic's before or after Post received its
21 first complaint about cracking in the 953 gel coat?
22   A.    I'm not sure of that. At the time, and
23 I'm talking about 2000 -- the end of 2001, 2002, I
24 don't believe there was any type of -- there was no
25 wholesale cracking or problems that we had been aware

13

1  of with the 953.
2           We had areas, you know, up on like a
3  console or something like that that might have cracked
4  or a cockpit floor that might have cracked.
5    Q.    Now, had there ever been -- strike that.
6  Let's go back.
7           What gel coat did Post use before the
8  953?
9    A.    952.
10   Q.    And had you ever experienced problems
11 with cracking with the 952?
12   A.    No, nothing that wasn't out of the
13 ordinary.
14   Q.    When did you first realize that the
15 cracking with the 953 was out of the ordinary?
16   A.    Probably started to suspect it to be out
17 of the ordinary in early -- well, 2003, I guess.
18   Q.    At that time how many owners had
19 complained about cracking with their 953 gel coat?
20   A.    I don't know that.
21   Q.    Were you involved with regard to Mr.
22 Hamilton's boat?
23   A.    Yes, I was.
24   Q.    When did you first become aware that
25 there was a problem with his boat?

(MARTORANA - ZAJAC)

14

1    A.    When he had contacted us in 2004, I
2  believe it was in the spring of 2004, somewhere around
3  there.
4    Q.    So by that time, you were fully aware of
5  a general problem with the 953 gel coat?
6    A.    I had suspected the problem.
7    Q.    Was Post actively repairing other
8  people's boats with 953 gel coat by the time that Mr.
9  Hamilton complained?
10    A.    Yes, I believe we were.
11    Q.    And have you been involved with the
12  repair of every boat that Post has repaired with the
13  953 gel coat?
14    A.    In some manner, yes.
15    Q.    Generally, in what manner are you
16  involved in the repairs of 953 gel coat?
17    A.    Usually look at the boat, inspect the
18  boat when we get it in, see what needs -- see what
19  work needs to be done, and not directly oversee the
20  repairs, but be involved with a supervisor who does
21  the repairs, and make decisions here and there.
22    Q.    Is there a particular supervisor who was
23  involved with all of the 953 gel coat repairs or did
24  that fall on different people at different times?
25    A.    No, it's our fiberglass supervisor.

15

1    Q.    And that's Cortez Marks?
2    A.    Yes.
3    Q.    Is Mr. Marks also involved in the
4  regular manufacturing process?
5    A.    Yes, he is.
6    Q.    What was your involvement with regard to
7  the gel coat cracking issues with Mr. Hamilton's boat?
8    A.    My involvement was bring -- you know,
9  setting the boat up to bring it into Post, getting it
10  inside the building, determining what we were going to
11  do and where we were going to do it, what areas were
12  affected on the boat by gel coat cracking.
13    Q.    So that would have begun in 2004 when
14  the boat first came to Post?
15    A.    It begun after we had the boat in our --
16  yeah, at our place.
17    Q.    Did you ever go to view the boat
18  anywhere besides when it was at Post?
19    A.    I don't believe so, no.
20    Q.    Did you speak with Mr. Hamilton before
21  the boat got to Post?
22    A.    I don't -- I'm not sure if I spoke to
23  him directly or not, but I think I was involved -- I
24  was in a conversation on the phone when he had called
25  and was talking to Ken. I believe I was in the office

16

1  at that time, but I don't think we had any -- I don't
2  think we had any -- any kind of conversations before
3  that that I can remember.
4    Q.    So did you have any involvement with
5  regard to Mr. Hamilton's boat before it actually
6  arrived at Post?
7    A.    What -- what do you mean? I'm not sure
8  I understand the question.
9    Q.    Did you speak with Ken about it? Did
10  you speak to --
11    A.    Yes, I did.
12    Q.    -- anyone about it?
13    A.    Yes, I did.
14    Q.    What did Ken tell you about it?
15    A.    That it was a boat that we were going to
16  repair, and we talked about, you know, when we could
17  bring it in, and when we could get it done.
18    Q.    And what did you discuss with Ken about
19  a time frame for repairing Mr. Hamilton's boat?
20    A.    I believe the boat -- we brought the
21  boat in in November and we were going to work on it
22  over the winter.
23    Q.    Did you work on Mr. Hamilton's boat over
24  the winter of 2004 into 2005?
25    A.    Yes.

17

1    Q.    What was the condition of the gel coat
2  on Mr. Hamilton's boat when you first saw it?
3    A.    The overall condition of the boat, I
4  thought, was good. It looked like it was maintained.
5  There were areas that were cracking, though. I saw
6  the stress cracking.
7    Q.    Okay. What areas did you first see
8  cracking in Mr. Hamilton's boat when you took it in
9  for repairs?
10    A.    On the shelter sides, the front deck,
11  the windshield, the cockpit floor, I believe the
12  cockpit side decks.
13    Q.    When did work on Mr. Hamilton's boat
14  start?
15    A.    In November.
16    Q.    Was that right when it first came in?
17    A.    Yes.
18    Q.    Where at your facility was the work
19  being performed?
20    A.    In our production building.
21    Q.    Were there other boats being repaired at
22  the same time?
23    A.    In the building?
24    Q.    Yes.
25    A.    No, I don't believe so.

(MARTORANA - ZAJAC)

18

1    Q.    And were there other Post boats being
2  manufactured at that time?
3    A.    Yes.
4    Q.    In the same building or a different
5  facility?
6    A.    In the same building.
7    Q.    Is the production building large enough
8  that you can work on one -- more than one repair at
9  the same time?
10    A.    Yes. Can I ask you a question there?
11    Q.    Sure.
12    A.    More than one repair or more than one
13  boat in addition to manufacturing?
14    Q.    More than one boat in addition to
15  manufacturing.
16    A.    Yes.
17    Q.    So what's the number of boats that can
18  be worked on either from manufacture or repair at the
19  same time inside the facility?
20    A.    Four.
21    Q.    Were there areas of Mr. Hamilton's boat
22  that needed to be -- that gel coat needed to be
23  stripped?
24    A.    Yes, there were.
25    Q.    And do you recall which areas?

