# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**C.A. No. 05-11682MLW**

| | |
|---|---|
| L & T YACHT SALES, INC. | ) |
| | ) |
|       Plaintiff, | ) |
| VS. | ) |
| | ) |
| | ) |
| POST MARINE CO., INC., | ) |
| | ) |
|       Defendant | ) |

## DEFENDANT POST MARINE CO., INC.'S MOTION TO EXCLUDE TESTIMONY, DOCUMENTS, EXPERT WITNESSES AND UNDISCLOSED WITNESSES

Post Marine Company, Inc., pursuant to the provisions of LR 1.3[1] and in conjunction with this Court's May 30, 2006 Scheduling Order and the provisions of Fed. R. Civ. P. 37 and Fed. R. Civ. P. 26 requests the following relief: (1) That Plaintiff be precluded from presenting any evidence relating to, or concerning any alleged or claimed damages suffered by Plaintiff; (2) That Plaintiff be precluded from calling any expert witnesses with respect to any issues in this lawsuit as a result of Plaintiff's failure to provide any expert witness disclosure as required by the scheduling order entered May 30, 2006 [2]; (3) Prohibit Plaintiff from calling at trial any witnesses not designated in Plaintiff's initial Rule 26(a)(1)(A) disclosures as Plaintiff has failed to supplement or vary the names

---

[1] Local Rule 1.3 provides, "Failure to comply with any of the directions or obligations set forth in, or authorized by, these local rules may result in dismissal, default, or the imposition of other sanctions as deemed appropriate by the judicial officer."

[2] Paragraph 5 of the scheduling order provides: "Plaintiff(s) and/or counter-claim or third-party plaintiff(s) shall by December 15, 2006 designate experts and disclose the information described in Fed.R.Civ.P. 26(a)(2), concerning each expert."

of the individuals disclosed by Plaintiff.

## PROCEDURAL HISTORY

1. This action was filed by Plaintiff on August 1, 2005.

2. On May 30, 2006, this Court entered a scheduling order setting forth the applicable deadlines and dates by which certain events were to occur. A true and correct copy of the scheduling order is attached hereto as Exhibit "A."

3. On May 24, 2006, Plaintiff filed its mandatory disclosures pursuant to Federal Rule of Civil Procedure 26 (a)(1). A true and correct copy of Plaintiff's disclosures are attached as Exhibit "B." Fed.R.Civ.P. 26(a)(1)(C) requires mandatory voluntary production of "a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the document or other evidentiary material..."[3]

4. On May 30, 2006 Defendant served a Request for Production of Documents on Plaintiff. Request No. 1 specifically requests "all documents that in any way relate to, will be relied on, or will be used by Plaintiff to in any way substantiate, demonstrate, establish or proof any damages which Plaintiff is asserting were suffered by it." A true and correct copy of the Request for Production is attached as Exhibit "C."

5. In response to this request, on February 22, 2007, Plaintiff designated three letters: one

---

[3] The Scheduling Order provides, "The parties shall by June 9, 2006, make the automatic document disclosure required by Local Rule 26.2A...."

dated August 6, 2004; one dated July 14, 2004; and one dated July 15, 2004 as the only documents related to any evidence of its damage claims.  Copies of the three letters are attached hereto as composite Exhibit "D."

6.  Document request No. 5 asks for "any and all documents and/or records indicating any surveys or evaluations of the vessel performed by anybody for the benefit of or at the request of the Plaintiff at any time since Plaintiff owned the yacht."  In response, Plaintiff indicated that the two documents responsive to that request were the letter of July 14, 2004 and the letter of August 6, 2004 previously identified in response to the first request for production of documents.

7.  Document request No. 6 asks for "all reports or records of any and all inspections of the yacht by any entity which supports the allegations of paragraph 25 of Plaintiff's complaint."[4]  In response to this request, Plaintiff provided two letters dated October 14, 2005 from Onset Bay Marina and July 10, 2006 from the Hinckley Company.  Copies of these two letters are attached as composite Exhibit "E."

8.  Neither of those two letters indicates that the boat was inspected or that the inspectors "concurred" with Plaintiff's assertion that "the boat was not repaired correctly."

9.  Instead, these two letters appear to be estimates, prepared at Plaintiff's request, providing a price to re-gelcoat the entire boat.  There is no indication on either of the documents that this work is necessary, or that the work is the result of anything improper or incorrectly done by Defendant Post Marine Company, Inc.

10.  On March 13, 2007, Defendant served a Notice of Taking Deposition on Plaintiff L&T

---

[4]  Paragraph 25 of Plaintiff's Complaint states: "After this two week vacation, Hamilton again traveled from Massachusetts to New Jersey and had the boat inspected by another yacht repair company who concurred with Hamilton's findings that the boat was not repaired correctly."

Yacht Sales, Inc., by and through its corporate representative.  The deposition notice indicated and designated the areas on which the corporate representative was to be examined.  The deposition notice specifically stated that the corporate representative would be examined concerning "the damages the Plaintiff claims."  A true and correct copy of the Defendant's Notice of Taking Deposition is attached as Exhibit "F."

11.   On Friday, April 13, 2007, Plaintiff produced Todd Hamilton as the corporate representative.

12.  Mr. Hamilton was examined, and was completely unprepared to offer a single shred of testimony concerning any alleged damages suffered by Plaintiff.  Mr. Hamilton was asked the following questions related to damages and provided the following answers:

> Q.  Okay. What damages are you claiming in this lawsuit?
> A.  The loss of the sale of the boat and the damages to repair it and the carrying cost.
>
> Q.  Okay. How much do you claim for the loss of the sale of the boat.
> A.  I'd have to sit down and figure it out now that it's been three years.
>
> Q.  Okay. Do you have an estimate?
> A.  I don't. I haven't really sat down; no one has asked me to sit down and put a number together yet.
> P. 22, ln. 4-16.
>
> Q.  How much is the value of the work that has been done?
> A.  I don't know. They didn't break it down in sections. I would have to ask them to come out and redo the estimate for the section.
> P. 23, ln. 6-10.
>
> Q.  How much have you paid?
> A.  Oh, I don't know exactly to date with materials and stuff.  I could get it for you.
>
> Q.  What are you claiming are the carrying costs?
> A.  Again, I'd have to sit down and figure out what my costs are to carry it.
>
> P. 23, ln. 14-19.

13.  In addition, Mr. Hamilton testified that he did absolutely nothing to prepare for his

4

deposition as the corporate representative.

> Q.  Did you do anything today to prepare for today's deposition?
> A.  No.
> Q.  Did you review the complaint?
> A.  No.
> Q.  Did you review any documents?
> A.  No.
> Q.  Did you review the notice of taking deposition?
> A.  No.
> Q.  Did you review the complaint?
> A.  No.
> Q.  Have you ever read the complaint?
> A.  I probably have at one point a long time ago.

P. 13, ln. 18-23, p. 14, 6.

14.  True and correct copies of the excerpts of Mr. Hamilton's deposition are attached as composite Exhibit "G" to this motion.

15.  Thus, despite this Court's Scheduling Order, and despite taking nine months (from the date of service on May 30, 2006 until a response was filed on February 22, 2007) to respond to a request for production of documents, and despite a proper deposition notice designating the specific areas upon which inquiry would be conducted, Plaintiff has consistently and categorically failed to provide any evidence supporting any claim for damages.

16.  Moreover, the issue in this complaint is that the Defendant did not repair Plaintiff's boat as it promised to.  As a corollary, Plaintiff asserts that the Defendant's repairs which were performed, were performed inadequately.  However, Plaintiff has provided no expert testimony indicating that any of the work Defendant did on the boat was improper, deficient or defective.  The only evidence Plaintiff has offered, are estimates of two facilities which prepared estimates at Plaintiff's request as to the cost of re-gelcoating the entire boat.

17.  The Scheduling Order required Plaintiff to designate experts and disclose the

5

information described in Fed.R.Civ.P. 26(a)(2) by December 15, 2006. Plaintiff made no disclosure and made no request to extend or modify this deadline.

18. Moreover, Plaintiff's Rule 26(a)(1)(A) witness disclosure only contained the following witnesses: Todd Hamilton, the Plaintiff's representative; Ken Jensen and Joel[sic] Martorama[sic][5] (employees of the Defendant Post); "Composites One LLC"; "Curran Composites"; and "Total Composites, Inc." None of the disclosed witnesses are indicated as having any knowledge as to the damages suffered by Plaintiff.

19. With respect to the location of documents, Plaintiff's disclosure states: "Mr. Hamilton has possession of correspondence with the Defendant, expense information and service records, estimates and other documents concerning the boat. All are stored at his above-mentioned addressed or at 77 RocSam Park Road, Braintree, MA ."

20. Despite this disclosure (and the Request for Production of Documents), no documents including but not limited to "expense information" or "service records" were ever produced.

21. At the scheduling conference held on May 4, 2007, this Court stated that discovery was closed, and no further discovery would be permitted.

22. The Plaintiff's conduct, in failing to produce documents required under this Court's scheduling order and under Fed.R.Civ.P. 26(a)(1)(C) and specifically requested in a Request for Production of Documents, and in providing a designated corporate representative to testify who was unprepared for the deposition and who failed to provide any testimony or evidence with respect to the damages claimed by the Plaintiffs, provides this Court with ample reason to bar the introduction of all such evidence at any trial.

---

[5] This witness' correct name is Joe Martorana.

23.  In addition, to the extent Plaintiff claims that any of the work actually done by the Defendant was deficient or defective, Plaintiff's failure to provide any expert analysis or report concerning this allegation, should preclude the introduction of any such evidence at trial.[6]

24.  To the extent Mr. Hamilton seeks to testify as to the condition of the boat, he has not been designated as qualified or as expert for the purpose of establishing the nature, extent or cause of any problems, or the viability of the repairs performed by Post.  Moreover, Plaintiff's representative testified at his deposition that the photographs he took of the boat when he picked it up did not show the problems.  Depo. L&T at p. 66, ln. 3 – p.67, ln.20.

WHEREFORE, Defendant requests that the Court impose the following minimum sanctions: (a) That no witnesses other than those listed in the Plaintiff's pretrial disclosure be permitted to testify; (b) that no evidence of Plaintiff's damages be admitted; and (c that no evidence concerning the workmanship of the Defendant as to the repairs it performed be permitted by way of opinion or expert testimony.

In addition, Defendant requests that this Court consider the following sanctions -dismissal of

---

[6]  At the pretrial conference on May 4, 2007, Plaintiff's counsel provided Defendant's counsel with a CD disk which purportedly contains photographs of the yacht.  These photographs were not previously produced, and were not available for the deposition of Plaintiff's designated representative.  Accordingly, these photographs should also be excluded, since any testimony concerning the photographs cannot be investigated, collaborated or contradicted since discovery is now closed.  See deposition of L&T Yacht, page 21,  a copy of which is attached as Exhibit G.

Plaintiff's Complaint for failure to comply with the provisions of the Scheduling Order to such an extent that the Defendant has been prejudiced to the point where it cannot properly defend the case, or in the alternative issue a ruling  that Plaintiff cannot prove two essential elements of its claims – damages or liability.

/s/ Howard M . Brown
Howard M. Brown
BBO #547948
Bartlett Hackett Feinberg P.C.
155 Federal Street, 9th floor
Boston, MA 02110


SEGREDO & WEISZ
9350 South Dixie Highway
Suite 1500
Miami, Florida 33156
(305) 670-3820 Telephone
(305) 670-8230 Facsimile


By:   /s/  Michel O. Weisz
Michel Ociacovski Weisz, Esquire
Florida Bar No. 336939
Attorney for Ocean Yachts, Inc.

Dated June 1, 2007

8

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

<u>L&T YACHT</u>
                    Plaintiff(s)

            v.                      CIVIL ACTION
                                    NO. <u>  05-11682      </u>


<u>POST MARINE</u>
                    Defendant(s)


<u>SCHEDULING ORDER</u>

WOLF, D.J.


