UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BOSTON DIVISION
DOCKET NO. 05-11682

L & T YACHT SALES, INC.,                    )
     Plaintiff               )
VS.                                         )
                                            )
                                            )
POST MARINE CO., INC.,                      )
     Defendant              )
                                            )

## STATEMENT OF MATERIAL FACTS PURSUANT TO RULE 56.1 IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, L & T Yacht Sales, Inc. pursuant to Local Rule 56.1 states that the following material facts are not in dispute:

1. L & T Yacht Sales, Inc. ("L & T") is a Rhode Island corporation. *See* Complaint, 1. The Complaint is attached hereto as Exhibit A.

2. Todd J. Hamilton is the President of L & T. Deposition of Todd Hamilton, p. 6, ln. 16-18. Relevant excerpts from said transcript are attached hereto as Exhibit B.

3. Post Marine Co., Inc. ("Post") manufactured the boat the Relentless. *See*, Complaint 1 (Exhibit A).

4. That boat is the only assets of L & T. Deposition of Todd Hamilton, p. 7, ln. 10-15.

5. Post has experienced problems with series 953 gel coat manufactured by Cook Composite and Polymer used on boats manufactured by Post between 1997 and 2002. Deposition of Kenneth Jensen, p. 22. ln. 1-p. 23. ln. 14. Relevant excerpts from said transcript are attached hereto as Exhibit C.

1

6.      Post first became aware of this problem in the summer of 2002. Deposition of Kenneth Jensen, p. 23, ln. 15-18.

7.      By the fall of 2002 Post knew this was not an isolated problem. Deposition of Kenneth Jensen, p. 24. ln. 12-15.

8.      The 953 series gel coat is defective. Deposition of Kenneth Jensen, p. 78, ln. 7-8.

9.      Post has characterized the failure of the 953 gel coat as "catastrophic." Deposition of Kenneth Jensen, p. 65, ln. 17-20.

10.     Post has characterized the problem as the "wholesale cracking" of the 953 gel coat. Deposition of Joseph Martorana, p. 12, ln. 19 - p. 13, ln. 1. Relevant excerpts from said transcript are attached hereto as Exhibit D.

11      Nevertheless, Post continued to use the 953 gel coat to perform repairs on boats until 2005. Deposition of Kenneth Jensen, p. 40 P. 41 In. 41.

12.     Post has now repaired approximately 15-18 boats with problems from the 953 gel coat. Deposition of Kenneth Jensen, p. 85, In. 20-25.

13.     Boats repaired using the 953 gel coat have experienced additional cracking in the repaired areas. Deposition of Kenneth Jensen, p. 41, In. 13-18.

14.     At least three of the other boats repaired by Post using additional 953 gel coat have already experienced further cracking. Deposition of Kenneth Jensen, p. 87, In. 5-13.

15.     As a result, Post no longer uses the 953 gel coat to perform repairs. Deposition of Joseph Martorana, p. 31, ln. 17 - p. 31, ln. 5.

2

16. Post now only uses another manufacturer's gel coat to perform repairs. Deposition of Joseph Martorana, p. 31, ln. 23-25.

17. L & T's boat was manufactured by Post in 2001 using the 953 gel coat. Deposition of Kenneth Jensen, p. 25, In. 15- p. 26 In. 5.

18. In May of 2004 Post was contacted about the defects with L & T's boat. Deposition of Kenneth Jensen, p. 26 In. 6-16.

19. The cracking of the gel coat on L & T's boat was the same type of major cracking experienced by boats manufactured with the 953 gel coat. Deposition of Joseph Martorana, p. 34, ln. 15-21.

20. Before Post performed any repairs on L & T's boat, Todd Hamilton threatened to sue Post. Deposition of Todd Hamilton, p. 81, ln. 5-8

21. In August of 2004, Post agreed to repair the gel coat on the boat. *See*, letter of August 25, 2004 attached hereto as Exhibit E.

22. Post told Todd Hamilton, how it would repair the boat and estimated how long it would take. Deposition of Kenneth Jensen, p. 45, In. 1-4.

23. Joseph Martorana clarified the letter of August 25, 2004 on September 2, 2004 by a further sent a letter to Todd Hamilton. This letter, Post states that the "[g]el coat will be removed from entire surfaces, examples being shelter sides, cockpit, forward deck, side decks, pulpit and hull to ensure consistency." See, September 2, 2004 letter, attached hereto as Exhibit F.

24. L & T brought the boat to Post for repairs in late October or early November of 2004. Deposition of Todd Hamilton, p. 32, ln. 18-21.

25.    Post began working on L & T's boat in the winter of 2004. Deposition of Joseph Martorana, p. 16, ln. 18-25, p. 17, ln. 13-15.

26.    Post did not strip the gel coat from the entire affected surfaces of the bottom of the boat, Deposition of Joseph Martorana, p. 19, ln. 11-15; the sides of the hull, p. 19, ln. 16-18; the bridge, p. 20, ln 3-7; the interior of the bridge, p. 20, ln 7-8; the hardtop p. 20, ln 12-13; or, the bottom of the boat, p. 21, ln. 14 - pg. 22, ln. 16.

27.    Post never stripped the hull, Deposition of Cortez Marks, p. 19, ln. 14-16; the back bulkhead, p. 20, ln. 7-8; the dashboard, p. 20, ln. 22-23; or the hardtop, p. 20, ln. 24-25. Relevant excerpts from said transcript are attached hereto as Exhibit B.

28.    Post never removed any gel coat from the bottom of L & T's boat. Deposition of Cortez Marks, p. 19, ln. 20-23.

29.    Post filled just the cracks on L & T's boat and sprayed and sanded over them. Deposition of Cortez Marks, p. 16, ln. 7-11.

30.    Post no longer repairs boats in this manner. Now Post sands out all the cracks, rather than filling them in. Deposition of Cortez Marks, p. 18, ln. 8 - p. 19, ln. 3.

31.    Post used more of the 953 gel coat to perform repairs to L & T's boat. Deposition of Joseph Martorana, p. 26, ln. 9-16.

32.    When Mr. Hamilton removed the boat from Posts facility in August of 2005, there were many areas where the gel coat had not been repaired. Deposition of Todd Hamilton, p. 16, ln. 9-20.

33.    After having L & T's boat for 9 ½ months, Post now said that it would not strip the bottom or hull of the boat. Deposition of Todd Hamilton, p. 26, ln. 4-21.

34.     The 953 gel coat sprayed on by Post to perform repairs on L & T's boat has re-cracked.  Deposition of Todd Hamilton, p. 33, ln. 7-10, p. 59, ln. 14-20.

35.     Post has no express warranty for gel coat on its boats.  Deposition of Kenneth Jensen, p. 80, ln. 9-10.

36.     Post has sued the manufacturer of the gel coat in Federal District Court in New Jersey.  Deposition of Kenneth Jensen, p. 82, ln. 7-9.

37.     Post is suing the gel coat manufacturer for $220,000 - $225,000 for each of the 81 boats that it made using the 953 gel coat.  Deposition of Kenneth Jensen, p. 85, ln. 10-19; p. 88, ln. 13-17.


                              Respectfully submitted,
                              The Plaintiff,
                              By its Attorneys,

                              _/s/ John E. Zajac_____
                              John E. Zajac, Esquire BBO # 560195
                              Carmichael, Zajac & Fleury, P.C.
                              170 High Street
                              Taunton, MA 02780
                              (508) 821-2552


## CERTIFICATE OF SERVICE

        I, John E. Zajac, Esquire this 8th day of June, 2007 have given notice of the within Plaintiff's Motion for Partial Summary Judgment, Statement of Material Facts and Memorandum of Law, by mailing a copy of the same to by overnight mail to Defendant's legal counsel, Michel O. Weisz, Esquire at his 9350 S. Dixie Highway, Miami, Florida 33156 office and by e-mail service, via the Court's CM/ECF system which sent notification of such filing to Howard M. Brown, Esquire, Bartlett Hackett Feinberg P.C., 155 Federal Street, 9th floor, Boston, MA 02110

                              _/s/ John E. Zajac_
                              John E. Zajac, Esquire

# EXHIBIT

# A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BOSTON DIVISION
DOCKET NO.
05 - 1 1 6 8 2

|  |  |
|---|---|
| L & T YACHT SALES, INC., ) | RECEIPT # |
| Plaintiff ) | AMOUNT $ |
| ) | SUMMONS ISSUED |
| VS. ) | LOCAL RULE 4.1 |
| ) | WAIVER FORM |
| POST MARINE CO., INC., ) | MCF ISSUED |
| Defendant ) | BY DPTY. CLK. |
|  | DATE |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**PARTIES**

MAGISTRATE JUDGE

1.   The Plaintiff, L & T YACHT SALES, INC., (hereinafter "L & T") is a duly organized Rhode Island corporation with a business address at 56 Ruggles Avenue, Newport, Rhode Island. L & T, is the registered owner of a 2001 50' yacht known as the "Relentless," (serial no. $PMC\ 50076A101$), manufactured by the Defendant, Post Marine Co., Inc. (the "boat").

2.   Todd J. Hamilton of 1061 Brush Hill Road, Milton, Massachusetts ("Hamilton") is each officer and the sole director of L & T.

