UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BOSTON DIVISION
DOCKET NO. 05-11682

L & T YACHT SALES, INC.                )
        PLAINTIFF,                     )
                                 )

VS.                                    )
                                 )

POST MARINE, INC.                      )
        DEFENDANT             )

## PLAINTIFF'S OPPOSITION TO DEFENDANT, POST MARINE CO., INC.'S MOTION
### TO EXCLUDE TESTIMONY DOCUMENTS EXPERT WTINESSES AND
### UNDISCLOSED WITNESSES

Now comes the Plaintiff, L & T Yacht Sales, Inc. and herby opposes the Defendant,

Post Marine Co., Inc's Motion to Exclude Testimony, Documents, Expert Witnesses and

Undisclosed Witnesses.   As grounds therefore, the Plaintiff states:  It is disingenuous for the

Defendant in this action to complain or protest about the conduct of discovery in this matter and

then attempt to use the same to a basis to exclude evidence. The Defendant has been far less

than forthcoming in responding to discovery in this action and has not been prejudiced as alleged

in its motion.

1

By way of example:

On August 1, 2006 Plaintiff served upon Defendant a set of interrogatories.

Interrogatory No. 2 asked:

Have you ever provided services on a 2001 Post Marine owned by L & T Yacht Sales, Inc.? If so, please state:

> (a) The date(s) that L & T Yacht Sales, Inc., requested any services from POST MARINE, INC.
> (b) The date(s) that POST MARINE, INC., provided any services;
> (c) The service(s) that L & T Yacht Sales, Inc., requested from POST MARINE, INC.
> (d) The services that POST MARINE, INC., provided to L & T Yacht Sales, Inc.

Defendant's answer to 2(b) relative to the dates that Defendant provided repair services was vague and did not provide the actual dates of repair services, "Boat came back to Post in November 2004 and left in August 2005. Work was stopped in July 2005 at the direction of

Todd Hamilton."

Defendant's answer to 2(c) relative to the services that Plaintiff requested for Defendant

was completely non-responsive, "Initially wanted money in lieu of repairs. Post would not pay and Post wanted to repair Gel Coat. Todd Hamilton then agreed to repairs."

Defendant's answer to 2(d) relative to the services provided by Defendant was also vague

"…winterized, hauled, and blocked the boat…. Post repaired the gel coat until Todd Hamilton directed Post to stop." While winterizing, hauling and blocking are terms

2

wherein reasonable inferences can be drawn, Plaintiff asks the Court to take note of "Post repaired the gel coat" as vague, evasive and shedding virtually no light on the critical questions of fact and issues of law relevant to Plaintiff's complaint including but not limited to Defendant's negligent repairs and whether Defendant breached its contractual obligations to Plaintiff.

Interrogatory No. 4 asked: ".... Did you receive any contact from L & T Yacht Sales, Inc. regarding the status of services either in writing or verbally by phone or in person?"

Defendant's answered "Plaintiff did not request repairs. Post Marine always offered the repairs. Plaintiff always requested money." Does that answer mean that Defendant never received any contact from L & T regarding status of services being provided by Defendant or was it merely a non-responsive answer lending itself more to an inflammatory, self-serving editorial comment from a "soapbox?"

Interrogatory No. 5 asked for dates of contact from L & T and full and complete detail of the nature of contact. Defendant's answer contains no specific dates but does contain inaccuracy, alleging that in June of 2005 Todd Hamilton stated that the boat was turning out better than he expected. The substance of that completely inaccurate statement within that answer flies in the face of the June 15, 2005 and July 13, 2005 written communications from Todd Hamilton to Defendant which ironically, Defendant refers to in its same answer! The June 15, 2005 written communication contains a list of 13 items which still needed to be repaired during the next several weeks. The July 13, 2005 communication memorializes to Defendant, Mr. Hamilton's "disappointment" regarding the current condition of the boat . . ."

3

Interrogatory No. 6 asked:, "Following the initial request for the services by the Plaintiff, did you ever receive any contact from the Plaintiff regarding the Plaintiff's concerns over POST MARINE, Inc.'s work and the condition of the boat subsequent to the start of the work? If your answer to this interrogatory is in the affirmative, please explain in full detail the nature of this contact and the contents of any correspondence. Defendant's answer repeats the same inaccuracy and ignores the questions request for full detail as to the Plaintiff's concerns over Defendant's work and condition of the boat subsequent to the start of the work.

