UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BOSTON DIVISION
DOCKET NO. 05-11682

L & T YACHT SALES, INC.,                          )
                          Plaintiff                )
                                                   )
VS.                                                )
                                                   )
POST MARINE CO., INC.,                             )
                          Defendant                )

## PLAINTIFF'S REPLY MEMORANDUM IN RESPOMSE TO DEFENDANT'S MEMORANDUM OF LAW OPPOSING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### I.    Statement of the Case

Defendant's Statement of the Case in its introduction to its memorandum opposing the Plaintiff's Motion for Summary Judgment is comprised of a number of specious statements that are for more conclusory than fact-oriented. They include the following subjects:

(1) Post's unsuccessful attempts to limit both expressed and implied warranties, a position which ironically Post argues against in its litigation (currently pending in the United States District of New Jersey) against Composites One, LLC, the manufacturer of the well-discussed series 953 gel coat;

(2) Post's attempt to ignore a valid contract, supported by significant and multiple forms of consideration, by relying upon a self serving written statement by its

1

legal counsel that Post's obligations were a gratuitous undertaking. Also, it would seem that in August of 2004, when the Defendant agreed to fix Plaintiff's boat, that it grossly underestimated the extent of the repairs needed and may have, as indicated by its subsequent actions, actually considered its agreement to be contractual. By its own acknowledgment Post spent more than 2200 labor hours attempting to fix Plaintiff's boat, prior to Plaintiff stopping the repair process due to Plaintiff's dissatisfaction with the process and substance of the repairs (as well as the fact that the repairs were nowhere near completion and that Post had already more than doubled the amount of time that it had estimated that it would take to complete them). It would seem that more than 2200 hours of labor reflects Post's perception of a contractual obligation rather than a gratuitous undertaking;

(3) As to the terms of the specific repairs which (Plaintiff strongly argues obligated by contract), Defendant states speciously, were set forth unambiguously. This litigation itself; the complexities related to the many factual issues pertaining to the repairs; and, the widely varying perceptions between Plaintiff and Defendant relative to all of the aforementioned, reflect likelihood of ambiguity in some of those terms.

A note at the outset, relative to Defendant's brief reference in this section to its asscrtion of affirmative defenses. One of those defenses asserted was the economic loss doctrine. While Plaintiff responded fully in its Response

2

Memorandum arguing that said doctrine had no application or relevance to this case, it is worthy of note that in the discovery process, particularly interrogatory #19 propounded to Defendant and request for production of documents #16 propounded to Defendant, Plaintiff asked Defendant for the following:

19.    Please state the basis for your seventh affirmative defense which alleges that any claims in tort are barred by the economic loss rule. Defendant has never provided an answer to this interrogatory.

16.    Any and all documents, which support or relate to your seventh affirmative defense in which Defendant alleges that any claims in tort, are barred by the economic loss rule.

Defendant did provide a response to this request, i.e. "None."

The final paragraph of Defendant's "Statement of the Case" substantially "misstates" L & T case against Post. The same is far more extensive than (1) affected areas vs. entire boat, relative to removal of gel coat; (2) use of defective series 953 gel coat in its repairs of L & T's boat 1 and (3) Post's repairs taking too long. Notably,

---

1 Defendant's footnote in this section makes a grossly specious reference to gel coat as a cosmetic protective gloss covering the boat's hull. Defendant's own officer, Joseph Martorana, in his September 2, 2004 letter, clearly mentioned that the gel coat covered (5) other specifically named and substantial sections of Plaintiff's boat in addition to the "hull" i.e. shelter sides, cockpit, forward deck side decks and pulpit. As far as the "cosmetic" reference, L & T calls attention to the following quote "Because of the cracking, the affected boats have hugely diminished values. The value of a boat with gel coat cracks is hundreds of thousand dollars less than a boat with no cracks. The difference equals the cost of repairing the boat. The trade value of an older boat is critical to selling a new boat. A boat owner who does not receive full trade value will not buy a new boat. As a result of the cracking, and the potential for future cracking, dealers are unwilling to accept boats built with 953 gel coat in trade. As a

Post's perception of Plaintiff's case is somewhat more accurate now, considering that in Post's own summary judgment memorandum, Post's perception of Plaintiff's case seemed to be limited to only the affected areas vs. entire boat issue.

Actually, beyond there said 3 allegations, L & T's case is also grounded in its claims that in the areas where Post did remove gel coat it did not do so as promised, and Defendant's performance through the perspective of both tort and contract were inconsistent with proper and workmanlike standards. Additionally, as stated within its Response Memorandum, L & T has alleged, as has been revealed by discovery and as trial evidence would show, Post failed to perform all (9) of its promises contained within the contract terms as defined and drafted by Post's legal counsel on August 25, 2004.

## II.    Standard on a Motion for Summary Judgment

L & T agrees with Defendant's statement of the most favorable light perspective being afforded to the non-moving party. Fed. R. Civ. Pro. 56(c) certainly lays out a formidable mountain for the moving party to climb "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The United States Supreme Court further defined whether a dispute about a material fact is a "genuine issue" if the evidence is such that a reasonable jury could return a verdict for the non-

---

result, Plaintiffs must repair or agree to repair the boats before a dealer will accept a trade. (Healey Dep. 132-135, 139-144)." That quote is an excerpt from Post's Brief in Opposition to Defendant Cook Composites Motion for Summary Judgment filed on July 11, 2007 in its litigation pending in the United States District Court in New Jersey.

moving party.  *Anderson* v. *Liberty Lobby Inc.,* 477 U.S. 242, 247-48 (1986).

**III.    Argument**

Facing hundreds of thousands of dollars in loss of value to its boat, in the spirit of good faith and in an effort to avoid a lawsuit against Post, L & T agreed to allow Post the opportunity to repair Plaintiff's boat.  After all, Defendant had in its August 25, 2004 letter, agreed word for word with 8 of 9 of the demands articulated in Plaintiff's August 19, 2004 letter to Defendant, in which a lawsuit was threatened.   Under the surrounding circumstances at the point in time, it would have been completely unreasonable for L & T to contest Defendant's additional self-serving language seeking to ignore the threatened lawsuit and refer to its actions as an "accommodation" with disclaimer and unreasonable limitation of reasonable warranties.  L & T simply wanted to avoid hundreds of thousands of dollars in damage to its boats value.  L & T simply wanted its boat fixed.

Another practical perspective is that when Todd Hamilton visited Defendant's facility during the 9 1/2 month "repair process," Plaintiff's boat was usually covered and difficult of providing significant inspection.  Plaintiff "pulled the plug" on July 15 not because the scope of work was not what Todd Hamilton wanted, but rather because of the poor quality of the repairs being performed and the repairs being so far from being finished, despite being 5 months beyond the original time estimate by Post.

---

The relevant portion of said Brief is attached hereto as Exhibit A.  Also attached as Exhibit B is and excerpt from Post's Predident' Ken Jensen's deposition in the New Jersey litigation wherein he testifies that

## A. Breach of Contract

Facing catastrophic cracking and six figure diminution of its boat's value, Plaintiff in the summer of 2004, through its legal counsel on August 17 sent a letter to Defendant's legal counsel threatening a lawsuit.    Two days later, Plaintiff's legal counsel sent a letter to Defendant's corporate officers Jensen and Matorana, detailing nine specific repair demands. On August 25, Defendant's legal counsel agreed to and outlined, word for word, 8 of the 9 repair demands as described in the August 19 letter from Defendant's legal counsel.    Ignoring forbearance of a very real and threatened lawsuit, and calling the repairs a "gratuitous accommodation," is self serving and unsupported by the facts and their reasonable inferences. Plaintiff discussed at length *Neuhoff* v. *Marvin Lumber*, 320 F.3d 197 in its Response Memorandum.    Neuhoff clearly stated that forbearance of a well founded claim is the surrender of a thing of value and sufficient consideration for a contract.