19

1    A.    Most of them, yes, I do recall.
2    Q.    What were they?
3    A.    The shelter sides, the windshield, the
4  front deck, the cockpit, the cockpit side decks. I
5  don't remember if the back bulkhead -- if we did work
6  to the back bulkhead or not or the tackle lockers.
7          There was, I believe, one or two cracks
8  on one side of the hull and on the other side, I
9  believe, there was a couple small cracks around the
10  vents.
11    Q.    Did you have to strip the bottom of the
12  boat?
13    A.    Did we strip the bottom?
14    Q.    Yes.
15    A.    No, we didn't.
16    Q.    Did you strip the sides of the hull?
17    A.    Did I completely strip the sides? No, I
18  did not.
19    Q.    What of the hull was stripped?
20    A.    The areas that were affected.
21    Q.    How large were those areas?
22    A.    On the side that we saw a couple cracks,
23  they were running top to bottom, and there was
24  probably two or three areas that we worked on there.
25          On the other side in the vent area, I

20

1  believe, there were small -- there were spots -- small
2  spots around the radiuses of the vents.
3    Q.    Did you have to strip the exterior of
4  the bridge?
5    A.    Exterior of the bridge? No. We didn't
6  see any cracking on the exterior.
7    Q.    Did you strip the inside of the bridge?
8    A.    No, we didn't.
9    Q.    Did you strip the floor of the bridge?
10    A.    I'm not sure. They might have. I'm not
11  sure.
12    Q.    Did you strip the hardtop?
13    A.    No, we did not. I don't believe we did.
14    Q.    While the boat was at Post for repair,
15  did Mr. Hamilton ever come and visit Post?
16    A.    I believe he was, yes.
17    Q.    Did he meet with you on any of those
18  occasions?
19    A.    I talked to him there, yes. He had been
20  there.
21    Q.    Do you recall how many separate
22  occasions you met with Mr. Hamilton at Post during the
23  repairs of the boat?
24    A.    No, I don't recall how many. It might
25  have been one or two.

21

1    Q.    Do you recall when the first time was
2  that you met with Mr. Hamilton at Post?
3    A.    No, I don't.
4    Q.    Do you recall any conversations that you
5  had with him when you met with him?
6    A.    I recall conversations about stripping
7  the bottom, yeah, because we had talked about him
8  sending us down some stripper, some solution to take
9  the bottom paint off.
10    Q.    And did he send that to you?
11    A.    Yes, he did.
12    Q.    What was the reason that he provided the
13  stripper?
14    A.    He had said he had a solution that would
15  take the bottom paint off pretty readily.
16    Q.    Did you use it?
17    A.    We tried.
18    Q.    Did it work?
19    A.    No, it didn't.
20    Q.    What was the problem with it?
21    A.    I don't know. I don't think it works.
22  We initially tried it with a pressure washer and it
23  didn't work, and then I think Todd suggested that we
24  had to use a hot water pressure washer or something
25  that generated heat so we rented a machine that

(MARTORANA - ZAJAC)

**22**

1  actually heated the water, and it was a heated
2  pressure washer, and that didn't work either so --
3      Q.    So, ultimately, how if at all did that
4  area get stripped?
5      A.    It did not. We were prevented from
6  stripping it.
7      Q.    When you say you were prevented, what do
8  you mean?
9      A.    Mr. Hamilton stopped us from working on
10  the boat around that time.
11      Q.    When did he -- strike that.
12          How long before you were prevented from
13  working on the boat had he provided you with something
14  to use as a stripper for it?
15      A.    I don't recall the exact -- exactly when
16  that stuff arrived at our place.
17      Q.    Do you recall a time that Mr. Hamilton
18  visited Post just before your two-week shutdown in
19  July of 2005?
20      A.    I think he was there twice before
21  before. I'm not sure.
22      Q.    Twice before that time or --
23      A.    Twice before the shutdown, yes.
24      Q.    When you say "twice before," like twice
25  just before, or twice in the whole nine months that

**23**

1  the boat was at Post?
2      A.    I'm thinking like once in July and I
3  don't know if he came down in June or not, but I
4  remember him coming down a couple times. He was there
5  more than once.
6      Q.    Do you recall any conversation you had
7  with him while at Post prior to July of 2005?
8      A.    No. Other than what we had just talked
9  about, about the stripper, and that probably was prior
10  to July. I don't know the time frame.
11      Q.    And do you recall any conversations you
12  had with him in July of 2005?
13      A.    I recall when he came down, which the
14  part that sticks in my mind is, you know, when he came
15  down, and he was -- he was unhappy with the progress
16  of the boat.
17      Q.    Specifically, what was he unhappy about?
18      A.    He was unhappy that the boat was not
19  completed at that time.
20      Q.    How long had Post had the boat at that
21  time?
22      A.    Since November.
23      Q.    And how long had Post worked on it?
24      A.    Since November.
25      Q.    Do you know how many hours over that

**24**

1  period of time Post had put in?
2      A.    Over 2,000. Probably somewhere around
3  2,200.
4      Q.    And was the boat close to being
5  finished?
6      A.    Yes.
7      Q.    What was left to do on it?
8      A.    The bottom was still left to be done.
9  There were some spots that had to be touched up here
10  and there.
11      Q.    What was left to do on the bottom?
12      A.    The bottom paint had to be taken off,
13  and the bottom had to be evaluated, and then we had to
14  decide, you know, do the epoxy coat.
15      Q.    Generally, how many hours would it need
16  to take the paint off the bottom?
17      A.    With a -- with a liquid stripper and
18  four people working on it, you could probably get it
19  done in a couple days, two or three days.
20      Q.    What sealer were you going to use for
21  the bottom after it was stripped?
22      A.    An Interlux epoxy sealer.
23      Q.    Do you recall any conversation you had
24  with Mr. Hamilton concerning a crack that went from
25  the water line to the rub rail of the boat?

**25**

1      A.    Specifically, no, but we did -- I did
2  describe when you asked me what we saw on the hull
3  sides, yes, I did see one.
4      Q.    And that was still left to be repaired
5  in July of 2005?
6      A.    I don't know. I don't believe it was.
7  I think we did repair it, what we had seen. I don't
8  know if we had finished it because at the time, you
9  know, the boat was outside. It was in the slings and
10  we were still working on it.
11      Q.    Was Mr. Hamilton upset about anything .
12  besides the amount of time that it had taken to repair
13  the boat through July of 2005?
14      A.    Yes, I believe he was.
15      Q.    What else was he upset about?
16      A.    He was upset that, I believe, he wanted
17  the whole hull side -- the gel coat taken off all of
18  the hull sides.
19      Q.    And had you indicated to Mr. Hamilton
20  that you were going to do that?
21      A.    I indicated I wasn't going to do that
22  because I didn't see evidence of mass cracking along
23  the sides. The areas that were affected were being
24  treated.
25      Q.    Is there a recommended thickness for gel

(MARTORANA - ZAJAC)

26

1    coat on a boat?
2        A.    Yes.
3        Q.    What is it?
4        A.    Different manufacturers different gel
5    coats, it will vary, but around 20 mils is an average.
6        Q.    And do you know how thick the gel coat
7    on Mr. Hamilton's boat was?
8        A.    No, I don't.
9        Q.    What type of gel coat were you using for
10   the repairs of Mr. Hamilton's boat?
11       A.    We were using -- I believe we used
12   Interplastic's on his house sides. Everything above
13   the rub rail and on the hull side, I believe we used
14   953.
15       Q.    What would be the reason that you used
16   the 953 on the hull side?
17       A.    Because it blended very well.
18       Q.    Because it was already 953 --
19       A.    Yes.
20       Q.    -- on the boat?
21       A.    Uh-huh.
22       Q.    Could you apply the Interplastic's gel
23   coat over the 953 gel coat?
24       A.    Yes.
25       Q.    So there was some areas that didn't have