        This case is governed procedurally by the 1992 Amendments to the Local Rules of the United States District Court for the District of Massachusetts (the "Local Rules"), which implement the District's Civil Justice Expense and Delay Reduction Plan. Counsel must, therefore, comply with the relevant Local Rules in the litigation of this case.

        It is hereby ORDERED pursuant to Fed. R. Civ. P. 16(b) and Local Rule 16(f) that:

[X]  1.    Any Motion to Amend the pleadings, or any Motion to File additional pleadings, shall be filed by <u>JUNE 9, 2006</u>, and responses shall be filed as required by the applicable provisions of the Federal Rules of Civil Procedure.

[X]  2.    The parties shall by <u>JUNE 9, 2006</u> make the automatic document disclosure required by Local Rule 26.2(A) and, if applicable, disclose the information required by Local Rule 35.1

[X]  3.    The parties shall by <u>JUNE 9, 2006 </u> make the disclosure authorized by Local Rule 26.1(B)(1) and (2).

[X]  4.    Counsel for the parties shall meet at least once to explore the possibility of settlement and report to the court by <u>SEPTEMBER 29, 2007 </u> the status and prospects for settlement.

        If the case is not settled, the parties shall report whether they wish to participate in mediation to be conducted by a magistrate judge or attorney on the Court's panel of mediators.

[X]   5.  Plaintiff(s)  and/or  Counterclaim  or  Third Party Plaintiff(s) shall by DECEMBER 15, 2006 designate experts and disclose the information described in Fed. R. Civ. P. 26(a)(2), concerning each expert. Each other party shall by FEBRUARY 1, 2007 designate expert(s) and disclose the information described in Fed. R. Civ. P. 26(a)(2).

[X]   6.   All discovery shall be complete by APRIL 1, 2007.

[X]   7.   Counsel for the parties shall confer and, by APRIL 20, 2007, file a report as to the prospects for settlement and whether either party feels there is a proper basis for filing a motion for summary judgment.

[X]   8.   A scheduling conference will be held on MAY 2, 2007 at 4:00 PM and must be attended by trial counsel with full settlement authority or with their client(s). If appropriate, a schedule for filing motions for summary judgment will be established at this conference. cwm

[X]   9.   A final pretrial conference will be held on MAY 24, 2007 at 4:00 PM and must be attended by trial counsel with full settlement authority or with their client. Counsel shall be prepared to commence trial as of the date of the final pretrial conference.

[X]   10.  Trial shall commence on MAY 29, 2007 .

     All provisions and deadlines contained in this Order having been established with the participation of the parties to this case, any requests for modification must be presented to the judge or magistrate judge, if referred for case management proceedings. Any requests for extension will be granted only for good cause shown supported by affidavits, other evidentiary materials, or reference to pertinent portions of the record.  The request shall be made by motion and shall contain the reasons for the request, a summary of the discovery which remains to be taken, and a date certain when the requesting party will complete the additional discovery.
     Counsel are encouraged to seek an early resolution of this matter. Additional case management conferences may be scheduled by the Court or upon the request of counsel.


                              By the Court,
                              DENNIS P. O'LEARY


May 30, 2006                  /s/ Dennis O'Leary
Date                          Deputy Clerk


                              2

EXHIBIT "B"

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BOSTON DIVISION
DOCKET NO. 05-11682 MLW

| | |
|---|---|
| L & T YACHT SALES, INC., | ) |
| Plaintiff | ) |
| | ) |
| VS. | ) |
| | ) |
| POST MARINE CO., INC., | ) |
| Defendant | ) |

## PLAINTIFF'S MANDATORY DISCLOSURES
## PURSUANT TO FED. R. CIV. P. 26(a)(1)

Now comes the Plaintiff and pursuant to Fed. R. Civ. P. Rule 26(a)(1) hereby discloses the following information:

A.  Witnesses likely to have discoverable information to support Plaintiff's claim(s) against Post Marine, Inc.:

1.  Todd J. Hamilton, 1061 Brush Hill Road, Milton, Massachusetts. Mr. Hamilton has knowledge of entire chronology and events concerning the defects and attempted repairs of the boat owned by L & T Yacht Sales, Inc.;

2.  Ken Jensen, Joel Martorama and/or other employees of Post Marine Co., Inc. 100 Post Road, Mays Landing, New Jersey. Messrs. Jensen and Martorama and others have knowledge and information about the defects with gel-coat on boats manufactured by Post Marine and the efforts to repair such defects, including those with the Plaintiff's boat;

3.  Composites One, LLC, 723 W. Algonquin Road, Arlington Heights, Illinois. This company has knowledge and information about the defects with gel-coat on boats manufactured by Post Marine.

4.  Curran Composites, 920 East 14th Avenue, North Kansas City, Missouri. This company has knowledge and information about the defects with gel-coat on boats manufactured by Post Marine.

5.  Total Composites, Inc., 2000 Market Street, 27th Floor, Philadelphia, Pennsylvania. This company has knowledge and information about the defects with gel-coat on boats manufactured by Post Marine.

1

B.    Description and location of documents that the Plaintiff may use to support its claim(s) against Post Marine, Inc.:

Mr. Hamilton has possession of correspondence with the Defendant, expense information and service records, estimates and other documents concerning the boat. All are stored at his above-mentioned address or at 77 RocSam Park Road, Braintree, Massachusetts.

Respectfully submitted,
The Plaintiff,
By its Attorneys,

John E. Zajac, Esquire
Carmichael & Zajac, P.C.
170 High Street
Taunton, MA 02780
(508) 821-2552
BBO No. 560195

Dated: May 24, 2006

2

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11682MLW

| | |
|---|---|
| L & T YACHT SALES, INC. | ) |
| | ) |
|      Plaintiff, | ) |
| VS. | ) |
| | ) |
| | ) |
| POST MARINE CO., INC., | ) |
| | ) |
|      Defendant | ) |

## REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant Post Marine Co., Inc., pursuant to Rule 34 Fed.R.Civ.P., hereupon requests the

Plaintiff, L & T Yacht Sales, Inc. ("Plaintiff") produce the following documents within the time

directed by the Federal Rules of Civil Procedure.

## REQUESTS

1. All documents that in any way relate to, will be relied on, or will be used by Plaintiff to

in any way substantiate, demonstrate, establish or prove any damages which Plaintiff is asserting

were suffered by it.

2. All documents, which demonstrate, refer to, or relate to any contract, which Plaintiff

asserts was formed between Plaintiff and Defendant.

3. All documents, which in any way evidence or demonstrate any payments made by

Plaintiff to Post Marine Co., Inc. as payment for any repairs performed by Post.

4. All documents, which refer to, demonstrate, or relate to Plaintiff's purchase of the yacht,

including any and all documents relating to the purchase price paid by Plaintiff, any sales tax paid

by Plaintiff, the registration or documentation of the vessel, and any loans or mortgages placed on

the vessel by any lender at the time of Plaintiff's purchase of the vessel or any time thereafter.

5. Any and all records or documents, including offers, brokerage agreements, or surveys relating to or evidencing any bonafide offers to purchase the yacht from Plaintiff as alleged in paragraph 9 of Plaintiff's complaint.

6. Any and all documents and/or records indicating any surveys or evaluations of the vessel performed by anybody for the benefit of or at the request of Plaintiff at any time since Plaintiff owned the yacht.

7. All reports or records of any and all inspections of the yacht by any entity which supports the allegations of paragraph 25 of Plaintiff's complaint.

8. Any and all records or documents indicating that at any time that the yacht was in Plaintiff's possession, Plaintiff was unable to use the yacht. All records or documents referring to or evidencing any losses or damages Plaintiff claims as a result of its inability to use the yacht.

9. Any and all records indicating any and all income earned from or derived by Plaintiff from the use of the yacht and any and all documentation reflecting or referring to any loss of income for which Plaintiff is claiming damages.

10. Any and all written documents which in any way refer to or reflect any statement made to Plaintiff by Defendant or any officer or employee of Defendant, which Plaintiff contends is either false, fraudulent or misleading.

11. All documents or records of any and all communications by and between Plaintiff and Defendant at any time, including letters, faxes, e-mails, notes of any conversations, agreements, or understandings.

12. Any and all documents reflecting any consideration or anything of value paid by Plaintiff to Defendant at any time in exchange for Defendant's promise to undertake repairs to Plaintiff's yacht.

Howard Brown, Esquire
Bartlett Hackett Feinberg P.C.
155 Federal Street, 9th floor
Boston, MA 02110


SEGREDO & WEISZ
9350 South Dixie Highway
Suite 1500
Miami, Florida 33156
(305) 670-3820 Telephone
(305) 670-8230 Facsimile


By: _____
Michel Ociacovski Weisz, Esquire
Florida Bar No. 336939
Attorney for Ocean Yachts, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 3Ọ 2006, I served the foregoing document by first class

mail, postage prepaid, upon the following counsel of record:

John E. Zajac, Esquire
CARMICHAEL & ZAJAC, P.C.
170 High Street
Taunton, MA 02780

Michel Ociacovski Weisz

DATED:

**EXHIBIT "D"**

FAX

July 15, 2005

Dear Joe & Ken:

As per our conversation today, July 15, 2005, and to reiterate once again my comments in my fax to you on July 13, 2005, I demand that Post Marine is not to do any additional work on my Boat whatsoever.

Ken & Joe there is no question that there is defects in the gel coat used on my boat and my decision to request that you halt all work is a result of the fact that it has now been 9 months since you received my boat to correct the defects in the gel coat. Ken informed me that the boat would be ready in the spring and that Post would complete the repairs as we discussed. We are now in mid July and I was informed to pick up the boat the weeks of July 11, 2005.

I arrived at Post on July 12th, 2005, at which time the sides and bottom of the boat had not even been touched. Additionally during this visit there were obvious additional defects on the topside of the boat.

I indicated to you during this third visit to Post Marine in New Jersey, that the current condition of the boat is incomplete and totally unacceptable.

Ken & Joe I have spent numerous hours including visits, phone conversations and faxes regarding the work to be done, and the boat is still not complete. At this late date I have no options. I am will be at Post Marine shortly with experts to review the current status of the boat and the workmanship. It is for this reason that you are not to do ANY further work on this boat as of today, July 15, 2005.

If you need to reach me please call or fax the following numbers

FAX:    617-333-3203
CELL:   781-640-9669
HOME:  617-333-3222

Very truly yours,

Todd



# QUALITY BEEF COMPANY

YOUR FULL LINE FOOD DISTRIBUTOR SINCE 1931

### FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Todd Hamilton | William Catauro, Sr. x 113 |
| COMPANY: | DATE: 7/14/04 |
| FAX NUMBER: 1-617-333-3203 | TOTAL NO. OF PAGES INCLUDING COVER: 1 |
| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
| RE: 2001 50' Post | YOUR REFERENCE NUMBER: |

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Todd,

I did originally agree to purchase your 2001 50ft Post for $750,000.  However due to the problem and possible future problems the boat  seems to be having with the gel coat cracking,  I am now willing to offer you $600,000 and sign a release with Post for any future gel coat issues.

I look forward to your response.

Thank you,

Bill Catauro Sr.

25 Bath Street    Providence, Rhode Island  02908    Ph:(401) 421-5668    Fx:(401) 421-8465
Email: billcatauro@qualitybeefco.com



# QUALITY BEEF COMPANY

### YOUR FULL LINE FOOD DISTRIBUTOR SINCE 1931

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Todd Hamilton | William Catauro, Sr. x 113 |

| COMPANY: | DATE: |
|---|---|
| | 8/06/04 |

| FAX NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER: |
|---|---|
| 1-617-333-3203 | 1 |

| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
|---|---|
| | |

| RE: | YOUR REFERENCE NUMBER: |
|---|---|
| 2001 50' Post | |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Todd,

I did originally agree to purchase your 2001 50ft Post for $750,000. However due to the problem and possible future problems the boat seems to be having with the gel coat cracking, I am now revising my offer to $625,000 with the understanding that Post will fix the gelcoat problem to my satisfaction.

I feel this is a fair offer due to the fact that I will lose use of the boat for four to five months. I originally planned to take the boat south for the winter which is now not possible.