3.   L & T and Hamilton usually docks and stores the boat in Hingham or New Bedford, Massachusetts.

4.   The Defendant, Post Marine Co., Inc., (hereinafter "Post") is, upon information and belief, a duly organized New Jersey corporation with a principal place of business at 100 Post Road, Mays Landing, New Jersey.

5.   Post advertises, sells yachts and does business throughout the United States, including the

1

Commonwealth of Massachusetts. Some of this is done through a network of eight (8) authorized Post dealers. Two (2) of the eight (8) authorized Post dealer locations are in the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

6.   Jurisdiction and venue are conferred upon this Court pursuant to Article III, Section 2 of the United States Constitution and 28 U.S.C § 1332 et seq.

## FACTS COMMON TO ALL COUNTS

7.   In May of 2004, while the boat was docked in Hingham, Massachusetts, Hamilton discovered a serious defect with the boat, in particular, the severe and extensive cracking and failure of its gel coat outer skin, as a result of design and /or manufacturing defects

8.   Post confirmed this finding to Hamilton and was or became aware a similar defect of other yachts manufactured by Post.

9.   Hamilton made Post aware that L & T had an existing bona fide offer to purchase the boat, but the amount offered was substantially diminished due to significant and widespread damage to the boat, which had become apparent to Hamilton in May of 2004.

10.   At the time of this offer on the boat, L & T stood to lose, *inter alia*, in excess of one hundred thousand dollars ($100,000.00) in the diminished resale value of the boat, as a result of the damage from the defect in the gel coat.

11.   Post informed Hamilton that they were repairing the gel coat on the boats that were brought in by Post customers.

12.   Post agreed to fix the gel coat problem on L & T's boat.

13.   Hamilton inquired about the process that Post would undertake to repair the boat and about the level of care and workmanship that would go into Post's repair of the boat. Post directed

2

Hamilton to another Massachusetts Post owner to review the recent work performed by Post to this owner's particular boat.

14.     Hamilton was very displeased with the work he viewed on this particular boat, noting that the defective gel coat was not removed, but instead only sanded down in certain spots and covered up with new gel coat. This method of repair was unacceptable to Hamilton. Therefore, Post agreed to completely replace the gel coat to the boat.

15.     On September 2, 2004, five months following the initial discussions with Post, Mr. Joseph Matorana, Vice President of Post, provided Hamilton a letter agreeing to perform the necessary repairs, which specifically included agreeing to remove the gel coat from the entire surface to ensure consistency.

16.     In addition, the parties also discussed in detail the overall standard care to be used by Post, so as to prevent over spray, dust in the engine or in the living quarters of the boat, etc. Post agreed to take the necessary measures to insure that the boat would be returned in the same, clean condition in which Hamilton would deliver it to Post.

17.     On November 1, 2004, Hamilton drove the boat from Massachusetts to Post's facility in New Jersey for the agreed-to repairs. At the time Post took delivery of the boat for the repairs, Post indicated to Hamilton that the boat would be ready by May of 2005; in time for most of the 2005 boating season. Post was fully aware that Hamilton was attempting to sell the boat and had at least two potential buyers for it once the anticipated repairs were completed.

18.     In February, Hamilton flew to Post to review the status of the work. At this time, very little work had been completed on the boat; however, Post continued to assure Hamilton that the repairs to the boat would be completed by May, as the parties had agreed.

19.     In May of 2005, Hamilton once again flew to Post's facility in New Jersey, expecting to find

3

the boat close to complete.    Hamilton inspected boat and noted and further indicated and provided in writing to Post a list of outstanding items, which were yet to be completed.

20.    Post indicated to Hamilton that they had not yet begun work to replace the gel coat on the sides of the hull or the bottom of the hull and but again assured Hamilton that it would be completed as the parties had discussed and agreed. However, Post stated that the boat repairs would not be completed in May, but not until mid July 2005, just prior to Post closing down for a two-week vacation beginning on July 18, 2005. Once again Hamilton and L & T relied on Post's word.

21.    The week of July 11, 2005, Hamilton contacted Post to let them know he would be down that week to pick up the boat before Post closed for vacation. Post indicated to Hamilton that the boat was indeed ready. Hamilton purchased a plane ticket, rented a car and got a hotel room, all at his expense, and took time out of his work schedule to go to the Post facility. For this trip however, he purchased only a one-way plane ticket based on Post's assurance that the boat was complete and he could drive it back to Massachusetts.

22.    Upon Hamilton's arrival at Post on July 12, 2005, it was apparent that the repairs were not complete. The bottom of the boat had not even been touched and the sides of the boat still had cracks. It was also apparent to Hamilton that additional cracks were occurring on the boat and that, contrary to what the parties had agreed, Post failed to remove the defective gel coat and replace it.

23.    Other portions of the boat were not in the same, clean condition as when Hamilton had delivered it from Massachusetts in November of 2004 and needed extensive cleaning or repair.

24.    Hamilton requested in writing that Post not do any additional work on the sides or the bottom

4

of the boat until the parties could have further since Post clearly failed to remove the defective gel coat as the parties had agreed. Post failed to contact Hamilton before closing for its two week vacation.

25.   After this two week vacation, Hamilton again traveled from Massachusetts to New Jersey and had the boat inspected by another yacht repair company, who concurred with Hamilton's findings that the boat was not repaired correctly.

26.   The 2005 boating season has almost ended and the value of the boat has diminished significantly. L & T continues to pay insurance and carrying cost on a boat that he cannot use and cannot sell.

27.   Post has now demanded that Hamilton remove the boat from its facility without performimg any additional repairs or cleaning.

## COUNT I: BREACH OF CONTRACT

28.   The Plaintiff re-alleges paragraphs 1 through 26 of this Complaint as if set forth in full herein and incorporates the same by reference.

29.   Post breached its contract with L & T by failing to repair the boat as promised and in a good and workmanlike and timely manner.

30.   As a result of the actions of Post and its breach of contract, L & T has incurred substantial monetary damages including, but not limited to, a loss of the benefit of its bargain; the diminished value of the boat; the lost opportunity of sale; expenditures for travel, insurance and carrying costs while the boat was at Post's facility in New Jersey; and the anticipated future expense of proper repair and cleaning, and has otherwise been damaged.

**WHEREFORE**, the Plaintiff demands the relief as set forth below

5

## COUNT II: FRAUDULENT MISREPRESENTATION

31.    The Plaintiff re-alleges paragraphs 1 through 30 of this Complaint as if set forth in full herein and incorporates the same by reference.

32.    In agreeing to provide said repairs to L & T's boat, Post, on numerous occasions falsely and fraudulently represented that Post was willing, ready and able to provide the repairs in a TIMELY, complete and workmanlike manner.

33.    Those representations were false and in fact known to be false by Post at the time they were made. In truth and in fact, Post did not intend to provide the repairs in a quality, workmanlike manner as promised.

34.    L & T relied on Post's false and misleading representations all to L & T's detriment.

35.    As a result of L & T's reliance on Post's false and misleading representations L & T was financially damaged.

**WHEREFORE,** the Plaintiff demands the relief as set forth below.

## COUNT III
## NEGLIGENT MISREPRESENTATION

36.    The Plaintiff re-alleges paragraphs 1 through 35 of this Complaint as if set forth in full herein and incorporates the same by reference.

37.    In agreeing to provide the repairs to L & T's boat, Post negligently represented that it was willing, ready and able to provide the repairs in a TIMELY, complete and workmanlike manner, when it knew or should have known that it could not or would not perform as promised.

38.    Post knew or reasonably should have known that the Plaintiff would rely on said promises and representations.

39.     The Defendants had a duty to truthfully represent its ability and willingness to provide the repairs in a TIMELY, complete and workmanlike manner, as promised.

40.     As a result of L & T's reliance on Post's misrepresentations, L & T has suffered substantial financial damages.

**WHEREFORE**, the Plaintiff demands the relief as set forth below.

### COUNT IV: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

41.     The Plaintiff re-alleges paragraphs 1 through 40 of this Complaint as if set forth in full herein and incorporates the same by reference.

42.     Post is a merchant as that term is defined by the Uniform Commercial Code.

43.     Post knew at the time of constructing the boat and its gel coat, its purchaser would rely on Post's skill and judgment in furnishing suitable products.

44.     The boat and its gel coat were not suited for its particular purpose.

        **WHEREFORE**, the Plaintiff demands the relief as set forth below.

### COUNT V: NEGLIGENCE

45.     The Plaintiff re-alleges paragraphs 1 through 44 of this Complaint as if set forth in full herein and incorporates the same by reference.

46.     In undertaking to perform repairs to the boat, Post had a duty to L & T do so at a certain standard of care.

47.     Post breached its duty to L & T, proximately causing damage to the boat and L & T.

**WHEREFORE**, the Plaintiff demands the relief as set forth below.

## RELIEF SOUGHT

I.    That a judgment for breach of contract be entered on Count I in favor of L & T with prejudgment interest from the date of breach;

II.   That a judgment based upon fraudulent misrepresentation stated be entered on Count II in favor of L & T with prejudgment interest;

III.  That a judgment for negligent misrepresentation be entered on Count III in favor of L & T with prejudgment interest;

IV.   That a judgment for breach of implied warranty be entered on Count IV in favor of L & T with prejudgment interest;

V.    That a judgment for negligence be entered on Count V in favor of L & T with prejudgment interest;

VI.   That the Court award the Plaintiffs costs and reasonable attorney's fees;

VII.  For further relief the Court deems just and proper.

### THE PLAINTIFF DEMANDS A TRIAL BY JURY

Respectfully submitted,
The Plaintiff,
By its Attorneys,

John E. Zajac, Esquire
Carmichael & Zajac, P.C.
170 High Street
Taunton, MA 02780
(508) 821-2552
BBO No. 560195

Dated: August 12, 2005

8

# EXHIBIT

# B

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11682MLW

L & T YACHT SALES, INC.,
                    Plaintiff,

vs.