Interrogatory No. 12 asked: Please identify any other POST boat owners or purchasers other than L & T Yacht Sales who have contacted POST MARINE, for the repair of the gel coat on their boats since 2001.

Interrogatory No. 13 asked: Please identify any boats (by owners name, address and boat serial number), other than the boat owned by L & T Yacht Sales, on which POST MARINE, Inc., has conducted repairs to the gel coat since 2001.

Interrogatory No. 14 asked: For each boat identified in your answer to the preceding interrogatory, please state whether the owner of the boat at the time that POST MARINE, Inc, conducted repairs to the gel coat was the person or equity to whom POST MARINE, Inc., originally sold the boat.

Interrogatory No. 15 asked: For each boat identified in your answer to the interrogatory number 13, please state how many times POST MARINE, Inc., received the same boat back for repair of the gel coat.

Interrogatory No. 16 asked: For each boat identified in your answer to the interrogatory number 13, describe any and all steps taken to remedy or repair the gel coat issues.

4

Interrogatory No. 17 asked.  Please identify and describe any and all corporate records and any method of recordation or maintenance observed for those records that relate to the repair of the gel coat for boats manufactured by POST MARINE, Inc., since 2001.

Defendant did not answer any of the preceding six (6) interrogatories all of which reasonably inquired of Defendant's experiences, interactions and repairs of other boats having the same problems as experienced by Plaintiff and its boat.  Moreover, as the Defendant has raised as a defense that there is no warranty for repairs to the gel coat, Defendant's history in repairing boats for other owners would be highly relevant.

Defendant's answer to interrogatory 20 is a paradox.  "We did all the work we said we would.  We were prepared to finish, but Mr. Hamilton ordered us to stop and he removed the boat".  This isagain vague and non-responsive.  Did the Defendant do all the work or does it claim that it was stopped before it completed the work?

Interrogatory No. 23 asked: Please identify all non-expert witnesses who you intend to call at trial and summarize their anticipated testimony.  Defendant's answer on March 22, 2007, almost eight (8) months after being served with the question as "undetermined;" and has never identified an expert.

Interrogatory No. 24 asked: Please identify all expert witnesses that you intend to call at trial and summarize their qualifications as an expert witness and their anticipated testimony.  Defendant's answer on March 22, 2007, almost eight (8) months after being served with the question as "undetermined."

Subsequently on May 1, 2007 Plaintiff's legal counsel communicated in writing with Defendant's legal counsel reasonably requesting that Defendant's answers to questions 2, 4 and 7 be more specific and emphasized relative to question 2(d), which services specifically

encompassed "Post repaired the gel coat". Said May 1 communication also reasonably asked for clarification of the paradox, aforementioned within Defendant's answer to interrogatory 20, did Defendant do all the work or did Defendant not finish the work?

Finally and very importantly, said May 1 written communication from Plaintiff's legal counsel to Defendant's legal counsel (received by facsimile of May 1) specifically called attention to interrogatory questions asked of Defendant exactly nine (9) months earlier."(23-24) These questions reasonably ask for your client to identify all non-expert and expert witnesses it intends to call at trial as well as summaries of anticipated testimony and expert qualifications if applicable. Your client's recent answer to both these questions was "undetermined."

Although my client has received no similar interrogatory request from Post, I reasonably suggest in good faith, that before the scheduling conference on May 4th, you and I exchange by facsimile delivery a complete list of non expert and expert witnesses we intend to call at trial on behalf of our clients."

Defendant, in bad faith did not respond to Plaintiff's invitation to exchange non-expert and expert witness lists in the spirit of openness and cooperation. Yet on June 1, Defendant   has the audacity to seek by motion, to limit Plaintiff's calling of witnesses.

Despite the aforementioned, Defendant's motion unreasonably requests that Plaintiff not be allowed to offer evidence of Plaintiff's damages. Perhaps this is so because Defendant's own President, Kenneth Jensen, has already done such a good job testifying under oath as to a significant dimension of L & T's damages. (See deposition of Kenneth Jensen, April 11, 2007 at page 88).