In addition to threat of lawsuit expressed in writing to Defendant, aforementioned, Defendant's President Jensen has testified through discovery that Mr. Hamilton threatened to sue Post.    Defendant's footnote on page 5 of its Response Memorandum goes on to make the preposterous statement that there is no evidence that Post agreed to perform the greatly needed repairs because of the threat. While mind-reading is difficult, it is quite easy to see that L & T gave up a significant and valid claim (as well as paying for delivery of its boat to Post and foregoing its use for a substantial period of time) rising to a value which supports its identity as sufficient consideration AND that L & T agreed to provide specific repairs.    A valid contract existed. Curiously in its footnote, Defendant cites *McNulty* v. *Great America Insurance*

6

*Company*, 727 F. Supp. 45. McNulty had only an alleged oral contract with the insurer that he would receive a share of insurance proceeds with the only consideration being his forbearance from filing a lawsuit against the insurer. The contract was found to be valid and supported by sufficient consideration. The Defendant's insurer's motion for summary judgment was denied as to McNulty's contract action. L & T has far more than *McNulty* on this point. L & T has a written expression of threat to sue, a demand for specific repairs and said specific repairs having been reduced to writing by Defendant's legal counsel.

Also as previously briefed by Plaintiff, L & T incurred significant expense of time and money in reliance upon Defendant's contractual promises. Said repairs were not gratuitously performed by Defendant, but rather a form of additional, sufficient consideration.

Relative to Defendant's footnote on page 4 of its Response Memorandum, the aforementioned exchange of correspondence between Plaintiff and Defendant wherein all nine of its August 19, 2004 repair demands were repeated back by Defendant (eight of them on August 25th ) and one of them on September 2, is completely inconsistent with the footnote's statement that there was no agreement as to scope of repairs. There may have been some ambiguity particularly as to the meaning and criteria of "affected areas," but there was an agreement as to scope of work. The further allegations by Defendant that it performed the repairs as promised sinks to the level of an ostrich's head beneath the sand.

Relative to its "public relations problem," inferences can reasonably be drawn when million dollar boats experience catastrophic cracking. Post reports in its July 11 brief in its New

7

Jersey litigation against the manufacturer of the defective gel coat, that 32 of the 81 boats Post built with the 953 gel coat have cracked and that thus far 15 of those 32 cracked boats have been repaired at a cost to Post of $1,549,935.00. Post estimated therein that the remaining 17 boats to be repaired will cost $279,000.00 each to repair (another $4,464,000.00). See attached **Exhibit A.** That's a potentially catastrophic image problem to a manufacturer of million dollar yachts. L & T's provision to Post in the fall of '04 and into the winter, spring and summer of '05 with the opportunity to repair Plaintiff's yacht and potentially turn a disgruntled owner of a Post manufactured yacht into a happy owner of the same, was valuable consideration flowing to Defendant. And by the way, the difference of a yacht owner in New England getting its yacht back in March as originally estimated by Defendant (and relied upon by L & T) and getting it back in August, when the boating season is almost over, is a huge difference.

## 1.    Replacement of gel coat on entire boat.

Defendant correctly references *Coll* v. *P.B. Diagnostic Systems*, 50 F. 3d 1115, 1122 (1st Cir. 1995) as holding that the interpretation of a contractual provision is an issue of law to be decided by the court. However, Defendant does not go on to acknowledge that *Coll* also held that if the contract is ambiguous, there is an issue of fact for the jury. Joseph Martorana, Vice President of Post on September 2, 2004 apparently felt his attorney's letter of August 25, 2004 must have been ambiguous, since the Martorana letter stated with the words "To clarify the letter sent to you from Michel Weisz . . ." A major ambiguity in the Weisz letter is the phrase "The areas affected will be treated in the following manner" for which L & T sought clarification.

8

To this day, almost 3 years later, there is a huge disparity between Plaintiff's and Defendant's perception of "affected area."  Language within a contract is usually considered ambiguous where an agreement's terms are inconsistent on its face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken.  See *Rey* v. *Lafferty*, 990 F2d 1379, 1385 (1st Circuit).  This case is certainly a classic case of the described ambiguity.

Todd Hamilton's opinion and objections expressed in his deposition as to the extent of the cracking on Plaintiff's boat when he picked it up from Post after it had been in Post's control for more than 9 months, was that approximately 80% of the boat was cracking.  Post's perception is that most of the cracking had been repaired by the time Plaintiff stopped the repairs due to Todd Hamilton's great dissatisfaction with the repair services.  Plaintiff's dissatisfaction with Defendant's gel coat removal scope has never been the product of an arbitrary or capricious demand but rather has always been grounded in a reasonable belief and observation that Post was ignoring in its repair process, significant areas of the boat which were experiencing cracking.

Again, there may be ambiguity as to the scope of repairs but as fully discussed in Plaintiff's Response memorandum "mutual mistake" does not apply have because there is no mistaken belief shared by both Plaintiff and Defendant. The reasonable inference can be drawn that Post, in August and September of 2004, seriously underestimated the areas of the Plaintiff's boat suffering from gel coat cracking.  That is Post's unilateral mistake and does not excuse Post from its obligations mistakenly underestimated.

9

In fact all the evidence demonstrates that Post failed to perform its obligations in accord with the terms and conditions set forth in the August 25, 2004 and September 2, 2004 letters of correspondence.

**2.     Post did, in fact, perform the repairs in an un-workmanlike manner.**

Defendant claims here that there is no evidence to support the assertion that Post used series 953 (certainly no question of fact as to whether this gel coat was/is defective) gel coat to repair L & T's boat. See Defendant's Response Memorandum page 8. In its footnote at the bottom of same page, Defendant states that the 953 was used "in one limited area of the hull." Turning the page to page 9 Defendant acknowledges that its Vice President, Joseph Martorana testified under oath at its deposition "Everything above the rub rail and on the hull side, I believe we used 953." Martorana goes on to later file a self-serving affidavit that completely contradicts his deposition testimony give under oath. affidavits . . . cannot be used to contradict previous statements made . . . under oath in order to create a material issue of fact to defeat summary judgment *Phinney* v. *Morgan*, 39 Mass. App. Ct. 202 *quoting  O'Brien* v. *Analog Devices, Inc.*, 34 Mass. App. Ct. 905, 906 (1993), *Morrell* v. *Precise Engr., Inc.*, 36 Mass. App. Ct. 935, 937 (1994). Virtually all of the areas in which he states by affidavit that other (non-953 series) gel was used are above the rub rail. See counter affidavit of Todd Hamilton attached as **Exhibit C.** This is consistent with the re-cracking observed by Hamilton in these areas. See Hamilton's deposition transcript at pages 64-68 attached hereto as **Exhibit D.**

Defendant also, without merit, attempts to rely upon **Maddalone** v. **Empressas Lineas Maritimus Argentinas,** 370 Mass 864 (1976) as general precedent to allow implied warranties, such as reasonably good and workmanlike manner, to be limited or disclaimed. In **Maddalone**, a Defendant company providing stevedoring services to a boat owner, attempted the following disclaimer of implied warranties: "This contract constitutes a full agreement between the parties hereto and no warranty of any nature shall be implied from any wording of this agreement." The court ruled, however, in this case (again curiously cited by Defendant) that the aforementioned language was not sufficient to negate the stevedore's implied warranty of workmanlike performance. "The elimination of such a crucial part of the stevedore/vessel relationship will not be assumed from general language disclaiming warranties..." A similar relationship also existed between L & T as boat owner and Post as a yacht builder providing repairs to avoid L & T being damaged by hundreds of thousands of dollars of diminished value to its boat.