27

1    to be sanded down; you could just apply --
2        A.    No, no. Everything has to be sanded
3    down. It has to be sanded pretty far down.
4        Q.    Did Post remove any lettering from the
5    back of Mr. Hamilton's boat?
6        A.    I don't -- I don't remember to be honest
7    with you. I don't remember if we took the name off or
8    not. I don't believe we did.
9        Q.    When did first -- when did Mr. Hamilton
10   first communicate that he didn't want Post to do any
11   more work on the boat?
12       A.    In July of 2005. I don't know the exact
13   date, but I believe it was the first or second week.
14       Q.    Do you know when it was relative to a
15   two-week shutdown that Post had in July of 2005?
16       A.    It was prior to it.
17       Q.    Just prior to it or?
18       A.    I don't remember. I don't recall.
19       Q.    Do you know the last date that Post did
20   any work on the boat?
21       A.    No, I don't.
22       Q.    At some point did Post ask Mr. Hamilton
23   to remove the boat?
24       A.    I believe -- I believe we did. Yes.
25       Q.    When was that?

28

1        A.    I don't know exactly.
2        Q.    And did Mr. Hamilton remove the boat?
3        A.    Yes, he did.
4        Q.    When was that?
5        A.    I believe it was in August.
6        Q.    Of 2005?
7        A.    Yes.
8        Q.    Did you work at all during what was
9    otherwise the shutdown for Post in July of 2005?
10       A.    Did I work?
11       Q.    Yes.
12       A.    Physically, me personally?
13       Q.    Yeah.
14       A.    I don't believe I did that year. No.
15       Q.    Did you speak with Mr. Hamilton when he
16   picked up the boat in August of 2005?
17       A.    I don't believe I had any contact then,
18   no.
19       Q.    What was the condition of the inside of
20   the boat when it arrived at Post?
21       A.    It was in good condition.
22       Q.    And what was the condition of the inside
23   of the boat when Mr. Hamilton picked it up?
24       A.    I believe it was in good condition.
25       Q.    Was Mr. Hamilton ever given an estimate

29

1    as to how long it would take to repair the boat while
2    it was at Post?
3        A.    Yes, I believe he was.
4        Q.    And do you recall what that estimate
5    was?
6        A.    Offhand, no.
7        Q.    What's the purpose of gel coat on a
8    boat?
9        A.    Gel coat gives it the -- it sits outside
10   the skin. It's the physical appearance, the gloss,
11   the white, yellow, or whatever.
12       Q.    Does it have any function besides
13   physical appearance?
14       A.    Meaning? I don't understand.
15       Q.    Does it have any protective qualities?
16       A.    It protects the boat from the elements,
17   I guess. You know, it keeps it -- it gives you -- it
18   gives the laminate some sort of protection, although
19   it's not structural. It's all cosmetic.
20       Q.    How does gel coat serve to protect the
21   laminate?
22       A.    It's the outside skin. It's the
23   barrier.
24       Q.    Was Mr. Hamilton's boat placed in the
25   water in June of 2005?

(MARTORANA - ZAJAC)

**30**

1    A.    I don't know. I believe -- I don't know
2  if it was June or July that it was -- I believe it was
3  in the water. I don't know which month.
4    Q.    Was there a period of time that it was
5  put in the water and then taken back out?
6    A.    Yes, I believe there was.
7    Q.    And that was either June or July of
8  2005?
9    A.    I believe it was taken out in July.
10   Q.    During that time frame, how long was it
11 in the water?
12   A.    Oh, I don't know.
13   Q.    And what was the reason that it was put
14 in the water?
15   A.    Because it was going to be -- the
16 outriggers were going to be put on it. I believe it
17 was put in the water because it was going to be taken
18 away.
19   Q.    So then why was it put in the water and
20 then taken back out?
21   A.    Because I believe we were going away on
22 vacation. You know, the plant was going to shut down
23 so we pulled the boat out of the water. Safety issue.
24   Q.    Was there ever a period of time that Mr.
25 Hamilton's boat was placed in the water simply because

**31**

1  you needed the space in the production facility?
2    A.    No. They're not related. The
3  production facility is inside. The water has three
4  slips out there or four slips out there.
5    Q.    Did Post deliver a brand new 53-foot
6  boat in July of 2005?
7    A.    I don't know.
8    Q.    Do you know what the total number of
9  hours expended on the repair of Mr. Hamilton's boat
10 was?
11   A.    Yeah. I believe you asked me that
12 before. It was somewhere around 2,200 hours. I don't
13 know the exact number.
14   Q.    And do you know the total cost of the
15 repairs?
16   A.    Personally, no.
17   Q.    Was there some period of time that Post
18 was used -- continuing to use 953 gel coat to repair
19 the boats manufactured with 953 gel coat?
20   A.    Yes, there was.
21   Q.    When was that?
22   A.    Exact time frame, I don't know. 2003
23 possibly. 2002, 2003.
24   Q.    And there was both 953 gel coat and
25 Interplastic's gel coat used in the repairs of Mr.

**32**

1  Hamilton's boat?
2    A.    Yes, I believe there was.
3    Q.    Is Post presently using any 953 gel coat
4  to perform repairs?
5    A.    No, it is not.
6    Q.    When did Post stop using 953 gel coat
7  for repairs in its entirety?
8    A.    Probably around 2004, 2005, during Mr.
9  Hamilton's boat.
10   Q.    Has Post had occasion to repair boats
11 more than once when 953 gel coat was used for the
12 initial repairs?
13   A.    Yes, I believe it has.
14   Q.    And has it had to repair the same areas
15 in which 953 gel coat was used?
16   A.    I can't answer that for sure. I don't
17 know.
18   Q.    How many boats have been in twice for
19 repairs?
20   A.    One, I believe.
21   Q.    Do you know the hull number of that
22 boat?
23   A.    No, I don't.
24   Q.    What was your job title prior to your
25 present job title?

**33**

1    A.    I was in charge of the fiberglass
2  departments.
3    Q.    And then you became production manager
4  for the whole facility?
5    A.    Yes.
6    Q.    Until what time were you in charge of
7  the fiberglass?
8    A.    Probably, I'm thinking like, 1992 when
9  Cortez started. It's gray area, but I'm thinking it
10 was somewhere around there.
11   Q.    Who at Post decides what repairs to
12 perform on a boat that's coming for cracked gel coat?
13   A.    Myself; Cortez.
14   Q.    Well, who at Post decides what process
15 to use in repairing cracked gel coat?
16   A.    Myself and Cortez.
17   Q.    Is it you and Cortez who have decided
18 that it's not necessary to strip all of the 953 gel
19 coat off a boat when conducting repairs for cracking?
20   A.    If -- if there is an area that's
21 cracked, we take the gel coat down.
22       If it's not cracked, it's not cracked.
23   Q.    And now you're only using Interplastic's
24 gel coat to perform gel coat repairs of cracked areas?
25   A.    Yes.