Please find attached a 10% deposit for $62,500 which is to be refunded if this offer is not accepted.

I look forward to your response.

Thank you,

Bill Catauro Sr.

25 Bath Street    Providence, Rhode Island 02908    Ph:(401) 421-5668    Fx:(401) 421-8465
Email: billcatauro@qualitybeefco.com

EXHIBIT "E"



**Onset Bay Marina**

October 14, 2005

Mr. Todd Hamilton
Fax: (617) 333-3203

    RE: 50' Post

Dear Mr. Hamilton:

    As per your request and pursuant to our inspection of the above captioned vessel, please find below our estimate for the work requested.

1. Prepare the vessel for gel coat removal by removing all cockpit, bridge and foredeck hardware. Protect interior from dust. Remove gel coat from all surfaces by using a gel coat peeler, grinding and sanding. Then apply faring, compound over a sealing coat of Awlgrip's 545 primer. Fare all surfaces, and then apply Awlgrip's high build epoxy primer. Re-sand/fare all surfaces and then apply Awlgrip's 545 primer. Sand and apply Awlgrip topcoat in any color presently available on the current Awlgrip color chart.

    A rough estimate for the work described above would probably run between $375,000 and $450,000.

    Onset Bay Marina would not perform this work on a fixed prices basis. A job of this magnitude would be billed on a times and materials basis (our current labor rate is $80.00 per hour), with a periodic payment schedule.

    If you have any questions, or if we can be of any assistance, please do not hesitate to contact me. Thank you.

        Sincerely,
        ONSET BAY II CORPORATION
        BY:

        LARRY SOULE
        PAINT FOREMAN

LS/neg

P.O. Box 780, Buzzards Bay, MA 02532 • (508) 295-0338  Fax (508) 295-8873
email: info@onsetbay.com    website: www.onsetbay.com

# THE HINCKLEY COMPANY
Since 1928.

One Little Harbor Landing
401 683 7100

Portsmouth, RI 02871
FAX 401 683 7138

| | |
|---|---|
| Customer Name | Todd Hamilton |
| Boat Name | RELENTLESS |
| Job Description | Strip gelcoat & paint |
| Estimate Type | Budgetary Estimate |
| Date/Time | 7/10/08 3:56 PM |
| Service Manager | Eric Leslie |

| Work Code | Line Description / Work Code Description | Planned Hours / LOA | Labor Rate per H LOA | Labor Extended | Est. Qty | Materials Description | Unit Price | Materials Extended | Mtls. & Labor Subtotal |
|---|---|---|---|---|---|---|---|---|---|
| PA | Hull: Remove all gelcoat, prepare and apply Awigrip primer system and topcoat | 1100.0 | 68.00 | 74,800.00 | 1 | Misc. materials | 13,000.00 | 13,000.00 | 87,800.00 |
| PA | Deck: Remove all gelcoat, prepare and apply Awigrip primer system and topcoat | 4000.0 | 68.00 | 272,000.00 | 1 | Misc. materials | 45,000.00 | 45,000.00 | 317,000.00 |
| | NO REPAIRS OR FIBERGLASS WORK FOUND AT OR BENEATH THE GELCOAT IS INCLUDED | | | | | | | | |
| CA | Removal of all deck hardware at T & M | | | | | | | | |
| | Subtotal | 5,100.00 | | 346,800.00 | | | | 58,000.00 | 404,800.00 |
| | Labor Sub-total | | | | | | | | 346,800.00 |
| | Materials Sub-total | | | | | | | | 58,000.00 |
| | Sales Tax | 7.0% | | | | | | | 4,058.00 |
| | Environmental Surcharge | 3.0% | | | | | | | 12,144.00 |
| | Grand Total | | | | | | | | 421,004.00 |

NOTE: If this is an Estimate, it constitutes a non-binding good faith reasonable approximation of the costs for the work based on the assumption that there are no unforeseen circumstances except as described. Because of this, the actual cost could fluctuate up to 20% over or under the estimate. Condition Reports will be filed indicating changes due to unforeseen obstructions and or condition of existing equipment/vessel that may need repairs or modifications to facilitate our install. In this case new estimates may be provided. If this is a Fixed Price Quotation, the work to be done is limited to that described above and/or subject to any conditions stated. Hinckley Yacht Services actively participates in measures and practices to improve our environment. To help fund these actions an environmental surcharge of 3% will be assessed to every invoice.

RELENTLESS Hull & Deck

**EXHIBIT "F"**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

### C.A. No. 05-11682MLW

| | |
|---|---|
| L & T YACHT SALES, INC. | ) |
| | ) |
|      Plaintiff, | ) |
| VS. | ) |
| | ) |
| | ) |
| POST MARINE CO., INC., | ) |
| | ) |
|      Defendant | ) |

## DEFENDANT POST MARINE CO., INC.'
## NOTICE OF TAKING DEPOSITION

TO:    John E. Zajac, Esq.
        CARMICHAEL & ZAJAC, P.C.
        170 High Street
        Taunton, MA 02780

YOU ARE HEREBY NOTIFIED that Defendant, Post Marine Co. Inc., will take the

deposition of the below-named person(s) on the date and at the hour indicated opposite the name at

the offices of Bartlett Hackett Feinberg P.C., 155 Federal Street, 9th floor, Boston, MA 02110

| Name | Date | Time |
|---|---|---|
| L & T Yacht Sales, Inc.<br>By and Through its Corporate Rep. | Fri., April 13, 2007 | 9:00 a.m. |
| Linda Kane | Fri., April 13, 2007 | 1:00 p.m. or immediately following L&T's deposition. |

The deposition will be taken before a Notary Public or other person duly authorized by law

to administer oaths, and may be recorded by any other means permitted by the Federal Rules of Civil

Procedure, including by video pursuant to Fed.R.Civ.P. 30(b)(2). The deposition will be conducted

pursuant to the Federal Rules of Civil Procedure and the Federal Rules of Evidence for the purpose

of discovery, as evidence at trial, and any other purposes allowed by law.

The corporate representative will be examined on the following subjects:

1. All communications between Plaintiff and Defendant Post.

2. All facts surrounding the allegations of Plaintiff's complaint, including but not limited to the formation of any contracts; the purchase of the yacht; any documents associated with the purchase of the yacht; any work or repairs performed on the yachts; any communications with any third parties concerning any work performed on the yacht or with any problems on the yacht; the manner of service of process or other notification to Defendant of the pending complaint; the damages the Plaintiff claims.

3. Any factual matters concerning the affirmative defenses.

Howard Brown, Esquire
Bartlett Hackett Feinberg P.C.
155 Federal Street, 9th floor
Boston, MA 02110


SEGREDO & WEISZ
9350 South Dixie Highway
Suite 1500
Miami, Florida 33156
(305) 670-3820 Telephone
(305) 670-8230 Facsimile


By: _____
Michel Ociacovski Weisz, Esquire
Florida Bar No. 336939
Attorney for Ocean Yachts, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 13, 2007, I served the foregoing document by first class mail, postage prepaid, upon the following counsel of record:

John E. Zajac, Esquire
CARMICHAEL & ZAJAC, P.C.
170 High Street
Taunton, MA 02780


Michel Ociacovski Weisz

# EXHIBIT "G"

Case 1:05-cv-11682-MLW     Document 23-8     Filed 06/01/2007     Page 2 of 19

L&T Yacht Sales vs. Post Marine                    Todd J. Hamilton                    April 17, 2007

Vol. 1 - 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11682MLW

L & T YACHT SALES, INC.,
    Plaintiff,

vs.

POST MARINE CO., INC.,
    Defendant.

DEPOSITION OF TODD J. HAMILTON, taken pursuant to Notice under the applicable provisions of the Federal Rules of Civil Procedure on behalf of the Defendant, before Simonne J. Elwood, R.P.R. and a Notary Public in and for the Commonwealth of Massachusetts, at the office of Bartlett Hackett Feinberg P.C., 155 Federal Street, 9th Floor, Boston, Massachusetts, commencing on Tuesday, April 17, 2007 at 9:57 a.m.

NEAL A. SALLOWAY - COURT REPORTERS
FIVE CARDIGAN ROAD
WEST PEABODY, MA 01960
781-581-3993 - 978-535-0313 - FAX 978-536-3142

Vol. 1 - 2

APPEARANCES:

JOHN E. ZAJAC, ESQ.
CARMICHAEL & ZAJAC, P.C.
170 HIGH STREET
TAUNTON, MA 02780
  REPRESENTS THE PLAINTIFF

MICHEL OCIACOVSKI WEISZ, ESQ.
SEGREDO & WEISZ
9350 SOUTH DIXIE HIGHWAY - SUITE 1500
MIAMI, FL 33156
  REPRESENTS THE DEFENDANT

Vol. 1 - 3

I N D E X

| DEPONENT | DIRECT EXAMINATION |
|---|---|
| TODD J. HAMILTON | |
| By Mr. Weisz | 6 |

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1 | Subpoena | 24 |
| 2 | Defendant Post Marine Co., Inc.'s Re-Notice of Taking Deposition | 24 |
| 3 | Letter - 8/17/04 to Mr. Michel O. Weisz from Lisa A. Kane, Esq. | 28 |
| 4 | Letter - 8/25/04 to Ms. Lisa A. Kane from Michel O. Weisz | 30 |
| 5 | Fax - To Mr. Hamilton from Joseph Martorana | 32 |
| 6 | Letter - 6/15/05 to Dear Joe & Ken from Todd | 37 |
| 7 | Fax - 7/13/05 to Dear Joe & Ken from Todd | 46 |
| 8 | Fax - 7/15/05 to Dear Joe & Ken from Todd | 50 |
| 9 | Fax - 8/10/05 to Mr. Todd Hamilton from Michel Ociacovski Weisz | 52 |

Vol. 1 - 4

CONTINUED

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 10 | Request for Production of Documents | 55 |
| 11 | Summons | 56 |

Case 1:05-cv-11682-MLW   Document 23-8   Filed 06/01/2007   Page 3 of 19

L&T Yacht Sales vs. Post Marine                Todd J. Hamilton                                April 17, 2007

Vol. 1 - 5

T. HAMILTON

1          S T I P U L A T I O N S
2              It is hereby stipulated and agreed by
3      and between counsel for the respective
4      parties that all objections, except as to
5      form, are reserved until the time of trial,
6      including motions to strike.
7              It is further stipulated and agreed
8      that the reading and signing of the
9      deposition are not waived and to be read and
10     signed under the pains and penalties of
11     perjury.
12             It is further stipulated and agreed
13     that the filing and sealing of the deposition
14     are waived.
15
16             TODD J. HAMILTON
17             A witness called on behalf of the
18     Defendant, having been satisfactorily
19     identified by the production of his
20     Massachusetts driver's license 022609789 and
21     duly sworn, under oath, by the Court Reporter
22     and Notary Public, was examined and testified
23     as follows:

Vol. 1 - 6

T. HAMILTON

1      DIRECT EXAMINATION
2   Q  (By Mr. Weisz)  Good morning, Mr. Hamilton.
3      I'm going to assume that your lawyer has told
4      you what to expect at the deposition, so I
5      won't go through the ground rules; but if I
6      ask you something that you don't understand,
7      please let me know.
8   A  Okay.
9   Q  If you need a break, please let me know, and
10     we'll try to make this as, I guess, the least
11     uncomfortable as possible.
12             I'm going to show you -- Well, before
13     we do that, let me ask you, please, to state
14     your full name.
15  A  Todd J. Hamilton.
16  Q  And, Mr. Hamilton, what's your relationship
17     to L & T Yacht Sales, Inc.?
18  A  President.
19  Q  How long have you been the President?
20  A  Since it was formed, I guess.
21  Q  Okay.  Do you know when it was formed?
22  A  Not off the top of my head, I don't.
23  Q  Do you have an estimate?