POST MARINE CO., INC.,
                    Defendant.

DEPOSITION OF TODD J. HAMILTON, taken
pursuant to Notice under the applicable
provisions of the Federal Rules of Civil
Procedure on behalf of the Defendant, before
Simonne J. Elwood, R.P.R. and a Notary Public
in and for the Commonwealth of Massachusetts,
at the office of Bartlett Hackett Feinberg
P.C., 155 Federal Street, 9th Floor, Boston,
Massachusetts, commencing on Tuesday, April 17,
2007 at 9:57 a.m.

NEAL A. SALLOWAY - COURT REPORTERS
FIVE CARDIGAN ROAD
WEST PEABODY, MA 01960
781-581-3993 - 978-535-0313 - FAX 978-536-3142

APPEARANCES:

JOHN E. ZAJAC, ESQ.
CARMICHAEL & ZAJAC, P.C.
170 HIGH STREET
TAUNTON, MA    02780
    REPRESENTS THE PLAINTIFF

MICHEL OCIACOVSKI WEISZ, ESQ.
SEGREDO & WEISZ
9350 SOUTH DIXIE HIGHWAY - SUITE 1500
MIAMI, FL 33156
    REPRESENTS THE DEFENDANT

1               S T I P U L A T I O N S

2                    It is hereby stipulated and agreed by

3               and between counsel for the respective

4               parties that all objections, except as to

5               form, are reserved until the time of trial,

6               including motions to strike.

7                    It is further stipulated and agreed

8               that the reading and signing of the

9               deposition are not waived and to be read and

10              signed under the pains and penalties of

11              perjury.

12                   It is further stipulated and agreed

13              that the filing and sealing of the deposition

14              are waived.

15

16                   TODD J. HAMILTON

17                   A witness called on behalf of the

18              Defendant, having been satisfactorily

19              identified by the production of his

20              Massachusetts driver's license 022609789 and

21              duly sworn, under oath, by the Court Reporter

22              and Notary Public, was examined and testified

23              as follows:

| | | |
|---|---|---|
| 1 | | DIRECT EXAMINATION |
| 2 | Q | (By Mr. Weisz)  Good morning, Mr. Hamilton. |
| 3 | | I'm going to assume that your lawyer has told |
| 4 | | you what to expect at the deposition, so I |
| 5 | | won't go through the ground rules; but if I |
| 6 | | ask you something that you don't understand, |
| 7 | | please let me know. |
| 8 | A | Okay. |
| 9 | Q | If you need a break, please let me know, and |
| 10 | | we'll try to make this as, I guess, the least |
| 11 | | uncomfortable as possible. |
| 12 | | I'm going to show you -- Well, before |
| 13 | | we do that, let me ask you, please, to state |
| 14 | | your full name. |
| 15 | A | Todd J. Hamilton. |
| 16 | Q | And, Mr. Hamilton, what's your relationship |
| 17 | | to L & T Yacht Sales, Inc.? |
| 18 | A | President. |
| 19 | Q | How long have you been the President? |
| 20 | A | Since it was formed, I guess. |
| 21 | Q | Okay.  Do you know when it was formed? |
| 22 | A | Not off the top of my head, I don't. |
| 23 | Q | Do you have an estimate? |

| | | |
|---|---|---|
| 1 | A | Sometime in '03. I don't know the exact |
| 2 | | month or date. |
| 3 | Q | Okay. What was the purpose of forming L & T |
| 4 | | Yacht Sales? |
| 5 | A | Just I was advised by attorneys and an |
| 6 | | accountant. |
| 7 | Q | Was there a business purpose? |
| 8 | A | No, just that's what they told me to do, so I |
| 9 | | listened to them. |
| 10 | Q | What is the business of L & T Yacht Sales? |
| 11 | A | Just L & T Yacht Sales. |
| 12 | Q | What does the company do? |
| 13 | A | Bought a boat, and it's holding a boat. |
| 14 | Q | Is that the only asset? |
| 15 | A | Yes. |
| 16 | Q | Does L & T Yacht Sales file tax returns? |
| 17 | A | Yeah. |
| 18 | Q | Does it have any income? |
| 19 | A | I'd have to ask the accountant that one. I |
| 20 | | don't even know. I don't handle any of the |
| 21 | | tax stuff to be honest with you; I don't; the |
| 22 | | accountant does. |
| 23 | Q | Do you know who signs the tax return? |

| | | |
|---|---|---|
| 1 | Q | Okay.  And then you took the boat away? |
| 2 | A | Yeah.  They put it in the water then, and |
| 3 | | then I left. |
| 4 | Q | So does that lead you to conclude that the |
| 5 | | complaint was filed before you took the boat |
| 6 | | out of Post? |
| 7 | A | I'd be lying.  I don't know the answer |
| 8 | | whether it was or wasn't.  I don't know. |
| 9 | Q | Okay.  All right.  When you took the boat |
| 10 | | from Post, were there any areas of gel coat |
| 11 | | cracking that had not been fixed? |
| 12 | A | Yes. |
| 13 | Q | Which ones? |
| 14 | A | The back deck, the stern, the port side, the |
| 15 | | bottom, the hard top, the freezer, the sink |
| 16 | | area in the back, the step area in the back, |
| 17 | | the gunnels in the back, the dashboard and |
| 18 | | the compass area and the bridge floor and the |
| 19 | | opposite side of the port which I'm drawing a |
| 20 | | blank for some reason, that side of the hull. |
| 21 | Q | Okay.  The back deck, is that on the top |
| 22 | | sides or on the hull? |
| 23 | A | It's when you walk in the boat, you step |

| | | |
|---|---|---|
| 1 | A | They wouldn't communicate with me when I |
| 2 | | tried before I took the boat to get an answer |
| 3 | | how we're going to fix the rest of it. |
| 4 | Q | Did they ever tell you that they would not |
| 5 | | fix the items that you claimed were |
| 6 | | outstanding? |
| 7 | A | Yes, they did. |
| 8 | Q | Who told you that? |
| 9 | A | Joe Martorana. |
| 10 | Q | When did he tell you that? |
| 11 | A | That was the week prior -- Let me think now. |
| 12 | | That would be the week that I gave him the |
| 13 | | letter of July 13th. |
| 14 | Q | So he told you that before you gave him the |
| 15 | | letter? |
| 16 | A | Yes. |
| 17 | Q | What did he say? |
| 18 | A | That they would not be stripping the bottom; |
| 19 | | they would not be stripping the hull; they |
| 20 | | wouldn't be doing this; they wouldn't be |
| 21 | | doing that. |
| 22 | Q | So they wouldn't fix the boat the way you |
| 23 | | wanted it, is that right? |

Vol. 1 - 27

T. HAMILTON

| | | |
|---|---|---|
| 1 | A | No, not the way I wanted, the way they said |
| 2 | | they were going to. |
| 3 | Q | How did they say they were going to fix it? |
| 4 | A | They said they were going to strip the hull |
| 5 | | and the cracked areas. |
| 6 | Q | Okay. Were they going to strip the entire |
| 7 | | hull or the areas where there were cracks? |
| 8 | A | They said they were going to strip the hull, |
| 9 | | deck, sides, the bottom. |
| 10 | Q | Was there ever anything in writing that |
| 11 | | indicated what Post was going to do? |
| 12 | A | Yes. |
| 13 | Q | Okay. What was there in writing? |
| 14 | A | A letter from Joe Martorana to me. |
| 15 | Q | Anything else? |
| 16 | A | About the work they were going to do? |
| 17 | Q | Yes. |
| 18 | A | No, not about -- The only thing in writing |
| 19 | | from them about work was the one letter, I |
| 20 | | believe, except for the letter from you, of |
| 21 | | course. |
| 22 | Q | Okay. Do you think the letter from me |
| 23 | | counts? |

1               (Whereupon the Stenographer marked as
2           Exhibit No. 5 - Fax - To Mr. Hamilton from
3           Joseph Martorana.)
4       Q   Do you recognize that letter?  (Indicating)
5       A   Yes, I do.
6       Q   Do you know when that letter was sent?
7       A   I do.  I don't have it in front of me because
8           it's on the top.
9       Q   Okay.
10      A   But it's not -- You can't see it here, but
11          the original you can see the date and time it
12          was faxed.  I believe it was in either
13          September or October of 2004.
14      Q   Do you know whether that letter was sent
15          before you brought the boat to Post for
16          repairs?
17      A   Yes, it was.
18      Q   Okay.  And when did you bring the boat to
19          Post for repairs?
20      A   I believe it was the end of October or
21          November 1st, somewhere in there.
22      Q   Did you ever pay Post anything to repair the
23          boat?

```
 1    A    Nope.

 2    Q    Do you know what the value of the work was

 3         that Post performed on the boat?

 4    A    The value that Post did?

 5    Q    Yes.

 6    A    Zero.

 7    Q    Okay.  And why do you say that?

 8    A    Because they sprayed gel coat over gel coat

 9         that's recracking so now it's double the work

10         to take it off.

11    Q    How do you know that's what they did?

12    A    When you're sanding it off, you could see

13         three layers; it was so thick.

14    Q    And --

15    A    Three different colors.

16    Q    Okay.  Is this something that you have

17         observed yourself?

18    A    Yes.

19    Q    And how do you know it's three layers of gel

20         coat?

21    A    Three different colors.

22    Q    What does that mean; why does that mean three

23         different --
```

Vol. 1 - 70

T. HAMILTON

## C E R T I F I C A T E

I, Simonne J. Elwood, R.P.R. and a Notary Public within and for the Commonwealth of Massachusetts, duly commissioned, qualified and authorized to administer oaths and to take and certify depositions, do hereby certify that heretofore, to wit, on the 17th day of April 2007, personally appeared before me Todd J. Hamilton, at the office of Bartlett Hackett Feinberg P.C., 155 Federal Street, 9th Floor, Boston, Massachusetts, in the aforecaptioned cause pending in the United States District Court for the District of Massachusetts; that the witness was by me duly sworn to testify to the truth, the whole truth and nothing but the truth; that thereupon and while said witness was under oath, the within deposition was taken down by me in shorthand at the time and place herein named and was thereafter reduced to computer transcription under my supervision. I further certify that I am not interested in the event of the action.