6

Q. "With regard to its claim against the gel coat manufacturer, has Post quantified its damages for the boats that have not yet been repaired, nor the gel coat has failed?

A. We've put a number out there, which is an average of time.

Q. What is that number?

A. I'm trying to remember. I believe it was like 220, 225, 225,000, the boat, I think.

Also, (same Kenneth Jensen deposition at page 63)

Q.        How much did it cost to repair Mr. Hamilton's boat?

A.        Well, we had 1,890 hours into repair. Our labor rate was $65 an hour and that's not counting materials. That's not counting the winterization of the engines that we had to do, storage that we had.

There certainly seems to be room for some math at trial, i.e. $225,000.00. Since Plaintiff's position is that none of the repairs provided by Post were of any benefit Post, there is no reason that this testimony would be excludable as to the cost of repairing the Plaintiff's boat.

7

Moreover, Plaintiff has provided its own estimates for the cost of repairing the boat as well as L
& T's damages.

Why is Defendant so apparently fearful of a trial on the merits with a full and complete
evidentiary record? Defendant's own Exhibit D attached to its June 1, 2007 Motion to Exclude
acknowledges damages to the Plaintiff in the amount of $125,000.00 to $150,000.00!

Similarly to the Plaintiff's interrogatories propounded to Defendant, Post unreasonably
refused to respond to 6 Requests for Production, all of which were directly on point with Post's
experiences with other boat owners having gel coat problems similar to Plaintiff's experiences.
The 6 Requests for Production of Documents by Defendant were:

REQUEST NO. 7: Any and documents identifying any POST MARINE Inc, boat
Owners, (and or identifying the number of boats other than L & T YACHT SALES) who have
provided their boats to POST MARINE for repairs to the of the gel coat since 2001.

REQUEST NO. 8: Any and all documents identifying and POST Marine, Inc boat
owners, or identifying the boat, other than L&T YACHT SALES, who have had the gel coat
repairs performed by POST MARINE, Inc. since 2001.

REQUEST NO. 9: Any and all DOCUMENTS which evidence, establish, show, refer to,
relate to, depict and/or describe gel coat repairs performed by POST MARINE, Inc. to boats that
it manufactured since 2001.

REQUEST NO. 25: Copies of any statements that concern gel coat on Post Marine, Inc.
boats, including copies of all deposition transcripts from the action Viking Yacht Co., et al v.
Composite One, LLC, et al, New Jersey Federal District Court, Docket No. 05-CV-00538-JEI-
JBR.

REQUEST NO. 26: Copies of any and all interrogatory answers, from any party, in the action *Viking Yacht Co., et al* v. *Composite One, LLC, et al*, New Jersey Federal District Court, Docket No. 05-CV00538-JEI-JBR.

REQUEST NO. 27: Any and all documents not produced in response to the preceding requests which you intend to mark for identification or offer into evidence at the trial of this matter.

During the course of Kenneth Jensen's aforementioned deposition, Defendant's legal counsel refused to allow Mr. Jensen to answer if there had been any other Post dealers in addition to the one that he testified to, in the past 10 years. This refusal blocked an attempt     by Plaintiff to obtain a full and complete picture of all Post dealers' experiences with   boat   owners having similar problems with their boats as those experienced by L & T. (See Jensen deposition page 21). Jensen also refused, under instruction from his legal counsel,    to     answer     certain questions about Defendant's litigation with the manufacturer of the gel coat concerning the same series 953 gel coat that Defendant in its own words caused "catastrophic cracking" as has been suffered by L & T (See Jensen deposition pages 92-98).

Defendant seeks to support its motion in part, to exclude Plaintiff's calling expert witnesses at trial, and to limit Plaintiff's witnesses at trial to Todd Hamilton, Ken Jensen, Composites One, LLC Curran Composites and Total Composites, by feebly attempting to analogize the case at hand with *Freund* v. *Fleetwood Enterprises, Inc.,* 956 F2nd 354 (1st Cir. 1992). In *Freund,* expert testimony was excluded not only because Plaintiff sought, for the first time, to supplement disclosure as to the experts testimony, only 4 days before trial  (emphasis added), but also at mid trial, the expert (in a court ordered mid-trial deposition) indicated that there would be a significant additional, previously unrevealed, area of his expert testimony.