Defendant is wrong and inaccurate in its statement on page 10 of its Response Memorandum that "L & T's claim now appears to be that the gel coat is defective (rather than the manner in which the gel coat was applied during the repair process)..." quite to the contrary, L & T is clearly claiming that Post failed to utilize reasonable and workmanlike standards relative to both the application of the new gel coat (including but not limited to its continued use of the knowingly defective series 953 gel coat) and the removal of the old gel coat in the repair process.

As an example relative to the application of the new gel coat process, Todd Hamilton has testified under oath at his deposition, "He saw gel coat that was too thick. He saw gel coat

11

applied over gel coat. He saw gel coat cracking that was just repaired. Daniel Briggs, that's the name Daniel Briggs." See Hamilton Deposition (Exhibit D) page 64. At page 68, Hamilton testified, "And I did not want him (meaning Post) going forward putting a bit of putty right here and a bit of putty right here, and then it's all re-cracking. It was already cracked before I left."

Relative to removal of the old gel coat, Hamilton testified at page 65, "Anything that was cracked was going to be completely stripped. If it was anything different I would have never brought my boat there… you would take the gel coat down until you started seeing the [fiber] glass beneath it… most of the people use a tool called a peeler instead of a sander, and they peel off the gel coat."

In its New Jersey District Court July 11, 2007 brief at page 9, Post states relative to the 953 removal process, "Repairs take nearly eight weeks and is labor intensive. It involves stripping the entire gel coat finish from the boat by manually grinding off the old gel coat, (emphasis added) then sanding, re-gelcoating and re-sanding the finished re-application." The "manually grinding off step" is conspicuously missing from Post's removal process with L & T's boat. L & T claims that grinding off and peeling down to the fiber glass as Todd Hamilton testified is consistent with the grinding off step which Post included in its New Jersey litigation position as Plaintiff, a step which Post ignored and continues to ignore as a Defendant in Massachusetts.

### 3.    Repairing the boat in few months was a term of the contract

Defendant in writing estimated the time for performance by Defendant to be 4 months. L & T, at significant expense and in reliance upon Defendant's representation is including time frames, delivered its boat to Defendant in New Jersey in November 2004. Getting its boat back to the limited boating season in New England by March was important to L & T. Getting the boat back in August made a huge difference to L & T. The condition of its boat when received back rubbed "salt in the wounds" of its lost 2005 boating season.

Defendant's footnote on page 11 of its Response Memorandum that Mr. Hamilton removed the boat after the work was nearly completed, flies in the face of reality and the evidence. Defendant's August 25 letter contained a punch-list of 9 items. Plaintiff vehemently claims that Defendant completed none of said 9 items. Not including all the problems with gel coat removal and application and the use of a gel coat causing catastrophic cracking with boats used or stored in cold weather (Massachusetts certainly qualifies here), going 0 for 9 is not "nearly completed."

### B.  L & T is entitled to summary judgment in its favor for negligent misrepresentation

As previously briefed, Massachusetts courts have generally treated negligent misrepresentation claims more as negligence actions than contract actions, focusing on the degree of care exercised by the speaker in making the statement. Mere negligence in discovering

the falsity of a statement before making the representation is sufficient in this action in tort for negligence. ***Cummings*** v. ***HPG Int'l Inc.***, 244 F3d 16.

As Post's United States District Court of New Jersey and Kenneth Jensen's deposition testimony bears out, Post has been aware that the failure of series 953 gel coat causes far more than cosmetic damage. Despite knowing about hundreds of thousands of dollars of diminution to the value of L & T's boat from the cracking arising from the 953 and despite Post's representations to L & T that it would repair the gel coat in a workmanlike manner and despite Post's representation that it would complete the repairs in an estimated 4 months. Defendant nonetheless seemed to make choices disregarding said representations. Specifically, (1) it chose to continue to utilize the 953 in its repairs upon Plaintiff's boat; (2) it seemingly ignored the target date of getting L & T's boat back to L & T for the 2005 boating season (not even close to 4 months); (3) it seemingly ignored areas of cracking and (4) in areas Post did not ignore, Post stripped an impartial part of the gel coat removal process i.e. manually grinding off the old gel coat before sealing as it acknowledged was the proper methodology in its New Jersey litigation.

Post has offered no good reasons or intervening forces as to why its estimated time frames came no where close to getting L & T's boat back to L & T in time for the 2005 boating season or why despite the time delays, the boat was returned to L & T with so much cracking still present.

As called for by ***Golber*** v. ***Bay Back Valley Trust Co.,*** 704 NE2d 1191, L & T justifiably relied on the information provide to Plaintiff in August and September of 2004 and Defendant at

that time failed to exercise reasonable care or competence in obtaining or communicating the information to L & T. L & T acknowledges as the *Golber* court points out that a claim for negligent misrepresentation is ordinarily one for the jury.

As stated above, reasonable inferences can be drawn that would support certain standards made by Defendant in the fall of 2004, reasonably relied upon by L & T, were known by Defendant not to be true when they were expressed. Performance of the expressed promises, which were not fulfilled, was certainly written in the control of Post. Unlike the Plaintiff in *Blacksmith* 228 FRD 66, Plaintiff did clearly participate in the alleged conversations on which the misrepresentation claims were made. There is no genuine issue of fact as to whether L & T relied upon the negligent misrepresentations.

## C.  L & T is entitled to summary judgment on its negligence claim

Again, Defendant's feeble attempt to hide behind the gratuitous undertaking argument of *Wheatley* v. *Pierce*, 354 Mass 573 was fully discussed in Plaintiff's previous memorandum, as completely inapplicable to the case at hand. This is not a guest rule case. L & T in its previous memorandum discussed Defendant's conduct in the course of its repairs rising to the level of gross negligence simply in response to Defendant's inaccurately stating in its initial memorandum that the "guest rule" requires such a level of negligence by Defendant. In closure of this muddying of the waters issue, inapplicable to L & T and Post, if L & T had to "go there" in its evidence against Post to "very great negligence, or the absence of slight diligence, or the

want or even scant care." *Altman* v. *Aronson*, 231 Mass 588 (1919)… it could easily "get there" against Post.

As has been fully discussed above in the breach of contract arguments by L & T, Defendant's repairs of Plaintiff's boat were far from gratuitous and were supported by multiple valid forms of consideration. However, looking purely through a tort perspective, where a business relationship exists between the parties a voluntary undertaking still requires the volunteer to use simple due care. An undertaking is voluntary but not gratuitous (requiring gross negligence), if the volunteered services are an indispensable part of a bundle of services for which consideration has been given, even though the undertaking in question has not been specifically contracted for." *Massachusetts Asset Financing Corporation* v. *Harter*, 220 F. Supp 2d 20 (2002). Proper removal of defective gel coat, proper application of new gel coat, refraining from re-using defective 953, and the 9 items of repair on Defendant's August 25, 2004 written punch-list were all indispensable parts of a bundle of services for which consideration had been given. In the event any one of them were to be found not to have been specifically contracted for, but rather voluntary, Defendant still was obligated to provide these services with due care.