(MARTORANA - ZAJAC)

34

1　Q.　Is CCP's 953 gel coat defective?
2　A.　I don't know that. I'm not a chemist.
3　I believe -- I suspect something's wrong.
4　Q.　And, generally, has it been boats kept
5　in cold climates that have had this cracking problem?
6　A.　Yes.
7　Q.　Has it happened to any boat that's not
8　kept in a cold climate yet?
9　A.　I think there's one boat that I know of
10　that, and I haven't seen it so I can't attest to if
11　it's a normal gel coat crack, you know, because gel
12　coat does crack after a certain amount of time, you
13　know, it raises and all, or it's the type of cracking
14　we've seen on some of the boats we've repaired.
15　Q.　And is it fair to say that the cracking
16　on Mr. Hamilton's boat is the typical kind of major
17　cracking you've seen on boats with 953 gel coat kept
18　in colder climates?
19　A.　In some areas it was, yes.
20　Q.　Which areas?
21　A.　The areas that we repaired.
22　　　MR. ZAJAC: If we could take a short
23　break, I'm probably done.
24　　　MR. WEISZ: Whatever you want.
25　　　MR. ZAJAC: I don't have too much

35

1　further to go with him.
2　　　(Whereupon a recess was taken.)
3　BY MR. ZAJAC:
4　Q.　Mr. Martorana, you had testified that of
5　the repairs that Post anticipated doing on Mr.
6　Hamilton's boat, it included applying Interlux,
7　correct?
8　A.　Uh-huh.
9　Q.　What type of Interlux was Post going to
10　apply?
11　A.　My answer was yes. I'm sorry. I said
12　uh-huh.
13　Q.　Yes.
14　A.　It was an Interlux -- it's an epoxy
15　system that they have.
16　Q.　Is there a particular model or
17　designation?
18　A.　I think it's 3000, 3001 designated.
19　That's its code numbers or whatever. It's a typical
20　epoxy bottom coat.
21　Q.　And is that something that Post
22　frequently does when repairing these type of problems?
23　A.　I've used the product probably three or
24　four times before. Not on this -- you know, not on
25　this gel coat-related thing.

36

1　Q.　Why were you going to use that on Mr.
2　Hamilton's boat?
3　A.　Because it's probably the best thing you
4　could put on the bottom of a boat. It's the toughest
5　coating you could put on there.
6　Q.　And what was the process that you were
7　going to do to prepare that area before applying
8　Interlux to it?
9　A.　The bottom paint would be taken off.
10　We'd physically go in there and inspect and look for
11　areas that are cracking, the whole bottom.
12　　　Those areas, we would sand very
13　aggressive with, like, a very heavy grit, like a 40
14　grit, taking most of the gel coat off.
15　　　Most of the bottom would be sanded or
16　all of the bottom would be sanded, not most of the
17　bottom, by hand, with like a 40 grit orbital sander.
18　Q.　Now, would that have only been when
19　there was cracking gel coat or the whole bottom?
20　A.　The whole bottom.
21　Q.　That had not been done, correct?
22　A.　That had not been done. We were
23　prevented from doing it.
24　Q.　In the areas that Post has had to deal
25　with cracking gel coat, are there particular parts of

37

1　the boat that it reoccurs or where it's been most
2　prevalent?
3　A.　Are there areas where it reoccurs or are
4　there areas where it's most prevalent?
5　Q.　Most prevalent.
6　A.　Most prevalent? It's most noticeable on
7　the -- and most prevalent shelter sides, front deck,
8　cockpit floor, cockpit side decks.
9　Q.　And are there particular areas where it
10　has reoccurred more frequently?
11　　　MR. WEISZ: Object to the form.
12　BY MR. ZAJAC:
13　Q.　You can still answer.
14　A.　I didn't really hear the whole question
15　really. Did it -- it didn't sound like a question to
16　me. I'm sorry.
17　Q.　Are there areas where the reoccurring
18　from cracking has been more common?
19　　　MR. WEISZ: Object to the form.
20　　　THE WITNESS: No, no. The occurrences
21　of a recracked area or an area that's been fixed and
22　cracked again, I can't say there's any pattern to
23　that, no, and there is -- it is not real prevalent to
24　be honest with you.
25　BY MR. ZAJAC:

(MARTORANA - ZAJAC)

38

1    Q.    How many boats has Post repaired to
2  date?
3    A.    I don't know that number.  I don't know
4  the total number.
5    Q.    And are there boats still waiting
6  repair?
7    A.    Yes, there are.
8    Q.    How many, if you know?
9    A.    I don't know the total number.
10   Q.    What's been the average number of hours
11 to repair a boat once it's been taken in?
12   A.    It's been in the 2,000 range probably.
13 Some a little bit lower.  Some higher.
14   Q.    And all of those are just repairs of
15 areas that have actual cracking, correct?
16   A.    Yes.
17   Q.    Could you estimate how long it would
18 take to remove and replace all of 953 gel coat on a
19 boat?
20   A.    On an entire boat?  No, I can't
21 accurately estimate that.
22       MR. ZAJAC: I don't have any other
23 questions for Mr. Martorana.
24       MR. WEISZ: Okay.  We'll read.  I have
25 no questions.

40

J U R A T

1
2  I have read my testimony in the foregoing transcript
3  and believe it to be true and correct to the best of
4  my knowledge and belief with the following changes:
5  PAGE    LINE            CHANGE
6  _____  ____  _____
7  _____  ____  _____
8  _____  ____  _____
9  _____  ____  _____
10 _____  ____  _____
11 _____  ____  _____
12 _____  ____  _____
13 _____  ____  _____
14 _____  ____  _____
15 _____  ____  _____
16 _____  ____  _____
17 _____  ____  _____
18 _____  ____  _____
19 _____
20 JOSEPH MARTORANA            DATE
21 Sworn and subscribed to before me this _____ day of
22 _____, 2007.
23 Notary Public of the
24 State of _____
25

39

1        MR. ZAJAC:  Thank you.
2        (Deposition concluded at 3:18 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

41

1        DEPOSITION SUPPORT INDEX
2        Direction to Witness Not to Answer
3  Page  Line    Page  Line    Page  Line
4
5            *  None  *
6
7        Request for Production of Documents
8  Page  Line    Page  Line    Page  Line
9
10           *  None  *
11
12           Stipulations
13 Page  Line    Page  Line    Page  Line
14
15           *  None  *
16
17        Questions Marked
18 Page  Line    Page  Line    Page  Line
19
20           *  None  *
21
22
23            * * *
24
25

# EXHIBIT "J"

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**C.A. No. 05-11682MLW**

L & T YACHT SALES, INC.,     )
                                )
       Plaintiff,         )
VS.                         )
                                )
POST MARINE CO., INC.,      )
                                )
       Defendant       )

## ANSWER AND JURY DEMAND OF POST MARINE CO., INC.

Defendant Post Marine Company, Inc. answers Plaintiff's complaint as follows:

1.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 1.