Vol. 1 - 7

T. HAMILTON

1   A  Sometime in '03.  I don't know the exact
2      month or date.
3   Q  Okay.  What was the purpose of forming L & T
4      Yacht Sales?
5   A  Just I was advised by attorneys and an
6      accountant.
7   Q  Was there a business purpose?
8   A  No, just that's what they told me to do, so I
9      listened to them.
10  Q  What is the business of L & T Yacht Sales?
11  A  Just L & T Yacht Sales.
12  Q  What does the company do?
13  A  Bought a boat, and it's holding a boat.
14  Q  Is that the only asset?
15  A  Yes.
16  Q  Does L & T Yacht Sales file tax returns?
17  A  Yeah.
18  Q  Does it have any income?
19  A  I'd have to ask the accountant that one.  I
20     don't even know.  I don't handle any of the
21     tax stuff to be honest with you; I don't; the
22     accountant does.
23  Q  Do you know who signs the tax return?

Vol. 1 - 8

T. HAMILTON

1   A  I don't know that.  I would assume I would be
2      the guy.
3   Q  Okay.  What does L & T stand for if anything?
4   A  Just Todd and Linda.  My mother's maiden name
5      is Linda.
6   Q  So it refers to your mother's maiden name?
7   A  My mother's first name is Linda.
8   Q  Okay.  Does L & T have any assets other than
9      the boat?
10  A  Not that I know of, no.
11  Q  Who are the other officers of L & T Yacht
12     Sales?
13  A  I think -- I'm not positive, but I think I'm
14     the only person, I believe, but I could be
15     wrong.  Without the documents, I don't know.
16  Q  Okay.  What boat does L & T Yacht Sales own?
17  A  Do I say by name or hull number?
18  Q  If you could describe it by the manufacturer?
19  A  50-foot Post.  P-O-S-T.
20  Q  When was that boat purchased?
21  A  Sometime in the spring of '03, spring or late
22     winter, somewhere in there.
23  Q  Were there any written documents related to

Case 1:05-cv-11682-MLW    Document 23-8    Filed 06/01/2007    Page 4 of 19

L&T Yacht Sales vs. Post Marine                    Todd J. Hamilton                                    April 17, 2007

**Vol. 1 - 9**
T. HAMILTON

1　　the sale?
2　A　Whatever they do for the paperwork, the bill
3　　of sales or whatever, yeah.
4　Q　Okay. Is the boat documented?
5　A　Yes.
6　Q　Okay. U.S. Coast Guard?
7　A　I believe. I don't know. The company -- The
8　　documentation company handled it.
9　Q　Do you know if it's documented with the Coast
10　　Guard or whether it's registered with the
11　　title in a particular state?
12　A　I think it's Coast Guard stuff.
13　Q　Okay. Who was the boat purchased from?
14　A　Jim Zappi (phonetic).
15　Q　Could you spell the last name, please?
16　A　I have no idea how to spell that. It's Jim
17　　Zappi (phonetic).
18　Q　Where was the boat purchased?
19　A　In Connecticut.
20　Q　Was it purchased through a broker?
21　A　No.
22　Q　Okay. Who made the decision to buy the boat?
23　A　I guess I did.

**Vol. 1 - 10**
T. HAMILTON

1　Q　Why did you decide to buy this boat?
2　A　It was a good deal at the time.
3　Q　Where did you learn about the availability of
4　　the boat?
5　A　Someone I had bumped into. I can't remember
6　　if it was in the Cape or the Vineyard; one of
7　　the places I was at, I had bumped into
8　　someone and knew this guy that was selling
9　　the boat, and he was trading it in on a new
10　　boat or something, and they weren't giving
11　　him much money for it or as much as he wanted
12　　or whatever, and they put me in touch with
13　　him.
14　Q　Did you contact this person, or did the
15　　person contact you?
16　A　I contacted him. I believe I contacted him.
17　Q　Okay. How much did you pay for it? How much
18　　did L & T pay for the boat?
19　A　700,000. Excuse me. 703,000, I think.
20　　Between 700 and 710, I think.
21　Q　Where did the closing take place?
22　A　You know, I don't know. That documentation
23　　or whatever, the registration people handled

**Vol. 1 - 11**
T. HAMILTON

1　　most of the stuff.
2　Q　Where was that office located?
3　A　I think they're out of Winchester, Mass.
4　Q　What's their name?
5　A　New England Marine Documentation.
6　Q　Does the boat have an mortgage?
7　A　I believe it does.
8　Q　Did L & T borrow any money to purchase the
9　　boat?
10　A　Yeah. I guess it would be from me.
11　Q　Do you know if sales tax was paid on the
12　　purchase?
13　A　I have no idea how the documentation was
14　　handled with the corporation.
15　Q　Well, I'm not asking about documentation.
16　　I'm asking about sales tax.
17　A　I don't believe in Rhode Island you have to
18　　pay it.
19　　　　MR. ZAJAC: What's the relevance of
20　　that, anyway?
21　　　　MR. WEISZ: Well, there's a venue
22　　question, Counsel. I think there's a
23　　jurisdiction to which the tax is paid would

**Vol. 1 - 12**
T. HAMILTON

1　　have a bearing on it.
2　Q　You don't think sales tax was paid?
3　A　Not in Rhode Island.
4　Q　What does Rhode Island have to do with the
5　　sale of the boat?
6　A　I don't understand.
7　Q　Well, the seller was in Connecticut, is that
8　　right?
9　A　Yes.
10　Q　Okay.
11　A　I don't know if he's from Connecticut,
12　　though. He might be from the another state,
13　　too.
14　Q　Where did you see the boat; in what state?
15　A　Connecticut.
16　Q　Okay. How did Rhode Island come into the
17　　picture?
18　A　What do you mean, how did it come in? I
19　　don't understand.
20　Q　Well, you said that sales tax is not due in
21　　Rhode Island. How did Rhode Island become
22　　the place where the sale took place, or how
23　　did Rhode Island become involved with any

## Vol. 1 - 13
### T. HAMILTON

1      part of this transaction?
2   A   Because sometimes I leave the boat in Rhode
3      Island. I used to boat in Rhode Island with
4      my father constantly. His boat used to be
5      there for years at the Sakonnet River.
6   Q   Is the boat based in Rhode Island?
7   A   Currently, no. It's being fixed.
8   Q   Okay. Other than when it's being fixed, is
9      it based in Rhode Island?
10  A   It's in Rhode Island; it's in Mass.; it's
11     been in Connecticut; it's been in New Jersey;
12     it's been all over.
13  Q   Okay. Where is the boat's home port?
14  A   There isn't one right now; hasn't been for
15     two years.
16  Q   Okay. Where is the boat registered?
17  A   Rhode Island.
18  Q   Did you do anything to prepare for today's
19     deposition?
20  A   No.
21  Q   Did you review any documents?
22  A   No.
23  Q   Did you review the notice of taking

## Vol. 1 - 14
### T. HAMILTON

1      deposition?
2   A   No.
3   Q   Did you review the complaint?
4   A   No.
5   Q   Have you ever read the complaint?
6   A   I probably have at one point a long time ago.
7   Q   Why do you say you probably have?
8   A   From time to time, John gives me stuff to
9      read, and I read it.
10  Q   Do you know whether you actually read the
11     complaint in this case?
12  A   I believe I did in the very very beginning.
13  Q   Okay. Do you know when the complaint was
14     filed?
15  A   No, I don't know the exact date.
16  Q   Do you know how long after you removed your
17     boat from Post the complaint was filed?
18  A   I don't know that either.
19  Q   Do you know whether the complaint was filed
20     before you removed the boat from Post?
21  A   I don't know that. The lawyers would handle
22     that. I wouldn't even know how to file it if
23     I tried to.

## Vol. 1 - 15
### T. HAMILTON

1   Q   I'm not asking you if you filed it. I'm just
2      asking you when it was filed.
3   A   Okay. No. I'm just saying I don't know.
4      The paperwork, I don't handle any of it.
5   Q   Did you bring a copy of the complaint down
6      with you when you went to Post?
7   A   Yes, I did.
8   Q   When you went to Post with the complaint, was
9      your boat still at Post?
10  A   Yes.
11  Q   Does that seem to indicate to you that the
12     complaint was filed before you took the boat
13     from Post?
14  A   I didn't even think about it to be honest.
15  Q   Okay. But let's go back over it. You took a
16     copy of the filed complaint with you when you
17     went down to Post?
18  A   Yes.
19  Q   Your boat was still there?
20  A   Yes.
21  Q   You gave a copy of the complaint to somebody
22     at Post?
23  A   Yes, I did. Ken Jensen.

## Vol. 1 - 16
### T. HAMILTON

1   Q   Okay. And then you took the boat away?
2   A   Yeah. They put it in the water then, and
3      then I left.
4   Q   So does that lead you to conclude that the
5      complaint was filed before you took the boat
6      out of Post?
7   A   I'd be lying. I don't know the answer
8      whether it was or wasn't. I don't know.
9   Q   Okay. All right. When you took the boat
10     from Post, were there any areas of gel coat
11     cracking that had not been fixed?
12  A   Yes.
13  Q   Which ones?
14  A   The back deck, the stern, the port side, the
15     bottom, the hard top, the freezer, the sink
16     area in the back, the step area in the back,
17     the gunnels in the back, the dashboard and
18     the compass area and the bridge floor and the
19     opposite side of the port which I'm drawing a
20     blank for some reason, that side of the hull.
21  Q   Okay. The back deck, is that on the top
22     sides or on the hull?
23  A   It's when you walk in the boat, you step

Vol. 1 - 17
T. HAMILTON

1      down.  It's the floor like in the back of the
2      boat.
3  Q  the stern, are you talking about the stern
4      where the name of the boat is?
5  A  Correct.
6  Q  On the outside of the boat?
7  A  Correct.
8  Q  That would be on the hull then?
9  A  Yes.
10 Q  When you say the port side, are you referring
11     to the hull?
12 A  Yes, I am.
13 Q  When you say the bottom, are you talking
14     about the bottom of the boat where the paint
15     is?
16 A  Yes.
17 Q  When you say the hard top, what are you
18     referring to?
19 A  Above the bridge where you drive, the hard
20     top above your head that -- both sides of
21     that top and bottom of that were cracked.
22 Q  Okay.  Are you saying the underside and the
23     topside?

Vol. 1 - 18
T. HAMILTON

1  A  Yes.  And the forward seat in front of the
2      windshield was still cracked.
3  Q  Okay.  Which freezer are you referring to?
4  A  On the back deck, there's a freezer to your
5      right when you walk in the back door.
6  Q  Which sink area are you referring to?
7  A  When you walk into the back door of the boat,
8      to your left, there's a sink next to the
9      engine-room compartment.
10 Q  What step area are you referring to?
11 A  The step that you walk into the back of the
12     boat.
13 Q  That's where you walk into the inside of the
14     boat?
15 A  Correct.
16 Q  Okay.  When you say the gunnels in back, what
17     are you referring to?
18 A  I might have that worded wrong.  When you
19     step onto the back deck, there's a wall that
20     goes like this on the inside.  (Indicating)
21 Q  Okay.
22 A  There's three walls.  There's one that backs
23     up to where the back of the stern is, the

Vol. 1 - 19

1      inside of the stern, and the two side walls
2      that connect to that were cracked.
3  Q  Okay.  When you say the dashboard, what
4      dashboard are you referring to?
5  A  The helm where you drive up top.
6  Q  When you say the compass area, what does that
7      refer to?
8  A  The bridge area.
9  Q  How is that different from the helm?
10 A  It's probably three or four feet away.  It's
11     in the bridge walls.
12 Q  Okay.  The bridge floor, I guess, is the
13     floor of that area --
14 A  Correct.
15 Q  -- where the helm station is?
16 A  Yes.
17 Q  And then you say office inside of port, what
18     was the last area?  I thought you said
19     something about office inside of port.
20 A  No.  I said the opposite side of the port of
21     the hull.  I was drawing a blank on it, the
22     name on it.
23 Q  Okay.  Opposite side of?