IN WITNESS WHEREOF, I have hereunto

subscribed my hand and affixed my seal of office

this _____ 30th _____ day of _____ April _____ , 2007.

_____
Simonne J. Elwood
REGISTERED PROFESSIONAL REPORTER

My Commission Expires:   February 14, 2008

# EXHIBIT

# C

ORIGINAL

1                UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3                BOSTON DIVISION

4                C.A. NO. 05-11682 MLW

5

6    L & T YACHT SALES, INC.,                    :

7                         Plaintiff,             :

8                    -vs-                        :

9    POST MARINE CO., INC.,                      :

10                        Defendant.             :

11   - - - - - - - - - - - - - - - - - - - - - - -

12

13

14         DEPOSITION OF:  KENNETH JENSEN

15            WEDNESDAY, APRIL 11, 2007

16

17

18

19

20         Atlantic City Court Reporting, LLC.

21    Certified Shorthand Reporters & Videographers

22         1125 Atlantic Avenue - Suite 416

23         Atlantic City, New Jersey  08401

24                (609) 345-8448

25             www.accourtreporting.com

(JENSEN · ZAJAC)

```
 1              Deposition of KENNETH JENSEN, taken in the
 2    above-entitled matter before Betty Ann Wasilewski, a
 3    Certified Shorthand Reporter, License No. XI01032,
 4    Registered Professional Reporter, Certificate of Merit
 5    Holder and Notary Public of the State of New Jersey,
 6    taken at the offices of ATLANTIC CITY COURT REPORTING,
 7    LLC., 1125 Atlantic Avenue, Suite 416, Atlantic City,
 8    New Jersey  08401, on Wednesday, April 11, 2007,
 9    commencing at 10:06 a.m.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

(JENSEN - ZAJAC)

```
 1   A P P E A R A N C E S:

 2

 3              CARMICHAEL & ZAJAC, P.C.

 4              BY:   JOHN E. ZAJAC, ESQ.

 5              170 High Street

 6              Taunton, Massachusetts  02780

 7              (508) 821-2552

 8              For the Plaintiff.

 9

10              SEGREDO & WEISZ

11              BY:   MICHEL O. WEISZ, ESQ.

12              9350 South Dixie Highway

13              Suite 1500

14              Miami, Florida  33156

15              (305) 670-3820

16              For the Defendant.

17

18   ALSO PRESENT:

19              Todd Hamilton

20

21

22

23

24

25
```

(JENSEN - ZAJAC)

```
1                K E N N E T H   J E N S E N,
2    having been first duly sworn, testified as follows:
3                        EXAMINATION
4    BY MR. ZAJAC:
5         Q.    Good morning, Mr. Jensen.
6         A.    Good morning.
7         Q.    My name is John Zajac, and as I'm sure
8    you know, I represent L & T Yacht Sales, Incorporated,
9    the plaintiff, in an action in the Massachusetts
10   Federal District Court against Post Marine Company.
11              We are here today to take your
12   deposition, and I believe you have been deposed
13   before.
14        A.    Yes, I have.
15        Q.    So I'm going to briefly go over the
16   rules with you, but I assume that having been through
17   this process before, you're pretty familiar with what
18   they are.  We're here to take your deposition, which
19   is that I'm going to ask you questions and you're
20   going to answer them.
21              If you need to take a break for any
22   reason, we can certainly do that.  I would simply ask
23   that if there is a question before you, that you
24   answer that question before we take any type of break.
25              If you don't understand my question,
```

(JENSEN - ZAJAC)

1          Q.      Mr. Jensen, has Post had problems with
2      the gel coating on boats in the past 10 years?
3          A.      With one particular series, yes.
4          Q.      When you say "series," what do you mean?
5          A.      One series of gel coat.
6          Q.      And is there a designation assigned to
7      that series of gel coat?
8          A.      Yes.
9          Q.      It's -- what is that designation?
10         A.      It's CCP's 953 series.
11         Q.      Who is CCP?
12         A.      * cook, Composite and Polymers.
13         Q.      When did Post begin using the 953 gel
14     coat?
15         A.      Fall of '97.
16         Q.      Did it use that -- did it use 953 gel
17     coat on all sizes of boats that it manufactured?
18         A.      Yes.
19         Q.      Did it use any other gel coat besides
20     the 953 between 1997 and 2004?
21         A.      Yes.
22         Q.      What other gel coats has Post used
23     besides the 953 gel coat since 1997?
24         A.      Early in '97 we used the CCP 952 gel
25     coat, and then late 2002 we started using the

(JENSEN · ZAJAC)

```
 1    Interplastic's gel coat.
 2         Q.    Did Post exclusively use the
 3    Interplastic's gel coat for all new boats manufactured
 4    after 2002?
 5         A.    Talking calendar year 2002, yes.
 6         Q.    So for boats that were manufactured as
 7    opposed to repaired, the 953 gel coat was only used
 8    between 1997 and 2002?
 9         A.    Yeah.  Realize calendar year 2002 would
10    encompass some 2003 model boats, yes.
11         Q.    And is the 953 gel coat the only one in
12    which Post has experienced significant problems with
13    cracking?
14         A.    Yes.
15         Q.    When did Post first become aware of a
16    problem with cracking with the 953 gel coat?
17         A.    First time we saw it was in the summer
18    of 2002.
19         Q.    And how did you become aware of that
20    problem?
21         A.    A customer asked us if we would look at
22    his boat, if we, you know -- take care of some cracks
23    in it so he brought it down, and we took care of it.
24         Q.    What was the hull number of that boat?
25         A.    I believe it was 52.
```

(JENSEN · ZAJAC)

1          Q.      And what size?

2          A.      50-foot.

3          Q.      When was that boat manufactured?

4          A.      1998.

5          Q.      What type of problems did the owner of

6     that boat encounter?

7          A.      Just some unusual indiscriminate

8     cracking.

9          Q.      And in 2002, was the person who brought

10    it to you the original owner of the boat?

11         A.      Yes.

12         Q.      When did Post become aware that this was

13    not an isolated problem with Boat 50-52?

14         A.      In the fall of 2002, we saw a second

15    boat.

16         Q.      What was the hull number of that boat?

17         A.      Number 60.  50, Number 60.

18         Q.      And did that boat have the same problems

19    as 50-52?

20         A.      Similar.

21         Q.      When was 60 manufactured?

22         A.      '98, '99.  I'm not sure.

23         Q.      In the time line of Post becoming aware

24    of these problems, what happened next?

25         A.      What do you mean?

(JENSEN · ZAJAC)

```
 1          Q.      Well, as of the fall of 2002, Post has
 2    become aware of problems with two boats.  When did
 3    Post become aware of more problems than that?
 4          A.      I'm going to say in '03.  I don't have
 5    specifics.
 6          Q.      How did Post become aware of further
 7    problems with cracking of gel coat?
 8          A.      Typically, a customer would call us up
 9    seeing something unusual.
10          Q.      So by 2003, how many such calls had Post
11    received?
12          A.      It really wasn't too many initially.  I
13    can't tell you exactly, but it wasn't -- it wasn't
14    that many.
15          Q.      What is the hull number of Mr.
16    Hamilton's boat or L & T Yacht Sales' boat?
17          A.      50-076.
18          Q.      And when was that boat manufactured?
19          A.      I believe 2001.  Excuse me.  Let me
20    backtrack on that, okay?  Manufacturing is a lengthy
21    time.  The boat would have been started in 2000,
22    completed -- it was completed, I believe, in January
23    of '01.
24          Q.      What's the normal time frame for the
25    manufacture of a 50-foot Post boat?
```

(JENSEN - ZAJAC)