9

Obviously, it is quite a stretch for Defendant to credibly argue that Post will suffer substantial and similar prejudice for Plaintiff to supplement and update its witness lists, as Plaintiff offered in writing to Defendant on May 1, 2007. This is not mid-trial; this is not 4 days before trial. A trial date has not even been scheduled as of yet. This is not even close to the situation faced by the ***Freund*** court where as the court therein stated, "A continuance on the eve of trial would have offered defendants only a Hobson's choice of inadequate preparation or costly delay; and a continuance midway through the trial could have meant losing the benefits of previously cross-examined witnesses as well". In L & T vs. Post, do not have a trial date as of yet and therefore we do not have a situation, which the court found in ***Freund*** to be "an inability to devise a fair and practical cure."

Defendant also attempts to characterize Plaintiff's counsel's delivery in hand to Defendant's legal counsel on May 4, 2007, a CD containing photographs of the boat in controversy as "willful disobedience." Defendant fails to mention, however, that both legal counsel discussed the CD at April depositions at which time Plaintiff's legal counsel was surprised to learn that Defendant did not already have said CD, which he belived had been produced along with the other documents in the case. In the interim, the pictures were e-mailed and to be sure, Plaintiff's legal counsel hand delivered the CD to Defendant's legal counsel when they next met on May 4.

Defendant, upon learning about the pictures at Mr. Hamilton's April 17 deposition, could have easily arranged with Plaintiff to suspend Mr. Hamilton's deposition and to cross examine Mr. Hamilton relative to the said pictures. Defendant's legal counsel chose not to do so, however, he now has months to prepare a quite thorough cross examination relative to the same

prior to trial if he so desires. There is no real problem or prejudice here, but if there were, there would certainly be a cure for it.

Wherefore, L & T respectfully submits that in light of (1) Defendant's far less than timely, cooperative, diligent, specific and fully responsive answers to interrogatories, production of documents and testimony at deposition; (2) discovery and evidence provided to date by both Plaintiff and Defendant relative to Plaintiff's damages; (3) lack of significant prejudice to Defendant    (4) the ability and opportunity to comprise a plan for the parties to exchange and supplement witness and expert witness lists, long before trial as L & T suggested in writing on May 1, 2007; that Defendant's Motion to Exclude be denied.

Respectfully submitted,
The Plaintiff,
By its Attorneys,

_/s/ John E. Zajac_
John E. Zajac, Esquire BBO # 560195
Carmichael, Zajac & Fleury, P.C.
170 High Street
Taunton, MA 02780
(508) 821-2552

## CERTIFICATE OF SERVICE

I, John E. Zajac, Esquire this 15th day of June, 2007 have given notice of the within Plaintiff's Motion for Partial Summary Judgment, Statement of Material Facts and Memorandum of Law, by mailing a copy of the same to by overnight mail to Defendant's legal counsel, Michel O. Weisz, Esquire at his 9350 S. Dixie Highway, Miami, Florida 33156 office and by e-mail service, via the Court's CM/ECF system which sent notification of such filing to Howard M. Brown, Esquire, Bartlett Hackett Feinberg P.C., 155 Federal Street, 9th floor, Boston, MA 02110

_/s/ John E. Zajac_
John E. Zajac, Esquire

# EXHIBIT

# A

ORIGINAL

```
 1                UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3                BOSTON DIVISION

 4                C.A. NO. 05-11682 MLW

 5

 6   L & T YACHT SALES, INC.,                    :

 7                        Plaintiff,             :

 8                -vs-                           :

 9   POST MARINE CO., INC.,                      :

10                        Defendant.             :

11   - - - - - - - - - - - - - - - - - - - - - - -

12

13

14        DEPOSITION OF:  KENNETH JENSEN

15          WEDNESDAY, APRIL 11, 2007

16

17

18

19

20        Atlantic City Court Reporting, LLC.

21   Certified Shorthand Reporters & Videographers

22         1125 Atlantic Avenue - Suite 416

23        Atlantic City, New Jersey  08401

24              (609) 345-8448

25           www.accourtreporting.com
```