This concept of a duty of care arising out of a particular relationship between the parties is also embedded in our law. *Mullins* v. *Pine Manor College*, 389 Mass 47 (1983). We saw this highly regarded duty of care given guest weight by the courts, when grounded by a relationship, within Plaintiff's discussion above relative to breach of contract and the court's reluctance to allow the disclaimer or limitation of implied warranties such as reasonable and workmanlike

service provision standards. In fact Mullins found actionable, failure to utilize reasonable care even to perform gratuitous undertakings particularly where the harm suffered because of a Plaintiff's reliance upon the Defendant's undertaking. We certainly have reasonable reliance by L & T with regard to Post's undertakings expressed in writing in the fall of 2004.

> Respectfully submitted,
> The Plaintiff,
> By its Attorneys,
>
> _/s/ John E. Zajac_
> John E. Zajac, Esquire BBO # 560195
> CARMICHAEL, ZAJAC & FLEURY, P.C.
> 170 High Street
> Taunton, MA 02780
> (508) 821-2552

### CERTIFICATE OF SERVICE

I, John E. Zajac, Esquire this 3rd day of August, 2007 have given notice of the within, Plaintiff's Reply Memorandum in Reply to Defendant's Memorandum of Law Opposing Plaintiff's Motion for Partial Summary Judgment by e-mail service, via the Court's CM/ECF system which sent notification of such filing to Howard M. Brown, Esquire, Bartlett Hackett Feinberg P.C., 155 Federal Street, 9th floor, Boston, MA 02110 and by regular mail, postage pre-paid to Michel O. Weisz, Esquire at 9350 S. Dixie Highway, Miami, FL 33156.

> _/s/ John E. Zajac_
> John E. Zajac, Esquire

# EXHIBIT

# A

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

| | |
|---|---|
| VIKING YACHT COMPANY, a New Jersey Corporation and POST MARINE CO., INC., a New Jersey Corporation) | ) CIVIL ACTION NO.: 05-CV-538 ) (JEI/JS) |
| Plaintiffs, | ) |
| vs. | ) |
| COMPOSITES ONE LLC, a Foreign Limited Liability Company, CURRAN COMPOSITES, INC., a Missouri Corporation, C TWO LLC a foreign Limited Liability Company, and TOTAL COMPOSITES, INC., a Delaware Corporation joint d/b/a COOK COMPOSITES AND POLYMERS, a fictitiously named Delaware Partnership, | ) *Document Electronically* ) *Filed* ) ) ORAL ARGUMENT REQUESTED ) ) ) ) ) |
| Defendants. | ) |

---

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT COOK COMPOSITES
AND POLYMERS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

Henry J. Tyler, Esquire
Society Hill Office Park
1874 Route 70 East, Suite 4
Cherry Hill, NJ 08003
Telephone: (856) 751-2282

Michel O. Weisz, Esquire
SEGREDO & WEISZ
9350 S.Dixie Highway, #1500
Miami, FL 33156
Telephone: (305) 670-3820

Attorneys    for    Plaintiffs
Viking Yacht Company and Post
Marine Co., Inc.

## PLAINTIFFS' FACTUAL BASIS FOR THEIR CLAIMS

Plaintiffs are New Jersey recreational boat builders. Each builds composite boats made of reinforced fiber-glass. To build a boat, various components are layered onto each other in a mold. The outermost skin, made of gel coat is the first part built. Gel coat is a liquid product. The liquid is stirred, and then pumped through a spray gun where it mixes with a chemical called an initiator. The combined mixture is sprayed onto a mold surface where it cures (hardens).

After curing, mats of fiberglass are laid over the gel coat (in Viking's case, sprayed by a large gauge "chop gun") and mixed with liquid resin. The fiberglass and resin react, harden, and bond to the gel coat. After hardening, fiberglass mats and resin are applied in layers, until the part being built achieves the desired thickness.

The completed part is called a composite. The gel coat layer is only 20 to 30 mils thick.[1] Gel coat provides a cosmetic finish, color to the part, and acts as a barrier to prevent water and other materials from damaging the underlying laminate.

Gel coat has been used in the marine industry for this purpose since the 1970's. (Hollenbeck Dep. 14, 15-16). It has an expected life span of more than 30 years. (Poole Dep. 43-44). Although the color may fade and the finish dull, it is expected

---

[1] A mil is 1/1000 of an inch.

1

to retain its integrity for the life span of the boat. (Chiappa Dep. 64-65).

CCP manufacturers gel coat. It holds itself as an industry leader, boasting a research lab, testing and manufacturing facilities and highly trained technicians. (Hollenbeck Dep. 87, 92, 93). It publishes an annual tome (nearly 200 pages long) known as the "Cookbook," described by Ed Malle, a former researcher at CCP, as "the primary reference for fiberglass manufacturing..." (Malle Dep. 45). CCP publishes articles in various trade magazines, (Malle Dep. 45, 66), and holds seminars on its products at its factory and at marine industry trade shows. (Leach Dep. at 25-26). It researches, develops and manufactures its own products. (Hollenbeck Dep. 16, 19-20, 70, 74-75). CCP regularly conducts field audits for customers to assist them in improving their boat building techniques and in better using CCP products. (Kaphingst Dep. 38; Chiappa Dep. 89; Poole Dep. 98-100; Malle Dep. 65). It also assists customers by performing "tests at no cost to the customer to help the customers qualify the materials that they used." (Malle Dep. 238). When the gel coat cracking problem surfaced at Viking in early 2004, CCP personnel were touted as experts in the field who could bring "added value" to resolving the problem. (Carreiro Dep. 229-230, Ex. 23).

CCP issues recommendations and suggestions for other

2

products to be used with its gel coats. (Malle Dep. 138-139; PB-58). CCP technical employees visited both Post and Viking, at which time they observed the manner in which Post and Viking applied gel coat. CCP never informed either that their construction methods were problematic, or that products they used were incompatible with CCP's gel coat.

From April 1994 through 1997, Viking and Post used a CCP gel coat designated as Series 952. In 1996, Viking, dissatisfied with Series 952's loss of luster over time (known as "buffback") approached CCP and asked if any better products were available. (Healey Dep. 37). In early 1997, CCP informed Viking that it had developed a new product, Series 953 gel coat, which was an improvement over 952 gel coat and would meet Viking's need. (Poole Dep. 23, 27, 31, 38-39). CCP provided Viking product information, including PB-58, a five-page product bulletin which described the enhancements to 953 gel coat over 952 gel coat. (Poole Dep. 28, 102-107, Ex. 1). The product bulletin italicized the assertion that 953 gel coat had improved flexibility and weathering characteristics over 952 gel coat. It expressly stated that 953 gel coat retained all other desirable characteristics customers had come to expect of 952 gel coat, including durability. (Hollenbeck Dep. 120). CCP did not disclose the changes it made in the composition of 953 gel coat. Based on CCP's representations, Viking agreed to replace 952 gel

3

coat with 953 gel coat (Healey Dep. 63-65, 73) at a higher cost (Healey Dep. 59).

RP Associates (Composite One's predecessor) then informed Post that 952 gel coat would be replaced by 953 gel coat. (Jensen, Dep. 117, Ex. 169). The same product information and bulletin provided to Viking was given to Post. (Jensen Dep. 147-163, Ex. 169). Post was told that 953 gel coat "had improved qualities over 952, it was more flexible gel coat, and better weathering." (Jensen Dep. 133-134). Based on the information provided, Post also agreed to purchase 953 gel coat at an increased price over 952 gel coat. (Jensen Dep. 127, 133).