2.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 2.

3.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 3.

4.     Defendant admits the allegations of paragraph 4.

5.     The allegations of paragraph 5 are denied.

6.     Paragraph 6 contains only legal conclusions to which no response is required. To the extent that the paragraph contains factual allegations they are denied.

7.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 7.

1

8.    The allegations of paragraph 8 are denied.

9.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 9.

10.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 10.

11.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 11.

12.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 12.

13.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 13.

14.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 14, except that Defendant denies the allegations contained in the last sentence of paragraph 14.

15.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 15.

16.    The allegations of paragraph 16 are denied.

17.    The allegations of paragraph 17 are denied.

18.    The allegations of paragraph 18 are denied.

19.    The allegations of paragraph 19 are denied.

20.    The allegations of paragraph 20 are denied.

21.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 21.

2

22.    The allegations of paragraph 22 are denied.

23.    The allegations of paragraph 23 are denied.

24.    The allegations of paragraph 24 are denied.

25.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 25.

26.    The allegations of paragraph 26 are denied.

27.    The allegations of paragraph 27 are denied.

## COUNT I: BREACH OF CONTRACT

28.    Defendant incorporates by references all prior answers to paragraphs 1 through 27 as though fully stated herein.

29.    The allegations of paragraph 29 are denied.

30.    The allegations of paragraph 30 are denied.

## COUNT II: FRAUDULENT MISREPRESENTATION

31.    Defendant incorporates by reference the prior answers to paragraphs 1 through 30 as though fully stated herein.

32.    The allegations of paragraph 32 are denied.

33.    The allegations of paragraph 33 are denied.

34.    The allegations of paragraph 34 are denied.

35.    The allegations of paragraph 35 are denied.

## COUNT III: NEGLIGENT MISREPRESENTATION

36.    Defendant incorporates by reference the prior answers to paragraphs 1 through 35 as though fully stated herein.

37.    The allegations of paragraph 37 are denied.

38.    The allegations of paragraph 38 are denied.

39.    The allegations of paragraph 39 are denied.

40.    The allegations of paragraph 40 are denied.

## COUNT IV: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

41.    Defendant incorporates by reference the prior answers to paragraphs 1 through 40 as though fully stated herein.

42.    Defendant admits the allegations of paragraph 42.

43.    The allegations of paragraph 43 are denied.

44.    The allegations of paragraph 44 are denied.

## COUNT V: NEGLIGENCE

45.    Defendant incorporates by reference the prior answers to paragraphs 1 through 44 as though fully stated herein.

46.    The allegations of paragraph 46 are denied.

47.    The allegations of paragraph 47 are denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiff's complaint must be dismissed for insufficiency of service of process or in the alternative for failure to properly serve the complaint as provided by Rule 4 of the Federal Rules of Civil Procedure.

### Second Affirmative Defense

Post Marine Co., Inc. states that Plaintiff purchased a used boat at a private sale, without reference or involvement with Post Marine Co., Inc.  Accordingly, as Plaintiff has no privity

4

with Post, there can be no implied warranty of merchantability or of fitness for a particular purpose, as Post was not a party to the transaction.

### Third Affirmative Defense

Post Marine Co., Inc. does provide an express, written, limited warranty which is issued for the benefit of the first retail purchaser of the yacht, which was not the Plaintiff in this action, which terms and limitations are the only warranties provided by Post, and which warranties (to the extent they have not expired) are not applicable to this Plaintiff.

### Fourth Affirmative Defense

Post Marine Co., Inc. states that by the terms of its express, written, limited warranty, Post disclaims any liability for consequential, indirect, or other damages, including but not limited to, lost profits, loss of use, or diminution in value.

### Fifth Affirmative Defense

Post Marine Co., Inc. states that no contract was ever formed between Plaintiff and Defendant insofar as Plaintiff provided no consideration to Defendant. Alternatively, no contract is enforceable due to failure of consideration.

### Sixth Affirmative Defense

Any issues related to gel coat are specifically excluded from the applicable written, limited warranty.

### Seventh Affirmative Defense

Post states that any claims in tort are barred by the economic loss rule.

### Eighth Affirmative Defense

Post states that to the extent any contract may have been formed, Post fully and completely performed its obligations thereunder, and was prevented from fulfilling and

completing performance by Plaintiff.

### Ninth Affirmative Defense

Post states that Plaintiff has failed to name an indispensable party to this action, which is the manufacturer of the gel coat which failed.

### Tenth Affirmative Defense

Post states that venue is not proper in this District.

## DEMAND FOR TRIAL BY JURY

Defendant Post Marine Company, Inc. demands trial by jury on all matters so triable.

Defendant
By its attorney,


/s/  Howard M. Brown
HOWARD M. BROWN
BBO #547948
Bartlett Hackett Feinberg P.C.
10 High Street, Suite 920
Boston, MA 02110
Tel. (617) 422-0200

DATED:September 13, 2005

6

madei

 **Civil** • **Criminal** • **Query** • **Reports** • **Utilities** • **Logout** 

## Answers to Complaints
1:05-cv-11682-MLW L & T Yacht Sales, Inc. v. Post Marine Co., Inc.

### United States District Court

### District of Massachusetts

Notice of Electronic Filing

The following transaction was received from Brown, Howard M. entered on 9/13/2005 at 4:28 PM
EDT and filed on 9/13/2005

| | |
|---|---|
| **Case Name:** | L & T Yacht Sales, Inc. v. Post Marine Co., Inc. |
| **Case Number:** | 1:05-cv-11682 |
| **Filer:** | Post Marine Co., Inc. |
| **Document Number:** | 4 |

**Docket Text:**
ANSWER to Complaint with Jury Demand by Post Marine Co., Inc..(Brown, Howard)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=9/13/2005] [FileNumber=1121522-0
] [c4791eba10faf419e4a8ef2fa66daad718e573c9c378d5a89493d084f41c99a244d
81b6a9693e2c5d1d1a4b0d5dc59f6164aeaadec8296bd632ad13a19c2a45f]]

**1:05-cv-11682 Notice will be electronically mailed to:**

Howard M. Brown    hmb@bostonbusinesslaw.com

**1:05-cv-11682 Notice will not be electronically mailed to:**

John E. Zajac
Carmichael & Zajac, P.C.
170 High Street
Taunton, MA 02780

# EXHIBIT "K"

5-30-06

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

### C.A. No. 05-11682MLW

| | |
|---|---|
| L & T YACHT SALES, INC. | ) |
| | ) |
|     Plaintiff, | ) |
| VS. | ) |
| | ) |
| | ) |
| POST MARINE CO., INC., | ) |
| | ) |
|     Defendant | ) |

## REQUEST FOR ADMISSIONS

Defendant Post Marine Co., Inc. directs the following Request for Admissions to Plaintiff

L & T Yacht Sales, Inc.:

1. Admit that Ms. Lisa A. Kane of 77 Rocsam Road, Braintree MA 02184 is the wife of

Todd Hamilton.