Vol. 1 - 20
T. HAMILTON

1  A  The port side of the hull.
2  Q  You mean the starboard side?
3  A  Correct.
4  Q  Okay.  That's on the hull?
5  A  Yes.
6  Q  And you say these cracks were all there when
7      you took the boat?
8  A  Yes.
9  Q  Okay.
10 A  The gentleman that picked it up with me also
11     witnessed the cracks.
12 Q  Did you take any photographs at that time?
13 A  We did; but taking pictures of white, you
14     can't see anything.
15 Q  Okay.
16 A  It's like taking a picture of a wall that's
17     white, you just don't see anything.
18 Q  Okay.  Did you ever take any pictures after
19     that?
20 A  Pictures when we started to do a lot of the
21     repairs.
22 Q  Okay.  Who did the repairs?
23 A  Some repairs were done by Nemic (phonetic)

Vol. 1 - 21
T. HAMILTON

1    Marine; some were done by me and Eric Mobilia
2    (phonetic).
3  Q  Where are those pictures now?
4  A  I believe that's a disk that I turned over to
5    John which I think went to your --
6  Q  Not in this lifetime.
7       MR. ZAJAC:  You don't have the disk
8    with the pictures?
9       MR. WEISZ:  No, I don't.
10      MR. ZAJAC:  I'll have to get it for
11   you.
12 A  I supplied that months and months ago.
13 Q  Did any of these pictures show the existing
14   cracks?
15 A  Yeah.  You could see some of it.  If it was a
16   sunny day, you couldn't see anything with a
17   camera, but we ended up stripping it down
18   completely to bare fiberglass.  You can see
19   the difference as we were stripping it with
20   tools.  You'll see it in the pictures.  It's
21   completely stripped in the pictures.
22 Q  The question I asked, though, is:  Do any of
23   the pictures show the existing cracks before

Vol. 1 - 22
T. HAMILTON

1    they were stripped?
2  A  Without having the pictures in front of me, I
3    can't remember now.  The pictures were taken
4    last spring of '06.
5  Q  Okay.  What damages are you claiming in this
6    lawsuit?
7  A  The loss of the sale of the boat and the
8    damages to repair it and the carrying cost.
9  Q  Okay.  How much do you claim for the loss of
10   the sale of the boat?
11 A  I'd have to sit down and figure it out now
12   that it's been three years.
13 Q  Okay.  Do you have an estimate?
14 A  I don't.  I haven't really sat down; no one
15   has asked me to sit down and put a number
16   together yet.
17 Q  Okay.  How much are you claiming for repairs
18   to the boat?
19 A  The estimates I have are between, I believe,
20   between 420,000 to 450,000.
21 Q  Are these repairs that have been performed
22   already?
23 A  Some have been done.  Some areas have been

Vol. 1 - 23
T. HAMILTON

1    completed 100 percent.
2  Q  What are you claiming, if anything, for
3    repairs that have been done?
4  A  That would be with the estimate that was
5    given.
6  Q  How much is the value of the work that has
7    been done?
8  A  I don't know.  They didn't break it down in
9    sections.  I would have to ask them to come
10   out and redo the estimate for the section.
11 Q  Have you paid any money to have any cracks in
12   the boat repaired?
13 A  Yes.
14 Q  How much have you paid?
15 A  Oh, I don't know exactly to date with
16   materials and stuff.  I could get it for you.
17 Q  What are you claiming the carrying costs?
18 A  Again, I'd have to sit down and figure out
19   what my costs are to carry it.
20 Q  You haven't done that before today?
21 A  No.  I haven't been asked to either.
22 Q  Did you review the Notice of Taking
23   Deposition that was sent for today's

Vol. 1 - 24
T. HAMILTON

1    deposition?
2  A  No.
3  Q  Okay.
4       MR. WEISZ:  Why don't we mark this as
5    Defendant's Exhibit 1, please.
6       (Whereupon the Stenographer marked as
7    Exhibit No. 1 - Subpoena.)
8  Q  Would you take a look at this document,
9    please?  (Indicating)
10 A  Do you want to me to read everything?
11 Q  No.  Just take a look at it.  You don't need
12   to read it.
13 A  Okay.
14 Q  Could you look at the following pages; make
15   sure you've looked at all the pages?
16 A  (Reviewing document).
17      MR. WEISZ:  Actually, let's do this.
18   Let's mark this as L & T 2, please.
19      (Whereupon the Stenographer marked as
20   Exhibit No. 2 - Defendant Post Marine Co.,
21   Inc.'s Re-Notice of Taking Deposition.)
22 Q  Would you take a look at what we've marked as
23   Exhibit 2 to this deposition?  (Indicating)

## Vol. 1 - 25
### T. HAMILTON

1  A    (Reviewing document) Okay.
2  Q    Have you ever seen that before?
3  A    You know, I don't know. I've seen so much.
4       I don't know what I have seen and haven't
5       seen.
6  Q    Okay. All right. When you removed the boat
7       from Post, did you provide Post with anything
8       in writing indicating what still had to be
9       done on the boat?
10 A    At the time I took it out?
11 Q    Yes.
12 A    No.
13 Q    Did you ever provide them anything in writing
14      after that time indicating what had not been
15      done?
16 A    No. Only before I took the boat.
17 Q    Okay. Since you took the boat from Post,
18      have you ever indicated to them what problems
19      remained to be fixed on the boat?
20 A    No.
21 Q    When you took the boat from Post, did anyone
22      at Post ever tell you they would not fix the
23      items that were still outstanding?

## Vol. 1 - 26
### T. HAMILTON

1  A    They wouldn't communicate with me when I
2       tried before I took the boat to get an answer
3       how we're going to fix the rest of it.
4  Q    Did they ever tell you that they would not
5       fix the items that you claimed were
6       outstanding?
7  A    Yes, they did.
8  Q    Who told you that?
9  A    Joe Martorana.
10 Q    When did he tell you that?
11 A    That was the week prior — Let me think now.
12      That would be the week that I gave him the
13      letter of July 13th.
14 Q    So he told you that before you gave him the
15      letter?
16 A    Yes.
17 Q    What did he say?
18 A    That they would not be stripping the bottom;
19      they would not be stripping the hull; they
20      wouldn't be doing this; they wouldn't be
21      doing that.
22 Q    So they wouldn't fix the boat the way you
23      wanted it, is that right?

## Vol. 1 - 27
### T. HAMILTON

1  A    No, not the way I wanted, the way they said
2       they were going to.
3  Q    How did they say they were going to fix it?
4  A    They said they were going to strip the hull
5       and the cracked areas.
6  Q    Okay. Were they going to strip the entire
7       hull or the areas where there were cracks?
8  A    They said they were going to strip the hull,
9       deck, sides, the bottom.
10 Q    Was there ever anything in writing that
11      indicated what Post was going to do?
12 A    Yes.
13 Q    Okay. What was there in writing?
14 A    A letter from Joe Martorana to me.
15 A    Anything else?
16 A    About the work they were going to do?
17 Q    Yes.
18 A    No, not about -- The only thing in writing
19      from them about work was the one letter, I
20      believe, except for the letter from you, of
21      course.
22 Q    Okay. Do you think the letter from me
23      counts?

## Vol. 1 - 28
### T. HAMILTON

1  A    It didn't really say what they were going to
2       do. That's why I called Joe back to verify
3       it.
4  Q    Who is Linda Kane; Lisa Kane?
5  A    My fiance.
6  Q    How long has she been your fiance?
7  A    2001 or 2002. I think it was August of 2001;
8       I think.
9  Q    Okay. We'll seal that part of the record.
10      Was she ever your lawyer?
11 A    Yes.
12 Q    Did she act as your lawyer in your dealings
13      with Post?
14 A    Yes.
15 Q    Did she ever write a letter on your behalf?
16 A    Yes.
17 Q    Did you look at the letter before it was
18      sent?
19 A    Yes.
20          MR. WEISZ: Why don't we mark this as
21      Exhibit 3, please.
22          (Whereupon the Stenographer marked as
23      Exhibit No. 3 - Letter - 8/17/04 to Mr.

Vol. 1 - 29
T. HAMILTON

1    Michel O. Weisz from Lisa A. Kane, Esq.)
2  Q  You can take a look at that letter, please.
3    Let me know when you're finished looking at
4    it. (Indicating)
5  A  **(Reviewing document) Yes.**
6  Q  Have you seen that letter before?
7  A  **Yes.**
8  Q  Okay. Can you tell me what that letter is?
9  A  **It's a letter addressed to you regarding the**
10   **boat and the situation.**
11  Q  Okay. Was that written by Lisa Kane?
12  A  **Yes, it was.**
13  Q  Was she acting as your attorney when she sent
14   that letter?
15  A  **At that time, yes.**
16  Q  When I say, "your," by the way, I mean L & T
17   Yacht Sales?
18  A  **Yes, I understand.**
19  Q  All right. Do you know if there was ever a
20   response to this letter?
21  A  **I know you had sent a letter to her. I don't**
22   **know the exact date or whatever. I know I've**
23   **seen it.**

Vol. 1 - 31
T. HAMILTON

1    was ever sent on behalf of L & T to this
2    letter?
3  A  **Yes, the letter from Joe Martorana.**
4  Q  I'm asking a slightly different question.
5  A  **Okay.**
6  Q  Do you know if anybody from L & T, either you
7    or your attorney at the time, ever sent a
8    letter in response to this?
9  A  **No. I called Ken Jensen.**
10  Q  Okay.
11  A  **Because, at the time, Bill Kachero**
12   **(phonetic), the guy that wanted to buy the**
13   **boat wouldn't accept this letter because he**
14   **said it was too vague; he wouldn't purchase**
15   **the boat. So I called Ken. Ken wasn't**
16   **around, and I spoke to Joe, and I said, "Joe,**
17   **the sale is falling apart. The guy is not**
18   **comfortable with what repairs and how they're**
19   **going to be done." I said, "You've got to**
20   **clarify it." And he faxed me that letter.**
21       MR. WEISZ: Let's mark this as the
22   next exhibit, please.
23

Vol. 1 - 30
T. HAMILTON

1  Q  Okay.
2       MR. WEISZ: Mark this as the next
3    exhibit.
4       (Whereupon the Stenographer marked as
5    Exhibit No. 4 - Letter - 8/25/04 to Ms. Lisa
6    A. Kane from Michel O. Weisz.)
7  Q  (Indicating)
8  A  **(Reviewing document) I have seen this.**
9  Q  That's a letter that I wrote to Ms. Kane?
10  A  **Yes, it is.**
11  Q  Okay. Do you see the bottom of the first
12   page where it says No. 1?
13  A  **Yes.**
14  Q  Do you see the line above that or the
15   paragraph above that that says, "Post Marine
16   will inspect the entire vessel to determine
17   the extent of the gel coat repairs to be
18   performed." Is that what it says?
19  A  **Yes, it does.**
20  Q  Does it say after that, "The areas affected
21   will be treated in the following manner."?
22  A  **Yes, it does.**
23  Q  Okay. Do you know if any written response

Vol. 1 - 32
T. HAMILTON

1       (Whereupon the Stenographer marked as
2    Exhibit No. 5 - Fax - To Mr. Hamilton from
3    Joseph Martorana.)
4  Q  Do you recognize that letter? (Indicating)
5  A  **Yes, I do.**
6  Q  Do you know when that letter was sent?
7  A  **I do. I don't have it in front of me because**
8    **it's on the top.**
9  Q  Okay.
10  A  **But it's not -- You can't see it here, but**
11   **the original you can see the date and time it**
12   **was faxed. I believe it was in either**
13   **September or October of 2004.**
14  Q  Do you know whether that letter was sent
15   before you brought the boat to Post for
16   repairs?
17  A  **Yes, it was.**
18  Q  Okay. And when did you bring the boat to
19   Post for repairs?
20  A  **I believe it was the end of October or**
21   **November 1st, somewhere in there.**
22  Q  Did you ever pay Post anything to repair the
23   boat?