```
 1          A.      Approximately four months.   Four,
 2   four-and-a-half months.
 3          Q.      And the 953 gel coat would have been the
 4   type of gel coat used on Number 76?
 5          A.      Yes.
 6          Q.      Did someone contact you about a problem
 7   with cracking of the gel coat on Boat 76?
 8          A.      Yes.
 9          Q.      Who contacted you?
10          A.      Mr. Hamilton.
11          Q.      And did he speak with you directly about
12   it?
13          A.      Yes.
14          Q.      When were you first contacted by Mr.
15   Hamilton about that boat?
16          A.      I believe it was in May of '04.
17          Q.      How did he first contact you?
18          A.      Telephone.
19          Q.      And what did he say to you?
20          A.      Just said he was experiencing some
21   unusual, odd cracking, and we told him what we had
22   experienced.
23          Q.      What did you tell him?
24          A.      Just that we were seeing in some -- on
25   some boats an unusual type of gel coat cracking.
```

(JENSEN · ZAJAC)

```
1          Q.      And is Post paying for that?
2          A.      We're paying for part of it.
3          Q.      Would those repairs require the removal
4     of a substantial amount of gel coat?
5          A.      It would require the remove of some gel
6     coat.  Yes.
7          Q.      How much?
8          A.      They need to -- let me backtrack just
9     one second.  At the time that Mr. Mobarri's boat was
10    repaired, it was repair using 953 gel coat, okay?  Mr.
11    Hamilton's boat was not repaired with 953 gel coat.
12    So the 953 gel coat on Mr. Mobarri's boat suffered a
13    second failure, okay?  The boat is being sanded -- you
14    know, is to be sanded aggressively.
15               The people at Onset Bay felt they knew
16    how far they had to take it down and then it was going
17    to be Awl Gripped.
18         Q.      And is it still at Onset Bay Marina for
19    repairs?
20         A.      I'm not sure.
21         Q.      For a period of time did Post use the
22    953 gel coat to perform repairs?
23         A.      Yes.
24         Q.      And during what period of time did Post
25    use 953 gel coat to perform repairs?
```

(JENSEN - ZAJAC)

1        A.      Up until either late 2004 or early 2005.

2        Q.      And what was the reason that Post

3   initially used 953 gel coat to perform those repairs?

4        A.      The -- we had the people from CCP come

5   in and, you know, look at what was going on.  They

6   assured us their product was good.  They assured us

7   that, you know, how we were fixing the boats, that we

8   wouldn't have further problems.

9        Q.      When did those conversations take place?

10       A.      They took place during '04, '02 when

11  they came in.  I'm not sure if we ever had them visit

12  us during '03.

13       Q.      And subsequently did the repairs using

14  the 953 gel coat experience the same problems as?

15       A.      Some did.  Some haven't.

16       Q.      Is that why Post no longer uses 953 gel

17  coat for repairs?

18       A.      Yes.

19       Q.      Do you know if Bill Catauro also went to

20  view Mr. Mobarri's boat?

21       A.      He may have.

22       Q.      For the second repairs done to Mr.

23  Mobarri's boat, were they only to fix the first

24  repairs or was there continued cracking in the other

25  areas that had not been repaired?

(JENSEN · ZAJAC)

1        Q.    Did Post ever advise Mr. Hamilton in

2  writing as to how the repairs to his boat would be

3  done?

4        A.    I believe we did.

5        Q.    And do you know who prepared that?

6        A.    I know that our attorney -- we prepared

7  an in-house memo, went to our attorney.  He forwarded

8  a letter and then Joe Martorana sent a follow-up

9  letter.

10        Q.    Did Mr. Hamilton indicate that he was

11  going to use that letter to show to any subsequent

12  purchaser or purchasers?

13        A.    Not that I recall.

14        Q.    Did Mr. Hamilton express any concerns as

15  to the type of repairs that Post stated in that

16  letter?

17        A.    Well, I know in the first letter he

18  wanted a little clarification, and then Joe sent that

19  second letter.

20        Q.    If you recall, what were those

21  clarifications?

22        A.    I don't recall.

23        Q.    At any time did Post ever offer a cash

24  settlement, rather than repairs to Mr. Hamilton's

25  boat?

(JENSEN - ZAJAC)

1          A.      Telephone.

2          Q.      When did Post first begin notifying

3    dealers with problems with the gel coat?

4          A.      Well, some of them knew because some of

5    them had their clients suffer that issue.  The only

6    people who weren't aware of it were the people in

7    Florida, and, I don't know, a couple years.

8          Q.      Is it a fair statement to characterize

9    the cracking of the 953 gel coat on Post boats a major

10   problem?

11         A.      It's not a structural issue.  It's not a

12   major problem with the boat.  It's a cosmetic issue,

13   which is labor intensive to repair, and it's expensive

14   to repair, but it is not a major problem in that it

15   prohibits a customer from utilizing the boat and

16   there's no safety issue involved in this problem.

17         Q.      Has Post ever referred to the gel coat

18   failure as being catastrophic?

19         A.      Yes, in the context of the gel coat, not

20   in the context of the boat.

21         Q.      Does the gel coat failure diminish the

22   value of a boat?

23         A.      It makes it unsightly and that's in the

24   eye of the beholder.  We've had people buy boats that

25   had this problem and it did not affect them buying the

(JENSEN · ZAJAC)

```
 1   Oyster Harbor as a dealer.  We had gone a few years
 2   without a dealer and then later -- and then
 3   probably -- I'm ball parking this, probably around
 4   '97, we had Oyster Harbor as a dealer and they were a
 5   dealer with us until '04-'05, in that time frame.
 6   BY MR. ZAJAC:
 7        Q.    Is the 953 gel coat defective?
 8        A.    In our opinion it is, yes.
 9        Q.    Is it necessary to replace all the 953
10   gel coat on a boat?
11        A.    No.  We're not seeing failure in all
12   areas.  We believe there is certain environmental
13   issues that will affect it on certain areas of the
14   boat quicker or --
15             MR. WEISZ:  At which we are not going to
16   discuss in this deposition.
17             THE WITNESS:  Yeah.
18             MR. WEISZ:  That's subject of expert
19   testimony that hasn't been disclosed yet.
20   BY MR. ZAJAC:
21        Q.    Is there anything that can be done
22   besides removal and replacing of the 953 gel coat to
23   prevent it from failing?
24             MR. WEISZ:  Hang on one second.  If you
25   ask the question in the sense of repairing the cracks,
```

(JENSEN · ZAJAC)

```
 1   BY MR. ZAJAC:
 2        Q.    At the time that -- strike that.
 3              In July of 2005, were there any areas of
 4   Mr. Hamilton's boat that still needed to be stripped?
 5        A.    There were -- again, I believe there
 6   were a few cracks on the hull that we were going to
 7   address, and we were going to remove the bottom paint
 8   and inspect the bottom.
 9        Q.    Does Post warranty gel coat?
10        A.    No.
11        Q.    Does Post offer any type of warranty on
12   its boats?
13        A.    Yes.
14        Q.    How long is that warranty?
15        A.    At the time that Mr. Hamilton's boat was
16   built, it was one year.
17        Q.    Does Post's warranty extend to anyone
18   beyond the original purchaser of the boat?
19        A.    No.
20        Q.    Is it Post's contention that if a boat
21   is sold one year -- resold within one year that the
22   warranty then expires?
23        A.    Yes.
24        Q.    Is it Post's contention that there is no
25   warranty applicable to Mr. Hamilton's boat?
```

(JENSEN - ZAJAC)

```
1              Q.     Did anyone besides Mr. Zappy (ph) and
2     L & T Yacht Sales, Incorporated own Number 76?
3              A.     To my knowledge, no.  Excuse me.  With
4     the exception of Portland Boat Works who was the
5     stocking dealer.  I don't believe that there was a Mr.
6     Zappy (ph) to somebody else.  I don't know the chain.
7              Q.     Post has brought a claim against the
8     manufacturer of the gel coat, correct?
9              A.     Yes.
10             Q.     And there's litigation pending in New
11    Jersey Federal District Court concerning that matter?
12             A.     Yes.
13             Q.     And Viking Yacht is also a party to that
14    case?
15             A.     Yes.
16             Q.     Is it Post's contention in the
17    litigation in New Jersey that it has a warranty from
18    manufacturer of the 953 gel coat?
19                    MR. WEISZ:  Object.  Calls for a legal
20    conclusion.  If you care to review the pleadings,
21    you'll see what the claims are.
22                    MR. ZAJAC:  I think he can answer that.
23    I don't think that requires a conclusion -- a legal
24    conclusion.
25                    MR. WEISZ:  Well --
```

(JENSEN · ZAJAC)

```
1              MR. WEISZ:  If you want to go off the
2    record for a second.
3              MR. ZAJAC:  Sure.
4              (Discussion off the record.)
5    BY MR. ZAJAC:
6         Q.   Does Post contend that it had any
7    implied warranty from the gel coat manufacturer?
8         A.   I don't want to sound dumb, okay, but
9    I'm not -- I don't want to say.  I don't know.
10        Q.   In its claim for damages -- strike that.
11             What is the claim for damages that Post
12   is making against the manufacturer of the gel coat?
13        A.   We have -- we have -- we have the boats
14   that we've repaired, the cost on those, and then we're
15   also trying to cover all the boats that were
16   manufactured with 953 gel coat.
17        Q.   And how many boats were manufactured
18   with 953 gel coat?
19        A.   81.
20        Q.   How many have been repaired to date?
21        A.   81 have not had a problem, okay?
22        Q.   Uh-huh.
23        A.   Of those repaired, without counting, I'm
24   goes to guess we're probably somewheres up between 15
25   and 18.  I'm guessing.  It's ballpark.
```

(JENSEN - ZAJAC)