(JENSEN · ZAJAC)

1           Deposition of KENNETH JENSEN, taken in the

2    above-entitled matter before Betty Ann Wasilewski, a

3    Certified Shorthand Reporter, License No. XI01032,

4    Registered Professional Reporter, Certificate of Merit

5    Holder and Notary Public of the State of New Jersey,

6    taken at the offices of ATLANTIC CITY COURT REPORTING,

7    LLC., 1125 Atlantic Avenue, Suite 416, Atlantic City,

8    New Jersey  08401, on Wednesday, April 11, 2007,

9    commencing at 10:06 a.m.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(JENSEN - ZAJAC)

1        A.      South Florida.

2        Q.      Black Pearl?

3        A.      Black Pearl.

4        Q.      And the one in Tequesta is the --

5        A.      International distributor.

6        Q.      -- international distributor.  Only --

7    they only distribute internationally?

8        A.      Correct.  They cannot sell domestically.

9        Q.      Have there been any other Post dealers

10   over the past 10 years?

11              MR. WEISZ: Objection.  Irrelevant.

12   We're not going to go there.

13              MR. ZAJAC:  That's your objection; it's

14   irrelevant?

15              MR. WEISZ:  Yes.  It's harassing,

16   burdensome.  It has nothing to do with anything and

17   you're just wasting time.

18              MR. ZAJAC:  I disagree.

19              MR. WEISZ:  Okay.

20              * MR. ZAJAC:  So you're instructing him

21   not to answer if there's been any other Post dealers

22   besides the one that he's testified to in the past 10

23   years?

24              MR. WEISZ:  I am.

25   BY MR. ZAJAC:

(JENSEN - ZAJAC)

1          Q.      Has Post repaired other second owner

2    boats?

3          A.      Yes.

4          Q.      Has Post had to repair second owner --

5    some second owner boats on more than one occasion for

6    gel coat problems?

7          A.      Yes.

8          Q.      What is Post's present procedure for

9    repairing gel coat?

10         A.      Sanding the affected areas and applying

11   new gel coat.

12         Q.      Is Post presently stripping all of the

13   gel coat or only the affected areas?

14         A.      The affected areas.

15         Q.      Has Post repaired any boats by removing

16   all of the gel coat?

17         A.      No.   The affected areas.

18         Q.      Is it Post's contention that that is all

19   of the repairs that are necessary for the gel coat

20   failures?

21         A.      Yes.

22         Q.      How much did it cost to repair Mr.

23   Hamilton's boat?

24         A.      Well, we had 1,890 hours into repair.

25   Our labor rate was $65 an hour and that's not counting

(JENSEN · ZAJAC)

1    materials.  That's not counting the winterization of

2    the engines that we had to do, storage that we did.

3              Q.      Now, is the $65 an hour what Post

4    typically would charge for repairs or what it cost

5    Post to repair a boat?

6         A.      It costs -- our labor rate is in the

7    mid-40s.

8         Q.      Is it fair to say that Post is not

9    generally a repair facility?

10        A.      No.  We have always repaired boats at

11   some degree and to some level throughout our history.

12        Q.      Are those repairs ever at customer's

13   request for which the customer pays?

14        A.      Yes.

15        Q.      And is that where the $65 an hour rate

16   would come from?

17        A.      Yes.

18        Q.      Has Post ever notified owners about the

19   problems with gel coat?

20        A.      No.

21        Q.      Has Post notified dealers about the

22   problems with gel coat?

23        A.      Yes.

24        Q.      How did Post notify dealers about

25   problems with gel coat?