Plaintiffs initially bought a white gel coat designated as 953WA411.[2] Each specific code of gel coat is chemically unique from all other variations of 953 gel coat. (Hollenbeck Dep. 29-34; Chiappa Dep. 73; Leach Dep. 58). Although there is one master formula, the variations require introducing or withholding different pigments or varying the amount of fillers, tints and other chemicals. (Hollenbeck Dep. 29-34). These changes, although small, affect the resulting physical characteristics and properties of the hardened gel coat. (Leach Dep. 59-64, 113-114; Kaphingst Dep. 90). One property of gel coat tested by CCP is elongation, a measure of the flexibility

---

[2] The first three numbers of the gel coat code describe the specific product, the first letter describes the color and the second letter and last three numbers describe variations in the

4

of gel coat as it stretches. (Hollenbeck Dep. 69). The higher

the elongation number, the more flexible it is. (Hollenbeck Dep.

105). As admitted by CCP, in the boat building industry this

characteristic is associated with a gel coat's ability to resist

cracking. (Hollenbeck Dep. 138-139; Kaphingst Dep. 80).

> Q. Mr. Malle, can you tell me what benefit, if any, there
> is to a more flexible gel coat?
>
> A. The benefits of a more flexible gel coat would be
> re...possibly reduce the risk of some types of cracking.
>
> Q. How would it do that?
>
> A. By allowing the gel coat to stretch more before the
> crack generated. (Malle, Dep. at 168)

He further testified:

> Q. (By Mr. Bizar) Is there a preferred test at CCP for
> measuring flexibility and elongation of gel coats?
>
> A. No. The three tests that we discussed for predicting
> the crack resistance of composites were used
> interchangeably. (Malle Dep. 237).

Changes in pigments, fillers and other chemicals change the

elongation characteristics of each version of gel coat.

(Hollenbeck Dep. 169, 336). CCP does not separately test the

elongation of each variation of gel coat. (Hollenbeck Dep. 85-

86).

After switching to 953 gel coat, Viking experienced various

problems, including color inconsistencies. Viking and CCP worked

to resolve these issues, resulting in the re-formulation of 953

product. (Hollenbeck, Dep. at 26-27, 37).

5

gel coat used by Viking. The reformulated 953 gel coats were assigned different product code numbers. Viking stopped using 953WA411 gel coat, and over time used white gel coats designated as 953WJ458, 953WJ208, and 953WJ737.[3] Post used only 953WA411 gel coat. The color matching problems experienced by Viking were resolved and CCP agreed to pay Viking over $450,000 to fix the affected yachts.

In 2002, Post began seeing massive 953 gel coat cracking in boats which were used in winter climates. The cracks begin as nearly invisible lines and over time progress to the point where the entire boat looks like a mosaic. The cracks are random and appear on all parts of the boat. Although Viking had noticed an increase in gel coat cracking after switching to Series 953 gel coat (Poole Dep. Ex. 23), it first began seeing similar massive cracking in 953 gel coat in early 2004.

Gel coat cracking is a known phenomenon (Hollenbeck Dep.52-54). All parties agree that the gel coat cracking in Plaintiffs' boats is unprecedented and catastrophic. (Hollenbeck Dep. 202, 203, 394; Leach Dep. 111; Poole Dep. 69; Jensen Dep. 167; Chiappa Dep. 69; Healey Dep. 47-48). No boats built in the 1997 to 2004 time frame, using gel coats manufactured by competitors of CCP suffered similar cracking. To date, no boats built by Post or Viking between 1994 and 1997 using 952 gel coat, have

---

[3] Viking has also used yellow and blue 953 gel coats on some

6

exhibited similar cracking.

CCP conducted an extensive investigation on the first Viking yacht with this gel coat cracking. The result, reported by Ed Malle, states that the gel coat was examined and found to have been manufactured in accordance with CCP's specifications. (Malle Dep. 103-104, Ex.13). It also states that nothing in Viking's manufacturing process caused the cracking. The letter concludes that the source of the cracking is unknown and not the result of either the gel coat or Viking's application.

CCP representatives also examined several Post yachts, but reported no results or findings as to the cause of the cracking.[4] (Kaphingst Dep. at 100-101, Plaintiffs Ex. 24; Kaphingst Dep. 102-108; Plaintiffs Ex. 26).

The only common elements in Plaintiffs' boats is that they both used white 953 gel coat and that the boats were either used or stored in cold weather. Boats used only in warm weather have not exhibited this cracking. Viking and Post use different resins and fiberglass in boat construction. They use different spray guns and different initiators to harden the gel coat. Boats exhibiting cracking were made at various times of the year by different crews.    Although different from each other, Post

---

hulls, which have not cracked.
    [4] CCP has provided no reports indicating the existence of such cracking on boats built with 952 gel coat. It did provide reports of other boat builders that had complaints about cracking of 953 gel coat.

7

and Viking's own boat building techniques, materials, gel coat spraying process, and boat designs remained constant. Plaintiffs used the exact same materials and techniques with gel coats not made by CCP, without cracking. Those other boats were used and stored in the same cold climates as the boats with cracked 953 gel coat. Viking boats using 953 gel coat built between 1997 and 2002 have cracked. Post boats using 953 gel coat built between 1998 and 2002 have cracked. Post stopped using CCP gel coat in 2002. Viking stopped using CCP gel coat in 2004.

Because of the cracking, the affected boats have hugely diminished values. The value of a boat with gel coat cracks is hundreds of thousand dollars less than a boat with no cracks. The difference equals the cost of repairing the boat. The trade value of an older boat is critical to selling a new boat. A boat owner who does not receive full trade value will not buy a new boat. As a result of the cracking, and the potential for future cracking, dealers are unwilling to accept boats built with 953 gel coat in trade. As a result, Plaintiffs must repair or agree to repair the boats before a dealer will accept a trade. (Healey Dep. 132-135, 139-144).

81 Post boats were built with 953 gel coat and 32 have cracked. 15 have been repaired by Post. 741 Viking boats were built with 953 gel coat and 32 have reported cracking.[5] Four

---

[5] Viking boats, unlike Post boats, are more likely to be

yachts have been repaired by Viking.[6] Both expect to learn of more problems after boats are taken out of winter storage in spring 2007.

Based on representations of CCP that 953 gel coat was not the cause, boats were repaired with 953 gel coat. Some of these repaired boats have again suffered gel coat cracking and require repair.

Repairs take nearly eight weeks and is labor intensive. It involves stripping the entire gel coat finish from the boat by manually grinding off the old gel coat, then sanding, re-gelcoating and re-sanding the finished re-application. Post and Viking do not have facilities or manpower to repair more than one or two yachts at a time.

Post has already spent $1,549,935.10 to fix 15 boats, and Viking has spent $2,698,068.25 to fix ten boats. Post estimates the remaining reported boats will each cost $279,000.00 to repair. Viking's estimate is $822,407.59 per boat.

### THE LAWSUIT

All of Plaintiffs' claims center on express warranties provided by CCP. The essence of these warranties are set out in CCP's product bulletin PB-58.

---

moved to warmer climates for use during the winter months.