2. Admit that Ms. Lisa A. Kane also goes by the name of Lisa Hamilton.

3. Admit that Lisa A. Kane acted as attorney for L & T Yacht Sales, Inc. with respect to

negotiations with Post Marine Co., Inc. concerning the proposed repairs to the yacht owned by L &

T Yacht Sales, Inc.

4. Admit that Lisa A. Kane is an attorney licensed to practice law and admitted to practice

law in the state of Massachusetts.

5. Admit that on or about August 17, 2004, Lisa A. Kane wrote, signed and delivered the

letter attached hereto as Exhibit "A" to Michel Weisz.

6. Admit that the fax number for Lisa A. Kane's office is (617) 333-3203.

7. Admit that Lisa Kane received via fax the two page letter dated August 25, 2004 attached

hereto as Exhibit "B."

8. Admit that Todd Hamilton is the authorized representative of L & T Yacht Sales, Inc., who negotiated with Post Marine with respect to the proposed repairs to L & T Yacht Sales, Inc.'s yacht.

9. Admit that on June 15, 2005 Todd Hamilton sent to Post Marine via fax the letter dated June 15, 2005 attached hereto as Exhibit "C."

10. Admit that on July 13, 2005 Todd Hamilton sent to Post Marine by fax the letter attached hereto as Exhibit "D."

11. Admit that on July 15, 2005 Todd Hamilton sent to Post Marine the letter attached hereto as Exhibit "E."

12. Admit that Todd Hamilton received via fax the letter dated August 10, 2005 attached hereto as Exhibit "F."

13. Admit that on or about September of 2004 Todd Hamilton received via fax a letter from Post Marine Co., Inc. signed by Joseph Martorana, attached hereto as Exhibit "G."

Howard Brown, Esquire
Bartlett Hackett Feinberg P.C.
155 Federal Street, 9th floor
Boston, MA 02110

SEGREDO & WEISZ
9350 South Dixie Highway
Suite 1500
Miami, Florida 33156
(305) 670-3820 Telephone
(305) 670-8230 Facsimile

By: _____
Michel Ociacovski Weisz, Esquire
Florida Bar No. 336939
Attorney for Ocean Yachts, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 30, 2006, I served the foregoing document by first class mail, postage prepaid, upon the following counsel of record:

John E. Zajac, Esquire
CARMICHAEL & ZAJAC, P.C.
170 High Street
Taunton, MA 02780

Michel Ociacovski Weisz

*Lisa A. Kane, Esq.*
*77 Rocsam Park Road*
*Braintree, Massachusetts, 02184*
*Telephone: 781-929-5303*
*Fax: 617-333-3203*

August 17, 2004

FAX/ CERTIFIED MAIL / RETURN RECEIPT REQUESTED

Mr. Michel O. Weisz
SEGRDO & WEISZ
Suite 1500
9350 south Dixie Highway
Miami, Florida 33156

Dear Mr. Weisz:

 I have been retained by Todd Hamilton, the owner of a 2001 model Post Sport Fish manufactured by Post Marine, Inc. ("Post"). I am writing concerning a defect in the gel coating which Post has applied to Mr. Hamilton's boat, a problem that he has previously discussed with representatives from your company. Specifically, Mr. Hamilton's boat is experiencing severe cracking in the gel coat. We have reason to believe that this is a widespread problem that Post has been aware of and has acknowledge for quite some time.

 In May of 2004, Mr. Hamilton made Post aware that he has an existing bona fide offer to purchase his boat, but the amount offered was substantially diminished due to the defective gel coat. In light of this defective condition, Mr. Hamilton stands to lose, *inter alia*, in excess of $100,000 in diminished resale value of the boat. A copy of this offer was provided to Post upon their request . Mr. Hamilton repeatedly contacted Post to discuss this offer, and the approach Post may take, however, Post would not reply and further evaded Mr. Hamilton's requests by closing for two weeks during these conversations without even informing Mr. Hamilton. Once Mr. Hamilton finally reached Ken Jensen at Post, Mr. Jensen simply indicated to Mr. Hamilton that he would repair the boat. Nevertheless, Post further evaded Mr. Hamilton's concerns by refusing to explain to him the precise manner in which Post intends to perform these repairs.

 As indicated, during Mr. Hamilton's previous discussions with Post, he was told that Post would agree to perform the necessary repairs to correct this defective condition. However, Mr.

EXHIBIT "A"

608489_1

Hamilton personally inspected a boat in Cambridge, Massachusetts, which Post repaired for this exact problem, and he found the resulting work to be completely unacceptable and still contained numerous cracks.   Moreover, he has recently learned that a dealership, Portland Boat Works, returned a boat to Post for a *re-repair* of the gel coat that was not satisfactorily repaired by Post in the first instance.

In light of this information, Mr. Hamilton has very serious and warranted concerns over the effectiveness of Post's repair of the cracking gel coat problem. Mr. Hamilton's concerns have been exacerbated by the fact that Post has refused to explain to him – upon his request – the precise manner in which Post intends to perform these repairs. Accordingly, Mr. Hamilton is asking one last time for an explanation, in writing, as to precise manner in which Post intends to repair the cracking in the gel coat of his boat – specifically including the areas on the sides of the hull, bottom of the hull, stern, forward and aft decks, bridge floor & helm and hard top and bulked of the salon.   As previously discussed with Post, these repairs must also include the removal of any hardware from the areas requiring repairs so that the gel coat flows under the hardware and does not end at the seam as Mr. Hamilton observed on the boat in Cambridge. Mr. Hamilton has also requested a detailed explanation as to how Post plans to prevent any fiberglass partials from entering the engines and the interior of the boat during these repairs. Moreover, Mr. Hamilton requests an established time frame as to when Post will take the boat fro repair and how long it will take to repair the boat from the point in which Post receives the boat for repair.

I have just been informed today, by you, as Post's counsel that you will be on vacation for a week, starting tomorrow.   As we discussed this morning, time is of the essence, and we therefore must request that Post provide the requested assurances relating to the repairs by the end of the day today. Attorney Weisz, during our conversation this morning, you agreed to fulfill this request.

In conclusion, Mr. Hamilton hopes to work cooperatively with Post to resolve this issue. However, he is immediately prepared to exercise all his legal rights to recoup any damages he incurs as a result of this defective condition and/or Post's failure to provide the requested information.   Therefore, please provide your insurance company with notice of this potential claim.

If you have any questions, please do not hesitate to give me a call.  We look forward to hopefully working together to resolve this unfortunate situation.