Case 1:05-cv-11682-MLW    Document 23-8    Filed 06/01/2007    Page 10 of 19

L&T Yacht Sales vs. Post Marine              Todd J. Hamilton                          April 17, 2007

Vol. 1 - 33
T. HAMILTON

1  A    Nope.
2  Q    Do you know what the value of the work was
3       that Post performed on the boat?
4  A    The value that Post did?
5  Q    Yes.
6  A    Zero.
7  Q    Okay. And why do you say that?
8  A    Because they sprayed gel coat over gel coat
9       that's recracking so now it's double the work
10      to take it off.
11 Q    How do you know that's what they did?
12 A    When you're sanding it off, you could see
13      three layers; it was so thick.
14 Q    And --
15 A    Three different colors.
16 Q    Okay. Is this something that you have
17      observed yourself?
18 A    Yes.
19 Q    And how do you know it's three layers of gel
20      coat?
21 A    Three different colors.
22 Q    What does that mean; why does that mean three
23      different --

Vol. 1 - 34
T. HAMILTON

1  A    Well, if you put three -- If you put paint on
2       this wall that's white and then put an off
3       white on top of that white then another off
4       white, you've got three different colors.
5       You can see the different layers.
6  Q    I see.
7  A    When you bury (phonetic) coat the bottom of a
8       boat and you buy the stuff from Intelex, they
9       tell you to put four coats, and the coats go
10      white, brown, white, brown so you can keep
11      track of how many colors and layers you put
12      on it.
13 Q    Okay. And has anyone else told you that's
14      how they repaired the boat?
15 A    Yes.
16 Q    Who else has told you?
17 A    Nemic (phonetic) Marine.
18 Q    Who, anybody in particular?
19 A    Marty.
20 Q    What's Marty's last name?
21 A    I don't know offhand. I can get it for you,
22      though.
23 Q    And what does Marty do?

Vol. 1 - 35
T. HAMILTON

1  A    Runs the boatyard and does a lot of gel coat
2       and fiberglass work.
3  Q    Have you ever paid him to do fiberglass work?
4  A    Yes, I did.
5  Q    How much have you paid him?
6  A    Off the top of my head, between $8,000 and
7       $10,000.
8  Q    And what have you paid him to do?
9  A    Respray a lot of the areas after they were
10      taken down and redone.
11 Q    Okay.
12 A    The pictures will show all the work that was
13      done and all the stripping.
14 Q    Okay. Now, was he fixing cracked gel coat on
15      your boat?
16 A    No. What he did I paid him because he has
17      the facility to bring it inside and spray the
18      gel coat. We did all the preparation.
19 Q    What do you mean, "We did all the
20      preparation"?
21 A    Myself and Eric Mobilia (phonetic).
22 Q    What did you do?
23 A    We removed all the gel coat; we refilled all

Vol. 1 - 36
T. HAMILTON

1       the pin holes or the polyester and prep'd it
2       for them to spray the gel coat.
3  Q    So has all the gel coat cracking been fixed
4       on the boat now?
5  A    The bottom and the cockpit only.
6  Q    Okay. So the areas you still discussed are
7       the ones that are still cracked?
8  A    The sides of the hull. As a matter of fact,
9       I uncovered the boat last week. They're
10      working on another section. I uncovered the
11      top side to have another inspector look at
12      it, and all the cracks and the helm that they
13      fixed and by the compass are coming back
14      right through.
15 Q    Did you inspect the boat at Post while it was
16      being fixed?
17 A    Yes.
18 Q    Did you ever write them a letter telling them
19      what you observed?
20 A    Somewhat. I mean, most of the time when I
21      went there, it was always a section to the
22      boat that were covered so you couldn't see
23      the whole boat.

Case 1:05-cv-11682-MLW    Document 23-8    Filed 06/01/2007    Page 11 of 19

L&T Yacht Sales vs. Post Marine                    Todd J. Hamilton                                       April 17, 2007

Vol. 1 - 37
T. HAMILTON

1 Q  Did you ever write a letter to Post after you
2    inspected the boat?
3 A  I know I sent them a list one time with a
4    letter.
5 Q  Okay.
6         MR. WEISZ: Mark this as the next
7    document, please.
8         (Whereupon the Stenographer marked as
9    Exhibit No. 6 - Letter - 6/15/05 to Dear Joe
10   & Ken from Todd.)
11 Q  Exhibit 6. (Indicating)
12 A  (Reviewing document) Yes.
13 Q  Okay. Did you look at the boat before June
14   15th, 2005?
15 A  Yes, I did.
16 Q  Did you look at it personally?
17 A  Yes, I did.
18 Q  Okay. Did you write this letter dated June
19   15th, 2005?
20 A  What do you mean did I write it.
21 Q  Did you write it?
22 A  No. I dictated it. I can't write. I can't
23   type.

Vol. 1 - 38
T. HAMILTON

1 Q  Okay.
2 A  I'll be honest with you.
3 Q  Okay. Who did you dictate the letter to?
4 A  It was either my mother or Lisa did it for
5    me.
6 Q  Did you check the letter after it had been
7    dictated?
8 A  Yes.
9 Q  Did you make sure it was correct?
10 A  For what I wanted, yes.
11 Q  Okay. Did you sign it?
12 A  Yes, I did.
13 Q  Okay. What was it that you wanted?
14 A  I wanted the areas fixed. I mean, they told
15   me they stripped the front deck; and then,
16   you know, I put in the letter the blended
17   spots around the front deck hatches. Well,
18   if you're telling me you stripped the front
19   deck and you sprayed the whole front deck,
20   why is there blended areas around the
21   hatches, you know, I mean?
22 Q  When did they tell you they stripped the
23   whole front deck?

Vol. 1 - 39
T. HAMILTON

1 A  They told me that in March.
2 Q  Okay. And how did they tell you that, over
3    the phone or in person?
4 A  Over the phone. I kept calling for a
5    progress report through the winter.
6 Q  It would always be Joe or Ken is the only two
7    people I'd speak to.
8 A  All right.
9 A  Let's just see what you say here.
10 A  Okay.
11 Q  "As a follow up to our conversation on June
12   14, 2005 at Post Marine in New Jersey, --."
13   So that was an in-person conversation?
14 A  Yes, it was.
15 Q  Okay. And you were at the boat?
16 A  I went and reviewed the boat. I remember
17   when they had the boat. It was outside.
18   They had one side covered. They were doing
19   something on the back.
20 Q  Okay. "-- and our subsequent phone
21   conversation on June 15, 2005, the following
22   are the items we have agreed that I need you
23   to repair prior to me picking up the boat

Vol. 1 - 40
T. HAMILTON

1    from Post Marine during first week of July."
2 A  Correct.
3 Q  Okay. "Blend spots around the front deck
4    hatches." What does that mean?
5 A  What I was saying is that told me they had
6    stripped the front deck; and when I walked up
7    on the front deck, I could see big spots like
8    this that was one color; then there was
9    another color over here. (Indicating)
10 Q  So what were they supposed to do?
11 A  Well, they told me because the front deck was
12   cracked from where the seat was to the bow
13   pulpit that they were going to remove the old
14   gel coat so they would spray one whole coat
15   over it.
16 Q  What does it mean -- What were they supposed
17   to do to blend spots around the front deck
18   hatches?
19 A  That's what I wanted to know what they were
20   going to do with it.
21 Q  Okay. So you didn't know what they were
22   going to do?
23 A  No. I was trying to get that out of them.

Case 1:05-cv-11682-MLW    Document 23-8    Filed 06/01/2007    Page 12 of 19

L&T Yacht Sales vs. Post Marine          Todd J. Hamilton                          April 17, 2007

Vol. 1 - 41

T. HAMILTON

1  Q  Okay.  Where does it say you wanted an
2      explanation as to what you're going to do?
3  A  Well, I had spoke to Joe when we walked
4      around the boat.
5  Q  No.  Where does it say in the letter?
6  A  It doesn't.  It doesn't.
7  Q  Okay.  "Refinish non skid on the front bench
8      seat."  What does that mean?
9  A  The non skid was all cracked on the seat
10     front like this.  (Indicating)
11 Q  So you wanted them to refinish that?
12 A  I wanted them to fix it.
13 Q  Okay.  "Fix the over spray on the back deck
14     walls below the fish holders."
15 A  Yes.
16 Q  You wanted them to fix the overspray?
17 A  Yeah.  They didn't — When they had sprayed
18     the back-deck floor, they didn't cover the
19     walls in there, and it was like 80-grit paper
20     when you put your hand over it.
21 Q  "Refinish bridge compartment door where the
22     paint was burned off caused by buffing."
23 A  Correct.

Vol. 1 - 42

T. HAMILTON

1  Q  "Refinish the compass area on the bridge."
2      What does that mean to refinish?
3  A  Well, they went in there, and they spot —
4      they went and fixed one little corner, and
5      then they found another corner over here.
6      (Indicating)  The whole thing was three
7      colors.  It's a square box.  There was one
8      color here; one color here and then the
9      original color.  (Indicating)
10 Q  Okay.  "Fix the overspray on the bridge
11     components and aluminum pipe."
12 A  Yes.
13 Q  Okay.  "Recock side windows."  What does that
14     mean?
15 A  They had taken some caulking out around the
16     windows, and they didn't put it back in the
17     way it was in there before.
18 Q  All right.  So instead of "recock," it's
19     recaulk, C-A-U-L-K?
20 A  Yes, I guess you could say that.
21 Q  Okay.  No. 8, "Clean the gunnels from
22     overspray."
23 A  Yes.

Vol. 1 - 43

T. HAMILTON

1  Q  Okay.  No. 9, "Repair a bubble below the
2      stern light on the transom."
3  A  Correct.
4  Q  The transom is the back of the boat?
5  A  Yes.
6  Q  Okay.  What's a bubble?
7  A  When I brought the boat in, where the name
8      was, there was cracks from the top rugrail
9      right down to the bottom paint through the
10     boot stripe, and Joe said, "We're going to
11     have to strip the stern, strip the tuna
12     (phonetic) door."  I said, "I know.  I
13     understand."  So they took all the lettering
14     off.  They told me they had stripped it.  I
15     get down there, and there's bubbles as big
16     as -- inch and-a-half bubbles protruding out
17     through the gel coat.
18 Q  Well, this says, "Repair a bubble."  That
19     means one bubble.
20 A  There was more than one.  I just put in there
21     a bubble.  I didn't really get into
22     specifics.  At this point, I thought we were
23     working through it.  I just didn't get into

Vol. 1 - 44

T. HAMILTON

1      nitty-gritty with them.  I just wanted to get
2      it over with to be honest with you.
3  Q  Well, the word, "a" is a pretty specific
4      word, isn't it?
5  A  Yes.
6  Q  Okay.  And it's a pretty specific area below
7      the stern light, right?
8  A  Yep.
9  Q  Nothing in here about bubbles all over the
10     transom, is there, in writing?
11 A  There was two bubbles; just two.
12 Q  Just two.  Okay.  No. 10, "Repair right and
13     left side boot stripe where there are
14     bubbles."  Is that right?
15 A  Correct.
16 Q  Okay.  "Re do the crack below the engine in
17     takes on the side of boat."
18 A  Correct.
19 Q  Is that correct?
20 A  Yes.
21 Q  "Refinish the back door step."
22 A  Correct.
23 Q  "Fix crack in the stem of the bow."

Case 1:05-cv-11682-MLW    Document 23-8    Filed 06/01/2007    Page 13 of 19

L&T Yacht Sales vs. Post Marine                              Todd J. Hamilton                                            April 17, 2007

Vol. 1 - 45
T. HAMILTON

1  A    Correct.

2  Q    Okay.  And 14 is blank.

3  A    Yes.

4  Q    Okay.  And that was your entire list of items

5       that needed to be done before the boat was

6       picked up, is that correct?

7  A    For what I could see.  The boat was half

8       covered when I got there.

9  Q    Okay.  Did you ask them to remove the cover?

10  A    They couldn't.  They had guys sanding.  They

11      had the thing all mast off.  So I kept poking

12      my head where I could put it.

13  Q    Okay.  Did you go back and look at the boat

14      again when they took it off?

15  A    When I came back in July, yes.  When it was

16      uncovered when I got there and it was a

17      cloudy day, yes, I did.

18  Q    Okay.

19  A    You can't look at the boat in direct sunlight

20      because it's too blinding.

21  Q    Okay.  So you can see the cracks better on a

22      cloudy day?