```
 1   three years ago with 953 gel coat.
 2        Q.    How many boats have been repaired once
 3   with 953 gel coat and have not required further
 4   repair?
 5        A.    Probably eight or nine.
 6        Q.    And how many have been repaired with 953
 7   gel coat and have required further repairs?
 8              MR. WEISZ:  I'm going to object to the
 9   form, but you can go ahead and answer it.
10              THE WITNESS:  Okay.  I know of two for
11   sure.  Three.  Three for sure.  Two have -- well, two
12   are in process.  One was done and there's maybe a
13   couple of others.
14   BY MR. ZAJAC:
15        Q.    Besides Mr. Brown's former boat, the
16   50-footer, are there any other boats in which Post has
17   obtained a release without performing any repairs or
18   paying for a third-party to perform repairs?
19        A.    No.
20        Q.    Is there any litigation pending against
21   Post from an owner besides Mr. Hamilton?
22        A.    No.
23        Q.    Have there previously been any
24   litigation against Post from a -- by a former -- by an
25   owner besides Mr. Hamilton?
```

(JENSEN · ZAJAC)

1    A.    No.   Post has been in business for 50

2  years.  Mr. Hamilton is the first person to sue Post

3  in 50 years, and the lawsuit that Post is bringing

4  against CCP is the first lawsuit that I'm aware of in

5  50 years.

6    Post has always been a company that has

7  tried to accommodate customers, take care of their

8  product and not get involved in these issues.

9    Q.    With regard to its claim against the gel

10  coat manufacturer, has Post quantified its damages for

11  the boats that have not yet been repaired, nor the gel

12  coat has failed?

13    A.    We've put a number out there, which is

14  an average of time.

15    Q.    What is that number?

16    A.    I'm trying to remember.  I believe it

17  was like 220, 225, 225,000, the boat.  I think.

18    Q.    Is Post seeking damages above and beyond

19  its cost of repair for boats that have already been

20  repaired once using the 953 gel coat?

21    A.    We've notified them that those boats --

22  what boats were repaired with 953 gel coat, and we

23  notified them that those boats may crack again in the

24  future based on what we've seen over the years, so

25  they've been notified of that.

(JENSEN · ZAJAC)

```
 1            C E R T I F I C A T I O N
 2            I, BETTY ANN WASILEWSKI, a Certified
 3    Shorthand Reporter of the State of New Jersey, do
 4    hereby certify that prior to the commencement of the
 5    examination, KENNETH JENSEN was duly sworn by me to
 6    testify to the truth, the whole truth and nothing but
 7    the truth.
 8            I DO FURTHER CERTIFY that the foregoing is a
 9    true and accurate transcript of the testimony as taken
10    stenographically by and before me at the time, place
11    and on the date hereinbefore set forth.
12            I DO FURTHER CERTIFY that I am neither a
13    relative nor employee nor attorney nor counsel of any
14    of the parties to this action, and that I am neither a
15    relative nor employee of such attorney or counsel, and
16    that I am not financially interested in this action.
17
18    _____
19            BETTY ANN WASILEWSKI
              Certified Shorthand Reporter
20            License No. XI01032
              Certificate of Merit
21            Registered Professional Reporter
              My Commission expires 12/18/08
22
23
24    DATED:   April 28, 2007.
25    THIS TRANSCRIPT FORMAT COMPLIES WITH NJ ADC 13:43-5.9.
```

# EXHIBIT

# D

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3              BOSTON DIVISION

4              C.A. NO. 05-11682 MLW

5

6    L & T YACHT SALES, INC.,                    :

7                        Plaintiff,              :

8                  -vs-                          :

9    POST MARINE CO., INC.,                      :

10                       Defendant.              :

11   - - - - - - - - - - - - - - - - - - - - - -

12

13

14         DEPOSITION OF:  JOSEPH MARTORANA

15             WEDNESDAY, APRIL 11, 2007

16

17

18

19

20         Atlantic City Court Reporting, LLC.

21    Certified Shorthand Reporters & Videographers

22          1125 Atlantic Avenue - Suite 416

23          Atlantic City, New Jersey  08401

24                  (609) 345-8448

25              www.accourtreporting.com

1          Deposition of JOSEPH MARTORANA, taken in the

2    above-entitled matter before Betty Ann Wasilewski, a

3    Certified Shorthand Reporter, License No. XI01032,

4    Registered Professional Reporter, Certificate of Merit

5    Holder and Notary Public of the State of New Jersey,

6    taken at the offices of ATLANTIC CITY COURT REPORTING,

7    LLC., 1125 Atlantic Avenue, Suite 416, Atlantic City,

8    New Jersey  08401, on Wednesday, April 11, 2007,

9    commencing at 2:14 p.m.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2

 3              CARMICHAEL & ZAJAC, P.C.

 4              BY:  JOHN E. ZAJAC, ESQ.

 5              170 High Street

 6              Taunton, Massachusetts  02780

 7              (508) 821-2552

 8              For the Plaintiff.

 9

10              SEGREDO & WEISZ

11              BY:  MICHEL O. WEISZ, ESQ.

12              9350 South Dixie Highway

13              Suite 1500

14              Miami, Florida  33156

15              (305) 670-3820

16              For the Defendant.

17

18    ALSO PRESENT:

19              Todd Hamilton

20

21

22

23

24

25
```

(MARTORANA - ZAJAC)

```
1              J O S E P H     M A R T O R A N A,
2    having been first duly sworn, testified as follows:
3                        EXAMINATION
4    BY MR. ZAJAC:
5         Q.     Good afternoon, Mr. Martorana.
6         A.     Good afternoon.
7         Q.     How are you?  My name is John Zajac and
8    I represent L & T Yacht Sales, Incorporated in
9    litigation in the federal district court against Post
10   Marine Company, Incorporated.
11              Have you ever given a deposition before?
12        A.     Yes, I have.
13        Q.     I'm going to assume that you're
14   relatively familiar with the ground rules, but I'm
15   going to state them very briefly, which is that we're
16   here to record your testimony, and I'm going to ask
17   you questions, and you're going to answer them; that
18   it's important that you answer verbally with yes or no
19   if that's the appropriate answer and not uh-huh or
20   uh-uh because that doesn't form a transcript or
21   nodding your head or indicating something, other than
22   verbally.
23              If you don't understand my questions,
24   please feel free to ask me to rephrase them or to
25   explain anything so that you are clear in what I'm
```

(MARTORANA - ZAJAC)

1          A.      I thought it had better flexible

2     properties to it, and it was better -- it was priced

3     better.  It was cheaper to be honest with you.

4          Q.      Had Post already been receiving

5     complaints about boats with the 953 gel coat at that

6     time?

7          A.      At what -- in 19 -- in 2002?

8          Q.      Yes.

9          A.      We had some boats, yes, but not -- yeah,

10    we did have some boats.  Yes, I believe.

11         Q.      Was it the complaints or was it the

12    better performance characteristics of the

13    Interplastic's at that time that made you select

14    Interplastic's over the 953?

15         A.      It was my suspicion of the

16    characteristics of 953 and the better pricing of the

17    other gel coat and the better characteristics of the

18    other gel coat.

19         Q.      Did you begin testing comparing the 953

20    to Interplastic's before or after Post received its

21    first complaint about cracking in the 953 gel coat?

22         A.      I'm not sure of that.  At the time, and

23    I'm talking about in 2000 -- the end of 2001, 2002, I

24    don't believe there was any type of -- there was no

25    wholesale cracking or problems that we had been aware

(MARTORANA - ZAJAC)

1    at that time, but I don't think we had any -- I don't

2    think we had any -- any kind of conversations before

3    that that I can remember.

4        Q.    So did you have any involvement with

5    regard to Mr. Hamilton's boat before it actually

6    arrived at Post?

7        A.    What -- what do you mean?  I'm not sure

8    I understand the question.

9        Q.    Did you speak with Ken about it?  Did

10   you speak to --

11       A.    Yes, I did.

12       Q.    -- anyone about it?

13       A.    Yes, I did.

14       Q.    What did Ken tell you about it?

15       A.    That it was a boat that we were going to

16   repair, and we talked about, you know, when we could

17   bring it in, and when we could get it done.

18       Q.    And what did you discuss with Ken about

19   a time frame for repairing Mr. Hamilton's boat?

20       A.    I believe the boat -- we brought the

21   boat in in November and we were going to work on it

22   over the winter.

23       Q.    Did you work on Mr. Hamilton's boat over

24   the winter of 2004 into 2005?