(JENSEN · ZAJAC)

```
 1          A.      No.   Post has been in business for 50

 2    years.  Mr. Hamilton is the first person to sue Post

 3    in 50 years, and the lawsuit that Post is bringing

 4    against CCP is the first lawsuit that I'm aware of in

 5    50 years.

 6                Post has always been a company that has

 7    tried to accommodate customers, take care of their

 8    product and not get involved in these issues.

 9          O.      With regard to its claim against the gel

10    coat manufacturer, has Post quantified its damages for

11    the boats that have not yet been repaired, nor the gel

12    coat has failed?

13          A.      We've put a number out there, which is

14    an average of time.

15          Q.      What is that number?

16          A.      I'm trying to remember.   I believe it

17    was like 220, 225, 225,000, the boat.   I think.

18          Q.      Is Post seeking damages above and beyond

19    its cost of repair for boats that have already been

20    repaired once using the 953 gel coat?

21          A.      We've notified them that those boats --

22    what boats were repaired with 953 gel coat, and we

23    notified them that those boats may crack again in the

24    future based on what we've seen over the years, so

25    they've been notified of that.
```

(JENSEN - ZAJAC)

```
 1          Q.       Did you attend any depositions for
 2    witnesses from Viking in the litigation against the
 3    gel coat manufacturer?
 4          A.       Yes.
 5          Q.       Are you familiar with what method Viking
 6    is using to repair boats?
 7          A.       Somewhat.
 8          Q.       Is Viking removing all of the 953 gel
 9    coat when it repairs a boat?
10          A.       I think at one time they did.  They are
11    no longer doing that.
12          Q.       If you know, how is Viking presently
13    repairing boats with 953 gel coat?
14          A.       What they're doing is they're sanding it
15    down to -- again, you'll have to ask Viking to be
16    specific.  I can tell you what we've been told.
17                   They'll sand down to about eight to 10
18    mils the gel coat.  Areas where -- in the actual crack
19    area in the gel coat, they will take that down to
20    the -- to the laminate, and then what they're doing is
21    they're using a epoxy primer, high build primer and
22    then they're painting the boats with a product called
23    Alexseal so they are not stripping all the gel coat
24    off the boats.
25          Q.       But they're sanding the entire gel coat
```

(JENSEN · ZAJAC)

1    surface to eight mils?

2         A.    Pretty much.

3         Q.    And what's your understanding of the

4    reason for that?

5         A.    My understanding -- I'm not an expert in

6    this, but my understanding is that the paint

7    manufacturer felt that that was a thin enough laminate

8    or layer of gel coat that the epoxy primer would

9    prevent any further cracking.

10              MR. WEISZ:  Is CCP paying you for this?

11              MR. ZAJAC:  Not yet, but they might want

12   to.

13   BY MR. ZAJAC:

14        Q.    Is it fair to say that gel coat creates

15   a water barrier?

16              * MR. WEISZ:  I'm going to instruct the

17   witness not to answer.  You are reading from another

18   deposition in another case with completely different

19   issues that have nothing to do with this case.

20              You're wasting time and you're far and

21   beyond harassment so we're not going to go there

22   anymore.

23              MR. ZAJAC:  How is it possible that the

24   issues aren't related when we're talking about the

25   same gel coat failing for which he's -- his company is

(JENSEN · ZAJAC)

1    seeking damages from the manufacturer, but he's

2    denying that my client is entitled to seek damages

3    from him?

4            MR. WEISZ:  Now, if you can't figure

5    that out, you haven't read the pleadings.  And by the

6    way, the question has been asked and answered.

7            Counsel, if you have any more questions.

8            MR. ZAJAC:  Yes, I do.

9    BY MR. ZAJAC:

10       Q.    Did you attend the deposition of Juan

11   Beltran of Viking?

12       A.    No.

13       Q.    Does the thickness of gel coat have any

14   affect on cracking?

15            * MR. WEISZ:  Objection.  Instruct the

16   witness not to answer.  It's got nothing to do with

17   this case.

18            If you want to ask him questions about

19   other people's testimony, it's not appropriate.