[6] Six (6) other Viking yachts were repaired by third parties and sold before the scope and severity of the cracking problem was known. Viking paid $96,535.53 for those repairs and, because the boats were resold, does not seek damages for future

9

CONCLUSION

Plaintiffs request that CCP's Motion for Summary Judgment be denied as to Counts III, IV, V, VI, VII, IX, X, XI, and XII, and that this Court enter summary judgment against CCP on the following issues and claims:

a) As to Counts IX and X, finding that CCP's representations about 953 gel coat and its improved characteristics over 952 gel coat contained in its product bulletin are express warranties;

b) That those express warranties are not disclaimed in CCP's "Disclaimer;"

c) That CCP's disclaimer does not properly disclaim implied warranties of merchantability or fitness for a particular purpose (Counts III, IV, V, and VI);

d) That CCP's limitation of remedy fails of its essential purpose and is unenforceable;

e) That CCP's exclusion of consequential damages is unconscionable and unenforceable; and

f) That CCP's claimed "warranty" is a sham and constitutes a violation of the CFA. (Count XII).

s/  Henry J. Tyler<br>
Henry J. Tyler, Esquire<br>
Attorney for Plaintiffs

Dated this 7th day of February, 2007.

# EXHIBIT

# B

VIDEOTAPED DEPOSITION OF KENNETH JENSEN, 10/3/06

13 (Pages 46 to 49)

46

1  just referred?
2    A.  2002.
3    Q.  What was the boat that
4  first experienced gel coat failure?
5    A.  50-052.
6    Q.  When was that boat
7  manufactured by Post?
8    A.  1999 or 1998. I believe it
9  was a 1999 model boat.
10    Q.  What type of gel coat was
11  applied to 50-052?
12    A.  CCP's 953.
13    Q.  Which type of 953?
14    A.  The WA411.
15    Q.  And when in 2002 was the
16  gel coat cracking to which you've
17  just referred reported?
18    A.  Customer called us up in
19  the -- I'm going to say approximately
20  May of 2002.  He was taking -- he and
21  his wife were taking a cruise that
22  was going to be basically a
23  three-month cruise through Europe and
24  stuff.

47

1    So he asked if, you know,
2  if something unusual, situation he
3  had never seen before, our dealer in
4  Connecticut had never seen before,
5  asked if we would take the boat, take
6  a look at it, and repair those cracks
7  while he was on his cruise.
8    Q.  And what was your response
9  to that customer?
10    A.  Yes.
11    Q.  Was the customer outside
12  his warranty when he contacted you?
13    A.  Yes, he was.
14    Q.  And the repairs that he was
15  requesting that be done were outside
16  the coverage of the warranty that
17  Post had provided to him; is that
18  right?
19    A.  Strictly from the printed
20  warranty.
21    Q.  Yes.
22    A.  Yes.
23    Q.  That's what I'm talking
24  about.

48

1    Now, what happened as a
2  result of that customer contacting
3  you and your decision to repair the
4  boat?  Did you take the boat and
5  repair it?
6    A.  Yes, we did.
7    Q.  Did you notify CCP or C-1
8  of the issue?
9    A.  Not on that boat.
10    Q.  When were the repairs
11  carried out?
12    A.  During the summer of 2002.
13    Q.  Where were they carried
14  out?
15    A.  At Post.
16    Q.  How many hours were
17  involved in that repair?
18    A.  I'm not sure.  It wasn't an
19  extensive repair because at that time
20  we didn't know what was going on, we
21  didn't realize that it was a gel coat
22  failure of the nature that we're
23  seeing.
24    We thought when we first

49

1  looked at it, we looked at ourselves
2  and said basically, you know, what
3  did we do?  We repaired the boat, as
4  you would typically repair a
5  traditional crack.
6    These are nontraditional.
7  These are not -- these are different
8  cracks than anybody has seen in this
9  industry.
10    Q.  Okay.  Well, let's -- we'll
11  get to that in a minute.  But you've
12  touched on something that I want to
13  cover with you very briefly.  You
14  talked about traditional cracks.
15    Am I right that the gel
16  coat does not provide any structural
17  protection to the hull?  It's not a
18  structural support?
19    A.  Gel coat in and of itself
20  is not structural.  Gel coat does
21  provide structural protection to the
22  hull in by it keeps water from the
23  laminate.  So if gel coat fails, you
24  can then lead to a structural

**James DeCrescenzo Reporting**, LLC
215.564.3905
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX  215.751.0581

VIDEOTAPED DEPOSITION OF KENNETH JENSEN, 10/3/06

14 (Pages 50 to 53)

50

1   problem.
2       Q.  Okay.  So gel coat by
3   itself is not structural?
4       A.  Correct.
5       Q.  And gel coat can crack
6   under a variety of circumstances; is
7   that right?
8       A.  Correct.
9       Q.  Am I right that thickness
10  can contribute to gel coat cracking?
11      A.  Correct.
12      Q.  So if the gel coat is
13  applied too thickly to the laminate,
14  to the hull, to the other parts of
15  the boat, it can crack.
16      A.  In areas.
17      Q.  Yes?
18      A.  Yes.
19      Q.  Am I right that stress can
20  cause gel coat cracking?
21      A.  Yes.
22      Q.  Am I right that impact can
23  cause gel coat cracking?
24      A.  Yes.

52

1       Q.  You believe that they can?
2       A.  Yes.
3       Q.  De-molding or stress caused
4   during the de-molding process can
5   cause gel coat cracking; am I right?
6       A.  Yes.
7       Q.  Temperature, severe changes
8   in temperature, can they cause gel
9   coat cracking?
10      A.  I don't know that.  I've
11  never seen that.
12      Q.  Okay.  If you have a boat
13  that's finished with gel coat and
14  it's maintained out of doors in the
15  winter, would you recommend that
16  somebody run a hot water hose over
17  the boat?
18      Would that be the
19  appropriate course of action for
20  cleaning the boat on a cold day in
21  the winter?
22      A.  Having never done that, I
23  can't say what that would do.
24      Q.  Are you familiar with the

51

1       Q.  Am I right that undercure
2   can cause gel coat cracking?
3       A.  Yes.
4       Q.  Am I right that overcure
5   can cause gel coat cracking?
6       A.  Yes.
7       Q.  Am I right that temperature
8   conditions during the application of
9   the gel coat can cause gel coat
10  cracking, if the temperature is not
11  proper?
12      A.  I can't answer that.
13      Q.  You don't know.
14      A.  I don't know.
15      Q.  Am I right that humidity
16  conditions during the application of
17  the gel coat can cause cracking?
18      A.  I don't know.
19      Q.  Dirt in the mold and other
20  things that affect the integrity of
21  the mold, am I right that those
22  things can cause gel coat cracking as
23  well?
24      A.  I believe.

53

1   concept of the coefficient of thermal
2   expansion?
3       A.  Yes.
4       Q.  And would you agree with me
5   that the other materials that make up
6   the hull of a boat or the top
7   structure, the superstructure, have
8   more power, more force, associated
9   with them when they expand than the
10  gel coat does?
11      A.  I don't understand what
12  you're asking.
13      Q.  The coefficient of thermal
14  expansion refers to the concept of
15  the expansion or contraction of
16  materials in response to other
17  factors like temperature; is that
18  right?
19      A.  I understand that.  Yes.
20      Q.  Would you agree with me
21  that because the gel coat is not
22  structural by itself, that the other
23  components of a hull or a
24  superstructure, which are structural,

James DeCrescenzo Reporting, LLC

215.564.3905                InnovatingLitigation              FAX  215.751.0581
                 1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
                              www.IDReporting.com

CERTIFICATION

1

2

3         I, ROSEMARY LOCKLEAR, a

4   Registered Professional Reporter, Certified

5   Realtime Reporter and Notary Public in and

6   for the Commonwealth of Pennsylvania, hereby

7   certify that the foregoing is a true and

8   accurate transcript of the deposition of said

9   witness who was first duly sworn by me on

10  the date and place herein before set forth.