Sincerely,

Lisa A, Kane, Esq.


Cc:    Mr. Todd Hamilton

2

# SEGREDO & WEISZ

ATTORNEYS AT LAW

A Partnership Including Professional Associations

Michel O. Weisz, P.A.
Frank J. Segredo, P.A.

Suite 1500
9350 South Dixie Highway
Miami, Florida 33156
Telephone: (305) 670-3820
Facsimile: (305) 670-8230

*FAXED*

August 25, 2004

Delivered Via Fax
(617) 333-3203

Ms. Lisa A. Kane
77 Rocsam Park Road
Braintree, MA 02184

Re: <u>Post Marine/Todd Hamilton</u>

Dear Ms. Kane:

I have reviewed various items of correspondence concerning a Post yacht owned by your husband, Todd Hamilton. It is my understanding that your husband purchased the yacht in a used condition sometime in the early summer of 2003. The yacht is a 2001 model year vessel which had been sold by a Post dealer at retail to the original purchaser in early to mid 2001.

As you may be aware, all Post yachts are covered by a written limited warranty. The warranty in effect at the time the yacht was originally sold was for one year from date of sale. Thus the warranty expired well before your husband purchased the yacht. In addition, the warranty expressly disclaims coverage of gel coat. As I understand it, the current issues related to the yacht concern gel coat issues, which in my view are not covered by the warranty and for which Post Marine has no liability or duty.

Having said that, Post is willing as a matter of accommodation and customer good will to gratuitously undertake and perform repairs to the gel coat finish. This work will be done at no cost to your husband and will consist of the following:

Post Marine will inspect the entire vessel to determine the extent of the gel coat repairs to be performed. The areas affected will be treated in the following manner.

1.  The engine room will be isolated by sealing the exhausts at the transom, sealing the hull side intake vents, sealing the cockpit hatches and engine room door.

EXHIBIT "B"

Ms. Kane
Page 2
August 25, 2004

Re: <u>Post Marine/Todd Hamilton</u>

2.    Bottom paint will be removed and the bottom will be inspected to locate any areas of gel coat cracking.

3.    Topsides and hull sides will be covered prior to bottom sanding, the bottom will be sanded to remove gel coat in areas of cracking.  Any hardware affected by stress cracking will be removed and reinstalled.

4.    Epoxy barrier coatings will be applied within manufacturer specifications.  Two coats of bottom paint will then be applied.

5.    All necessary hardware will be removed and reinstalled to facilitate gel coat removal.

6.    Gel coat will be sanded off using random orbital sanders, laminate will be inspected, and prepared for reapplication of gel coat.

7.    The vessel will be taped off and covered in appropriate areas in preparation for spraying gel coat to proper specifications.

8.    Once gel coat has been sprayed, it will be sanded to a 1200 grit finish in preparation for polishing.

9.    Polishing will be completed and a coat of fiberglass gel coat resin cleaner-sealer will be applied.

Prior to delivery, the boat will be cleaned as we clean all new boats for customer pickup.  Post Marine will make every attempt to complete these repairs in a timely manner and estimate the process will take approximately four months upon receipt of the vessel at our facility.

These repairs are made as an accommodation only and no warranty will be provided other than a 90 warranty of workmanlike performance which will cover only the workmanship of the application of the gel coat. No warranty will be extended with respect to the gel coat, its characteristics, color or finish.

Very truly yours,

Michel O. Weisz

SEGREDO & WEISZ, 9350 South Dixie Highway, Miami, Florida 33156 • Tel: (305) 670-3820, Fax: (305) 670-8230

08/09/05    09:31    POST MARINE → 13056708230                    NO.016    P04

FAX    1 - 609 - 625 - 2336

June 15, 2005

Dear Joe & Ken:

As a follow up to our conversation on June 14, 2005 at Post Marine in New Jersey, and our subsequent phone conversation on June 15, 2005, the following are the items we have agreed that I need you to repair prior to me picking up the boat from Post Marine during first week of July.

1) Blend spots around the front deck hatches
2) Refinish non skid on the front bench seat
3) Fix the over spray on the back deck walls below the fish holders
4) Refinish bridge compartment door where the paint was burned off caused by buffing
5) Refinish the compass area on the bridge
6) Fix the overspray on the bridge components and aluminum pipe
7) Recock side windows
8) Clean the gunnels from overspray
9) Repair a bubble below the stern light on the transom
10) Repair right and left side boot stripe where there are bubbles
11) Re do the crack below the engine in takes on the side of boat
12) Refinish the back door step
13) Fix crack in the stem of the bow
14)

If you need to reach me please call or fax the following numbers

FAX:    617-333-3203
CELL:   781-640-9669
HOME:   617-333-3222

Very truly yours,

*Todd Kn*

Todd

608489_1

EXHIBIT "C"

**FAX**

July 13, 2005

Dear Joe & Ken:

As per our conversation today, July 13, 2005 during my third visit to Post Marine in New Jersey, due to my disappointment regarding the current condition of the boat, even after numerous visits, phone conversations and faxes regarding the work to be done, I now must request that you do not touch the bottom or the sides of my boat until the three of us have the opportunity to discuss the steps moving forward.

I will be flying back to Boston this evening and will be available any time this week to talk. At this very late date we must come to a resolution. I expect that I will hear from you prior to you vacation this Friday.

If you need to reach me please call or fax the following numbers

FAX:    617-333-3203
CELL:   781-640-9669
HOME:  617-333-3222

Very truly yours,

Todd

608489_1

EXHIBIT "D"

<u>FAX</u>

July 15, 2005

Dear Joe & Ken:

As per our conversation today, July 15, 2005, and to reiterate once again my comments in my fax to you on July 13, 2005, I demand that Post Marine is not to do any additional work on my Boat whatsoever.

Ken & Joe there is no question that there is defects in the gel coat used on my boat and my decision to request that you halt all work is a result of the fact that it has now been 9 months since you received my boat to correct the defects in the gel coat. Ken informed me that the boat would be ready in the spring and that Post would complete the repairs as we discussed. We are now in mid July and I was informed to pick up the boat the weeks of July 11, 2005.

I arrived at Post on July 12th, 2005, at which time the sides and bottom of the boat had not even been touched. Additionally during this visit there were obvious additional defects on the topside of the boat.

I indicated to you during this <u>third</u> visit to Post Marine in New Jersey, that the current condition of the boat is incomplete and totally unacceptable.

Ken & Joe I have spent numerous hours including visits, phone conversations and faxes regarding the work to be done, and the boat is still not complete. At this late date I have no options. I am will be at Post Marine shortly with experts to review the current status of the boat and the workmanship. It is for this reason that you are not to do ANY further work on this boat as of today, <u>July 15, 2005</u>.

If you need to reach me please call or fax the following numbers

FAX:    617-333-3203
CELL:   781-640-9669
HOME:  617-333-3222

Very truly yours,

Todd

608489_1

**EXHIBIT "E"**

# SEGREDO & WEISZ

## ATTORNEYS AT LAW

### A Partnership Including Professional Associations

Michel O. Weisz, P.A.
Frank J. Segredo, P.A.