23  A    Oh, absolutely.

Vol. 1 - 46
T. HAMILTON

1  Q    Okay.  And you were there on a cloudy day?

2  A    Not in June; in July.

3  Q    All right.

4          MR. WEISZ:  Please mark this as the

5      next exhibit.

6          (Whereupon the Stenographer marked as

7      Exhibit No. 7 - Fax - 7/13/05 to Dear Joe &

8      Ken from Todd.)

9  Q    (Indicating)

10  A    (Reviewing document)  I recognize this.

11  Q    Did you dictate this?

12  A    Yes, I did.

13  Q    Did you have this sent to Post?

14  A    Yes, I did.

15  Q    Did you have it sent on or about July 13th,

16      2005?

17  A    Yes, I did.

18  Q    Okay.  It says, "As per our conversation

19      today, July 13, 2005 during my third visit to

20      Post Marine in New Jersey, --."  Do you see

21      that?

22  A    Yes, I do.

23  Q    All right.  Was that your third visit since

Vol. 1 - 47
T. HAMILTON

1      the first time you brought the boat?

2  A    No.  That would be my fourth then if you

3      wanted to -- See, I didn't bring the boat to

4      Post because when I called them, they said,

5      "Leave it at the mouth of the river because

6      the river is not marked."  There's no marking

7      on the charts to bring it into their dock

8      unless you know how to get in there.  So they

9      told me to leave it there.  So I never went

10      to Post.  The first time, I went to New

11      Jersey and got on a plane from that marina.

12  Q    Okay.  The letter that you wrote on June

13      15th, the one we were looking at before this,

14      was that your first visit to Post?

15  A    No.  I think the first visit to Post was

16      either March or April, I think.

17  Q    Okay.  The letter you wrote on June 15th, was

18      that your second visit to Post?

19  A    I believe so.

20  Q    Okay.  The letter that you're writing on July

21      13th, was that your third visit to Post?

22  A    I believe I was at Post the 12th, I thought.

23      I'd have to check the plane tickets to

Vol. 1 - 48
T. HAMILTON

1      remember exactly -- whether it was the 13th

2      or the 12th, but it's one of those two days.

3  Q    "-- due to my disappointment regarding the

4      current condition of the boat, even after

5      numerous visits, --."  Were there more than

6      three visits?

7  A    Not to my knowledge that I can remember

8      offhand.

9  Q    Okay.  "-- phone conversations and faxes --."

10      What faxes do you have before July 13th, 2005

11      regarding the fixing of the boat?

12  A    There was a lot of faxes prior to the boat

13      going there.

14  Q    Where are those?

15  A    Those are some of the letters between you and

16      Lisa, the letter from Joe, and I have one

17      more letter that I've got to go through

18      because I moved.  It's in storage boxes

19      somewhere, a letter that Ken made me a

20      written offer to settle it, a $50,000 cash

21      offer.  I've got to check two more storage

22      facilities to see if I can find the letter,

23      but I believe I have it.

Case 1:05-cv-11682-MLW    Document 23-8    Filed 06/01/2007    Page 14 of 19

L&T Yacht Sales vs. Post Marine    Todd J. Hamilton    April 17, 2007

Vol. 1 - 49

T. HAMILTON

1  Q  When do you think you're going to do that?
2  A  I'm going to try -- I was going to try and do
3     it over this weekend. I was just too sick.
4     I'm going to try and do it in the next couple
5     days.
6  Q  You further state, "-- I now must request
7     that you do not touch the bottom or the sides
8     of my boat until the three of us have the
9     opportunity to discuss the steps moving
10    forward."
11 A  Correct.
12 Q  So you tell them not to touch the bottom or
13    the sides of the boat, is that right?
14 A  Yes.
15 Q  Okay.
16 A  Because they wouldn't tell me how they were
17    going to fix it.
18 Q  Okay.
19 A  And I asked them.
20 Q  All right. Did you put anything in writing
21    here that indicates that anything other than
22    the bottom or sides of the boat still needs
23    to be fixed?

Vol. 1 - 50

T. HAMILTON

1  A  No. At that point when I went down on July
2     13th, Joe walked me around, and they took the
3     step off the back of the boat. They had a
4     worker taking the step off the back of the
5     boat where you walk into it, and he'd
6     actually taped off around the non-skid and
7     sanded the non-skid very lightly and went to
8     spray over it, and I said to Joe, "You're
9     spraying gel coat right over the other gel
10    coat without removing it. What do you think
11    this is going to do?" I said, "This is what
12    the whole boat has been." I said, "We're not
13    doing the hull this way and bottom this way."
14    I said, "Until we get firm what we're doing,
15    I'm not going further."
16 Q  Okay.
17       MR. WEISZ: Mark this as the next
18    exhibit.
19       (Whereupon the Stenographer marked as
20    Exhibit No. 8 - 7/15/05 to Dear Joe &
21    Ken from Todd.)
22 Q  (Indicating)
23 A  (Reviewing document) Yes, I recognize this.

Vol. 1 - 51

T. HAMILTON

1  Q  All right. Did you dictate this letter?
2  A  Yes, I did.
3  Q  Did you send it?
4  A  Did I, personally, send it?
5  Q  Or did someone send it for you?
6  A  Yes. Do you know what? This one I could
7     have done because I was home then. I could
8     have faxed it myself.
9  Q  Okay. Do you know if it was sent on or about
10    July 15th, 2005?
11 A  It was sent -- Yeah. I remember that day,
12    distinctly, being on the phone with Ken from
13    morning until late afternoon.
14 Q  And the next to the last paragraph, the last
15    sentence reads, "It is for this reason that
16    you are not to do ANY --," and "any" is in
17    capitals and bold, "-- further work on this
18    boat as of today, July 15, 2005." Is that
19    right?
20 A  Correct.
21 Q  Okay. Did you ever authorize Post to proceed
22    with the repairs that remained to be done on
23    the boat after July 15th, 2005?

Vol. 1 - 52

T. HAMILTON

1  A  Could you repeat that again?
2  Q  Sure. Did you ever tell Post to go ahead and
3     finish doing the work they were going to do
4     after July 15th, 2005?
5  A  No. I never heard from them. I begged Ken
6     to get back with a response so we could try
7     and settle it, him and I, without lawyers to
8     be honest, and we couldn't get anywhere.
9        MR. WEISZ: Would please mark this as
10    the next exhibit?
11       (Whereupon the Stenographer marked as
12    Exhibit No. 9 - Fax - 8/10/05 to Mr. Todd
13    Hamilton from Michel Ociacovski Weisz.)
14 Q  Did you receive that letter? (Indicating)
15 A  (Reviewing document) Yes, I did.
16 Q  Did you ever respond to that letter in
17    writing?
18 A  No.
19 Q  Okay. Did you, in fact, remove the boat?
20 A  Yes, I did.
21 Q  Other than the letters you've looked at today
22    and the faxes that you've looked at today,
23    are you aware of any other written

Case 1:05-cv-11682-MLW   Document 23-8   Filed 06/01/2007   Page 15 of 19

L&T Yacht Sales vs. Post Marine                    Todd J. Hamilton                                    April 17, 2007

Vol. 1 - 53

T. HAMILTON

1    communications between yourself and Post
2    regarding the repairs to your boat?
3  A  Repairs, not that I know of unless I don't
4    have one of the letters, but I think
5    everything, except for the one letter that
6    Ken made me the written offer in November of
7    '04. There was a letter, I think, in the
8    very beginning that I addressed to him just
9    about how it was going to be repaired and all
10   that stuff, but I think that's in this pile,
11   my concerns. (Indicating)
12 Q  Did you buy this as a new boat or a used
13   boat?
14 A  Used boat; secondhand.
15 Q  Did you communicate with Post at any time
16   before you bought this boat?
17 A  Yes, I did.
18 Q  Who did you communicate with?
19 A  Joe Martorana.
20 Q  And when did you see Mr. Martorana or speak
21   to Mr. Martorana?
22 A  It was sometime in the spring or whenever it
23   was when the boat was purchased.

Vol. 1 - 54

T. HAMILTON

1  Q  After it was purchased?
2  A  No, before. It could have been before or
3    after, somewhere in there.
4  Q  What do you recall of that conversation or
5    meeting?
6  A  There was a list of things that they hadn't
7    repaired for the previous owner because they
8    said they would take care of it, so I called
9    him to confirm it, and they said they would.
10 Q  Did they?
11 A  No.
12 Q  Did you ever follow up and say, "You didn't
13   fix stuff that you said you were going to
14   fix."?
15 A  No.
16 Q  Did you ever have any written communications
17   with Post?
18 A  They had sent a letter to Jim, the original
19   owner, that they were going to fix the hole
20   in the back deck because they had to fix the
21   sending unit for the fuel tank. I guess when
22   he had the boat, the fuel gauge wasn't
23   working, so they had to drill a hole in the

Vol. 1 - 55

T. HAMILTON

1    back deck to get it out, and they put a metal
2    plate over it. So that was something they
3    were going to fix for him. I don't know.
4    There were a couple of little things, nothing
5    major that I know of.
6  Q  Okay.
7        MR. WEISZ: Let's mark this as the
8    next document.
9        (Whereupon the Stenographer marked as
10   Exhibit No. 10 - Request for Production of
11   Documents.)
12 Q  Okay. Have you ever seen that before?
13   (Indicating)
14 A  I'm pretty sure I have read -- at one point,
15   I'm sure I read it.
16 Q  Do you know what it is?
17 A  Yeah, request for the documents and any
18   paperwork, I guess, pertaining to the boat or
19   the claims or whatever.
20 Q  Okay. Did you look for any of the documents
21   that are asked for in this request?
22 A  Yes, I did.
23 Q  Did you produce everything that you found and

Vol. 1 - 56

T. HAMILTON

1    had?
2  A  At that time, everything that I could get my
3    hands on, yes, except for that one thing that
4    I think I'm missing.
5  Q  Well, this document is dated May 30th, 2006.
6    Do you see that, the back, the last page?
7  A  Yes, it is.
8  Q  All right. Are there any documents you have
9    responsive to this request that have not been
10   produced?
11 A  It would only be the one if I have it in my
12   storage facility, and I only remembered it
13   the other day when Ken was asked a question
14   that popped into my head.
15       MR. WEISZ: Mark this as the next
16   document, please.
17       (Whereupon the Stenographer marked as
18   Exhibit No. 11 - Summons.)
19 Q  Do you recognize that? (Indicating)
20 A  I think I've seen it.
21 Q  Do you know what it is?
22 A  I think it was the paper, the lawsuit when it
23   was filed.

Case 1:05-cv-11682-MLW    Document 23-8    Filed 06/01/2007    Page 16 of 19

L&T Yacht Sales vs. Post Marine                Todd J. Hamilton                                April 17, 2007

## Vol. 1 - 57
### T. HAMILTON

1  Q   Okay.  Do you know if you read it before it
2        was filed?
3  A   I believe I did.
4  Q   Have you read it since it was filed?
5  A   No.
6  Q   Did you have an offer from somebody to buy
7        your boat before you contacted Post to repair
8        it?
9  A   Yes.
10 Q   Did you look at another boat Post had
11       repaired before Post started working on your
12       boat?
13 A   Yes.
14 Q   Which boat did you look at?
15 A   It was a 2150 Post over in the Charles River.
16 Q   Were you dissatisfied with the repairs --
17 A   Yes.
18 Q   -- on that boat?
19 A   Yes.
20 Q   Did you tell Post?
21 A   Yes.
22 Q   Did you tell them that before they started
23       working on your boat?