25       A.    Yes.

(MARTORANA - ZAJAC)

```
1         Q.      What was the condition of the gel coat
2   on Mr. Hamilton's boat when you first saw it?
3         A.      The overall condition of the boat, I
4   thought, was good.  It looked like it was maintained.
5   There were areas that were cracking, though.  I saw
6   the stress cracking.
7         Q.      Okay.  What areas did you first see
8   cracking in Mr. Hamilton's boat when you took it in
9   for repairs?
10        A.      On the shelter sides, the front deck,
11  the windshield, the cockpit floor, I believe the
12  cockpit side decks.
13        Q.      When did work on Mr. Hamilton's boat
14  start?
15        A.      In November.
16        Q.      Was that right when it first came in?
17        A.      Yes.
18        Q.      Where at your facility was the work
19  being performed?
20        A.      In our production building.
21        Q.      Were there other boats being repaired at
22  the same time?
23        A.      In the building?
24        Q.      Yes.
25        A.      No, I don't believe so.
```

(MARTORANA - ZAJAC)

```
1           A.      Most of them, yes, I do recall.
2           Q.      What were they?
3           A.      The shelter sides, the windshield, the
4   front deck, the cockpit, the cockpit side decks.  I
5   don't remember if the back bulkhead -- if we did work
6   to the back bulkhead or not or the tackle lockers.
7                   There was, I believe, one or two cracks
8   on one side of the hull and on the other side, I
9   believe, there was a couple small cracks around the
10  vents.
11          Q.      Did you have to strip the bottom of the
12  boat?
13          A.      Did we strip the bottom?
14          Q.      Yes.
15          A.      No, we didn't.
16          Q.      Did you strip the sides of the hull?
17          A.      Did I completely strip the sides?  No, I
18  did not.
19          Q.      What of the hull was stripped?
20          A.      The areas that were affected.
21          Q.      How large were those areas?
22          A.      On the side that we saw a couple cracks,
23  they were running top to bottom, and there was
24  probably two or three areas that we worked on there.
25                  On the other side in the vent area, I
```

(MARTORANA - ZAJAC)

```
 1    believe, there were small -- there were spots -- small
 2    spots around the radiuses of the vents.
 3           Q.     Did you have to strip the exterior of
 4    the bridge?
 5           A.     Exterior of the bridge?  No.  We didn't
 6    see any cracking on the exterior.
 7           Q.     Did you strip the inside of the bridge?
 8           A.     No, we didn't.
 9           Q.     Did you strip the floor of the bridge?
10           A.     I'm not sure.  They might have.  I'm not
11    sure.
12           Q.     Did you strip the hardtop?
13           A.     No, we did not.  I don't believe we did.
14           Q.     While the boat was at Post for repair,
15    did Mr. Hamilton ever come and visit Post?
16           A.     I believe he was, yes.
17           Q.     Did he meet with you on any of those
18    occasions?
19           A.     I talked to him there, yes.  He had been
20    there.
21           Q.     Do you recall how many separate
22    occasions you met with Mr. Hamilton at Post during the
23    repairs of the boat?
24           A.     No, I don't recall how many.  It might
25    have been one or two.
```

ATLANTIC CITY COURT REPORTING, LLC    (609) 345-8448
www.accourtreporting.com

(MARTORANA - ZAJAC)

```
 1          Q.     Do you recall when the first time was
 2    that you met with Mr. Hamilton at Post?
 3          A.     No, I don't.
 4          Q.     Do you recall any conversations that you
 5    had with him when you met with him?
 6          A.     I recall conversations about stripping
 7    the bottom, yeah, because we had talked about him
 8    sending us down some stripper, some solution to take
 9    the bottom paint off.
10          Q.     And did he send that to you?
11          A.     Yes, he did.
12          Q.     What was the reason that he provided the
13    stripper?
14          A.     He had said he had a solution that would
15    take the bottom paint off pretty readily.
16          Q.     Did you use it?
17          A.     We tried.
18          Q.     Did it work?
19          A.     No, it didn't.
20          Q.     What was the problem with it?
21          A.     I don't know.  I don't think it works.
22    We initially tried it with a pressure washer and it
23    didn't work, and then I think Todd suggested that we
24    had to use a hot water pressure washer or something
25    that generated heat so we rented a machine that
```

(MARTORANA - ZAJAC)

```
 1   coat on a boat?

 2        A.    Yes.

 3        Q.    What is it?

 4        A.    Different manufacturers different gel

 5   coats, it will vary, but around 20 mils is an average.

 6        Q.    And do you know how thick the gel coat

 7   on Mr. Hamilton's boat was?

 8        A.    No, I don't.

 9        Q.    What type of gel coat were you using for

10   the repairs of Mr. Hamilton's boat?

11        A.    We were using -- I believe we used

12   Interplastic's on his house sides.  Everything above

13   the rub rail and on the hull side, I believe we used

14   953.

15        Q.    What would be the reason that you used

16   the 953 on the hull side?

17        A.    Because it blended very well.

18        Q.    Because it was already 953 --

19        A.    Yes.

20        Q.    -- on the boat?

21        A.    Uh-huh.

22        Q.    Could you apply the Interplastic's gel

23   coat over the 953 gel coat?

24        A.    Yes.

25        Q.    So there was some areas that didn't have
```

(MARTORANA - ZAJAC)

1    you needed the space in the production facility?

2        A.    No.  They're not related.  The

3    production facility is inside.  The water has three

4    slips out there or four slips out there.

5        Q.    Did Post deliver a brand new 53-foot

6    boat in July of 2005?

7        A.    I don't know.

8        Q.    Do you know what the total number of

9    hours expended on the repair of Mr. Hamilton's boat

10   was?

11       A.    Yeah.  I believe you asked me that

12   before.  It was somewhere around 2,200 hours.  I don't

13   know the exact number.

14       Q.    And do you know the total cost of the

15   repairs?

16       A.    Personally, no.

17       Q.    Was there some period of time that Post

18   was used -- continuing to use 953 gel coat to repair

19   the boats manufactured with 953 gel coat?

20       A.    Yes, there was.

21       Q.    When was that?

22       A.    Exact time frame, I don't know.  2003

23   possibly.  2002, 2003.

24       Q.    And there was both 953 gel coat and

25   Interplastic's gel coat used in the repairs of Mr.

(MARTORANA - ZAJAC)

```
 1        Q.     Is CCP's 953 gel coat defective?
 2        A.     I don't know that.  I'm not a chemist.
 3   I believe -- I suspect something's wrong.
 4        Q.     And, generally, has it been boats kept
 5   in cold climates that have had this cracking problem?
 6        A.     Yes.
 7        Q.     Has it happened to any boat that's not
 8   kept in a cold climate yet?
 9        A.     I think there's one boat that I know of
10   that, and I haven't seen it so I can't attest to if
11   it's a normal gel coat crack, you know, because gel
12   coat does crack after a certain amount of time, you
13   know, it raises and all, or it's the type of cracking
14   we've seen on some of the boats we've repaired.
15        Q.     And is it fair to say that the cracking
16   on Mr. Hamilton's boat is the typical kind of major
17   cracking you've seen on boats with 953 gel coat kept
18   in colder climates?
19        A.     In some areas it was, yes.
20        Q.     Which areas?
21        A.     The areas that we repaired.
22        MR. ZAJAC:  If we could take a short
23   break, I'm probably done.
24        MR. WEISZ:  Whatever you want.
25        MR. ZAJAC:  I don't have too much
```

(MARTORANA · ZAJAC)

```
 1              C E R T I F I C A T I O N
 2              I, BETTY ANN WASILEWSKI, a Certified
 3    Shorthand Reporter of the State of New Jersey, do
 4    hereby certify that prior to the commencement of the
 5    examination, JOSEPH MARTORANA was duly sworn by me to
 6    testify to the truth, the whole truth and nothing but
 7    the truth.
 8              I DO FURTHER CERTIFY that the foregoing is a
 9    true and accurate transcript of the testimony as taken
10    stenographically by and before me at the time, place
11    and on the date hereinbefore set forth.
12              I DO FURTHER CERTIFY that I am neither a
13    relative nor employee nor attorney nor counsel of any
14    of the parties to this action, and that I am neither a
15    relative nor employee of such attorney or counsel, and
16    that I am not financially interested in this action.
17
18              BETTY ANN WASILEWSKI
                  Certified Shorthand Reporter
19                License No. XI01032
                  Certificate of Merit
20                Registered Professional Reporter
                  My Commission expires 12/18/08
21
22
23    DATED:  April 29, 2007.
24
25    THIS TRANSCRIPT FORMAT COMPLIES WITH NJ ADC 13:43-5.9.
```

# EXHIBIT

# E

# SEGREDO & WEISZ

ATTORNEYS AT LAW

A Partnership Including Professional Associations

Michel O. Weisz, P.A.
Frank J. Segredo, P.A.

Suite 1500
9350 South Dixie Highway
Miami, Florida 33156
Telephone: (305) 670-3820
Facsimile: (305) 670-8230

**FAXED**

August 25, 2004

Delivered Via Fax
(617) 333-3203

Ms. Lisa A. Kane
77 Rocsam Park Road
Braintree, MA 02184

Re: <u>Post Marine/Todd Hamilton</u>

Dear Ms. Kane:

I have reviewed various items of correspondence concerning a Post yacht owned by your husband, Todd Hamilton. It is my understanding that your husband purchased the yacht in a used condition sometime in the early summer of 2003. The yacht is a 2001 model year vessel which had been sold by a Post dealer at retail to the original purchaser in early to mid 2001.

As you may be aware, all Post yachts are covered by a written limited warranty. The warranty in effect at the time the yacht was originally sold was for one year from date of sale. Thus the warranty expired well before your husband purchased the yacht. In addition, the warranty expressly disclaims coverage of gel coat. As I understand it, the current issues related to the yacht concern gel coat issues, which in my view are not covered by the warranty and for which Post Marine has no liability or duty.

Having said that, Post is willing as a matter of accommodation and customer good will to gratuitously undertake and perform repairs to the gel coat finish. This work will be done at no cost to your husband and will consist of the following:

Post Marine will inspect the entire vessel to determine the extent of the gel coat repairs to be performed. The areas affected will be treated in the following manner.