20            MR. ZAJAC:  Again, I disagree as to

21   whether or not the thickness of gel coat would have

22   something to do with this case because --

23            MR. WEISZ:  Counsel --

24            MR. ZAJAC:  -- you're --

25            MR. WEISZ:  -- if you want to ask the

(JENSEN - ZAJAC)

```
 1    witness a question about this case, that's fine.
 2                 If you want to ask him about somebody
 3    else's testimony, whose deposition you're looking at,
 4    it's not proper.
 5                 MR. ZAJAC:   I think his testimony
 6    relative to the thickness is relevant to this case.
 7                 MR. WEISZ:   Have you qualified him as an
 8    expert?
 9                 MR. ZAJAC:   No.
10                 MR. WEISZ:   Then he's not competent to
11    answer the question, so we're going to move on.
12                 MR. ZAJAC:   Again, I disagree, because
13    he's taking the position that it's not necessary to
14    sand or remove all the gel coat --
15                 MR. WEISZ:   Yes.  And?
16                 MR. ZAJAC:   -- for proper repair.
17                 MR. WEISZ:   And?
18                 MR. ZAJAC:   Well, if he's got that
19    opinion, then I can ask him what effect --
20                 MR. WEISZ:   Yes.
21                 MR. ZAJAC:   -- the thickness of the gel
22    coat has.
23                 MR. WEISZ:   They're not related.
24                 MR. ZAJAC:   How are they not related?
25                 MR. WEISZ:   Counsel, do you have any
```

(JENSEN · ZAJAC)

```
 1    idea what the thickness --
 2              MR. ZAJAC:  Huh?
 3              MR. WEISZ:  What the reason -- whether
 4    or not the thickness of the gel coat has anything to
 5    do with whether it cracks?  Do you have any idea
 6    whether the thickness of the gel coat has any reason
 7    why this gel coat is cracking?
 8              MR. ZAJAC:  Sure.
 9              MR. WEISZ:  Okay.  Then you testify.
10              MR. ZAJAC:  He's taking the position
11    that Mr. Hamilton's boat does not need to be -- to
12    have all the gel coat stripped or to have all the gel
13    coat sanded.
14              MR. WEISZ:  Okay.
15              MR. ZAJAC:  So I want to know why -- if
16    the thickness of gel coat has an effect on cracking.
17              MR. WEISZ:  It's got nothing to do with
18    what he testified to.  He testified that not all the
19    gel coat had to be stripped off; that they were fixing
20    the areas that were cracked.  That was the agreement
21    they made with the client.  What's that got to do with
22    thickness of gel coat?
23              MR. ZAJAC:  Whether or not that's an
24    adequate repair for Mr. Hamilton's boat.
25              MR. WEISZ:  He already testified that it
```

(JENSEN - ZAJAC)

1    is.   You got somebody to disagree with it?   Bring him
2    on.
3                  MR. ZAJAC:   But I'm asking him whether
4    or not the thickness of gel coat has an effect on
5    cracking.
6                  MR. WEISZ:   What evidence do you have
7    that the gel coat -- what the thickness of the gel
8    coat is?
9                  MR. ZAJAC:   On what, on Mr. Hamilton's
10   boat?
11                 MR. WEISZ:   Yeah.
12                 MR. ZAJAC:   I can certainly prove that.
13                 MR. WEISZ:   No, you can't because you
14   don't know.
15                 MR. ZAJAC:   How would I not know?
16                 MR. WEISZ:   Because you don't.
17                 MR. ZAJAC:   The boat's in his
18   possession.
19                 MR. WEISZ:   You don't know.
20                 MR. ZAJAC:   How do you know what I know
21   about my client's own boat?
22                 MR. WEISZ:   Counsel, move on.
23   BY MR. ZAJAC:
24       Q.      What effect does the cracking -- what
25   effect does the thickness of gel coat have on

(JENSEN · ZAJAC)

```
 1    cracking?
 2                * MR. WEISZ:  Objection.  Beyond the
 3    competency and scope of this witness's expertise, not
 4    qualified as an expert.
 5                MR. ZAJAC:  Okay.  Are you instructing
 6    him not to answer that?
 7                MR. WEISZ:  I am.
 8                MR. ZAJAC:  Huh?
 9                MR. WEISZ:  Yes.
10                MR. ZAJAC:  Are you instructing him not
11    to answer that?
12                MR. WEISZ:  Yes.
13    BY MR. ZAJAC:
14        Q.    Is the value of a Post boat with 953 gel
15    coat diminished because it has 953 gel coat?
16        A.    With what's going on in the marketplace
17    with that gel coat, I would say that it has.
18        Q.    Would you say that it's significantly
19    diminished?
20        A.    I'm not really involved in the
21    aftermarket sale of boats and it's a little difficult,
22    so I would say it certainly has been a negative.
23    That's why we're repairing the boats now with the
24    Interplastic.
25        Q.    The first boat that had the problem with
```