11         I FURTHER CERTIFY that I am

12  neither attorney nor counsel for, not related

13  to nor employed by any of the parties to

14  the action in which this deposition was

15  taken; and further that I am not a relative

16  or employee of any attorney or counsel

17  employed in this action, nor am I

18  financially interested in this case.

19

20  _____

21  ROSEMARY LOCKLEAR
22  Registered Professional Reporter
23  Certified Realtime Reporter and
24  Notary Public

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd , 6th Floor. Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                    FAX 215.751.0581

# EXHIBIT

# C

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

BOSTON DIVISION
DOCKET NO. 05-11682

| | |
|---|---|
| L. & T YACHT SALES, INC.,<br>Plaintiff | )<br>)<br>) |
| VS. | )<br>) |
| POST MARINE CO., INC.,<br>Defendant | )<br>)<br>) |

## AFFIDAVIT OF TODD HAMILTON IN SUPPORT OF
## PLAINTIFF'S REPLY MEMORANDUM IN REPLY TO DEFENDANT'S
## MEMORANDUM OPPOSING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
## JUDGMENT

This 3rd day of August 2007, Todd Hamilton, President of L&T Yacht Sales Inc., under oath deposes and states as follows:

1.   I have been around boats, their operation, maintenance and repair all my life.

2.   I have read the July 10, 2007 affidavit of Joseph Martorana, Vice President of Post Marine Company.

3.   I also was present at Joseph Martorana's deposition taken in New Jersey in or about April 2007 relative to my company's law suit against Post.

4.   In his April 2007 deposition, Joseph testified that in the repair of my boat, Post used series 953 gel coat "above the rub rail and on the hull side."

5.   In his July 10, 2007 affidavit, Joseph states in paragraphs 9 through 16 and 18 that the areas of my boat referenced in those paragraphs i.e. entire shelter side surfaces, entire windshield surface, entire front deck, entire cockpit side deck, entire cockpit floor, bridge floor, exterior of the bridge, forward deck and toe rails were repaired using gel coat from

1

interplastics.

6.    The above mentioned portion of Joseph's deposition testimony under oath in New Jersey

is in direct conflict with the above mentioned paragraphs of Joseph's July 10, 2007

affidavit because all of the sections specifically described in said paragraphs 9 through 16

and paragraph 18, are in fact, above the rub rail.

Signed under pains and penalties of perjury this 3rd day of August, 2007.

L & T Yacht Sales, Inc.

By _____

Todd Hamilton, President

2

# EXHIBIT

# D

April 17, 2007

L&T Yacht Sales vs. Post Marine    Todd J. Hamilton

**Vol. 1 - 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11682MLW

L & T YACHT SALES, INC.,
　　Plaintiff,

vs.

POST MARINE CO., INC.,
　　Defendant.

DEPOSITION OF TODD J. HAMILTON, taken
pursuant to Notice under the applicable
provisions of the Federal Rules of Civil
Procedure on behalf of the Defendant, before
Simonne J. Elwood, R.P.R. and a Notary Public
in and for the Commonwealth of Massachusetts,
at the office of Bartlett Hackett Feinberg
P.C., 155 Federal Street, 9th Floor, Boston,
Massachusetts, commencing on Tuesday, April 17,
2007 at 9:57 a.m.

NEAL A. SALLOWAY - COURT REPORTERS
FIVE CARDIGAN ROAD
WEST PEABODY, MA 01960
781-581-3893 - 978-535-0313 - FAX 978-536-3142

**Vol. 1 - 2**

APPEARANCES:

JOHN E. ZAJAC, ESQ.
CARMICHAEL & ZAJAC, P.C.
170 HIGH STREET
TAUNTON, MA 02780
　REPRESENTS THE PLAINTIFF

MICHEL OCIACOVSKI WEISZ, ESQ.
SEGREDO & WEISZ
9350 SOUTH DIXIE HIGHWAY - SUITE 1500
MIAMI, FL 33156
　REPRESENTS THE DEFENDANT

**Vol. 1 - 3**

1　　　　　　　　I N D E X

2　DEPONENT　　　　　　　DIRECT EXAMINATION

3　TODD J. HAMILTON

4　　By Mr. Weisz　　　　　　6

5

6　　　　　　　E X H I B I T S

7　EXHIBIT NO.　　DESCRIPTION　　　PAGE NO.

8　　1　　Subpoena　　　　　　24

9
　　2　　Defendant Post Marine Co.,　　24
10　　　　Inc.'s Re-Notice of Taking
　　　　Deposition
11
　　3　　Letter - 8/17/04 to Mr. Michel　28
12　　　　O. Weisz from Lisa A. Kane,
　　　　Esq.
13
　　4　　Letter - 8/25/04 to Ms. Lisa　30
14　　　　A. Kane from Michel O. Weisz

15　　5　　Fax - To Mr. Hamilton from　32
16　　　　Joseph Martorana

　　6　　Letter - 6/15/05 to Dear Joe　37
17　　　　& Ken from Todd

18　　7　　Fax - 7/13/05 to Dear Joe &　46
19　　　　Ken from Todd

　　8　　Fax - 7/15/05 to Dear Joe &　50
20　　　　Ken from Todd

21　　9　　Fax - 8/10/05 to Mr. Todd　52
22　　　　Hamilton from Michel Ociacovski
　　　　Weisz
23

**Vol. 1 - 4**

1　CONTINUED
　　EXHIBIT NO.　　DESCRIPTION　　PAGE NO.
2
　　10　Request for Production of　55
3　　　Documents

4　11　Summons　　　　　　56

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

L&T Yacht Sales vs. Post Marine                    Todd J. Hamilton                    April 17, 2007

Vol. 1 - 61
T. HAMILTON

1  Q   Okay. So why don't you just work faster?
2  A   Because I want to do it right.
3  Q   I see.
4  A   I'm not just going to do a make-O.
5  Q   Okay. Is the boat for sale?
6  A   No.
7  Q   The offer that you claim you had before you
8      notified Post of the cracking problem, how
9      much was that offer for?
10 A   750,000.
11 Q   So you were offered more than what you paid
12     for the boat?
13 A   Yeah. I put probably 10,000 or 15,000 into
14     it.
15 Q   Okay.
16 A   The gentleman that was buying the boat
17     notified me of the cracks. I didn't even
18     know that there was an issue. He had been
19     looking at Vikings and Post and told me there
20     was a serious problem with it when he saw
21     them on my boat, and that's when I called
22     Ken.
23 Q   Have you discussed this lawsuit with anyone

Vol. 1 - 63
T. HAMILTON

1  A   No, they have not at this date.
2  Q   Do you know if they have contacted your
3      attorneys?
4  A   Not to my knowledge. You'd have to ask them.
5  Q   Have you ever had this boat surveyed?
6  A   You mean for the fiberglass gel coat itself?
7  Q   Any type of survey?
8  A   Just the gel coat.
9  Q   Who did the gel coat survey?
10 A   I'm drawing a blank on his name. I'd have to
11     get you his name.
12 Q   When was the survey done?
13 A   Last -- I don't know the exact date now.
14 Q   What year was it done?
15 A   '06, I believe.
16 Q   What was the purpose of the survey?
17 A   I wanted someone to witness the thicknesses
18     of the gel coat.
19 Q   What was the purpose of doing that?
20 A   To show that it was too thick.
21 Q   What were the results of the survey?
22 A   He couldn't believe what he saw.
23 Q   What did he say?