Suite 1500
9350 South Dixie Highway
Miami, Florida 33156
Telephone: (305) 670-3820
Facsimile: (305) 670-8230

August 10, 2005

~FAXED~

### SENT VIA FACSIMILE
(617) 333-3203

Mr. Todd Hamilton

Dear Mr. Hamilton:

I have been asked to respond to your letters of July 13, 2005 and July 15, 2005 and various phone conversations, which have taken place between you and several Post dealers over the past week. At the present time your Post yacht is at the Post facility. The yacht had been hauled at your direction.

Pursuant to your instructions of July 15, 2005, you have instructed my client to do no further work on the yacht. In recent conversations, you have indicated that you were going to arrive at the facility at some undetermined time with lawyers and experts to film the yacht. You have removed the keys to the yacht from the Post facility, which resulted in my clients having no access to the interior of the yacht, which poses a serious safety hazard.

At this time you are advised that your yacht is to be removed from the Post facility by August 17, 2005. Your failure to do so, will result in the yacht being removed from the facility by such means as Post deems expedient. If you wish, you may designate a destination for storage, and the yacht will be delivered there at your expense. In addition, Post must receive a set of keys for the yacht by 11:00 a.m EDT, August 15, 2005. If keys are not received by that time, the yacht will be blocked and chocked at your expense.

If the yacht is not removed by August 17, 2005, and no instructions acceptable to Post Marine have been received from you, Post will undertake such measures and actions as it deems appropriate to remove the yacht from its premises. If the yacht remains on the premises beyond August 17, 2005, you will be charged a daily storage fee of $250.00.

Very truly yours,

Michel Ociacovski Weisz

**EXHIBIT "F"**

# EXHIBIT "L"

FAX

July 15, 2005

Dear Joe & Ken:

As per our conversation today, July 15, 2005, and to reiterate once again my comments in my fax to you on July 13, 2005, I demand that Post Marine is not to do any additional work on my Boat whatsoever.

Ken & Joe there is no question that there is defects in the gel coat used on my boat and my decision to request that you halt all work is a result of the fact that it has now been 9 months since you received my boat to correct the defects in the gel coat. Ken informed me that the boat would be ready in the spring and that Post would complete the repairs as we discussed. We are now in mid July and I was informed to pick up the boat the weeks of July 11, 2005.

I arrived at Post on July 12th, 2005, at which time the sides and bottom of the boat had not even been touched. Additionally during this visit there were obvious additional defects on the topside of the boat.

I indicated to you during this third visit to Post Marine in New Jersey, that the current condition of the boat is incomplete and totally unacceptable.

Ken & Joe I have spent numerous hours including visits, phone conversations and faxes regarding the work to be done, and the boat is still not complete. At this late date I have no options. I am will be at Post Marine shortly with experts to review the current status of the boat and the workmanship. It is for this reason that you are not to do ANY further work on this boat as of today, July 15, 2005.

If you need to reach me please call or fax the following numbers

FAX:    617-333-3203
CELL:   781-640-9669
HOME:  617-333-3222

Very truly yours,

Todd



# QUALITY BEEF COMPANY

YOUR FULL LINE FOOD DISTRIBUTOR SINCE 1931

FACSIMILE TRANSMITTAL SHEET

| TO: Todd Hamilton | FROM: William Catauro, Sr. x 113 |
|---|---|
| COMPANY: | DATE: 7/14/04 |
| FAX NUMBER: 1-617-333-3203 | TOTAL NO. OF PAGES INCLUDING COVER: 1 |
| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
| RE: 2001 50' Post | YOUR REFERENCE NUMBER: |

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☒ PLEASE REPLY   ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Todd,

I did originally agree to purchase your 2001 50ft Post for $750,000. However due to the problem and possible future problems the boat seems to be having with the gel coat cracking, I am now willing to offer you $600,000 and sign a release with Post for any future gel coat issues.

I look forward to your response.

Thank you,

Bill Catauro Sr.

25 Bath Street    Providence, Rhode Island 02908    Ph:(401) 421-5668    Fx:(401) 421-8465
Email: billcatauro@qualitybeefco.com



# QUALITY BEEF COMPANY

YOUR FULL LINE FOOD DISTRIBUTOR SINCE 1931

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Todd Hamilton | William Catauro, Sr. x 113 |

| COMPANY: | DATE: |
|---|---|
| | 8/06/04 |

| FAX NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER |
|---|---|
| 1-617-333-3203 | 1 |

| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
|---|---|
| | |

| RE: | YOUR REFERENCE NUMBER: |
|---|---|
| 2001 50' Post | |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Todd,

I did originally agree to purchase your 2001 50ft Post for $750,000. However due to the problem and possible future problems the boat seems to be having with the gel coat cracking, I am now revising my offer to $625,000 with the understanding that Post will fix the gelcoat problem to my satisfaction.

I feel this is a fair offer due to the fact that I will lose use of the boat for four to five months. I originally planned to take the boat south for the winter which is now not possible.

Please find attached a 10% deposit for $62,500 which is to be refunded if this offer is not accepted.

I look forward to your response.

Thank you,

Bill Catauro Sr.

25 Bath Street    Providence, Rhode Island  02908    Ph:(401) 421-5668    Fx:(401) 421-8465
Email: billcatauro@qualitybeefco.com

# EXHIBIT "M"



# UNITED STATES OF AMERICA

DEPARTMENT OF HOMELAND SECURITY
UNITED STATES COAST GUARD

NATIONAL VESSEL DOCUMENTATION CENTER

# CERTIFICATE OF DOCUMENTATION

| VESSEL NAME | OFFICIAL NUMBER | IMO OR OTHER NUMBER | YEAR COMPLETED |
|---|---|---|---|
| RELENTLESS | 1115294 | PMC50076A101 | 2001 |

| HAILING PORT | HULL MATERIAL | | MECHANICAL PROPULSION |
|---|---|---|---|
| NEWPORT, RI | FRP | | YES |

| GROSS TONNAGE | NET TONNAGE | LENGTH | BREADTH | DEPTH |
|---|---|---|---|---|
| 41 GRT | 33 NRT | 50.6 | 16.9 | 7.3 |

| PLACE BUILT |
|---|
| MAYS LANDING, NJ |

| OWNERS | OPERATIONAL ENDORSEMENTS |
|---|---|
| L & T YACHT SALES INC | RECREATION |

**MANAGING OWNER**

L & T YACHT SALES INC
56 RUGGLES AVE
NEWPORT, RI 02840

**RESTRICTIONS**
NONE

**ENTITLEMENTS**
NONE

**REMARKS**
NONE

**ISSUE DATE**
AUGUST 12, 2003

**THIS CERTIFICATE EXPIRES**
JULY 31, 2004