## Vol. 1 - 58
### T. HAMILTON

1  A   I told them less than two hours after looking
2        at it by cell phone.
3  Q   What happened after that?
4  A   They told me that was a quickie, and they
5        would ensure that they would do better with
6        mine.  And the reason I was sent there is
7        Ken, originally, said that he would stand
8        behind if the guy bought the boat; he'd fix
9        it; and the guy that was buying the boat
10       said, "I want to see a boat that they fixed
11       first."  And I said to Ken, "I think I better
12       look at it before he does."  And thank God I
13       did.
14 Q   Okay.  And then after you saw that boat, you
15       decided to let Post fix your boat, anyway, is
16       that right?
17 A   At that point, they didn't want to settle it
18       any other way.  They put in writing how they
19       were going to do it.  They said they were
20       going to do it right.  I gave them the
21       benefit of the doubt.
22 Q   Okay.  You state in the complaint that L & T
23       continues to pay insurance and carrying costs

## Vol. 1 - 59
### T. HAMILTON

1        on a boat that he cannot use.  What do you
2        mean you cannot use?
3  A   Well, for nine months, I couldn't use it
4        because Post had it, and then it came back
5        here and sat for another ten months being
6        stripped and worked on.  That's two years.
7  Q   Why was it taking ten months to strip and
8        work on it after you took it from Post?
9  A   Because they sprayed right over the old gel
10       coat, so I had to redo their work; twice the
11       work.
12 Q   Is the boat completely fixed now?
13 A   Nope.
14 Q   What still needs to be done?
15 A   The sides of the hull, the front deck, the
16       bridge, the hard top, the front of the
17       windshield and where it says, "Post," it all
18       has to be stripped.  It's all cracking.
19       Everything they've touched and sprayed is
20       cracked.
21 Q   Why hasn't that been fixed yet?
22 A   Because it took us six and-a-half months to
23       strip that one section correctly and do it

## Vol. 1 - 60
### T. HAMILTON

1        right.
2  Q   Which section was stripped and done
3        correctly?
4  A   The complete bottom, the complete cockpit,
5        back wall, sink, freezers, gunnels.  All the
6        pictures, and I don't know why you don't have
7        them; but when you have them, you'll see what
8        was stripped exactly right to bare
9        fiberglass.
10 Q   Okay.  Have you complained to anybody that
11       it's taking too long to get your boat fixed?
12 A   When who's fixing it?
13 Q   Whoever is fixing it now?
14 A   They're only spraying it.  I'm making sure I
15       do it myself so it's done right.
16 Q   So you're not complaining to yourself that
17       it's taking too long?
18 A   Sure I am.  I spent probably six straight
19       months and my weekends and weekdays going
20       there.
21 Q   Are you complaining to yourself that it's
22       taking too long to fix?
23 A   Oh, very very upset.

Case 1:05-cv-11682-MLW    Document 23-8    Filed 06/01/2007    Page 17 of 19

L&T Yacht Sales vs. Post Marine                     Todd J. Hamilton                                April 17, 2007

Vol. 1 - 61
T. HAMILTON

1  Q    Okay.  So why don't you just work faster?
2  A    **Because I want to do it right.**
3  Q    I see.
4  A    **I'm not just going to do a make-O.**
5  Q    Okay.  Is the boat for sale?
6  A    **No.**
7  Q    The offer that you claim you had before you
8       notified Post of the cracking problem, how
9       much was that offer for?
10 A    **750,000.**
11 Q    So you were offered more than what you paid
12      for the boat?
13 A    **Yeah.  I put probably 10,000 or 15,000 into**
14      **it.**
15 Q    Okay.
16 A    **The gentleman that was buying the boat**
17      **notified me of the cracks.  I didn't even**
18      **know that there was an issue.  He had been**
19      **looking at Vikings and Post and told me there**
20      **was a serious problem with it when he saw**
21      **them on my boat, and that's when I called**
22      **Ken.**
23 Q    Have you discussed this lawsuit with anyone

Vol. 1 - 62
T. HAMILTON

1       other than your attorneys?
2  A    **Yes.**
3  Q    Who have you discussed it with?
4  A    **I haven't discussed in detail.  I've told**
5       **people that there's a lawsuit pending.**
6  Q    Who have you told?
7  A    **Nemic (phonetic) Marine; other Post dealers,**
8       **probably.**
9  Q    Okay.
10 A    **Portland Boat Work.**
11 Q    Have you contacted anybody who -- I'm sorry.
12      Have you contacted the company that makes the
13      gel coat?
14 A    **Not to date.**
15 Q    Have they contacted you?
16 A    **Not to date.**
17 Q    Have you contacted the attorneys who are
18      representing the gel coat manufacturer?
19 A    **Not as of to date.**
20 Q    Has your -- Have they contacted you?
21 A    **You already asked me that I believe.**
22 Q    No.  I asked if you contacted them.  I'm
23      asking if they contacted you?

Vol. 1 - 63
T. HAMILTON

1  A    **No, they have not at this date.**
2  Q    Do you know if they have contacted your
3       attorneys?
4  A    **Not to my knowledge.  You'd have to ask them.**
5  Q    Have you ever had this boat surveyed?
6  A    **You mean for the fiberglass gel coat itself?**
7  Q    Any type of survey?
8  A    **Just the gel coat.**
9  Q    Who did the gel coat survey?
10 A    **I'm drawing a blank on his name.  I'd have to**
11      **get you his name.**
12 Q    When was the survey done?
13 A    **Last -- I don't know the exact date now.**
14 Q    What year was it done?
15 A    **'06, I believe.**
16 Q    What was the purpose of the survey?
17 A    **I wanted someone to witness the thicknesses**
18      **of the gel coat.**
19 Q    What was the purpose of doing that?
20 A    **To show that it was too thick.**
21 Q    What were the results of the survey?
22 A    **He couldn't believe what he saw.**
23 Q    What did he say?

Vol. 1 - 64
T. HAMILTON

1  A    **He saw gel coat that was too thick.  He saw**
2       **gel coat applied over gel coat.  He saw gel**
3       **coat cracking that was just repaired.  Daniel**
4       **Briggs, that's the name, Daniel Briggs.**
5  Q    B-R-I-G-G-S?
6  A    **You're going to have to -- I told you, I left**
7       **school at 16.  When it comes to spelling and**
8       **stuff, I'm not good.**
9  Q    You don't have to go to school to learn how
10      to spell.
11 A    **No.  I just -- It was one of the things I**
12      **couldn't grasp.**
13 Q    I understand that.  I have the same problem.
14 A    **I'm a guy with my hands.  I can't do anything**
15      **with a pen; but if you give me something to**
16      **fix or build, I can do it.**
17 Q    Okay.  Is Mr. Briggs a surveyor?
18 A    **Yes, he is.**
19 Q    Do you know where he's based?
20 A    **I think Dartmouth, Mass., I think.**
21 Q    Is it your contention that when you were told
22      the boat -- Is it your contention that when
23      Post told you that the gel coat would be

Vol. 1 - 65
T. HAMILTON

1    stripped that you understood that they would
2    strip the entire boat?
3  A  That was my impression, yes. Anything that
4    was cracked was going to be completely
5    stripped.
6  Q  Okay.
7  A  If it was anything different, I would have
8    never brought the boat there.
9  Q  Okay. And does strip mean that the crack
10    would be ground down to the underlying
11    fiberglass?
12  A  No. You wouldn't grind the crack down. You
13    would take the gel coat down until you
14    started seeing the glass itself beneath it.
15  Q  But that's what stripped means, that you
16    would take the gel coat down to the glass
17    itself?
18  A  Yeah. Most of the people use a tool called a
19    peeler instead of a sander, and they peel off
20    the gel coat.
21  Q  Okay. And that would apply to the areas
22    where the gel coat cracks were?
23  A  Yeah, which would be the entire boat.

Vol. 1 - 66
T. HAMILTON

1  Q  Okay. So you're saying that every area of
2    the entire boat was cracked?
3  A  Currently, you could find a crack anywhere
4    except for where I repaired right now
5    anywhere you want. You're welcome to come
6    visit it.
7  Q  Were these cracks there when you took the
8    boat from Post?
9  A  Probably about 80 percent of them, yeah.
10    Eric Mobilia (phonetic), the guy that picked
11    it up with me, couldn't believe the cracks.
12  Q  Okay. And you have no photographs of the
13    cracks that were there when you picked the
14    boat up from Post, is that correct?
15  A  I took pictures, but it's like staring into
16    this white piece of paper with your face like
17    this. You can't see anything. (Indicating)
18  Q  And where are those photographs?
19  A  I have them at home, but you can't see
20    anything.
21  Q  Okay.
22  A  All you can see is this big white wall. You
23    wouldn't know if you're looking at a piece of

Vol. 1 - 67
T. HAMILTON

1    paper or a boat.
2  Q  Did you have the opportunity, after you took
3    the boat, to have somebody professionally
4    photograph the boat so you could see the
5    cracks that you claim were there?
6  A  We tried it with a videocam. We've tried it
7    with a digital camera. We've tried it with a
8    35-millimeter. That's how many times we've
9    tried it. You just can't — It's no thicker
10    than your hair. It's so fine. You can't see
11    it. I mean, you can see it on a cloudy day.
12    If you go look at the boat on a sunny day,
13    you can't look at it because it blinds your
14    eyes, at least my eyes. I mean, the other
15    guys were trying.
16  Q  Did you try to take any pictures on cloudy
17    days?
18  A  Yeah. That's the photographs that you'll see
19    that we did the best we could do including
20    the videocam.
21  Q  Now, none of your letters indicate that those
22    cracks existed when you took the boat, is
23    that right?

Vol. 1 - 68
T. HAMILTON

1  A  Well, no, it does. It exists because I said
2    to him flat out, "The hull on the bottom
3    hasn't been touched." And I didn't want him
4    going forward putting a bit of putty right
5    here, a bit of putty right here, and then
6    it's all recracking. It was already cracked
7    before I left. They never even touched it.
8  Q  That's the hull and the bottom?
9  A  And the back deck that they did spray which
10    was cracked all the way across it.
11  Q  But that's not in any of the written letters,
12    is it?
13  A  No, no, no.
14  Q  All right.
15      MR. WEISZ: I don't have any further
16    questions.
17      MR. ZAJAC: Okay. No questions.
18      (Whereupon the deposition of Todd J.
19    Hamilton concluded at 11:02 p.m.)
20
21
22
23

Vol. 1 - 69
T. HAMILTON

## C E R T I F I C A T E

I, TODD J. HAMILTON, do hereby certify
that I have read the foregoing transcript of my
testimony and further certify that said
transcript is a true and accurate record of said
testimony and signed under the pains and
penalties of perjury.

Dated this _____ day of_____
2007.

_____
TODD J. HAMILTON

---

Vol. 1 - 70
T. HAMILTON

## C E R T I F I C A T E

I, Simonne J. Elwood, R.P.R. and a
Notary Public within and for the Commonwealth of
Massachusetts, duly commissioned, qualified and
authorized to administer oaths and to take and
certify depositions, do hereby certify that
heretofore, to wit, on the 17th day of April
2007, personally appeared before me Todd J.
Hamilton, at the office of Bartlett Hackett
Feinberg P.C., 155 Federal Street, 9th Floor,
Boston, Massachusetts, in the aforecaptioned
cause pending in the United States District Court
for the District of Massachusetts; that the
witness was by me duly sworn to testify to the
truth, the whole truth and nothing but the truth;
that thereupon and while said witness was under
oath, the within deposition was taken down by me
in shorthand at the time and place herein named
and was thereafter reduced to computer
transcription under my supervision. I further
certify that I am not interested in the event of
the action.

IN WITNESS WHEREOF, I have hereunto
subscribed my hand and affixed my seal of office
this _____ day of _____, 2007.

_____
Simonne J. Elwood
REGISTERED PROFESSIONAL REPORTER

My Commission Expires: February 14, 2008

---

Vol. 1 - 71
T. HAMILTON

### E R R A T A   S H E E T

Date of Deposition: April 17, 2007

Case Name: L & T Yacht Sales, Inc. vs. Post
Marine Co., Inc.
C.A. No. 05-11682MLW

Deponent's Name: Todd J. Hamilton

I, the undersigned, do hereby certify
that I have read the foregoing deposition
transcript and that to the best of my knowledge,
said deposition transcript is true and accurate
(with the exceptions of the following changes
listed below):

_____
TODD J. HAMILTON

Dated _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

---

Vol. 1 - 72
T. HAMILTON

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____

Page No. ___Line No.___ Correction _____