1.      The engine room will be isolated by sealing the exhausts at the transom, sealing the hull side intake vents, sealing the cockpit hatches and engine room door.

EXHIBIT "B"

Ms. Kane
Page 2
August 25, 2004

      Re:  <u>Post Marine/Todd Hamilton</u>

2.      Bottom paint will be removed and the bottom will be inspected to locate any areas of gel coat cracking.

3.      Topsides and hull sides will be covered prior to bottom sanding, the bottom will be sanded to remove gel coat in areas of cracking.  Any hardware affected by stress cracking will be removed and reinstalled.

4.      Epoxy barrier coatings will be applied within manufacturer specifications.  Two coats of bottom paint will then be applied.

5.      All necessary hardware will be removed and reinstalled to facilitate gel coat removal.

6.      Gel coat will be sanded off using random orbital sanders, laminate will be inspected, and prepared for reapplication of gel coat.

7.      The vessel will be taped off and covered in appropriate areas in preparation for spraying gel coat to proper specifications.

8.      Once gel coat has been sprayed, it will be sanded to a 1200 grit finish in preparation for polishing.

9.      Polishing will be completed and a coat of fiberglass gel coat resin cleaner-sealer will be applied.

Prior to delivery, the boat will be cleaned as we clean all new boats for customer pickup.  Post Marine will make every attempt to complete these repairs in a timely manner and estimate the process will take approximately four months upon receipt of the vessel at our facility.

These repairs are made as an accommodation only and no warranty will be provided other than a 90 warranty of workmanlike performance which will cover only the workmanship of the application of the gel coat. No warranty will be extended with respect to the gel coat, its characteristics, color or finish.

Very truly yours,

Michel O. Weisz

# EXHIBIT

# F



100 Post Road • Mays Landing, NJ 08330-1698 • (609) 625-2434 • Fax: (609) 625-2336 • www.postyachts.com

Todd Hamilton
Via FAX: 617-333-3203

Dear Mr. Hamilton:

To clarify the letter sent to you from Michel Weisz. In making the repairs to your
your boat we will spray gelcoat in such a way as to eliminate any spotting or color
variation in the areas to be repaired. Gelcoat will be removed from entire surfaces,
example being shelter sides, cockpit, forward deck, side decks, pulpit and hull to
ensure consistency.

Sincerely,

Joseph Martorana

Joseph Martorana
Vice President

Exhibit F

# EXHIBIT

# G

ORIGINAL

1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3                    BOSTON DIVISION

4                    C.A. NO. 05-11682 MLW

5

6    L & T YACHT SALES, INC.,                          :

7                              Plaintiff,              :

8                    -vs-                               :

9    POST MARINE CO., INC.,                            :

10                             Defendant.              :

11   - - - - - - - - - - - - - - - - - - - - - - - -

12

13

14              DEPOSITION OF:  CORTEZ MARKS

15              WEDNESDAY, APRIL 11, 2007

16

17

18

19

20         Atlantic City Court Reporting, LLC.

21     Certified Shorthand Reporters & Videographers

22          1125 Atlantic Avenue - Suite 416

23         Atlantic City, New Jersey  08401

24                  (609) 345-8448

25             www.accourtreporting.com

2

1            Deposition of CORTEZ MARKS, taken in the

2    above-entitled matter before Betty Ann Wasilewski, a

3    Certified Shorthand Reporter, License No. XI01032,

4    Registered Professional Reporter, Certificate of Merit

5    Holder and Notary Public of the State of New Jersey,

6    taken at the offices of ATLANTIC CITY COURT REPORTING,

7    LLC., 1125 Atlantic Avenue, Suite 416, Atlantic City,

8    New Jersey  08401, on Wednesday, April 11, 2007,

9    commencing at 3:20 p.m.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2

 3              CARMICHAEL & ZAJAC, P.C.

 4              BY:   JOHN E. ZAJAC, ESQ.

 5              170 High Street

 6              Taunton, Massachusetts  02780

 7              (508) 821-2552

 8              For the Plaintiff.

 9

10              SEGREDO & WEISZ

11              BY:   MICHEL O. WEISZ, ESQ.

12              9350 South Dixie Highway

13              Suite 1500

14              Miami, Florida  33156

15              (305) 670-3820

16              For the Defendant.

17

18    ALSO PRESENT:

19              Todd Hamilton

20

21

22

23

24

25
```

(MARKS - ZAJAC)

```
 1                C O R T E Z   M A R K S,
 2    having been first duly sworn, testified as follows:
 3                         EXAMINATION
 4    BY MR. ZAJAC:
 5         Q.    Good afternoon, Mr. Marks.
 6         A.    Good afternoon.
 7         Q.    How are you?
 8         A.    Very well.  Thank you.
 9         Q.    My name is John Zajac, and I represent
10    L & T Yacht Sales, Incorporated in a lawsuit in the
11    Federal District Court in Massachusetts against Post
12    Marine Company.
13               We're here today to take your
14    deposition.  Have you ever given a deposition before?
15         A.    Yes.
16         Q.    Once or more than once?
17         A.    Once.
18         Q.    I'm going to assume that you probably
19    know the ground rules, but I'll restate them briefly
20    for you.  I'm going to ask you questions and you're
21    going to answer them.  Someone is going to record
22    your -- my questions and your testimony, and to
23    prepare an accurate record of that, it's important
24    that you answer questions verbally, not by nodding
25    your head, not by saying uh-huh or uh-uh, because that
```

(MARKS · ZAJAC)

1    sides of the boat?

2         A.    Yes.  As I remember, there might have

3    been either three or four cracks on the port side, and

4    maybe a couple small ones on the starboard side.

5         Q.    And were those repaired?

6         A.    Yes.

7         Q.    What was the process of repairs that

8    were done to Mr. Hamilton's boat?

9         A.    Well, that was ground out.  The cracks

10   were ground out and filled with a filler, and then it

11   was sanded and sprayed and sanded out.

12        Q.    Do you recall which gel coat Post used

13   to repair Mr. Hamilton's boat, the 953 or

14   Interplastic's or both?

15        A.    I can't remember which one they used at

16   this time.

17        Q.    Was there a period of time that Post was

18   using the 953 because the color blended well over --

19        A.    Yes.

20        Q.    -- 953?

21        A.    Yes.

22        Q.    And does Interplastic's blend less well

23   from a coloring standpoint?

24        A.    Well, the two -- the two may not look

25   exactly the same if you patch with it.  You'd have a

(MARKS - ZAJAC)

1    and he wasn't pleased.

2         Q.    Did he have any specific complaints that

3    you recall?

4         A.    I can't remember.

5         Q.    Do you remember anything that you said

6    to him?

7         A.    I can't remember.

8         Q.    Besides using Interplastic's gel coat

9    instead of 953 gel coat, has anything changed in the

10   way that Post has been fixing cracked gel coat since

11   the problem arose?

12        A.    We tried to sand the gel coat off more

13   aggressively than we did in the past.

14        Q.    What do you mean by that?

15        A.    Well, if there's an area where there's

16   cracks, we try to sand it down as close to the

17   laminate as we can.

18        Q.    And how does that differ from the way

19   you had previously been repairing it?

20        A.    Well, previously, we tried to repair the

21   cracks, and refinish it after we repaired the cracks.

22        Q.    Which way was Mr. Hamilton's boat

23   repaired, if you recall?

24        A.    We filled the cracks and sprayed over

25   the cracks.

(MARKS - ZAJAC)

1        Q.      So it wasn't the aggressive sanding

2    that's now being done?

3        A.      No, no.

4        Q.      Because of the repairs that Post has had

5    to do, has it been required to purchase any equipment

6    to do those repairs?

7        A.      No, other than just the regular tools

8    like sanders, or grinders, or whatever it may be.

9        Q.      Can gel coat be applied over gel coat?

10       A.      Yes.

11       Q.      Is there any danger in applying new gel

12   coat over potentially defective 953 gel coat?

13       A.      That, I don't know.

14       Q.      With regard to the hull of Mr.

15   Hamilton's boat, was the hull stripped?

16       A.      No.

17       Q.      Was any of the gel coat stripped from

18   the hull?

19       A.      No.

20       Q.      Was the bottom of the boat stripped?

21       A.      No.

22       Q.      Was any gel coat removed from the bottom

23   of the boat?

24       A.      No.

25       Q.      Was the stern stripped?

(MARKS - ZAJAC)

```
 1          A.    I can't remember whether it was or not.
 2          Q.    Was the cockpit area stripped?
 3          A.    I believe the cockpit may have been
 4   stripped.
 5          Q.    Was the freezer area stripped?
 6          A.    I'm not sure.  I don't remember.
 7          Q.    Was the back bulkhead stripped?
 8          A.    I don't remember that.
 9          Q.    Was the front deck stripped?
10          A.    Front deck was.
11          Q.    Was the front of the salon stripped?
12          A.    The front of the salon?  What is the
13   front of the salon?
14          Q.    Where the seat is in the front of the
15   boat.
16          A.    The windshield was stripped.  The front
17   seat, I recall that wasn't stripped at the time.
18          Q.    Was the bridge stripped?
19          A.    I -- I'm not sure.  I don't think so.
20          Q.    How about the bridge floor?
21          A.    The bridge floor, yes.
22          Q.    And the dashboard?
23          A.    That wasn't stripped.
24          Q.    And the hardtop?
25          A.    I don't think that was stripped either.
```