Vol. 1 - 62
T. HAMILTON

1      other than your attorneys?
2  A   Yes.
3  Q   Who have you discussed it with?
4  A   I haven't discussed in detail. I've told
5      people that there's a lawsuit pending.
6  Q   Who have you told?
7  A   Nemic (phonetic) Marine; other Post dealers,
8      probably.
9  Q   Okay.
10 A   Portland Boat Work.
11 Q   Have you contacted anybody who -- I'm sorry.
12     Have you contacted the company that makes the
13     gel coat?
14 A   Not to date.
15 Q   Have they contacted you?
16 A   Not to date.
17 Q   Have you contacted the attorneys who are
18     representing the gel coat manufacturer?
19 A   Not as of to date.
20 Q   Has your -- Have they contacted you?
21 A   You already asked me that I believe.
22 Q   No. I asked if you contacted them. I'm
23     asking if they contacted you?

Vol. 1 - 64
T. HAMILTON

1  A   He saw gel coat that was too thick. He saw
2      gel coat applied over gel coat. He saw gel
3      coat cracking that was just repaired. Daniel
4      Briggs, that's the name, Daniel Briggs.
5  Q   B-R-I-G-G-S?
6  A   You're going to have to -- I told you, I left
7      school at 16. When it comes to spelling and
8      stuff, I'm not good.
9  Q   You don't have to go to school to learn how
10     to spell.
11 A   No. I just -- It was one of the things I
12     couldn't grasp.
13 Q   I understand that. I have the same problem.
14 A   I'm a guy with my hands. I can't do anything
15     with a pen; but if you give me something to
16     fix or build, I can do it.
17 Q   Okay. Is Mr. Briggs a surveyor?
18 A   Yes, he is.
19 Q   Do you know where he's based?
20 A   I think Dartmouth, Mass., I think.
21 Q   Is it your contention that when you were told
22     the boat -- Is it your contention that when
23     Post told you that the gel coat would be

Vol. 1 - 65
T. HAMILTON

1   stripped that you understood that they would
2   strip the entire boat?
3  A  That was my impression, yes. Anything that
4     was cracked was going to be completely
5     stripped.
6  Q  Okay.
7  A  If it was anything different, I would have
8     never brought the boat there.
9  Q  Okay. And does strip mean that the crack
10    would be ground down to the underlying
11    fiberglass?
12 A  No. You wouldn't grind the crack down. You
13    would take the gel coat down until you
14    started seeing the glass itself beneath it.
15 Q  But that's what stripped means, that you
16    would take the gel coat down to the glass
17    itself?
18 A  Yeah. Most of the people use a tool called a
19    peeler instead of a sander, and they peel off
20    the gel coat.
21 Q  Okay. And that would apply to the areas
22    where the gel coat cracks were?
23 A  Yeah, which would be the entire boat.

Vol. 1 - 66
T. HAMILTON

1  Q  Okay. So you're saying that every area of
2     the entire boat was cracked?
3  A  Currently, you could find a crack anywhere
4     except for where I repaired right now
5     anywhere you want. You're welcome to come
6     visit it.
7  Q  Were those cracks there when you took the
8     boat from Post?
9  A  Probably about 80 percent of them, yeah.
10    Eric Mobilia (phonetic), the guy that picked
11    it up with me, couldn't believe the cracks.
12 Q  Okay. And you have no photographs of the
13    cracks that were there when you picked the
14    boat up from Post, is that correct?
15 A  I took pictures, but it's like staring into
16    this white piece of paper with your face like
17    this. You can't see anything. (Indicating)
18 Q  And where are those photographs?
19 A  I have them at home, but you can't see
20    anything.
21 Q  Okay.
22 A  All you can see is this big white wall. You
23    wouldn't know if you're looking at a piece of

Vol. 1 - 67
T. HAMILTON

1     paper or a boat.
2  Q  Did you have the opportunity, after you took
3     the boat, to have somebody professionally
4     photograph the boat so you could see the
5     cracks that you claim were there?
6  A  We tried it with a videocam. We've tried it
7     with a digital camera. We've tried it with a
8     35-millimeter. That's how many times we've
9     tried it. You just can't — It's no thicker
10    than your hair. It's so fine. You can't see
11    it. I mean, you can see it on a cloudy day.
12    If you go look at the boat on a sunny day,
13    you can't look at it because it blinds your
14    eyes, at least my eyes. I mean, the other
15    guys were trying.
16 Q  Did you try to take any pictures on cloudy
17    days?
18 A  Yeah. That's the photographs that you'll see
19    that we did the best we could do including
20    the videocam.
21 Q  Now, none of your letters indicate that those
22    cracks existed when you took the boat, is
23    that right?

Vol. 1 - 68
T. HAMILTON

1  A  Well, no, it does. It exists because I said
2     to him flat out, "The hull on the bottom
3     hasn't been touched." And I didn't want him
4     going forward putting a bit of putty right
5     here, a bit of putty right here, and then
6     it's all recracking. It was already cracked
7     before I left. They never even touched it.
8  Q  That's the hull and the bottom?
9  A  And the back deck that they did spray which
10    was cracked all the way across it.
11 Q  But that's not in any of the written letters,
12    is it?
13 A  No, no, no.
14 Q  All right.
15       MR. WEISZ: I don't have any further
16    questions.
17       MR. ZAJAC: Okay. No questions.
18       (Whereupon the deposition of Todd J.
19    Hamilton concluded at 11:02 p.m.)
20
21
22
23

L&T Yacht Sales vs. Post Marine                          Todd J. Hamilton                                        April 17, 2007

Vol. 1 - 69

T. HAMILTON

C E R T I F I C A T E

I, TODD J. HAMILTON, do hereby certify

that I have read the foregoing transcript of my

testimony and further certify that said

transcript is a true and accurate record of said

testimony and signed under the pains and

penalties of perjury.

Dated this _____ day of_____

2007.

_____

TODD J. HAMILTON

Vol. 1 - 70

T. HAMILTON

C E R T I F I C A T E

I, Simonne J. Elwood, R.P.R. and a
Notary Public within and for the Commonwealth of
Massachusetts, duly commissioned, qualified and
authorized to administer oaths and to take and
certify depositions, do hereby certify that
heretofore, to wit, on the 17th day of April
2007, personally appeared before me Todd J.
Hamilton, at the office of Bartlett Hackett
Feinberg P.C., 155 Federal Street, 9th Floor,
Boston, Massachusetts, in the aforecaptioned
cause pending in the United States District Court
for the District of Massachusetts; that the
witness was by me duly sworn to testify to the
truth, the whole truth and nothing but the truth;
that thereupon and while said witness was under
oath, the within deposition was taken down by me
in shorthand at the time and place herein named
and was thereafter reduced to computer
transcription under my supervision. I further
certify that I am not interested in the event of
the action.

IN WITNESS WHEREOF, I have hereunto
subscribed my hand and affixed my seal of office
this _____ day of _____, 2007.

_____
Simonne J. Elwood
REGISTERED PROFESSIONAL REPORTER

My Commission Expires: February 14, 2008

Vol. 1 - 71
T. HAMILTON
ERRATA SHEET

Date of Deposition: April 17, 2007

Case Name: L & T Yacht Sales, Inc. vs. Post
Marine Co., Inc.
C.A. No. 05-11682MLW

Deponent's Name: Todd J. Hamilton

I, the undersigned, do hereby certify
that I have read the foregoing deposition
transcript and that to the best of my knowledge,
said deposition transcript is true and accurate
(with the exceptions of the following changes
listed below):

TODD J. HAMILTON

Dated _____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Vol. 1 - 72
T. HAMILTON

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____

Page No. __Line No.__ Correction_____